# EXHIBIT 3

# Resolutions Handbook



Revised January 15, 2019

Document Change Log

| Date | Contact | Chapter | Comments |
|------|---------|---------|----------|
|      |         |         |          |
|      |         |         |          |
|      |         |         |          |
|      |         |         |          |
|      |         |         |          |
|      |         |         |          |
|      |         |         |          |

# Contents

**Chapter 1    Introduction** ............................................................................................. 1

**Chapter 2    Resolution Handbook at a Glance** ........................................................ 5
Resolution Process ......................................................................................................... 5
Resolution Transaction Methods.................................................................................... 6
FDIC's Role as Receiver ................................................................................................ 6

**Chapter 3    Resolution Process** ...................................................................................... 8
Resolution Timeline ....................................................................................................... 8
Determining the Resolution Strategy ............................................................................ 9
Financial Institution Information ................................................................................ 10
Asset Valuation Review (AVR) ................................................................................... 10
Marketing the Institution ............................................................................................. 11
Virtual Data Room (VDR) ........................................................................................... 11
On-site Due Diligence .................................................................................................. 11
Bid Submission ............................................................................................................ 12
Least Cost Analysis ...................................................................................................... 12
FDIC Board of Directors Approval .............................................................................. 14
Bid Approval Memorandum ......................................................................................... 14
Closing the Institution .................................................................................................. 14

**Chapter 4    Types of Resolution Transactions**........................................................ 16
Purchase and Assumption Transactions ...................................................................... 16
    Basic P&As.............................................................................................................. 16
    Whole Bank P&As ................................................................................................... 17
    P&As with Optional Shared Loss ........................................................................... 18
    Bridge Bank P&As ................................................................................................... 18
Deposit Payoffs ............................................................................................................ 19
    Straight Deposit Payoff ........................................................................................... 20
    Insured Deposit Transfer (IDT) .............................................................................. 20
    Deposit Insurance National Bank (DINB)............................................................... 20
Historical Resolution Methods .................................................................................... 20
    Open Bank Assistance (OBA) ................................................................................. 21
    Net Worth Certificate Program................................................................................ 21
    Income Maintenance Agreements ........................................................................... 21
    Capital Forbearance Program .................................................................................. 22
    Loan Loss Amortization Program ........................................................................... 22
    Branch Breakup ....................................................................................................... 22

**Chapter 5    Receivership Process – Post-closing Activities** ................................... 23
Comparison with Bankruptcy Law .............................................................................. 23
Why the FDIC Acts as Receiver .................................................................................. 24
How the FDIC Becomes a Receiver ............................................................................ 25

The FDIC's Functions as Receiver ................................................................................. 26
The FDIC's Closing Function .......................................................................................... 27
Resolution of Claims against the Failed Institution ....................................................... 27
Payment of Claims .......................................................................................................... 27
Special Receivership Powers .......................................................................................... 28
   Repudiation of Contracts ............................................................................................. 28
   Enforcement of Contracts ........................................................................................... 29
Placing Litigation on Hold ............................................................................................. 29
   Avoiding Fraudulent Conveyances ............................................................................. 30
   Special Defenses .......................................................................................................... 30
   Improperly Documented Agreements are not Binding on the Receiver ...................... 30
   Courts May Not Enjoin the Receiver .......................................................................... 30
Settlement with the AI .................................................................................................... 30

# List of Figures

Figure 1: FDIC Resolution Activity 1980–2016 ............................................................. 3
Figure 2: Timeline of a Typical Resolution Process ....................................................... 9
Figure 3: Least Cost Test Calculation ........................................................................... 13
Figure 4: Allocation of Receivership Losses ................................................................. 13
Figure 5: Basic P&A Agreements .................................................................................. 17
Figure 6: Whole Bank P&A Agreements ....................................................................... 18
Figure 7: P&A Agreement with Optional Shared-loss ................................................... 18
Figure 8: Bridge Banks .................................................................................................. 19

## Abbreviations and Acronyms

| | |
|---|---|
| AI | assuming institution |
| DIF | Deposit Insurance Fund |
| DINB | Deposit Insurance National Bank |
| DRR | Division of Resolutions and Receiverships |
| FDICIA | Federal Deposit Insurance Corporation Improvement Act |
| FSLIC | Federal Savings and Loan Insurance Corporation |
| IDT | insured deposit transfer |
| NWC | Net Worth Certificate |
| OBA | open bank assistance |
| OCC | Office of the Comptroller of the Currency |
| P&A | purchase and assumption |
| QFC | qualified financial contract |
| RTC | Resolution Trust Corporation |
| S&L | Savings and Loan |
| U.S.C. | United States Code |
| VAI | value appreciation instrument |
| VDR | virtual data room |

# Chapter 1   Introduction

Each year, the FDIC provides information and resources to a wide range of foreign and domestic parties interested in the FDIC's resolution experiences. Many countries face difficulties with their financial systems similar to those the United States has experienced. By sharing this information, the FDIC hopes to contribute to the international dialogue needed to promote stable banking systems and productive economies throughout the world. The intended audiences for this publication are regulators and chartering authorities of foreign financial institutions, foreign central bankers, and others interested in the methods of resolving failing institutions in the United States. This publication:

- Describes the FDIC's resolution process.
- Outlines the different resolution methods used.
- Provides information on historical resolution alternatives.
- Describes the FDIC's duties as receiver.
- Incorporates some important lessons learned in resolving failed institutions.

The FDIC has been a vital part of the U.S. financial system for more than 80 years. During the Great Depression, from 1929 to 1933, nearly 9,000 banks suspended operations or failed. In response to this crisis, the U.S. Congress created the FDIC through the Banking Act of 1933.[1] The FDIC's creation laid the foundation for the current system of deposit insurance in the U.S.

The FDIC's primary mission is to preserve and promote public confidence in the U.S. financial system by insuring deposits[2] up to the legal limit of $250,000 and promoting sound banking practices of member institutions. Member institutions pay quarterly deposit insurance premiums to the FDIC's insurance fund based upon risk assessments. In its unique role as deposit insurer, and in cooperation with other federal and state regulatory agencies, the FDIC promotes the safety and soundness of insured depository institutions and the U.S. financial system by identifying, monitoring, and addressing risks to the Deposit Insurance Fund (DIF) through its bank examination practices.

The primary purposes of the FDIC are (1) to insure the deposits, (2) protect the depositors of insured banks through its bank supervision and examination function and (3) to resolve failed banks. The DIF is funded mainly through quarterly assessments on insured banks, but it also receives interest income on its investment securities. The DIF is reduced by loss provisions associated with failed banks and by FDIC operating expenses.

---

[1] For more information about the early years of the FDIC, see "The First Fifty Years: A History of the FDIC 1933–1983" at https://www.fdic.gov/bank/historical/firstfifty/

[2] Deposits in an FDIC-insured commercial bank, savings bank, or savings association are protected by FDIC deposit insurance. Savings, checking, and other deposit accounts, when combined, are generally insured up to $250,000 per depositor in each financial institution insured by the FDIC. Deposits held in different ownership categories, such as single or joint accounts, are separately insured. Also, separate $250,000 coverage is usually provided for retirement accounts, such as individual retirement accounts.

To fulfill its mission, the FDIC performs the following functions:

- In its capacity as insurer, the FDIC maintains, manages, and controls risks to the DIF. Whenever a federally insured depository institution fails, the FDIC pays insured deposits or, more frequently, it arranges for the transfer of accounts from the failed institution to a healthy assuming institution (AI).

- The FDIC shares responsibility for the supervision and regulation of federally insured depository institutions in the United States with other federal regulators and with state banking authorities. Of the federal banking agencies, the Office of the Comptroller of the Currency (OCC) is responsible for supervising national banks and thrifts; the Federal Reserve System (FRS) is responsible for supervising both state FRS member banks in conjunction with state regulators, and bank holding companies; and the FDIC, in conjunction with state regulators, is responsible for supervising state FRS nonmember banks and the FDIC-insured state-chartered savings banks.[3]

- The FDIC acts as the receiver, or liquidating agent, for failed federally insured depository institutions. In its role as receiver, the FDIC has a fiduciary obligation to all creditors of the receivership and to stockholders of the failed institution to maximize the amounts recovered as quickly as possible.

Past financial crisis have taught the FDIC a great deal about how best to resolve a failing financial institution. By resolving a failed institution, the FDIC meets its obligations to the failed institution's insured depositors and helps maintain the stability of the banking system.

The **resolution process** involves valuing a failing institution, marketing the failing institution to healthy institutions, soliciting and accepting bids for the sale of some or all of the institution's assets and assumption of deposits (including some liabilities), determining which bid is least costly to the insurance fund, and working with the AI through the closing process (or ensuring the payment of insured deposits in the event there is no acquirer)

The **receivership process** begins when the failing institution's chartering authority revokes its charter and appoints the FDIC as receiver. The process continues with the closing of a failed institution; liquidating the failed institution's remaining assets; and distributing any proceeds of the liquidation to the FDIC, to the failed institution's customers who had uninsured deposit amounts, to general creditors, and to others with approved claims.

Since 1933, the FDIC has led the U.S. through two other periods of massive financial institution failures. The first period was the Savings and Loan (S&L) crisis, from 1986 to 1994, when 1,617 banks and 1,295 S&L institutions failed or required financial assistance.[4] Factors that led to the S&L crisis were inflation, high interest rates, deregulation, and a recession. In 1987, the Federal Savings and Loan Insurance Corporation (FSLIC) insurance fund (the fund that insured deposits in S&Ls) was declared insolvent; however, the FSLIC continued to resolve failed savings

---

[3] FDIC, History of the Eighties — Lessons for the Future: An Examination of the Banking Crises of the 1980s and Early 1990s (Washington, D.C. Federal Deposit Insurance Corporation, 1997), 463.
[4] For more information on the Savings and Loan crisis, see "Managing the Crisis: The FDIC and RTC Crisis" at http://www.fdic.gov/bank/historical/managing/index.html.

institutions until it was dissolved by Congress in 1989. Congress transferred the FSLIC's resolution and receivership responsibilities to the Resolution Trust Corporation (RTC), a temporary agency it created to handle failed savings institutions during the crisis. Congress also gave the FDIC the responsibility of insuring the deposits in S&Ls, along with the task of assisting the RTC in developing a plan to address the crisis and the resolution of hundreds of thrift failures. When the RTC was dissolved on December 31, 1995, its duties with regard to the resolution and receivership of failed S&Ls were transferred to the FDIC. During its six-year life span, the RTC resolved 747 S&Ls.

The number of combined annual failures and assistance transactions had dropped to eight by 1995, and to six by 1996. In 1997, there was only one bank failure, and no failures of S&L associations.

