# EXHIBIT 10



**Federal Deposit Insurance Corporation**
600 North Pearl Street, 700 Dallas, Texas 75201                    Division of Resolutions and Receiverships

October 20, 2023

**EMAIL AND UPS OVERNIGHT**
sacksr@sullcrom.com

Robert A. Sacks
Sullivan & Cromwell LLP
1888 Century Park East
Los Angeles CA 90067-1725

Re:   FIN 10539 - Silicon Valley Bank
      Santa Clara, California - In Receivership
      Closing Date: March 10, 2023
      **SVB Financial Group**
      **Final Deposit Insurance Determination**

Dear Mr. Sacks:

This letter responds to the letter dated June 26, 2023, that you submitted on behalf of SVB Financial Group ("SVBFG" or "Debtor") to the FDIC in its corporate capacity ("FDIC-C") claiming that FDIC-C owes SVBFG more than $1.929 billion.

SVBFG's claim for deposit insurance or for any funds from FDIC-C based on an alleged guarantee under the systemic risk exception is denied because SVBFG's insured deposit is statutorily defined not to exceed $250,000, and FDIC-C has satisfied its obligation to provide deposit insurance by making that amount (and more) available to SVBFG in an account at the Silicon Valley Bridge Bank, N.A ("Bridge Bank"). Further, as explained below, the Treasury Secretary's invocation of the systemic risk exception under 12 U.S.C. § 1823(c)(4)(G) imposed no enforceable payment obligation on FDIC-C. Instead, it merely enabled FDIC-C to protect all depositors. This denial is a final determination under 12 U.S.C. §1821(f).

## Factual Background

**Silicon Valley Bank's Failure**

On Friday, March 10, 2023, the California Department of Financial Protection & Innovation closed Silicon Valley Bank, Santa Clara ("SVB" or "Bank"), and the FDIC as receiver of SVB ("FDIC-R1") was appointed its receiver. To protect insured depositors, the FDIC created the Deposit Insurance National Bank of Santa Clara ("DINB"), and FDIC-C, FDIC-R1, and DINB

entered into a purchase and assumption agreement to immediately transfer to DINB liability for all insured deposits of SVB.[1]

On Sunday, March 12, 2023, the Secretary of the Treasury, acting on the recommendation of the FDIC Board of Directors and the Board of Governors of the Federal Reserve System, and after consulting with the President, invoked the systemic risk exception under 12 U.S.C. §1823(c)(4)(G), which authorized the FDIC to complete its resolution of SVB in a manner that protected all depositors, both insured and uninsured.[2]

The next day, March 13, 2023, FDIC-C, FDIC-R1, and DINB rescinded their purchase and assumption agreement, as that agreement had been designed to protect only insured depositors. Instead, to protect all depositors, FDIC-R1 exercised its discretion under §1823(c) to transfer all liability for substantially all deposits—both insured and uninsured—and substantially all assets of SVB to a newly created, full-service FDIC-operated bridge bank named Silicon Valley Bridge Bank, N.A.[3]

A bridge bank is a chartered national bank that operates under a board appointed by the FDIC. It assumes the deposits and certain other liabilities and purchases certain assets of a failed bank. The bridge bank structure is designed to "bridge" the gap between the failure of a bank and the time when the FDIC can stabilize the institution and implement an orderly resolution.

On March 26, 2023, the Bridge Bank was placed into receivership, with the FDIC as receiver of the Bridge Bank ("FDIC-R2") named as its receiver.[4] On March 27, 2023, FDIC-C and FDIC-R2 entered into a purchase and assumption agreement with First-Citizens Bank & Trust Company for substantially all deposits and loans of the Bridge Bank.[5] Certain deposits were excluded from this transaction.

**SVBFG's Deposits**

SVBFG is the holding company of SVB. When SVB failed on March 10, 2023, SVBFG had deposits at the Bank totaling $2,116,066,368.10.

---

[1] *See* Press Release, FDIC Creates a Deposit Insurance National Bank of Santa Clara to Protect Insured Depositors of Silicon Valley Bank, Santa Clara, California (Mar. 10, 2023), https://www.fdic.gov/news/press-releases/2023/pr23016.html.