The mortgage crisis (2008–2013) was the second period of massive financial institution failures. The FDIC resolved 25 institutions in 2008, 140 in 2009, 157 in 2010, 92 in 2011, 51 in 2012, and 24 in 2013. This crisis was caused by a number of factors that emerged over a number of years in both the housing and credit markets. These factors included the inability of homeowners to make their mortgage payments (due primarily to increasing adjustable-rate mortgages, overextended borrowers, predatory lending, and speculation), overbuilding during the real estate boom period, high personal and corporate debt levels, flawed monetary and housing policies, international trade imbalances, and relaxed government regulation.

**Figure 1: FDIC Resolution Activity 1980–2018[5]**



On July 21, 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act was signed into law. This act provides the FDIC with additional resolution powers for certain financial

---

[5] Source: FDIC Annual Reports, 1980-2018

companies. The FDIC also assumed the Office of Thrift Supervision's (OTS) powers, other than rulemaking, with respect to state-chartered thrifts.[6]

Since the start of FDIC insurance on January 1, 1934, no depositor has lost any insured funds as a result of a failure. Some notable milestones for the FDIC's deposit insurance are as follows:

- 1934 – Deposit insurance coverage is initially set at $2,500, and is raised mid-year to $5,000.

- 1950 – Deposit insurance is increased to $10,000.

- 1966 – Deposit insurance is increased to $15,000.

- 1969 – Deposit insurance is increased to $20,000.

- 1974 – Deposit insurance is increased to $40,000.

- 1980 – Deposit insurance is increased to $100,000.

- 1989 – RTC is created to resolve problem thrifts.

- 1991 – Least costly resolution requirement is imposed.

- 2006 – Deposit insurance for individual retirement accounts is increased to $250,000.

- 2008 – Emergency Economic Stabilization Act of 2008 is signed and temporarily increases the deposit insurance from $100,000 to $250,000 per depositor.

     - The FDIC issues simplification of Deposit Insurance Coverage rules for Revocable Trust Accounts to expedite insurance determinations.

     - Temporary Liquidity Guarantee Program is created, which provides full coverage for noninterest-bearing transaction deposit accounts, regardless of dollar amount.

- 2010 – The Dodd-Frank Wall Street Reform and Consumer Protection Act is signed into law. Deposit insurance is permanently increased to $250,000 per depositor for each account ownership category.

**Note**: A listing of resolution terms the FDIC uses, both historically and currently, can be found in the Glossary.

---

[6] For a complete copy of the Dodd-Frank Wall Street Reform and Consumer Protection Act, see http://www.gpo.gov/fdsys/pkg/BILLS-111hr4173enr/pdf/BILLS-111hr4173enr.pdf.

# Chapter 2    Resolution Handbook at a Glance

Over the years, the sheer number of failed institutions during various economic cycles has given the FDIC a wide range of resolution experiences. One of the FDIC's primary missions is to maintain public confidence in our nation's financial system. When an insured financial institution fails, the FDIC accomplishes this mission through prompt and efficient payment of insured deposits and by minimizing the impact of an institution's failure on the local economy.

The following is a brief outline of the material presented in this handbook, which is a compilation of the resolution and receivership lessons the FDIC has learned throughout its history.

## RESOLUTION PROCESS

Resolution activities begin when an institution's primary regulator notifies the FDIC of the potential failure. Upon notification, the FDIC contacts the failing institution's chief executive officer and arranges for specialists to go to the institution to gather information in preparation for the potential closing. During this on-site visit, the FDIC analyzes the institution's financial and operational structure. It then selects and offers one or more resolution transactions to potential bidders.

The FDIC submits a written recommendation to the failing bank's board of directors to pass a resolution to begin onsite due diligence by prospective bidders. The FDIC also begins to confidentially market the failing institution to a group of potential bidders to encourage competition. The initial contact to insured depository institutions does not contain any identifiable information regarding the troubled institution. A virtual data room (VDR) is set up to provide potential bidders with details of the failing institution. In order to access the VDR, potential bidders must sign a confidentiality agreement. All bidders are provided with the same information and opportunities so no bidder has an advantage. Bid parameters are provided to allow for quicker comparison of any bids submitted. If feasible, all potential bidders are also given the opportunity to perform on-site due diligence. Before the FDIC notifies the winning bidder, it first contacts the institution's primary regulator for authorization to approve the transaction.

Bids must be submitted prior to the established bid deadline. Generally, the bids consist of two components: the first for the deposit franchise and the second for the assets of the institution. With the passage of the Federal Deposit Insurance Corporation Improvement Act (FDICIA) in 1991, the FDIC amended its resolution procedures in an effort to decrease the costs to the DIF. These new procedures require the FDIC to choose the bid that is the least costly resolution to the DIF when resolving a failing institution. Prior to passage of the FDICIA, the FDIC was not required to use the least costly bid and could pursue any resolution alternative as long as it was less costly than liquidation.

The final step in the resolution process is the closing of the institution and the appointing of the FDIC as receiver by the failing institution's chartering authority.

The entire resolution process including the closing event generally takes 90 days or less, not including post-closing activities.

## RESOLUTION TRANSACTION METHODS

To minimize disruption to the local community when an institution fails, the FDIC must perform the resolution process as quickly and smoothly as possible. Currently, the FDIC uses two basic resolution methods: Purchase and Assumption (P&A) transactions and deposit payoffs.

The most common method for resolving a failing institution is the P&A transaction, of which there are several types. In a P&A transaction, a healthy institution agrees to purchase some or all of the assets of the failed institution and assumes some or all of the liabilities, including all insured deposits, as dictated by the language in the P&A agreement.

In a deposit payoff, the FDIC as insurer pays all the insured depositors of the failed financial institution. This resolution option is only executed when the FDIC does not receive a P&A bid that meets the least cost test. Other resolution methods that are no longer used include: net worth certificate programs, income maintenance agreements, capital forbearance programs, and loan loss amortization programs.

## FDIC'S ROLE AS RECEIVER

To become the receiver of a failed institution, the FDIC must be appointed by the failing institution's chartering authority, primary federal regulator, or the FDIC can self-appoint under FDICIA. In many ways, the FDIC's powers as a receiver of a failed institution are similar to those of a bankruptcy trustee. Like a bankruptcy trustee, a receiver steps into the shoes of an insolvent party (i.e., the failing institution) but with different rights and responsibilities. Federal law provides the FDIC the powers to expedite the liquidation process of failed institutions to maintain the public's confidence in the nation's banking system and to maximize the cost effectiveness of the receivership process to preserve a strong insurance fund.

Immediately after failure, the receiver's first task is to take custody of the failed institution's premises and all its records. The next step is to inform the public of the institution's closing and ensure the public that all insured deposits are safe. Federal law provides the receiver with a number of special powers upon failure of an institution.

- The receiver may repudiate contracts of the failed depository institution that the receiver deems burdensome.

- The receiver is substituted as a party in litigation pending against the failed institution. However, a court must stay the litigation at the request of the receiver. This 90 day stay allows the receiver time to evaluate the facts to decide how to proceed. The receiver also has the right to remove litigation from state court to federal court.

- The receiver may avoid certain fraudulent transfers made by an institution's obligors (within the period beginning five years before and ending five years after the receiver's appointment) if there was intent to hinder, delay, or defraud the institution.

- Federal statutes provide certain "special defenses" to the FDIC in its role as receiver to allow for the efficient resolution of a failed institution's affairs. Both statutes and court decisions recognize that, unless an agreement is properly documented in the institution's records, it cannot be enforced against the receiver, either to make a claim or to defend against a claim by the receiver. Congress also provided the FDIC, as receiver, with additional protection by prohibiting courts from issuing injunctions or similar equitable relief to restrain the receiver from completing its resolution or liquidation activities.

The receiver is expected to maximize the return on the assets of the failed institution and to minimize any loss to the insurance fund that may result from closing the institution. A receivership is empowered to market the institution's assets, liquidate them, and distribute the proceeds to the institution's creditors. The FDIC, as receiver, succeeds to the rights, powers, and privileges of the institution and its stockholders, officers, and directors. The FDIC also has the power to merge a failed institution with another depository institution or to form a new nationally chartered institution, known as a bridge bank. The receiver is not subject to the direction or supervision of any other regulatory authority. Finally, the receiver's authority is terminated once the affairs of the failed institution have been concluded.

# Chapter 3    Resolution Process

The FDIC assumes two roles in the resolution process. First, the FDIC in its corporate capacity acts as insurer for all of the insured deposits of the failing financial institution. That is, the FDIC guarantees that customers with deposits held at failed financial institutions will receive their full deposit amounts up to the insured deposit limit of $250,000. Second, the FDIC acts as the receiver of the failed financial institution and administers the receivership estate for all creditors.

When an FDIC-insured financial institution is about to fail, the FDIC takes immediate action to resolve it by selling the franchise of the failing institution—its deposits, branch locations, and assets. The resolution process is accomplished in a relatively short amount of time to minimize disruption to the local community and to avoid national economic implications. The primary goals of the resolution process are to provide depositors with timely access to their insured funds and resolve the failing institution in the least costly manner.

Two basic methods are available for resolving failing institutions.

- A **Purchase & Assumption (P&A)** transaction is a resolution transaction between the FDIC, in its receivership capacity, and a healthy financial institution, generally referred to as the Assuming Institution (AI).

- A **deposit payoff** is where the FDIC, as insurer, pays all of the insured depositors of the failed financial institution. The FDIC's insurance limit is $250,000 per depositor for each account ownership category. Any amount over that limit, including accrued interest, is uninsured.

Over the years, these basic resolution methods have been adapted as the FDIC grappled with surges of failing financial institutions under challenging economic conditions. Although cost considerations determine the ultimate method through which a failed institution is resolved, the FDIC still possesses sufficient latitude to customize particular resolution methods within that framework. Circumstances may dictate that the resolution methods used be modified considerably.

## RESOLUTION TIMELINE

Formal resolution activities by the FDIC begin when a financial institution's chartering authority sends a Prompt Corrective Action letter to the failing institution advising that it is critically undercapitalized or insolvent. (Section 38 of the Federal Deposit Insurance Act (FDI Act) generally requires that an insured depository institution be placed in receivership within 90 days after the institution has been determined to be critically undercapitalized.) At this time, a representative from the FDIC's Division of Resolutions and Receiverships (DRR) meets with the board of directors of the failing financial institution to explain the FDIC's resolution process, obtain a board resolution allowing due diligence from interested and regulatory approved

financial institutions, and request a current loan and deposit download for the purpose of loan portfolio and insured deposit analysis. A franchise marketing team leader is assigned to work in the failing financial institution to gather information for use by the FDIC and potential buyers.