[2] *See* Press Release, Joint Statement by the Department of the Treasury, Federal Reserve, and FDIC (March 12, 2023), https://www.fdic.gov/news/press-releases/2023/pr23017.html.

[3] *See* Press Release, FDIC Acts to Protect All Depositors of the former Silicon Valley Bank, Santa Clara, California, https://www.fdic.gov/news/press-releases/2023/pr23019.html; Transfer Agreement (Mar. 13, 2023), https://www.fdic.gov/resources/resolutions/bank-failures/failed-bank-list/silicon-valley-transfer-agreement.pdf.

[4] *See* Failed Bank Information for Silicon Valley Bank, Santa Clara, CA, https://www.fdic.gov/resources/resolutions/bank-failures/failed-bank-list/silicon-valley.html.

[5] *See* Press Release, First-Citizens Bank & Trust Company, Raleigh, NC, to Assume All Deposits and Loans of Silicon Valley Bridge Bank, N.A., from the FDIC (Mar. 26, 2023), https://www.fdic.gov/news/press-releases/2023/pr23023.html; Purchase and Assumption Agreement (Mar. 27, 2023), https://www.fdic.gov/resources/resolutions/bank-failures/failed-bank-list/silicon-valley-p-and-a.pdf.

Along with liability for other insured and uninsured deposits, the Bridge Bank assumed liability for SVBFG's deposit accounts on March 13, 2023, pursuant to a transfer agreement between FDIC-R1 and the Bridge Bank.

SVBFG alleges that between March 13, 2023, and March 16, 2023, it withdrew approximately $176,963,755.92 from its deposit accounts. On March 15, 2023, FDIC-R1 exercised its rights under the transfer agreement to call SVBFG's deposit liabilities back to FDIC-R1. As of March 16, 2023, FDIC-R1 had a deposit liability to SVBFG of more than $1.929 billion.

On March 17, 2023, SVBFG filed a Chapter 11 bankruptcy petition in the Southern District of New York.[6]

**SVBFG's Claims to FDIC-R1 and FDIC-R2**

FDIC-R1 administers the remaining assets and liabilities of SVB, while FDIC-R2 administers the remaining assets and liabilities of the Bridge Bank. The two receiverships are separate legal entities with separate balance sheets and separate claims processes under 12 U.S.C. §1821(d).[7]

On May 2, 2023, FDIC-R1 and FDIC-R2 each sent a notice to SVBFG that proofs of claim against FDIC-R1 and FDIC-R2 must be submitted on or before July 10, 2023.

On July 9, 2023, SVBFG commenced an adversary proceeding against FDIC-C, FDIC-R1, and FDIC-R2, in its bankruptcy case in the Southern District of New York.[8] Motions to dismiss filed by FDIC-C, FDIC-R1, and FDIC-R2 are pending.

The next day, July 10, 2023, SVBFG filed proofs of claim, including deposit claims, with FDIC-R1 and FDIC-R2. The deposit claims seek payment of at least $1,933,805,708.13, which the proofs of claim contend is the amount SVBFG had on deposit at the Bridge Bank before the deposit liability was returned to FDIC-R1.[9] FDIC-R1 and FDIC-R2 have not yet issued decisions on these claims.

**Procedural History**

On June 26, 2023, SVBFG submitted a letter to FDIC-C demanding that FDIC-C "pay to the Debtor the deposit balance of more than $1.929 billion the Debtor maintained in deposit accounts at Silicon Valley Bank ('SVB') at the time the Debtor's access to those accounts was improperly blocked."

SVBFG's June 26, 2023 letter asserts as follows:

---

[6] *See In re SVB Financial Group*, No. 1:23-bk-10367 (Bankr. S.D.N.Y.).
[7] *See* Joint Statement (Aug. 18, 2023), Dkt. No. 45 in *SVB Financial Group v. FDIC, et al.*, No. 1:23-ap-1137 (Bankr. S.D.N.Y.).
[8] *See SVB Financial Group v. FDIC, et al.*, No. 1:23-ap-1137 (Bankr. S.D.N.Y.).
[9] *See* Proofs of Claim (July 10, 2023), Dkt. No. 25-1 in *SVB Financial Group v. FDIC, et al.*, No. 1:23-ap-1137 (Bankr. S.D.N.Y.).