Sometimes, the usual resolution process cannot be fully completed before the institution fails, such as in cases of sudden/severe liquidity problems or fraud. In those instances, the FDIC might not have time to value the assets. Under this scenario, the FDIC retains the assets of the failing financial institution while structuring a more immediate solution for the institution's deposits and other liabilities.

A timeline of a typical resolution process is illustrated in Figure 2.

**Figure 2: Timeline of a Typical Resolution Process**



Note: The timeline represents the actual sequence of marketing steps but start times and durations can vary significantly.

## DETERMINING THE RESOLUTION STRATEGY

 After the initial contact with the failing institution, DRR sends one or more representatives to the financial institution to collect information for bidders to see in the VDR.

Information gathered on the failing institution is used to determine the appropriate resolution strategies to offer potential acquirers. In developing the resolution strategies, the FDIC considers:

- Asset and liability composition of the failing institution.

- The liquidity position of the failing institution.

- Marketability of the franchise given the competitive and economic conditions of the institution's market area.

- Available time to market the failing institution prior to failure.

- Other relevant information, such as potential fraud at the institution.

Based on this information, the FDIC determines how to best structure the sale of the financial institution. Typically, the FDIC offers more than one type of P&A transaction to give potential acquirers flexibility, to increase competition between potential acquirers, and to ensure the least costly resolution.

The terms of each P&A transaction offered focus on the treatment of the deposits and assets held by the failing institution. The terms cover the types and amounts of assets that will pass to an acquirer as part of the transaction; which assets the FDIC plans to retain; the terms of the asset sale, such as loss sharing arrangements and optional asset pools; and other significant conditions that are part of each proposed P&A transaction.

Sometimes the FDIC cannot complete the entire resolution process before the institution fails because of sudden or severe liquidity problems (e.g., a deposit run). In those instances, the FDIC usually does not have the time to prepare a review of the assets onsite,[7] resulting in a greater likelihood that the FDIC will retain the failed institution's assets while structuring a more immediate solution for the institution's deposits and other liabilities. The primary alternatives available in the face of such time pressure are a transfer of the insured deposits to another institution, a payoff of the insured deposits, or the formation of a bridge bank.

## FINANCIAL INSTITUTION INFORMATION

As part of its resolution process, the FDIC collects detailed information on the assets and liabilities held by the failing institution. Information regarding the deposits; bank facilities and branches; loan portfolio characteristics; securities; information and technology systems; contracts and leases; subsidiaries; and specialized activities, such as mortgage originations, credit card processing, and international operations, are also collected.

## ASSET VALUATION REVIEW (AVR)

It is critical that the FDIC estimates the asset values of the failing financial institution. These values are used to estimate the liquidation value of the institution and the estimated cost of alternative resolution options in order to determine the least costly transaction. The FDIC may hire contractors to complete this work.

---

[7] When there is insufficient time to perform an on-site review, the FDIC uses its research model to value all or most of the non-loan assets and an Aggregate Asset Valuation Review (AAVR) to value loan and other real estate assets. The research model is based on the FDIC's historical recovery experience from a sample of prior bank failures, and the AAVR is an aggregate of values of similar type assets from recently failed banks' Asset Valuation Reviews.

The failing institution's asset portfolio is stratified by asset type, such as single family, commercial real estate, and installment loans. A loan sample is then selected that appropriately represents the valuation and credit characteristics of the total portfolio. An estimate of cumulative loss is calculated for each sampled asset that reflects total remaining cumulative losses—assuming the asset is held to maturity and is managed with the objective of maximum recovery realization. A market value is also estimated for each asset, which reflects a secondary market cash sale value representing the net present value of projected cash flows discounted at the current market investor yield for that asset type. Market value estimates and cumulative loss estimates from the asset sample are then extrapolated to the total asset portfolio.

## MARKETING THE INSTITUTION

Once the resolution strategy has been determined, the FDIC, cognizant of confidentiality concerns, begins the process of marketing the failing institution to a group of approved potential bidders. The criteria used to select approved potential bidders include geographic location, minority-owned status, asset size, capital level, and regulatory ratings. Once the bidders list has been generated, the FDIC must obtain consent from each potential bidder's regulatory (chartering) authority in order to allow them to participate in the failing bank resolution. Private investors wishing to bid on a failing institution must have adequate funds and be engaged in the process of obtaining a charter and deposit insurance to create a new institution. No information that can lead to the identity of the troubled institution is provided at this stage of the marketing process.

## VIRTUAL DATA ROOM (VDR)

The FDIC sets up a VDR to market each failing institution to potential bidders. The VDR provides potential bidders access to financial data on the institution, legal documents, information on the due diligence process, bidding procedures, and descriptions of the resolution transactions being offered. The information posted in the VDR will vary depending on each institution's size and business strategy. The FDIC can add information to the VDR at any time. Documents collected from the failing institution are redacted to remove personally identifiable information and proprietary information before they are provided to bidders.

After the VDR is set up, the FDIC emails invitations to potential bidders to view information on the failing institution. The FDIC provides all potential bidders interested in the failing institution with access to the VDR once they have signed a confidentiality agreement. The VDR allows potential bidders to access the information at their convenience—24 hours a day, seven days a week—and provides them an opportunity to perform due diligence on a failing institution prior to the bid deadline.

## ON-SITE DUE DILIGENCE

Prior to offering on-site due diligence, the FDIC requests an executed board resolution from the failing institution's board of directors authorizing an on-site review of the institution's records and facilities by third parties. Because all potential failing institutions are "open institutions" under private ownership, the FDIC requests permission from the failing institution's board of

directors for third parties to conduct on-site due diligence. By offering on-site due diligence, the FDIC is more likely to receive additional bids, particularly from potential bidders who are not familiar with the failing institution.

To conduct due diligence at the failing institution, approved prospective acquirers must sign additional confidentiality agreements prepared by the FDIC. On-site due diligence enables prospective bidders the opportunity to inspect the books and records of the failing institution in order to assess the franchise's value, and assists potential bidders in submitting bids. All potential bidders performing due diligence are provided the same information so that no one potential bidder has an advantage. Questions posed by one bidder are answered and provided to all bidders.

Occasionally, the reality of the due diligence process spurs the failing bank to find sources of capital on their own. When this happens, the resolution process does not stop but rather continues simultaneously. If the failing bank's plan for an unassisted merger or capital injection is successful, the resolution process is terminated; if the institution's recapitalization plan fails, the resolution process resumes, and all information is updated, if a significant amount of time has elapsed.

## BID SUBMISSION

Bids for the failing institution must be submitted prior to the bid deadline (date/time) set by the FDIC. The bid deadline is generally one to two weeks prior to the scheduled closing. Bidders can submit bids for either all deposits or insured deposits. To determine the least costly resolution, all bids are evaluated and compared with each other and with the FDIC's estimated cost of liquidation. Bids that do not conform to
the FDIC's offered transaction(s) may also be considered, if they can be priced.

A bid typically has at least two pricing terms. The first is the bid amount for the franchise value (i.e., the bid for the deposits (insured-only or all deposits) of the failing financial institution). The second is the bid amount for the failing financial institution's assets. The first bid amount generally represents the value of the deposit customer base, and the second reflects the market value associated with the assets.

## LEAST COST ANALYSIS

The passage of the Federal Deposit Insurance Corporation Improvement Act (FDICIA) in 1991 legislated that the FDIC could only choose the least costly option to the Deposit Insurance Fund when resolving a failing financial institution. Prior to 1991, the FDIC could consider other factors, such as the availability of local banking services and banking stability, before making its final selection, as long as the bid was less costly than liquidation.

The FDIC performs a least cost analysis to compare the cost of liquidating the failing financial institution to the cost of bids received from other interested institutions. Liquidation requires the FDIC, in its capacity as receiver of the failed financial institution, to pay off insured depositors up to the current insured amount and dispose of the assets, if no acceptable bids are received. If

an acceptable bid is received, all deposits or insured deposits are transferred to the acquiring institution.

Figure 3 shows a simplified calculation of the estimated loss in receivership. Assets available for distribution are calculated by deducting estimated asset losses and adding any bids received for the failed bank. The FDIC's internal receivership expenses are also deducted from total assets. Total liabilities (claims) of the receivership are then deducted to determine the total loss to the receivership.

**Figure 3: Least Cost Test Calculation**

Total Gross Assets
    Less: Asset Losses + FDIC Receivership Expenses
    Plus: Bid
                Deposit Premium,
                    and/or
                (Asset Discount)
    Less: Liabilities (Claims) on Receivership:
Total Receivership Loss

Claims on the receivership are paid in the following order (losses are allocated in reverse order, see figure 4).

1. Secured depositors and preferred creditors: Paid in full.

2. Depositor class: The FDIC and the uninsured depositors share losses on a pro-rata basis based on their respective percentages of total deposits.

3. General creditors: Typically have losses in the total amount outstanding.

4. Subordinated creditors: Typically have losses in the total amount outstanding.

**Note:** Any creditors that experience losses that file a claim receive a receivership certificate and may be paid in the future from proceeds generated from additional asset sales.

**Figure 4: Allocation of Receivership Losses**

Receivership Losses are Allocated in the Following Order:

    1 Subordinated Creditors
    2 General Creditors

```
        3 Depositor Class (share pro-rata)
           FDIC
           Uninsured Depositors
        4 Secured Depositors & Preferred Creditors
```

## FDIC BOARD OF DIRECTORS APPROVAL

Prior to the closing of a failing financial institution, the FDIC's Board of Directors approves a Failing Bank Case and board resolutions that include, but are not limited to, allowing staff to determine the least costly method of resolution and authorizing the Director of DRR (or designee) to accept appointment of the FDIC as receiver for the bank.

## BID APPROVAL MEMORANDUM

The Director of DRR signs a Bid Approval Memorandum, which is a narrative about all bids submitted and the recommendation of the least costly bid. The bid approval memorandum includes the cost of the least costly bid and the next least costly bid. It also authorizes FDIC representatives to accept the appointment of receiver from the chartering agency that is officially closing the bank and revoking its charter. Once the memorandum is signed, the FDIC notifies the AI, all unsuccessful bidders, and the chartering agency. The FDIC then arranges for the AI to sign the appropriate legal documents before the closing of the failed financial institution. At that time, the FDIC staff meets with the AI to coordinate the mechanics of the closing procedures.

## CLOSING THE INSTITUTION

The final step of the resolution process begins when the institution closes, and the assets and deposits are transferred to the AI. The chartering authority closes the institution and appoints the FDIC as receiver. This event usually occurs on a Friday at the end of the business day, which gives the FDIC time to work over the weekend. The FDIC, as receiver, is then responsible for settling the affairs of the closed financial institution. Such activities include balancing the accounts of the institution immediately after closing, transferring certain assets and liabilities to the AI, and determining the exact amount of payment due the AI. The settling of various accounts between the receiver and the AI is called a "settlement." This process takes from 6 to 12 months, depending on the size of the failed institution.