3

Prior to March 10, the Debtor had established, and as of March 10 it maintained, bank accounts at SVB (the "Debtor Accounts"), including account numbers 101035270, 3303510822 and 7899916176.

On March 12, 2023, the Boards of the FDIC and the Federal Reserve voted to recommend, and after consulting with the President, the Secretary of the Treasury approved actions to invoke the systemic risk exception under the Federal Deposit Insurance Act to enable the FDIC-C to fully guarantee all deposits of SVB and Signature Bank. The FDIC-C took that action. Before the opening of business on March 13, 2023, the FDIC-C announced that "all deposits—both insured and uninsured" of the former Silicon Valley Bank of Santa Clara, California had been transferred to a newly created FDIC-operated bridge bank, Silicon Valley Bridge Bank, N.A. (the "Bridge Bank"). The headline of the announcement was "FDIC Acts to Protect All Depositors" and in the announcement the FDIC-C represented that depositors would "have full access to their money beginning this morning [March 13], when Silicon Valley Bridge Bank, N.A., the bridge bank, opens and resumes normal banking hours and activities, including online banking." The FDIC-C further represented that "[a]ll depositors of the institution will be made whole." The use of the word "all"—multiple times in multiple places—is deliberate and unambiguous, with the FDIC-C's announcement distinguishing between SVB's deposits (which are "all" transferred) and depositors (which will "all" be made whole), on the one hand, and SVB's assets, on the other hand, of which only "substantially all" were transferred.

The Debtor was a large depositor of SVB. It retained its deposits with SVB after the appointment of the FDIC as receiver, and the transfer of "all deposits" to the Bridge Bank included the transfer of "all" Debtor Accounts. The Debtor confirmed through the Bridge Bank's information systems that the Debtor Accounts had transferred, and, consistent with the self-declared purpose of the FDIC's announcement and actions, the Debtor retained the vast majority of tis deposits with the Bridge Bank.

Nevertheless, on approximately March 16, 2023, the Bridge Bank, at the direction of the FDIC-C or FDIC-R or both, stopped honoring the Debtor's withdrawal requests, and since that time the FDIC has blocked the Debtor from accessing the Debtor Accounts. At the time Debtor's access to the Debtor Accounts was blocked, the accounts contained in excess of $1.929 billion.

The obligation to pay the uninsured deposits of SVB is a legal obligation of the FDIC-C, through the Deposit Insurance Fund. Having invoked the systemic risk exception, the FDIC-C guaranteed "all" uninsured deposits formerly held at SVB without exception, and acted to induce counterparties to maintain their relationships with the Bridge in part to improve its recoveries, the FDIC-C cannot now unilaterally condition or limit the coverage of its action. It must give the

> Debtor "full access" to all of its uninsured funds as it has every other former depositor of SVB.

On September 19, 2023, FDIC-C sent a letter to SVBFG acknowledging the June 26 letter "as a timely claim for insurance coverage with respect to a deposit under 12 U.S.C. §1821(f)." In its September 19, 2023, letter, FDIC-C noted that although there is no statutory time limit for it to decide SVBFG's claim under §1821(f), FDIC-C was working to provide a final determination regarding insurance coverage within 30 days.

Having now fully reviewed and considered SVBFG's claim, FDIC-C denies the claim for the reasons explained below.

## Legal Framework

**Deposit Insurance**

The Federal Deposit Insurance Act ("FDI Act"), 12 U.S.C. §§1811 *et seq.*, governs the FDIC and federal deposit insurance.

FDIC-C insures the deposits of insured depository institutions (subject to the maximum deposit insurance amount described below). 12 U.S.C. §1821(a)(1)(A). An insured depository institution is any bank or savings association the deposits of which are insured by FDIC-C. 12 U.S.C. §1813(c)(2). SVB was an insured depository institution.

To carry out its deposit insurance purposes, FDIC-C maintains and administers the Deposit Insurance Fund. 12 U.S.C. §1821(a)(4)(A). The Deposit Insurance Fund is available to FDIC-C "for use with respect to insured depository institutions the deposits of which are insured by the Deposit Insurance Fund." 12 U.S.C. §1821(a)(4)(B).