The AI reopens the financial institution usually by the next business day, and the failed institution's customers automatically become customers of the AI with access to their insured funds. The FDIC, as receiver, is responsible for operating the receivership, including collecting on assets retained by the receiver, and to the extent possible, satisfying the creditor claims against the receivership. In cases where the FDIC provides continuing assistance, such as in a

loss share transaction, the FDIC monitors the assistance payments for the duration of the agreement.

# Chapter 4    Types of Resolution Transactions

The methods for resolving failing financial institutions have evolved over the years due to economic changes and legislative mandates. Prior to 1991, the FDIC could consider factors such as the availability of local banking services and banking stability when selecting a resolution method. With the passage of the FDICIA, the FDIC must accept the least costly resolution method to the DIF, with P&A transactions and deposit payoffs being two common resolution methods.

## PURCHASE AND ASSUMPTION TRANSACTIONS

A P&A is a resolution transaction in which a healthy institution purchases some or all of the assets of a failing institution and assumes some of the liabilities, including all insured deposits. The P&A is the most common method used by the FDIC to resolve a failing institution and is considered the least disruptive to local communities. This transaction can vary based on factors such as the amount of time available to arrange the transaction, the location and size of the financial institution, the nature of its deposits, and the assets available for sale.

The structure of P&As has evolved to incorporate procedures and incentives to entice potential acquirers to assume more assets of the failed institution. It is designed to provide flexibility since each potential acquirer has different interests and market conditions change over time. Some acquirers may believe it is essential to acquire a substantial portion of the assets with the deposit franchise; other acquirers may prefer to only purchase assets or deposits. Generally, the FDIC attempts to dispose of as many of the failing institution's assets as possible at the time of closing; however, the results of the winning bid must meet the mandated least cost test requirements.

The following describes some variations of P&A transactions that the FDIC has used under differing circumstances.

### Basic P&As

In basic P&As, assets that pass to acquirers generally are limited to cash, cash equivalents, and marketable securities. Optional loan pools may be offered. The premises of failed institutions (including furniture, fixtures, and equipment) often are offered to acquirers on an optional basis. The liabilities assumed by the acquirer will include the portion of the deposit liabilities covered by FDIC insurance and may also include all deposits, if that is the least costly bid.

**Figure 5: Basic P&A Agreements**

| |
|---|
| **Benefits** |
| Customers with insured deposits suffer no loss in service. |
| Customers with insured deposits have new accounts with the new institution, but old checks can still be used. |
| Customers with insured deposits do not lose interest on their accounts (up to $250,000). |
| The AI has an opportunity for new customers. |
| The AI has a 30-day option to purchase individual loans at book value. |
| The FDIC can use this method when there is not enough time to complete due diligence. |
| The FDIC costs are less than a deposit payoff. |
| |
| **Other Considerations** |
| Receivership must liquidate the majority of the failed institution's assets. |
| Uninsured depositors may or may not suffer losses. |
| The FDIC's cash outlay increases. |

**Note**: After the FDICIA was signed, the FDIC was required to select the least costly resolution method available. The requirement had a significant effect on the FDIC's resolution practices. Previously, the FDIC had structured most of its transactions to transfer both insured and uninsured deposits along with certain failed bank assets. Under FDICIA, however, when transferring the uninsured deposits was not the least costly solution, the FDIC began entering into P&A transactions that included only the insured deposits. Since the Emergency Economic Stabilization Act of 2008 and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 increased deposit insurance from $100,000 to $250,000, reducing the amount of uninsured deposits in banks has resulted in mostly all-deposit P&A transactions.

### Whole Bank P&As

The whole bank P&A structure emerged as the result of an effort to persuade acquirers of failed institutions to purchase the maximum amount of a failed institution's assets. Bidders are asked to bid on all assets of the failed institution on an "as is" discounted basis (with no guarantees). This type of sale is beneficial to the FDIC for three reasons. First, loan customers continue to be served locally by the AI. Second, the whole bank P&A minimizes the one-time FDIC cash outlay by having the AI purchase all assets, with the FDIC having no further financial obligation to the AI. Finally, a whole bank transaction reduces the amount of assets held by the FDIC for liquidation. See Figure 6.

**Figure 6: Whole Bank P&A Agreements**

**Benefits** (all the benefits of Basic P&As, plus the following):
Loan customers continue to be served locally by the AI.
The one-time FDIC cash outlay is minimized.
The amount of assets held by the FDIC for liquidation is greatly reduced.
The expenses associated with liquidating assets are also greatly reduced.

**Other Considerations**
May not prove to be the least costly method compared to other types of resolutions.
Can be a negative bid.

## P&As with Optional Shared Loss

An optional shared loss P&A is a resolution transaction where the FDIC, as receiver, agrees to share losses on certain types of assets with the AI. This agreement is similar to the whole bank P&A except for the sharing provision on the assets purchased. During the most recent crisis, the FDIC has offered loss share where the AI accepts 20 percent of the losses, or more, depending on the bid. Shared loss assets are typically distressed assets of the failing institution that otherwise might not appeal to potential acquirers without some sort of incentive or protection from losses. Under a shared loss option, the FDIC splits defined losses and expenses on certain assets with the acquirer. Shared loss assets have typically been single-family residential loans, commercial loans, commercial real estate loans, and owned real estate (some earlier agreements included additional types of loans). The shared loss option also reduces the FDIC's immediate cash needs, is operationally simpler, and moves assets quickly into the private sector. See Figure 7.

Additionally, loss share bidders may be able to submit a value appreciation instrument (VAI) along with their bid. The VAI grants to the FDIC a warrant to purchase a certain interest in the bidder's stock at a certain price on a certain date. This enables the FDIC to participate in any increase in the market value of the bidder's stock that may result from entering into the transaction.

**Figure 7: P&A Agreement with Optional Shared-loss**

**Benefits** (all the benefits of basic P&As, plus the following):
Reduced risk for the AI and can lower the FDIC's cost.
Reduces the FDIC's immediate funding needs.
Assets remain in the private sector.

**Other Considerations**
Requires additional administrative duties for both the AI and the FDIC.
Time consuming as agreements generally last 8 to 10 years.
The FDIC does not control the assets, yet retains a large portion of the potential loss.

## Bridge Bank P&As

A bridge bank transaction is a P&A in which the FDIC acts temporarily as the AI. The original failed institution is closed by its chartering authority and placed in receivership. A new,

temporary national bank chartered by the OCC is created and controlled by the FDIC. This new institution is designed to "bridge" the gap in time between the failure of the original institution and the time it takes the FDIC to evaluate and market the institution to a third party. A bridge bank can be operated for two years, with three one-year extensions, after which time it must be sold or otherwise resolved.

When appropriate, the FDIC establishes a bridge bank to provide the time needed to arrange a permanent transaction. It also provides prospective purchasers with the time necessary to assess the bank's condition in order to submit their offers.

Before establishing a bridge bank, a cost analysis must show that the franchise value of the bank is greater than the marginal costs of operating the bridge bank, thus being less costly than a payoff. A resolution timetable and strategy are also completed. The resolution strategy for the bridge bank will vary depending on whether the bridge bank is to be held long term (more than nine months) or short term (less than nine months). A bridge bank is established only if it is projected to be the least costly resolution alternative for the DIF.

The sale and closing of a bridge bank is similar to the sale and closing of other failed banks. The FDIC requires at least 16 to 24 weeks to properly prepare for the sale, which includes gathering information, soliciting interest from potential acquirers, arranging for due diligence by potential acquirers, and receiving and analyzing bids. The bridge bank may be resolved through a P&A transaction, a merger, a stock sale, or a payoff. See Figure 8.

**Figure 8: Bridge Banks**

| |
|---|
| **Benefits** |
| Provides the FDIC time to arrange a permanent transaction. |
| Provides prospective purchasers time to assess the bank's condition in order to submit reasonable bids. |
| Preserves the bank's franchise value. |
| Provides continuity of service to bank customers. |
| |
| **Other Considerations** |
| Duplicates part of the resolution process; the FDIC must complete two closings, one for the original bank and one for the **bridge bank.** |
| Requires increased FDIC time and effort. |
| The FDIC becomes responsible for the operation of the bridge bank. |
| Difficult to retain key employees during the transition period. |
| Economic conditions may continue to deteriorate, leading to lower premiums. |
| Best customers may leave institution for more stable environment, thereby reducing the franchise value. |

## DEPOSIT PAYOFFS

A deposit payoff is executed when the FDIC does not receive a least costly bid for a P&A transaction or if no bids are received at all. In a payoff, no liabilities are assumed, and no assets are purchased by another institution. The FDIC must pay depositors of the failed institution the amount of their insured deposits (either directly or through an agent). The three most common

versions of a deposit payoff are a straight deposit payoff, an insured deposit transfer (IDT), and a Deposit Insurance National Bank (DINB).

### Straight Deposit Payoff

A straight deposit payoff is a resolution method that is used when the liquidation, closing, or winding down of affairs is determined to be the least costly resolution. In this type of transaction, the FDIC determines the amount of insured deposits and pays that amount directly to each depositor. Once the insured deposits are determined, the FDIC mails a check to each depositor. The FDIC, as receiver, retains all assets and other liabilities, and the receivership bears the responsibility and cost of liquidating all of the assets.

### Insured Deposit Transfer (IDT)

The IDT is a type of deposit payoff in which the insured and secured deposits of a failed financial institution are transferred to a transferee or agent institution in the community, permitting a direct payoff of the failed institution's depositors by the agent institution. The agent institution pays customers of the failed institution the amount of their insured deposits or, at the customer's request, opens a new account in the agent institution for the customer. Though rarely used, when an AI cannot be found for a failed bank, an IDT is an alternative to a straight deposit payoff.

### Deposit Insurance National Bank (DINB)

A DINB is a bank of limited life and powers that is chartered without any capitalization. To protect depositors, the FDIC may create a DINB to ensure that depositors, particularly those in underserved areas, have continued access to their insured funds, as well as time to open accounts at other insured institutions, when no other bank has agreed to assume the insured deposits. The goal of a DINB is to provide time for account holders to transfer their banking relationships via uninterrupted direct deposits and automated payments from customer accounts to other financial institutions. By using a DINB rather than a payoff, the transferring of accounts to account holders occurs in a less disruptive and more orderly manner for the local community.

The FDI Act (12 U.S.C. §1821(m)),enables the FDIC to operate an individual DINB for up to two years; however, the majority of recent DINBs have been operated for only 30 days. The chartering authority closes a failing bank, appoints the FDIC as receiver, then the FDIC creates (with an OCC Charter) a DINB that will remain open for a limited period to give depositors access to their insured deposits. All assets of the failing bank remain in receivership.