When an insured depository institution fails, "payment of the insured deposits in such institution shall be made by the Corporation as soon as possible" either "by cash or by making available to each depositor a transferred deposit in a new insured depository institution in the same community or in another insured depository institution in an amount equal to the insured deposit of such depositor." 12 U.S.C. §1821(f)(1). FDIC-C draws on the Deposit Insurance Fund as needed to provide depositors with prompt access to their deposits, up to the insurance limit.

**Insurance Limit**

The standard maximum deposit insurance amount is $250,000. 12 U.S.C. §1821(a)(1)(E); *see also* 12 C.F.R. §330.1(o). When a depositor has multiple deposit accounts at an insured depository institution, FDIC-C is required to "aggregate the amounts of all deposits in the insured depository institution which are maintained by a depositor in the same capacity and the same right" and insure the aggregated amount up to the standard maximum deposit insurance amount of $250,000. 12 U.S.C. §1821(a)(1)(C); *see also* 12 C.F.R. §330.3(a). The FDI Act contains no provision authorizing FDIC-C to increase the standard maximum deposit insurance amount.

**Claims for Insurance Coverage**

When a dispute arises over whether a deposit is covered by FDIC-C insurance, resolution of the dispute is governed by 12 U.S.C. §1821(f)(2)–(5). These provisions provide:

> **(2) Proof of claims**
>
> The Corporation, in its discretion, may require proof of claims to be filed and may approve or reject such claims for insured deposits.
>
> **(3) Resolution of disputes**
>
> A determination by the Corporation regarding any claim for insurance coverage shall be treated as a final determination for purposes of this section. In its discretion, the Corporation may promulgate regulations prescribing procedures for resolving any disputed claim relating to any insured deposit or any determination of insurance coverage with respect to any deposit.
>
> **(4) Review of Corporation determination**
>
> A final determination made by the Corporation regarding any claim for insurance coverage shall be a final agency action reviewable in accordance with chapter 7 of title 5 by the United States district court for the Federal judicial district where the principal place of business of the depository institution is located.
>
> **(5) Statute of Limitations**
>
> Any request for review of a final determination by the Corporation regarding any claim for insurance coverage shall be filed with the appropriate United States district court not later than 60 days after the date on which such determination is issued.

Section 1821(f)(3) grants FDIC-C "discretion" to promulgate procedural regulations, but it need not do so. That discretionary language was added by an amendment to §1821(f)(3) in 2006 as part of the Financial Services Regulatory Relief Act of 2006, Pub. L. No. 109-351, 120 Stat. 1966, 1999 (2006). The statute similarly gives FDIC-C discretion as to what documentation (if any) is required, as when it provides that FDIC-C "*in its discretion*, *may* require proof of claims to be filed," §1821(f)(2) (emphasis added), but need not. To date, FDIC-C has exercised its discretion not to promulgate procedural regulations or otherwise specify particular documentation for submitting a claim.

**The Systemic Risk Exception**

The systemic risk exception is an exception to the least-cost resolution requirement, which in turn is a limit on FDIC-C's authority to act under 12 U.S.C. §1823. Understanding the systemic risk exception thus requires starting with §1823 and the least-cost resolution requirement.

Section 1823 authorizes FDIC-C, in its discretion, to take various actions and provide certain types of assistance with respect to a failing or failed bank. *See, e.g.*, §1823(c)(1), (c)(2)(A), (c)(3), (d)(4), (f), (h), (k)(1)(A)(i). FDIC-C's authority to act under §1823 is limited by the least-cost resolution requirement detailed in §1823(c)(4)(A) and (E), which provide in pertinent part:

> **(4) Least-cost resolution required.—**
>
> > **(A) In general.**—Notwithstanding any other provision of this chapter, the Corporation may not exercise any authority under this subsection [*i.e.*, §1823(c)] or subsection (d), (f), (h), (i), or (k) with respect to any insured depository institution unless—
> >
> > > **(i)** the Corporation determines that the exercise of such authority is necessary to meet the obligation of the Corporation to provide insurance coverage for the insured deposits in such institution; and
> > >
> > > **(ii)** "the total amount of the expenditures by the Corporation and obligations incurred by FDIC-C . . . in connection with the exercise of any such authority with respect to such institution is the least costly to the Deposit Insurance Fund of all possible methods for meeting the Corporation's obligation under this section.
>
> . . .
>
> > **(E)** Deposit insurance fund available for intended purpose only.—
> >
> > > **(i) In general.**—After December 31, 1994, . . . the Corporation may not take any action, directly or indirectly, with respect to any insured depository institution that would have the effect of increasing losses to the Deposit Insurance Fund by protecting—
> > >
> > > > **(I)** depositors for more than the insured portion of deposits (determined without regard to whether such institution is liquidated); or
> > > >
> > > > **(II)** creditors other than depositors.