## HISTORICAL RESOLUTION METHODS

Many resolution methods used in the past, although appropriate at the time, are no longer legislatively available and do not meet the economic challenges we face today, nor are they considered least costly to DIF. However, these methods may provide other countries with some alternative resolution options.

## Open Bank Assistance (OBA)

The open bank assistance resolution method was used when an insured institution in danger of failing received assistance from the FDIC in the form of direct loans, contributions, deposits, asset purchases, or the assumption of liabilities. This option ceased being used after 1992 because of legislative changes that restricted its use and broadened the resolution options available to the FDIC, such as bridge bank authority. However, OBA was used again in 2008 with Citigroup and Bank of America. The Dodd-Frank Law enacted in July 2010 eliminated this option altogether.

## Net Worth Certificate Program

Under the Depository Institutions Act of 1982, Congress expanded FDIC powers to assist troubled institutions, including the establishment of the Net Worth Certificate (NWC) program. Under this program, the FDIC purchased a NWC from a qualified institution in exchange for an FDIC-insured promissory note, which was an asset on the institution's books, with the offsetting liability of the NWC counted as regulatory capital. Extended twice by Congress, this program expired in 1986.

The primary purpose of the NWC program was to provide capital forbearance to institutions that were not performing well in the new and more competitive deregulated environment. The FDIC's program was restricted to institutions with insufficient net worth that had recurring losses not caused by mismanagement; that would agree to establish a comprehensive, goal-oriented business plan; and that would consider reasonable merger opportunities.

## Income Maintenance Agreements

From 1981 through 1983, the FDIC used Income Maintenance Agreements to compensate for the effect that the deregulation of interest rates was having on some of the larger savings institutions. The failing savings institution's income was primarily tied to low-yielding, single-family, long-term mortgage loans. The credit quality of the collateral supporting the loans was not a problem.

A major concern to the FDIC was how to resolve those failing savings institutions without incurring enormous losses. The FDIC's resolution strategy was to force the weaker savings institutions to merge into healthier institutions. To attract a merger partner, the FDIC guaranteed a market rate of return on the acquired assets through the use of an income maintenance agreement. The FDIC paid the acquirer the difference between the yield on assets acquired and the failed savings institution's average cost of funds. The FDIC entered into these agreements only if the resulting institution would be viable. In most cases, the senior officials at the troubled institutions were required to resign, and subordinated debt holders received only a portion of their investments. There are no shareholders in mutual savings institutions, so the issue of an unexpected windfall gain for existing shareholders did not need to be addressed.

### Capital Forbearance Program

As large numbers of agricultural institutions failed in the 1980s, methods were developed to save institutions that were historically well managed but financially troubled due to the depressed economy in their areas.

The Capital Forbearance program permitted well-managed, economically sound institutions with concentrations of 25 percent or more in agricultural or energy loans to be temporarily exempt from regulatory capital requirements. Eligible banks were required to have a capital ratio of at least 4 percent, and their weakened capital position had to be a result of external problems in the economy and not a result of mismanagement, excessive operating expenses, or excessive dividends.

### Loan Loss Amortization Program

The Loan Loss Amortization program allowed institutions to amortize agricultural losses on their books over a seven-year period. Only institutions of less than $100 million in total assets and with at least 25 percent of their total loans in agricultural credits were eligible for this program. Qualified institutions were judged to be economically viable and fundamentally sound, except for needing additional capital to carry the weak agricultural credits.

### Branch Breakup

A branch breakup is a resolution strategy that provided bidders with the choice of bidding on the entire franchise or on individual or groups of branches of the failing institution. Marketing failing institutions on both a whole bank and a branch breakup basis can expand the universe of potential buyers and may result in better bids in the aggregate. In branch breakup transactions, prospective acquirers are required to submit bids on both the "all deposits" and "insured deposits" options except for bids on the entire franchise. The RTC developed the branch breakup resolution strategy to allow smaller institutions to participate in the resolution process and to increase competition among the bidders. However, the FDIC can only use this strategy if the bank's deposit and loan systems are already established in a way that they can be easily split apart and enough time is available to prepare the bank for this resolution.

# Chapter 5    Receivership Process – Post-closing Activities

Congress recognized the importance of deposit protection in providing stability in the nation's economy. As such, Congress gave the FDIC special powers to use in the liquidation of assets from failed depository institutions and the payment of claims against the receivership estate. Federal laws governing the resolution of failed depository institutions were designed to promote the efficient and expedient liquidation of failed institutions. The more significant of these powers are detailed below.

## COMPARISON WITH BANKRUPTCY LAW

As mentioned earlier, in many ways, the powers of the FDIC as receiver of a failed institution are similar to those of a bankruptcy trustee. For example, the receiver may liquidate the assets of the insolvent institution or transfer some or all of its assets to an AI. Although many of the concepts central to the operation of an FDIC receivership are similar to those of the bankruptcy process, federal law grants the FDIC additional powers resulting in critical differences between bankruptcy and the FDIC receivership law.

The FDIC's role and responsibilities when serving as receiver are defined by specific statutory provisions. These additional powers enable the FDIC to both expedite the liquidation process for banks and thrifts in order to maintain confidence in the nation's banking system, and to maximize the cost effectiveness of the receivership process to preserve a strong insurance fund. The primary advantage is that the FDIC, in administering the assets and liabilities of a failed institution as its receiver, is not subject to court supervision and its decisions are not reviewable except under very limited circumstances. A few key differences between bankruptcy and FDIC receivership law are as follows:

- **Claims process** – After failure, anyone with a claim against the failed bank must, in a timely manner, file a claim with the receiver or the claim is barred. The receiver has the power to allow or disallow claims. If not allowed within 180 days after failure, it is deemed to be disallowed. The holder of a claim that has been disallowed, in whole or in part, may then file litigation against the receiver in certain federal district courts specified by statute for a court determination. In bankruptcy, a debtor is required to schedule all known creditors and, if not disputed, the claims are allowed in full. A creditor can also file a timely claim with the bankruptcy estate that is allowed in full if not disputed. A bankruptcy trustee can only object to a claim, but the decision of whether to allow or disallow the claim is made by the bankruptcy court.

- **Contract repudiation** – A receiver may repudiate any burdensome contract within a "reasonable time" of its appointment, generally 180 days but subject to the specific circumstances of the failed institution. A bankruptcy trustee can repudiate only executory contracts and generally must do so within 120 days without a court order granting a further extension.

- **Stay of litigation** – A receiver can request a stay of legal proceedings of up to 90 days. The automatic stay in bankruptcy becomes effective immediately upon the filing of a bankruptcy petition and is only terminated by court order or the conclusion of the case.

- **Avoidance powers** – Both a receiver and a bankruptcy trustee have avoidance powers. A receiver can pursue fraudulent transfers by obligors of a failed financial institution made with the intent to hinder, delay, or defraud the institution. This power applies to transfers made five years before the date of the receiver's appointment. A bankruptcy trustee can avoid fraudulent transfers and recover property for the bankruptcy estate.

- **Special defenses** – A receiver has special statutory defenses that it can use to defeat the defenses of obligors of a failed institution. A bankruptcy trustee generally can use only the defenses that were available to the debtor to defeat claims.

- **Depositor preference** – A receiver is required to pay depositor creditor claims in full before any distribution is made to allow general unsecured creditor claims against the receiver.

A more detailed discussion of the FDIC's special receivership powers follows later in this chapter.

## WHY THE FDIC ACTS AS RECEIVER

To understand why Congress gave the FDIC the powers it has, it is necessary to look at the conditions and structure of the banking industry prior to the establishment of the FDIC. The FDIC was created in 1933 to halt a banking crisis. Nine thousand banks—a third of the banking industry in the United States at that time—failed in the four years before the FDIC was established. The failure of one bank set off a chain reaction, bringing about other failures. Sound banks frequently failed when large numbers of depositors panicked and demanded to withdraw their deposits, leading to "runs" on the banks. The behavior of depositors was not irrational. They had learned from hard experience that if they kept their money in a bank, the money might not be available when they needed it, and they might lose a large portion of it if their bank failed.

Before the creation of the FDIC, the OCC supervised national bank liquidations. Liquidations of state banks by state regulators were generally handled under the provisions for general business insolvencies. By 1933, most state banking authorities had at least some control over state bank liquidations. However, the increased incidence of national bank failures from 1921 through 1932 created a shortage of experienced receivers. Furthermore, there were concerns that appointments of receivers, both national and state, had been handed out as political favors, with the recipients attempting to make large commissions and to extend the work as long as possible.

In general practice, between 1865 and 1933, depositors of national and state banks were treated in the same way as other creditors—they received funds from the liquidation of the bank's assets after those assets were liquidated. On average, it took about six years at the federal level to liquidate a failed bank's assets, pay the depositors and other creditors, and close the bank's books. Even when depositors did ultimately receive their funds, the amounts were significantly less than they had originally deposited into the banks. From 1921 through 1930, more than 1,200

banks failed and were liquidated. From those liquidations, depositors at state chartered banks received, on average, 62 percent of their deposits back. Depositors at banks chartered by the federal government received an average of 58 percent of their deposits back. Given the long delays in receiving any money and the significant risk in getting their deposits back, it was understandable why anxious depositors withdrew their savings at any hint of problems. With the wave of banking failures that began in 1929, it became widely recognized that the lack of liquidity that resulted from the process for resolving bank failures contributed significantly to the economic depression in the United States.[8]

To manage the crisis, the government of the United States focused on returning the financial system to stability by restoring and maintaining the confidence of depositors in the banking system. When Congress created the FDIC, it addressed that problem by providing that the FDIC would insure deposits up to the deposit limit, initially up to $2,500 but now up to $250,000; by giving the FDIC special powers to resolve failed banks; and by requiring the appointment of the FDIC as receiver for all national banks. Congress believed that the appointment of the FDIC simplified procedures, eliminated duplication of records, and vested responsibility for liquidation in the largest creditor (the FDIC in its corporate capacity, as subrogee for the insured deposits it had paid), whose interest was to obtain the maximum possible recovery. For state-chartered banks, Congress preferred that the FDIC be receiver but allowed each state to appoint a receiver according to state law. By 1934, 30 states had provisions under which the FDIC could be appointed receiver, but, in practice, most states often did not do so. Today, however, it is the rare exception when the FDIC is not appointed, and most states now require that the FDIC be appointed as receiver.

## HOW THE FDIC BECOMES A RECEIVER

A depository institution's charter determines which state or federal regulatory agency will appoint a receiver or a conservator for a failing institution.[9]

For federal savings associations and national banks, the OCC is the chartering authority responsible for determining when the appointment of a receiver is necessary. The FDIC must be appointed as receiver for insured federal savings associations and national banks.