The systemic risk exception, which is codified in §1823(c)(4)(G), is an exception to the least-cost resolution requirement of §1823(c)(4)(A) and (E). It provides in pertinent part:

> **(G) Systemic risk.—**
>
> > **(i) Emergency determination by secretary of the treasury.—** Notwithstanding subparagraphs (A) and (E) [*i.e.*, §1823(c)(4)(A) and (E)], if, upon the written recommendation of the Board of Directors . . . and the Board of Governors of the Federal Reserve

> System . . . , the Secretary of the Treasury (in consultation with the President) determines that—
>
>> **(I)** the Corporation's compliance with subparagraphs (A) and (E) with respect to an insured depository institution for which the Corporation has been appointed receiver would have serious adverse effects on economic conditions or financial stability; and
>>
>> **(II)** any action or assistance under this subparagraph would avoid or mitigate such adverse effects,
>
> the Corporation may take other action or provide assistance under this section for the purpose of winding up the insured depository institution for which the Corporation has been appointed receiver as necessary to avoid or mitigate such effects.

By providing that FDIC-C "may take other action or provide assistance under this section," the systemic risk exception gives FDIC-C discretion ("may") to take action or provide assistance that does not comply with the least-cost requirement ("take other action or provide assistance"), so long as the action or assistance is authorized by §1823 ("under this section").

In short, §1823 authorizes certain actions or assistance, the least-cost resolution requirement limits those actions or assistance, and the systemic risk exception (where invoked) waives the least-cost resolution requirement. When the systemic risk exception is invoked, FDIC-C may exercise its authority under §1823 without complying with the least-cost resolution requirement.

## Discussion

**SVBFG Has Submitted a Claim Under §1821(f)**

SVBFG's June 26, 2023, letter is a claim for insurance coverage with respect to a deposit under 12 U.S.C. §1821(f).

By its terms, §1821(f) governs "any claim for insurance coverage," which includes "any disputed claim relating to" (1) "any insured deposit" or (2) "any determination of insurance coverage with respect to any deposit." §1821(f)(3). The reference to "any deposit" encompasses both insured and uninsured deposits.[10] Thus, any claim for insurance coverage of an uninsured deposit is covered by §1821(f).

The June 26 letter contends that, following the invocation of the systemic risk exception, "FDIC-C guaranteed 'all' uninsured deposits formerly held at SVB," which created "a legal obligation of

---

[10] *Cf. SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348, 1351, 200 L.Ed.2d 695 (2018) ("the word 'any' ordinarily implies every member of a group . . ."); *Richardson v. Reno*, 162 F.3d 1338, 1357 (11th Cir. 1998) ("When Congress says 'any,' it means 'any' . . . .").

8

the FDIC-C, through the Deposit Insurance Fund," to "pay the uninsured deposits of SVB," and "FDIC-C cannot now unilaterally condition or limit the coverage of its action."

In the proofs of claim SVBFG filed with FDIC-R1 and FDIC-R2 on July 10, 2023, it described the June 26 letter as a claim under §1821(f). SVBFG wrote, in reference to its June 26 letter to FDIC-C, that it "has demanded that FDIC-C, *pursuant to its obligations under 12 U.S.C. 1821(f)* and the terms of its invocation of a systemic risk exception, pay to the Debtor the full amount of its uninsured deposits in the Deposit Accounts."[11] FDIC-C now turns to the substance of the claim.