For state-chartered S&L associations or banks that are not members of the Federal Reserve System, the FDIC may accept appointment as receiver by the appropriate state regulatory authority, but it is not required to do so.

For state-chartered banks that are members of the Federal Reserve System, the state banking authority may also appoint the FDIC as receiver.

In certain limited instances, the FDIC may appoint itself as receiver for a state-chartered insured depository institution. The FDIC received this additional authority from Congress in

[8] C.D. Bremer, *American Bank Failures* (New York: Columbia University Press, 1935), chapters IV and V.
[9] The same authority would appoint the FDIC as conservator for the institution if the imposition of a conservatorship was determined to be the appropriate strategy for dealing with a failing institution. However, the FDIC has never been appointed conservator by the OCC or a state regulatory authority and may decline the appointment if tendered; the FDIC was appointed conservator once by the OTS.

1991 out of concern that the FDIC depended on the judgment of individual state chartering authorities or that of other federal chartering authorities and Congress needed an independent basis to protect the insurance fund in a timely manner.

The FDIC, as receiver, is functionally and legally separate from the FDIC acting in its corporate role as deposit insurer, and the FDIC, as receiver, has separate rights, duties, and obligations from those of the FDIC as insurer. Courts have long recognized these dual and separate capacities.

## THE FDIC'S FUNCTIONS AS RECEIVER

Congress has entrusted the FDIC with virtually complete responsibility for resolving failed federally insured depository institutions and has conferred expansive powers to ensure the efficiency of the process. In exercising this significant authority, the FDIC is required by statute to maximize the return on the assets of the failed bank or thrift and to minimize any loss to the insurance fund.

A receivership is designed to market the assets of a failed institution, liquidate them, and distribute the proceeds to the institution's creditors. The FDIC, as receiver, takes over the rights, powers, and privileges of the institution and its stockholders, officers, and directors. The FDIC may collect all obligations and money due to the institution, preserve or liquidate its assets and property, and perform any other function of the institution consistent with its appointment.

A receiver also has the power to merge a failed institution with another insured depository institution and to transfer its assets and liabilities without the consent or approval of any other agency, court, or party with contractual rights. Furthermore, the FDIC may form a new institution (Bridge Bank) to take over the assets and liabilities of the failed institution, or it may sell or pledge the assets of the failed institution to the FDIC in its corporate capacity.[10]

The FDIC, as receiver, is not subject to the direction or supervision of any other agency or department of the United States or of any state in the operation of the receivership. These provisions allow the receiver to operate without interference from other executive agencies and to exercise its discretion in determining the most effective resolution of the institution's assets and liabilities.

In many respects, the powers of a receiver and a conservator are similar, though FDIC's conservator powers have been rarely used. Many of the statutory powers of a receiver, however, are expressly conferred upon a conservator, while certain powers are limited to the receiver. The guiding principle is to grant to the FDIC (acting in either capacity) those powers and obligations that are most consistent with performance of its statutory role. A conservatorship is designed to operate the institution for a period of time in order to return the institution to a sound and solvent operation. While in conservatorship, the institution remains subject to the supervision of the appropriate state or federal banking agency. The conservator's goal is to preserve the "going concern" value of the institution. For example, a conservator, like a receiver, is empowered to

---

[10] While the FDIC, in either its corporate or receivership capacity, can establish a bridge institution, to date all bridge banks have been established by the FDIC in its corporate capacity. Refer to Purchase and Assumption Transactions for further discussion of bridge institutions.

disaffirm or repudiate contracts such as leases, but it may choose not to do so if the contracts would benefit the open institution.

## THE FDIC'S CLOSING FUNCTION

When a chartering authority closes a bank or thrift and appoints the FDIC as receiver, the first task for the FDIC is to take custody of the failed institution's premises and all its records, loans, and other assets. After taking possession of the premises, the FDIC posts notices to explain the action to the public. It then notifies correspondent banks and other appropriate parties of the closing.

The FDIC closing staff, working in conjunction with employees of the failed institution, bring all accounts forward to the closing date and post all applicable entries to the general ledger, making sure everything is in balance.

## RESOLUTION OF CLAIMS AGAINST THE FAILED INSTITUTION

Immediately after its appointment, the FDIC, as receiver, must notify the failed institution's creditors (which include customers with uninsured deposits) to submit their claims to the receiver. The FDIC arranges for a notice to be published in a local newspaper stating that the financial institution has failed and how claimants may file their claims. The receiver must also mail notices to all creditors identified in the institution's records telling them to file claims.

All claimants, including those who may have been suing the failed institution, must then file proof of their claims with the receiver by a specified deadline that is set to be at least 90 days after institution failure. The receiver may seek to put any pending litigation to which the failed institution was a party on hold. Once a claim has been filed, the receiver has 180 days to determine if the claim should be allowed. If the receiver is not satisfied that the claim has merit, the claim will be disallowed.

An allowed claim will be paid on a pro rata basis with other allowed claims of the same class, to the extent there are funds available in the receivership after the expenses are paid. If a creditor's claim is denied, the creditor may seek judicial review of the claim by filing a lawsuit or continuing pending litigation within 60 days after the date the claim is denied. If the receiver has not acted on the claim within 180 days of its filing, it is deemed to have been disallowed and the creditor may file suit within 60 days thereafter.

## PAYMENT OF CLAIMS

The priority for paying allowed claims against a failed depository institution is now determined by federal law. On August 10, 1993, a uniform distribution plan for depository institutions—the National Depositor Preference Amendment—became effective. The amendment gives payment priority to depositors, including the FDIC as subrogee, over general unsecured creditors. Inasmuch as most liabilities of a failed institution are deposit liabilities, the practical effect of depositor preference in most situations is to eliminate any recovery for unsecured general creditors. The statute applies to all receiverships established after its enactment. For

receiverships commenced prior to that time, distribution of the assets of a failed depository institution was determined according to the law of the chartering jurisdiction, either state or federal. A number of states had depositor preference statutes for their state-chartered institutions prior to enactment of the federal statute.

Claims against the failed institution are paid from monies recovered by the receiver through its liquidation efforts. Under the National Depositor Preference Amendment and related statutory provisions, claims are paid in the following order of priority:

1. Administrative expenses of the receiver
2. Deposit liability claims (the FDIC claim takes the position of all insured deposits)
3. Other general or senior liabilities of the institution
4. Subordinated obligations[11]
5. Shareholder claims

Payments on these claims are known as dividends. Customers with uninsured deposits are sometimes issued advance dividends based on the estimated recovery value of the failed institution's assets. This provides customers with uninsured deposits a portion of their uninsured funds early in the receivership process but maintains market discipline. However, the FDIC does not pay advance dividends when the value of the failed institution's assets cannot be reasonably determined at closing. Federal law applicable to all depository institution receiverships provides that a receiver's maximum liability to a claimant is an amount equal to what the claimant would have received if the institution's assets had been liquidated.

## SPECIAL RECEIVERSHIP POWERS

As mentioned earlier in this chapter, the FDIC, as receiver, has a number of special powers that have been granted by federal law. A discussion of some of the more significant powers follows.

### Repudiation of Contracts

A receiver may repudiate or disaffirm a contract of the depository institution if the receiver determines that the failed institution was a party to the contract, deems it burdensome, and finds that repudiation would promote the orderly administration of the receivership estate. The power to disaffirm or repudiate a contract simply permits the receiver to terminate the contract, thereby ending any future obligations imposed by the contract. The receiver must act to repudiate a contract within a "reasonable time" after appointment, generally 180 days but subject to the specific circumstances of the failed institution. While the receiver may be liable for damages resulting from the repudiation of a contract, those damages are limited to actual direct compensatory damages determined as of the date of the receiver's appointment. Actual direct compensatory damages do not include punitive or exemplary damages, damages for lost profits or opportunity, or damages for pain and suffering. Any claim for damages due to the repudiation of a contract is subject to the receivership's claim process.

---

[11] Any liability of the insured depository for a cross-guarantee assessment would receive distributions after subordinated debt holders but before distributions were made to shareholders.

Slightly different rules apply for contracts that are qualified financial contracts (QFCs), which include securities contracts, commodity contracts, forward contracts, repurchase agreements, and swap agreements. When the receiver repudiates a QFC, damages are measured as of the date of the repudiation and may include the cost of assuming a replacement QFC. These special rules are necessary to protect the U.S. financial markets.

### Enforcement of Contracts

In addition to being able to repudiate or disaffirm contracts, the receiver also has the limited ability to enforce a contract and prevent the other party to the contract from terminating the agreement if keeping the contract in place is in the best interest of the receivership. Any contract clause that allows the termination of the agreement due to insolvency or appointment of the receiver (or similar language) is unenforceable against the receiver with the contract remaining intact.

Also, even if the failed institution was in default under the terms of the contract at the time of its closing, the receiver can prevent the third party from exercising any right or power to terminate, accelerate, or declare a default under the contract or to obtain possession or exercise control over any property of the failed bank for a period of 90 days following closing without the consent of the receiver. The FDIC, as conservator, has this same power but for only 45 days following its appointment.

## PLACING LITIGATION ON HOLD

The receiver is substituted as a party for litigation pending against the failed institution. However, because the receiver may need time to assess and evaluate the facts of each case to decide whether and how to proceed, the law permits the receiver to request a court to put on hold, or "stay," the litigation. That power also extends to litigation filed after the institution's failure. The receiver must request the stay for it to become effective. The courts, however, cannot decline to issue the stay once the receiver has filed its request.[12]

When litigation resumes after a stay is lifted, the receiver is generally entitled to have the controversy resolved in either state or federal court. Typically, when the litigation is before a state court, the FDIC has the added flexibility to keep it in state court or to remove it to federal court.

A special statute of limitations exists for actions brought by a receiver. Under the statute, the receiver has up to six years to file a contract claim and up to three years to begin a tort suit.[13]

---

[12] A receiver may obtain a stay for 90 days; a conservator is allowed 45 days.

[13] Tort actions are lawsuits that seek compensation for a civil wrong (as opposed to a crime) committed by one party against another party. They include lawsuits for personal injury or property damage due to negligence, as well as suits for libel, false arrest, and other disputes.

### Avoiding Fraudulent Conveyances

A receiver has the power to avoid certain fraudulent conveyances. Under federal banking law, a receiver may avoid a security interest in a property, even if perfected, in which the security interest is taken in contemplation of the institution's insolvency or with the intent to hinder, delay, or defraud the institution or its creditors. The receiver may avoid any transfers made by obligors within five years of the appointment of the receiver. Those rights are superior to any rights of a trustee or any other party.