**SVBFG Has Already Received the Insurance Limit of $250,000**

When Silicon Valley Bank failed on March 10, 2023, SVBFG had deposits totaling $2,116,066,368.10 spread across several deposit accounts at the Bank. The standard maximum deposit insurance amount is $250,000 per depositor, per insured bank, per account ownership category. 12 U.S.C. §1821(a)(1)(E). As a corporation, SVBFG's deposit accounts are aggregated for insurance coverage purposes and insured up to a total of $250,000. 12 U.S.C. §1821(a)(1)(C); 12 C.F.R. §330.3(a).

FDIC-C is obligated to provide a failed bank's depositors with access to their insured deposits "as soon as possible," subject to certain statutory requirements. 12 U.S.C. §1821(f)(1). FDIC-C may satisfy that obligation either by paying the insured amount in cash or by providing each depositor with a new account at another insured bank in an amount equal to the insured balance of their account at the failed bank. *Id.*

More than $250,000 was made available to SVBFG in new accounts at the Bridge Bank as of March 13, 2023. Indeed, SVBFG submitted a declaration in federal court averring that it withdrew approximately $176,963,755.92 from its accounts at the Bridge Bank between March 13 and March 15, 2023.[12] SVBFG thus received well over a hundred million dollars more than the amount of its insured deposits.

Accordingly, FDIC-C has satisfied its obligation under 12 U.S.C §1821(f)(1) to provide SVBFG with access to its insured deposits.

**SVBFG Is Not Entitled to Additional Payments Under the Systemic Risk Exception**

SVBFG's argues in its June 26, 2023 letter that the Secretary of the Treasury's invocation of the systemic risk exception under §1823(c)(4)(G) caused FDIC-C to fully guarantee SVBFG's deposits, such that FDIC-C is legally obligated to use the Deposit Insurance Fund to pay SVBFG the full amount of its uninsured deposits. This argument misunderstands the systemic risk exception and FDIC-C's actions after it was invoked by the Secretary of the Treasury.

---

[11] *See* Proofs of Claim, *supra* note 9, at ¶ 20 (emphasis added).
[12] *See* Declaration of Robert Sacks (Aug. 15, 2023) at ¶7, Dkt No. 42 in *SVB Financial Group v. FDIC, et al.*, No. 1:23-ap-1137 (Bankr. S.D.N.Y.).

SVBFG asserts that "the Secretary of the Treasury *approved actions to invoke the systemic risk exception* under the Federal Deposit Insurance Act to enable the FDIC-C *to fully guarantee all deposits* of SVB and Signature Bank" (emphasis added). This assertion reflects that SVBFG misreads the joint statement issued March 12, 2023. The Department of the Treasury, Federal Reserve, and the FDIC, issued a joint statement that "Secretary Yellen approved actions enabling the FDIC to complete its resolution of Silicon Valley Bank, Santa Clara, California, in a manner that fully protects all depositors."[13] The joint statement was referring to the Secretary of the Treasury's approval of the systemic risk exception, which would enable the FDIC to complete its resolution of Silicon Valley Bank in a manner that fully protected all depositors—*i.e.*, the FDIC was able the next day to rescind the purchase and assumption agreement with DINB (which would have protected only insured depositors) and instead transfer substantially all deposits to the Bridge Bank.

The Secretary of the Treasury did not "approve" or otherwise instruct FDIC-C to "fully guarantee all deposits," nor did invocation of the systemic risk exception increase the deposit insurance limit above $250,000.

Instead, invocation of the systemic risk exception in §1823(c)(4)(G) triggered a statutory grant of authority to FDIC-C to take discretionary actions under §1823 without complying with the least-cost resolution requirement in 12 U.S.C. §1823(c)(4)(A) and (E). It did not obligate FDIC-C to engage in any particular course of conduct.

According to its own terms, once the systemic risk exception is invoked, the FDIC-C "may"—but need not—take certain actions or provide certain types of assistance under §1823. §1823(c)(4)(G). The statute reiterates that "[a]ny determination which the Corporation may take under this paragraph [*i.e.*, under §1823(c)(4)] shall be made in the sole discretion of the Corporation."

Moreover, each action or type of assistance generally authorized under §1823 is explicitly defined as discretionary. *See, e.g.*, §1823(c)(1) ("in its sole discretion"); §1823(c)(2)(A) ("in its sole discretion"); §1823(c)(3) ("may"); §1823(d)(4) ("in its discretion"); §1823(h) ("may"); §1823(k)(1)(A)(i) ("in its discretion").