### Special Defenses

Over the years, federal statutes and court decisions have provided certain special defenses to the FDIC in its role as receiver to allow for the efficient resolution of a failed institution's affairs.

### Improperly Documented Agreements are not Binding on the Receiver

Like a bank regulator, the receiver must be able to rely upon the books and records of the failed financial institution to evaluate its assets and liabilities accurately. For the receiver, the ability to rely on the failed institution's records in resolving the institution's affairs is critical in completing cost-effective resolution transactions, such as the sale of assets to third parties and the effective collection of debts due to the failed bank or thrift.

As a result, both the common law (D'Oench Doctrine) and its statutory counterparts, U.S.C., Title 12, section 1821(e) and section 1821(d)(9)(A), recognize that, unless an agreement is properly documented in the institution's records, it cannot be enforced either in making a claim or defending against a claim by the receiver. Therefore, an argument by an obligor on a promissory note that an undocumented, unrecorded side agreement with the failed institution changes or releases the duty to repay the loan will generally be barred.

### Courts May Not Enjoin the Receiver

Congress has provided the FDIC, as receiver, with additional protection by prohibiting courts from issuing injunctions or similar equitable relief to restrain the receiver from completing its resolution and liquidation activities. For example, U.S.C., Title 12, section 1821(j) bars an injunction to prevent foreclosures or asset sales. Similarly, courts are prohibited from issuing any order to attach or execute upon any assets in the possession of the receiver. These statutory provisions, however, do not bar the recovery of monetary damages.

## SETTLEMENT WITH THE AI

The FDIC and the AI handle most of their post-closing activities through the "settlement" process. The FDIC settlement agent ensures that the transfer of a failed institution's assets and liabilities occurs in accordance with the terms of the P&A agreement. The settlement period begins with the AI's purchase or assumption of some or all of the failed institution's assets or liabilities, and normally continues for up to 364 days. Typical settlement transactions include all of the following:

- Corrections of discrepancies related to the balances of the failed institution's assets and liabilities purchased by or transferred to the AI.

- The exercise of options by the AI.

- Any repurchase of assets by the receiver or any put back of assets to the receiver by the AI.

- The valuation of assets sold to the AI at market prices.

# Glossary

**Assuming institution (AI)** – A healthy financial institution that purchases some or all of the assets and assumes some or all of the liabilities of a failed institution in a P&A transaction.

**Asset Valuation Review** – A review of all of a failing institution's loans and OREO used to estimate the liquidation value of the failing institution. This estimate is used in the least costly analysis that is required by the Federal Deposit Insurance Corporation Improvement Act (FDICIA) of 1991. The Asset Valuation Review compares the book value of the failing institution's loans and OREO to the estimated recovery value to help determine the projected net loss to the FDIC.

**Bank** – A financial institution that in the normal course of its business operations accepts deposits; pays, processes, or transacts checks or other deposit accounts; and performs related financial services for the public. Also, a bank generally makes loans or advances credit.

**Book value** – The dollar amount shown on the institution's accounting records or related financial statements. The gross book value of an asset is the value without consideration for adjustments, such as valuation allowances. The net book value is the book value net of such adjustments. The FDIC restates amounts on the books of a failed institution to conform to the FDIC's liquidation accounting practices. Therefore, in the FDIC accounting environment, book value generally refers to the unpaid balance of loans or accounts receivable, or the recorded amount of other types of assets (for example, owned real estate or securities).

**Bridge bank** – A temporary national bank established by a P&A transaction and operated by the FDIC on an interim basis to acquire the assets and assume the liabilities of a failed institution until final resolution can be accomplished. The use of bridge banks generally is limited to situations in which more time is needed to permit the least costly resolution of a large or complex institution.

**Branch breakup** – A resolution strategy that provides bidders with the choice of bidding on the entire franchise or on individual or groups of branches of the failing institution. Marketing failing institutions on both a whole franchise and a branch breakup basis can expand the universe of potential buyers and may result in better bids in the aggregate.

**Capital forbearance** – The temporary permission for a bank or thrift to operate with capital levels below regulatory standards if the bank or thrift has adequate plans to restore capital. For example, banks suffering because of the energy and agricultural crises in the mid-1980s were permitted to operate with capital levels below regulatory standards if they had adequate plans to restore capital. A joint policy statement issued in March 1986 by the FDIC, OCC, and the Federal Reserve Board encouraged a capital forbearance program for agricultural banks.

**Chartering authority** – A state or federal agency that grants charters to new depository institutions. For state-chartered institutions, the chartering authority is usually the state banking department; for national banks and for federal savings institutions, it is the OCC.

**Claim** – An assertion of the indebtedness of a failed institution to a depositor, general creditor, subordinated debt holder, or shareholder.

**Conservator** – A person or entity, including a government agency, appointed by a regulatory authority to operate a troubled financial institution in an effort to conserve, manage, and protect the troubled institution's assets until the institution has stabilized or has been closed by the chartering authority.

**Conservatorship** – The interim entity established after a person or entity, including a government agency, is appointed by a regulatory authority to operate a troubled financial institution in an effort to conserve, manage, and protect the troubled institution's assets until the institution has stabilized or has been closed by the chartering authority.

**Deposit Insurance Fund (DIF)** – An insurance fund responsible for protecting insured financial institution depositors from loss due to institution failures. It was established on March 31, 2006, as a result of the 2005 legislation requiring the merger of the Bank Insurance Fund and the Savings Association Insurance Fund pursuant to enacted deposit insurance reform legislation. The FDIC is the administrator of the DIF.

**Deposit Insurance National Bank (DINB)** – The Banking Act of 1933 authorized the FDIC to establish a new bank to assume the insured deposits of a failed bank. Passage of the act permits the FDIC to pay the depositors of a failed FDIC-insured institution through a DINB, a national bank that is chartered with limited life and powers. Depositors of a DINB are given up to two years to move their insured accounts to other institutions but since 2009, DINBs have not extended beyond 30 days. A DINB allows a failed bank to be liquidated in an orderly fashion, minimizing disruption to local communities and financial markets. All assets remain in the receivership.

**Deposit payoff** – A resolution method for failed FDIC-insured institutions that is used when liquidation of the institution is determined to be the least costly resolution or when no AI can be found. Deposit payoffs generally have three forms: a straight deposit payoff, in which FDIC directly pays the insured amount of each depositor; an insured deposit transfer, in which a healthy institution is paid by the FDIC to act as its agent and pay the insured deposits to customers of the failed institution; and a DINB (see above). A deposit payoff is sometimes called a payoff.

**Dodd-Frank Wall Street Reform and Consumer Protection Act** – Federal financial regulatory reform passed by the 111th U.S. Congress and signed into law by President Barack Obama on July 21, 2010. The act was passed as a response to the late-2000s recession. It was touted as the most sweeping change to financial regulation in the United States since the Great Depression. It represents a significant change in the American financial regulatory environment affecting all federal financial regulatory agencies and almost every aspect of the nation's financial services industry.

**Due diligence** – A potential purchaser's on-site inspection of the books and records of a failing institution. Before an institution's failure, the FDIC invites potential purchasers to review pertinent files (either at the institution or via the VDR) so they can make informed decisions about the value of the failing institution's assets. All potential purchasers must first sign a

confidentiality agreement. In addition, contractors may be hired to perform due diligence work on assets that are earmarked for multi-asset sales initiatives. By hiring outside firms to provide and certify the due diligence, investors have the assurance that an independent source is providing them with reliable investment information.

**Failure** – The closing of a financial institution by its chartering authority, which rescinds the institution's charter and revokes its ability to conduct business because the institution is insolvent, critically undercapitalized, or unable to meet deposit outflows.

**Federal Deposit Insurance Corporation Improvement Act of 1991 (FDICIA)** – Federal law enacted in 1991 to address the thrift industry crisis. FDICIA recapitalized the Bank Insurance Fund of the FDIC, expanded the authority of banking regulators to seize undercapitalized banks, and expanded consumer protections available to banking customers.

**Federal Reserve System (Fed)** – The central banking system of the United States, founded by Congress in 1913 to provide the nation with a safer, more flexible, and more stable monetary and financial system. Over the years, the Fed's role in banking and the economy has expanded. The Fed administers the nation's monetary policy using three major tools: open market operations, the reserve requirement, and the discount rate. The Fed also plays a major role in the supervision and regulation of the U.S. banking system. The Board of Governors of the Federal Reserve System (the Federal Reserve Board) is composed of seven members appointed to 14-year terms by the President of the United States and confirmed by the Senate. The Chairman and Vice Chairman of the board, however, serve four-year terms. The Federal Reserve Board's policies are carried out by the 12 regional Federal Reserve Banks.

**Federal Savings and Loan Insurance Corporation (FSLIC)** – The federal corporation chartered by Congress in 1934 to insure deposits in savings institutions. The FSLIC also served as a conservator or receiver for troubled or failed insured savings associations. Effective April 1, 1980, for insured savings and loan institutions, the FSLIC insured savings accounts up to $100,000. The FSLIC functioned under the direction of the Federal Home Loan Bank Board, which provided certain administrative services and conducted the examination and supervision of insured savings and loan associations. In 1989, Congress abolished the FSLIC, transferring its resolution, conservatorship, and receivership functions to the RTC and its responsibility to insure deposits in savings and loan institutions to the Savings Association Insurance Fund, which was administered by the FDIC.

**Forbearance** – A bank resolution method that exempts certain distressed institutions that are operating in a safe and sound manner from minimum capital requirements. The forbearance program used by the FDIC in the mid-1980s was designed for well-managed, economically sound institutions with concentrations of 25 percent or more of their loan portfolios in agricultural or energy loans.

Forbearance is also a means of handling a delinquent loan. A forbearance agreement is a written agreement providing that a lender will delay exercising its rights (in the case of a mortgage foreclosure) as long as the borrower performs in accordance with certain agreed-upon terms.

**General creditors** – Entities, including uninsured depositors, suppliers, tradespeople, and contractors, with unsecured claims against a failed financial institution.

**Income Maintenance Agreement** – A resolution method used by the FDIC in the early 1980s to guarantee a market rate of return on the acquired assets of failed savings banks. The FDIC paid the acquirer the difference between the yield on assets acquired and the savings bank's average cost of funds.

**Insured deposit** – The portion of a deposit in an FDIC-insured commercial bank, savings bank, or savings association that is fully protected by FDIC deposit insurance. Savings, checking, and other deposit accounts, when combined, are generally insured up to $250,000 per depositor in each financial institution insured by the FDIC. Deposits held in different ownership categories, such as single or joint accounts, are separately insured. Also, separate $250,000 coverage is usually provided for retirement accounts, such as individual retirement accounts.