SVBFG also asserts in its June 26, 2023 letter that, after the systemic risk exception was invoked, FDIC-C "guaranteed 'all' uninsured deposits formerly held at SVB without exception." That is incorrect. FDIC-C did not exercise its discretion to "guarantee" uninsured deposits or to increase the insurance limit of $250,000. That insurance limit is set by statute. *See* 12 U.S.C. §1821(a)(1)(E).

SVBFG appears to misconstrue the difference between a mandated course of conduct – *i.e.*, an immediately payable obligation of FDIC-C to pay SVBFG's insured claim from the Deposit Insurance Fund –and FDIC-C's discretion to provide assistance under the systemic risk exception in the manner which FDIC-C deems appropriate. Here, FDIC-C exercised its discretion to protect insured and uninsured depositors by facilitating the transfer of substantially

---

[13] https://www.fdic.gov/news/press-releases/2023/pr23017 html

all deposit accounts to the Bridge Bank, where all transferred deposits were accessible starting March 13, 2023.[14] That FDIC-R1 subsequently exercised its rights to call SVBFG's deposit liabilities back to FDIC-R1 on March 15, 2023, does not change the fact that FDIC-C had already acted to protect depositors, nor does it impose on FDIC-C any legal obligation to pay SVBFG from the Deposit Insurance Fund. To the extent SVBFG's claims to FDIC-R1 under §1821(d) are allowed, SVBFG will be protected through the receivership process.

In sum, invocation of the systemic risk exception did not impose any legal obligation on FDIC-C to pay SVBFG for its uninsured deposits or cause FDIC-C to guarantee SVBFG's uninsured deposits. *See also* 12 U.S.C. § 1821(i)(3)(A) (FDIC-C is not "obligated" to make a payment to a claimant because it made payments to "other claimant[s] or categor[ies] of claimants."). Rather, the systemic risk exception empowered FDIC-C to exercise its discretion to protect all depositors.

SVBFG's claim to FDIC-C is therefore denied.

**SVBFG Claims for Uninsured Deposits Remain Pending in the FDIC-R1 and FDIC-R2 Claims Processes**

Although this letter denies SVBFG's claim to FDIC-C under §1821(f), it does not resolve SVBFG's separate claims to FDIC-R1 and FDIC-R2 under §1821(d), which remain pending determinations by FDIC-R1 and FDIC-R2. Under the FDI Act's grant of exclusive authority to the FDIC as receiver to determine in the first instance the claims and liabilities of a failed bank's estate, its claims exhaustion provisions (*e.g.*, 12 U.S.C. §1821(d)), provisions explicitly granting authority to withhold payment for offset (*e.g.*, 12 U.S.C. §1822(d)), and its anti-injunction provisions (*e.g.,* 12 U.S.C. §1821(j)), Congress enacted a comprehensive scheme intended to enable the FDIC to conduct an orderly administration of a failed bank's estate. Nothing in this letter is intended to be, or should be construed as, a waiver of the FDIC's rights (as receiver or in its corporate capacity) to withhold payments and/or to assert offset, counterclaims and claims for subordination and/or recharacterization of SVBFG's §1821(d) claims to the fullest extent possible under the FDI Act and any applicable law.

### Conclusion and Appeal Rights

SVBFG's claim to FDIC-C is denied for the reasons explained above. This letter constitutes a final determination under 12 U.S.C. §1821(f).

If SVBFG disagrees with FDIC-C's final determination, it may request review in accordance with the provisions of the Administrative Procedure Act in the United States District Court for the Federal judicial district where Silicon Valley Bank's principal place of business was located.

---

[14] *See* Press Release, FDIC Acts to Protect All Depositors of the former Silicon Valley Bank, Santa Clara, California, https://www.fdic.gov/news/press-releases/2023/pr23019.html; Transfer Agreement (Mar. 13, 2023), https://www.fdic.gov/resources/resolutions/bank-failures/failed-bank-list/silicon-valley-transfer-agreement.pdf.

12 U.S.C §1821(f)(4). SVBFG must request this review no later than 60 days after the date of this final determination. 12 U.S.C §1821(f)(5).

Very Truly Yours,


Cathy Davis
Chief, Claims Section