**Insured deposit transfer (IDT)** – A type of deposit payoff in which the insured and secured deposits of a closed bank or thrift are transferred to a transferee or agent institution in the community, permitting a direct payoff of the failed institution's depositors by the agent institution. The agent institution pays customers of the failed institution the amount of their insured deposits or, at the customer's request, opens a new account in the agent institution for the customer. When no AI can be found for the failed bank, an insured deposit transfer is an alternative to a straight deposit payoff.

**Least Cost Test** – A procedure mandated by FDICIA that requires the FDIC to implement the resolution alternative that is determined to be least costly to the relevant deposit insurance fund of all possible resolution alternatives, including liquidation of the failed institution. Before enactment of FDICIA, the FDIC could pursue any resolution alternative, as long as it was less costly than a deposit payoff combined with liquidation of the failed bank's assets.

**Liquidation** – The winding down of the business affairs and operations of a failed insured depository institution through the orderly disposition of its assets after it has been placed in receivership.

**Loss sharing** – A method in a P&A transaction in which the FDIC as receiver agrees to share with the acquirer losses on certain types of loans. Loss sharing may be offered by the receiver in connection with the sale of classified or nonperforming loans that otherwise might not be sold to an acquirer at the time of resolution. The FDIC usually agrees to absorb a significant portion (for example, 80 percent) of future disposition losses on assets that have been designated as shared loss assets for a specific period of time (for example, three to five years). The economic rationale for such transactions is that retaining shared loss assets in the banking sector would produce a better net recovery than would the FDIC's liquidation of the assets.

**National Depositor Preference Amendment** – Provisions of the Omnibus Budget Reconciliation Act that established the priority for paying claims filed against a failed depository institution. The Omnibus Budget Reconciliation Act was enacted on August 10, 1993, and amended section 11(d) of the FDI Act and standardized the assets distribution scheme for all receiverships regardless of the institution's chartering agency. As a result of this act, deposit liabilities of the institution have priority over all claims except the administrative expenses of the receiver.

**Net Worth Certificate (NWC)** – A capital instrument purchased by the FDIC, or the former FSLIC, under a special program created by Congress in 1982 to maintain or increase the capital of troubled institutions that qualified for the program. Under this program, the FDIC purchased a NWC from a qualified institution in exchange for an FDIC-insured promissory note, which was an asset on the bank's books, with the offsetting liability of the NWC counted as regulatory capital. Extended twice by Congress, this program expired in 1986.

**Office of the Comptroller of the Currency (OCC)** – A bureau within the U.S. Department of the Treasury, established in 1863. The OCC charters, regulates, and supervises national banks and federally chartered thrifts, which can usually be identified because they have the word "national" or "national association" in their names. The OCC also supervises and regulates the federally licensed branches and agencies of foreign banks doing business in the United States. The Comptroller of the Currency, is appointed by the President of the United States with Senate confirmation, is one of the FDIC's five directors, and heads the OCC.

**Office of Thrift Supervision** – An organization within the U.S. Department of the Treasury, established on August 9, 1989, by the Financial Institutions Reform Recovery and Enforcement Act, to supervise, regulate, and examine all federally chartered thrift institutions. On July 21, 2011, the Office of Thrift Supervision was merged into the OCC, which became the successor regulator of federally chartered thrifts.

**Open bank assistance (OBA)** – A resolution method where an insured institution in danger of failing received assistance from the FDIC in the form of direct loans, contributions, deposits, asset purchases, or the assumption of liabilities. The Dodd-Frank Wall Street Reform and Consumer Protection Act passed in July 2010 eliminated this option.

**Payoff** – A resolution method for a failed bank or thrift in which the FDIC directly pays the insured amount of each insured depositor; also known as a deposit payoff.

**Purchase and assumption (P&A)** – A resolution method in which a healthy insured institution purchases some or all of the assets and assumes the deposit liabilities of a failed bank or thrift. On a case-by-case basis, the AI's bid may be sufficient to allow assumption of all the deposit liabilities of the failing institution, including the uninsured deposits.

**Qualified financial contract (QFC)** – A type of financial agreement that includes, but is not limited to, securities contracts, forward contracts, repurchase agreements, and swap agreements. When a receiver repudiates a QFC, damages are measured as of the date of the repudiation and may include the cost of acquiring a replacement QFC. Special rules for the repudiation of QFCs exist to protect domestic financial markets.

**Receiver** – A person or entity, including a government agency, appointed to handle the assets and liabilities of a failed insured depository institution. A receiver succeeds to all the interests and property owned by the failed institution. Congress requires the FDIC to be the receiver for insured federal depository institutions. The FDIC may accept appointment as the receiver of a state-chartered insured institution and has authority under certain circumstances to appoint itself as the receiver for a state-chartered insured depository institution.

**Receivership certificate** – A document issued by the FDIC, as receiver of a failed institution, that represents the total amount of the proved claim that each depositor or unsecured creditor has against a failed institution in receivership.

**Repudiate** – The Act by which a receiver (or conservator) exercises its right to disaffirm outstanding contractual obligations previously entered into by a failed insured depository institution. The receiver may take such action only if the contracts are considered burdensome and repudiation will promote the orderly administration of the receivership estate. The FDI Act provides that certain contracts cannot be repudiated.

**Resolution** – The disposition plan for a failed institution, designed to protect insured depositors and minimize the losses to the insurance fund that are expected from covering insured deposits and disposing of the institution's assets. Resolution methods generally include P&A transactions, insured deposit transfers, and straight deposit payoffs.

**Resolution Trust Corporation (RTC)** – An entity established in 1989 by the Financial Institutions Reform Recovery and Enforcement Act to oversee the resolution of insolvent thrifts and to dispose of assets acquired from the failed thrifts in the wake of the thrift crisis of the 1980s. The RTC operated from August 9, 1989 to December 31, 1995.

**Straight deposit payoff** – A resolution method for failed FDIC-insured institutions that can be used when the liquidation, closing, or winding down of affairs is determined to be the least costly resolution of the institution. A straight deposit payoff is one of the three methods of deposit payoffs. In a straight deposit payoff, the FDIC determines the amount of insured deposits and pays that amount directly to each depositor. The FDIC, as receiver, retains all assets and liabilities, and the receivership bears the cost of liquidating all of the assets.

**Thrift** – A financial institution that ordinarily possesses the same depository, credit, financial intermediary, and account transactional functions as a bank, but which is chiefly organized and primarily operated to promote savings and home mortgage lending rather than commercial lending. A thrift can also be known as a savings bank, a savings association, a savings and loan association, or an S&L.

**Uninsured deposit** – Deposit amounts in a financial institution that exceed the amounts insured by the FDIC's DIF based on the applicable deposit ownership category.

**Value appreciation instrument (VAI)** – An option, given to the FDIC by a potential AI as part of its bid, to purchase a certain interest in its stock at a certain price at a certain date, as set forth by the potential AI. This option allows the FDIC to participate in any increase in the market value of the bidder's stock that may result from entering into the P&A transaction with the FDIC. Bids submitted with a VAI option may increase the overall value of the bid.

# Index

Aggregate Asset Valuation Review, 10
Agreements
    Improperly documented, 30
Asset Valuation Review, 10
Avoidance Powers, 24
Avoiding fraudulent conveyances, 30
Banking Act of 1933, 1
Bankruptcy Law, 23
Basic P&A, 16
Bid Approval Memorandum, 14
Bid submission, 12
Bidders list, 11
Bids, 5
Board resolution, 11
Branch breakup transaction, 22
Bridge bank, 18
Bridge bank transaction, 18
Capital Forbearance Program, 22
Claims
    Paying, 27
    Process, 23
    Resolving, 27
Closing an institution, 14
Confidentiality agreements, 12
Contract repudiation, 23
Contracts enforcement, 29
Courts, 30
Creditor claims, 24
D'Oench Doctrine, 30
Deposit insurance coverage rules
    Revocable trust accounts, 4
Deposit Insurance National Bank, 20
Deposit payoff, 6, 8, 19
    DINB, 19
    Insured, 19
    Straight, 19
Depositor creditor claims, 24
Disaffirming contracts, 28
Dividends, 28
Documented agreements
    Improper, 30

Due diligence, 5
Emergency Economic Stabilization Act of
    2008, 4
Enforcing contracts, 29
FDIC
    As insurer, 2, 8
    As Receiver, 2, 26
    Insurance limit
        Current, 8
    Special defenses, 7, 30
    Special powers, 6
        Enforcement of contracts, 29
        Placing litigation on hold, 29
        Repudiation of contracts, 28
Federal Savings and Loan Insurance
    Corporation, 3
Fraudulent conveyances, 30
FSLIC, 2
Income Maintenance Agreements, 21
Least cost analysis, 12
Liquidation cost formula, 13
Liquidation value, 10
Litigation, 27
    Placing a hold on, 29
    Stay of, 24
Loan loss amortization, 22
Marketing a failing institution, 11
Mortgage crisis, 3
National Depositor Preference Amendment,
    27
Net Worth Certificate Program, 21
Office of the Comptroller of the Currency, 2
On-site due diligence, 5, 11
Open Bank Assistance, 20
Optional Shared Loss transaction, 18
Paying claims, 27
Pending litigation, 27
Post-closing activities, 23
Private investors, 11
Process
    Receivership, 2

Resolution, 2
Prompt Corrective Action letter, 9
Purchase & Assumption transactions, 6, 8
    Basic, 16
    Bridge bank, 18
    Optional Shared Loss, 18
    Whole Bank, 17
Qualified financial contracts, 29
Receivership certificate, 13
Receivership process, 2
Repudiation of contracts, 28
Research model, 10
Resolution method
    Deposit payoff, 6
    Purchase & Assumption, 6
Resolution process, 2, 5, 8
Resolution strategy
    Selecting, 9
Resolution timeline, 9
Resolution Trust Corporation (RTC), 3
Resolving claims, 27
Settlement process, 30
Special defenses, 24
Stay of litigation, 24
Temporary Liquidity Guarantee Program, 4

Tort actions, 29
Transactions
    Capital Forbearance Programs, 22
    Deposit payoff, 6, 8, 19
    Income Maintenance Agreements, 21
    Loan Loss Amortization Programs, 22
    Net Worth Certificate Programs, 21
    Other resolution options
        Branch breakup, 22
        Capital Forbearance Program, 21
        Income Maintenance Agreements, 21
        Loan Loss Amoritization Program, 21
        Net Worth Certificate Program, 20
        Open bank assistance, 20
    P&A, 6, 8, 16
        Basic, 16
        Bridge bank, 18
        Whole bank, 17
        With Optional Shared Loss, 18
Transferring assets/deposits to AI, 14
Uninsured deposits, 27
Uninsured funds, 28
Virtual Data Room (VDR), 5, 11
Whole bank P&A, 17