# EXHIBIT 1

Robert A. Sacks
James L. Bromley
Adam S. Paris
Christian P. Jensen
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

Diane L. McGimsey (*pro hac vice* pending)
**SULLIVAN & CROMWELL LLP**
1888 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 712-6600
Facsimile:  (310) 712-8800

*Counsel for Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ———————————————————— x | | |
| In re | : | Chapter 11 |
| | : | |
| SVB FINANCIAL GROUP, | : | Case No. 23-10367 (MG) |
| | : | |
| Debtor. | : | Adv. Case No. _____ |
| | : | |
| ———————————————————— | : | |
| SVB FINANCIAL GROUP, | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| FEDERAL DEPOSIT INSURANCE | : | |
| CORPORATION, in its corporate capacity, and | : | |
| FEDERAL DEPOSIT INSURANCE | : | |
| CORPORATION, as Receiver for Silicon Valley | : | |
| Bank and Silicon Valley Bridge Bank, N.A., | : | |
| Defendants. | x | |

## COMPLAINT

SVB Financial Group ("SVBFG" or the "Debtor"), for its complaint ("Complaint") against Defendants (defined below), alleges as follows on knowledge as to itself, and on information and belief as to all other matters:

## Nature of the Action

1.      The Debtor brings this action to recover approximately $1,933,805,708.13[1] that is owed, due and payable to the Debtor (the "Account Funds") plus interest.  In violation of both the automatic stay imposed by 11 U.S.C. section 362 and its legal obligations, including those arising under the Bankruptcy Code and related to the systemic risk exception determination, the Federal Deposit Insurance Corporation ("FDIC") acting in its corporate capacity ("FDIC-C") and the FDIC acting as receiver ("FDIC-R") for Silicon Valley Bank ("SVB" or the "Bank") and Silicon Valley Bridge Bank, N.A. (the "Bridge Bank"),[2] each refuse to comply with the Debtor's repeated demands that it be paid its Account Funds.  The FDIC continues wrongfully to withhold those funds from the Debtor, demanding that any claim for payment of the Account Funds must proceed through the FDIC-R's administrative claims process.

2.      As described in further detail below, this adversary action involves claims that are not susceptible of proper resolution through the FDIC-R's administrative claims procedure.  This action concerns claims to monies encompassed by the Debtor's estate, administered almost entirely by the FDIC-C, not the FDIC-R.  And, in all events, any purported claims either the FDIC-C or the FDIC-R think that they may have against the Debtor, including any claims that

---

[1]    This figure includes approximately $6,222,681.93 in intercompany receivables owed to the Debtor by Silicon Valley Bank that were improperly reversed or unwound on March 17, 2023, in violation of the automatic stay.

[2]    The FDIC-C and the FDIC-R are sued in their separate and distinct legal capacities.  The FDIC-C and the FDIC-R are referred to collectively herein as the FDIC.

either asserts give rise to a right of setoff against the Debtor relating to these monies, must be adjudicated in this Court.

3.      On March 12, 2023, the Secretary of the Treasury, acting on the unanimous written recommendations of the Board of Directors of the FDIC and the Board of Governors of the Federal Reserve System (the "Federal Reserve"), and after consultation with the President of the United States, authorized application of the systemic risk exception to the least-cost resolution provision of the Federal Deposit Insurance Act. Pursuant to this exception, the FDIC-C guaranteed all deposits at SVB.

4.      That same day, Secretary of the Treasury Janet L. Yellen, Federal Reserve Board Chair Jerome H. Powell and FDIC Chairman Martin J. Gruenberg announced the invocation by the Executive Branch of the systemic risk exception to "fully protect[] all depositors" of SVB. Before the opening of business on March 13, 2023, the FDIC-C declared that "all deposits—both insured and uninsured" of the former SVB had been transferred to the newly created FDIC-operated Bridge Bank, confirmed that "all" depositors "w[ould] be made whole," and stated that depositors would "have full access to their money beginning this morning [March 13], when Silicon Valley Bridge Bank, N.A., the bridge bank, opens and resumes normal banking hours and activities, including online banking."

5.      The use of the word "all" was deliberate and unambiguous. The FDIC-C's announcement distinguished between SVB's deposits (which are "all" transferred, "both insured and uninsured") and depositors (who will "all" be made whole), on the one hand, and SVB's assets, on the other hand, of which only "substantially all" were transferred. The purpose for guaranteeing "all" deposits was to prevent further deposit outflows at other banks experiencing such outflows.

6.      The action of the FDIC-C was successful, convincing depositors to maintain their deposits at those institutions.  As FDIC Chairman Gruenberg explained to Congress on May 18, 2023, "[f]ollowing the decision to fully protect **all** depositors in the resolution of both SVB and Signature Bank, there has been a moderation of deposit outflows at the publicly traded banks that were experiencing large outflows in the immediate aftermath of those failures."  May 18, 2023 Statement of Martin Gruenberg to the Committee on Banking and Urban Affairs of the United States Senate, at 3 (emphasis added).  It is therefore incontrovertible that the full balances in the deposit accounts were protected by the action of the FDIC-C, which can pay those balances and committed to do so.

7.      Despite acting to make "all" depositors whole, despite announcing publicly it was doing so and assuring "full access" to depositors on an immediate basis and later confirming that undertaking in filings in this Court,[3] and despite inducing reliance on that legal commitment by large depositors, including the Debtor, who chose not to move their remaining deposit funds out of the Bridge Bank, the FDIC has refused to pay the Debtor its Account Funds.

8.      Neither the FDIC-C nor the FDIC-R has suggested that these deposit accounts do not belong to the Debtor, that the Debtor's accounts did not contain approximately $1.93 billion in Account Funds at the time SVB was placed into receivership, or that the FDIC does not have the resources to pay the Account Funds to the Debtor.  Rather, the sole basis on which the FDIC purports to justify the continued refusal to pay the Debtor the full amount of the Account Funds is the FDIC-R's assertion that it has one or more claims against the Debtor that might provide the

---

[3]     *See, e.g.,* Press Release, FDIC, **FDIC Acts to Protect All Depositors of the former Silicon Valley Bank, Santa Clara, California** (Mar. 13, 2023), https://www.fdic.gov/news/press-releases/2023/pr23019.html; *see also* Objection to Debtor's First Day Motion, filed March 20, 2023 ("To the extent that the FDIC agrees that any amount is due to the Debtor (and unavailable for setoff), such amount will be paid in full through the Deposit Insurance Fund.")

FDIC-R with a right to "setoff" such claim(s) against the Account Funds owed to the Debtor. The FDIC-R has not identified a single ground for exercising such "setoff" despite numerous opportunities to do so. The FDIC further asserts that to claim its Account Funds, the Debtor must file an administrative claim in the FDIC-R's receivership proceeding.

9.     Both the FDIC-C and the FDIC-R have violated, and are continuing to violate, the Debtor's automatic stay as well as their legal obligations, including others under the Bankruptcy Code, by transferring funds and refusing to honor the Debtor's demand that they pay the Debtor its Account Funds.

10.     *First,* the possibility that the FDIC may in the future assert a claim against the Debtor that it argues could give it a right of setoff against the Debtor's assets cannot serve as a basis to refuse to pay the Debtor its Account Funds indefinitely. The automatic stay prohibits such indefinite freezes on a debtor's accounts, and forbids any entity from withholding amounts over that to which a valid setoff claim applies. At the current time, no claim against the Debtor that could justify setoff in any amount has been asserted—much less demonstrated. Moreover, there is no right of setoff for contingent claims. Thus, although the deadline for the FDIC to file a claim against the Debtor is September 14, 2023, without a valid, cognizable and quantified claim against the Debtor, there is no current right of setoff or right to take any action against the Debtor's undisputed $1.93 billion that the FDIC is obligated to pay to the Debtor.

11.     *Second,* the Debtor's claims against the FDIC-C in this action cannot be resolved through the FDIC-R's administrative claims procedure. The FDIC-C and the FDIC-R are separate juridical entities. *Fed. Deposit Ins. Corp.* v. *Bernstein*, 944 F.2d 101 (2d Cir. 1991). The FDIC-C functions to "insure the deposits of all insured depository institutions" as provided for in Title 12, Chapter 16. 12 U.S.C. § 1821. The FDIC-R acts in a separate capacity to

liquidate or wind up the affairs of a depository institution that has been put into receivership. *Id.* The Debtor's claims against the FDIC-C for the payment of the Account Funds involve claims to monies in the Deposit Insurance Fund ("DIF") administered by the FDIC-C. These are not claims against the institutions in receivership, SVB and/or Bridge Bank.

12.     *Third*, the FDIC-C has no right of setoff against the Debtor because there is no mutuality of obligations. Mutuality—which requires the same two parties—is an essential requirement of setoff. 11 U.S.C. § 553(a); *Modern Settings, Inc.* v. *Prudential-Bache Secs., Inc.*, 936 F.2d 640, 648 (2d Cir. 1991). The mutuality required to support setoff—*i.e.*, offsetting claims between the same two parties—does not exist because the claim by the Debtor to its Account Funds following the invocation of the systemic risk exception is a claim against the FDIC-C, whereas any purported claim against the Debtor would be a claim by the FDIC-R.

13.     *Fourth*, in the alternative, if the obligation to pay the Debtor is deemed to be an obligation of the FDIC-R, rather than the FDIC-C, the FDIC-R's administrative claims procedure is still not capable of adjudicating this dispute. Regardless of whether the FDIC-C or the FDIC-R is obligated to pay, there is no dispute about either the Debtor's ownership of, or the amount of, the funds guaranteed by the invocation of the systemic risk exception. The only issue to be resolved is the validity, extent, and priority of claims the FDIC-R states it intends at some point to assert against the Debtor, and whether those purported claims give rise to a valid right of setoff in favor of the FDIC-R. Those claims are not claims ***against*** the FDIC-R or against the assets of SVB or Bridge Bank; instead, they are claims ***by*** the FDIC-R seeking to collect assets from the Debtor. Adjudication of any purported claims against the Debtor falls squarely within this Court's jurisdiction—not within the FDIC-R's internal administrative claims process. The FDIC-R's ability to execute on its hypothetical setoff right could only occur after this Court

approves a motion to lift the Debtor's automatic stay for cause. Under settled bankruptcy law principles, including Sections 541, 542 and 553 of the Bankruptcy Code, the FDIC-R's setoff claim must be asserted against the Debtor in this Court, which has exclusive jurisdiction over the *res* of the Debtor's estate.

14. The FDIC's rights will be fully protected in this Court. The FDIC-R has admitted that it could not exercise any right of setoff without seeking Court approval. And the Court has jurisdiction to enter any appropriate orders to protect legitimate setoff rights (if the Court determines any exist) or other claims the FDIC-R may allege, even before the final deadline for the FDIC-R to file any claims against the Debtor. If and when the FDIC-R articulates any supposed claims against the Debtor, the Court can take appropriate action in response and adjudicate the FDIC-R's claims, if any.

15. *Finally*, neither the FDIC-C nor the FDIC-R may avoid its legal obligations by seeking to avoid this Court's jurisdiction. The FDIC-R already submitted to, and availed itself of, the Court's jurisdiction. This Court not only has jurisdiction to adjudicate the Debtor's claims against both the FDIC-C and FDIC-R to pay the Account Funds—which constitute the most significant asset of the estate—but it is within this Court's core jurisdiction to adjudicate any claims the FDIC, in either legal capacity, may later seek to assert against the Debtor, and to determine the priority those claims have to the assets of Debtor's estate.

16. In sum, by refusing to pay the Debtor the Account Funds, the FDIC has violated, and is continuing to violate, both the Bankruptcy Code and the "systemic risk exception" under 12 U.S.C. § 1823(c)(4)(G) invoked jointly by the FDIC-C and the Federal Reserve, and with the agreement of the Treasury, to protect "all" depositors of the former SVB.

17.     These continuing violations are having a significant impact on the Debtor.  The $1.93 billion in Account Funds is the core estate asset.  The Debtor's lack of access to these Account Funds is impeding its ability to reorganize, and causing harm to the Debtor on a continuous basis.  Among other things, immediate receipt of the Account Funds is critical to the Debtor's ability to formulate a plan that maximizes the value of the Debtor's tax attributes.  In addition, the Account Funds should be generating more than $100 million in annual interest for the estate at current rates.  Without immediate payment of the Account Funds, the Debtor likely will have to obtain costly and uncertain debtor-in-possession financing.

18.     Given the importance of the Account Funds to the administration of the Debtor's estate and any plan of reorganization, any claim by either the FDIC-C or the FDIC-R that it may refuse Debtor's demands to pay the Debtor the amount of the Account Funds, based on contingent, unspecified claims, must be adjudicated as soon as possible.  The Debtor has commenced this adversary proceeding not only to remedy the current, ongoing automatic stay violations, but also to bring these issues to a timely resolution.

19.     Accordingly, in light of the foregoing and as set forth more fully below, the Debtor respectfully requests that the Court order the following relief:

(a).     require the FDIC-C immediately to pay to the Debtor the full amount of the Account Funds or,

(b).     alternatively, to the extent the Court determines that there is valid setoff argument (which the Debtor asserts is precluded both by the absence of mutuality and the contingent nature of any claims the FDIC-R may allege), require the FDIC-C to place in a Court-supervised, interest-bearing account the amount of Account Funds sufficient to satisfy the

potential setoff as determined by the Court, and immediately to turn over to the Debtor any Account Funds in excess of such amount to be used by the Debtor like any other estate asset;

(c). to the extent the obligation to pay the Debtor the amount of the Account Funds is deemed to be an obligation of the FDIC-R, require the FDIC-R immediately to pay to the Debtor the full amount of the Account Funds or, in the alternative, to the extent the Court determines that there is valid setoff argument in some amount (despite the contingent nature of any claims the FDIC-R may allege), require the FDIC-R to place in a Court-supervised, interest-bearing account the amount of Account Funds sufficient to satisfy the potential setoff as determined by the Court and immediately to turn over to the Debtor any Account Funds in excess of such amount to be used by the Debtor like any other estate asset;

(d). subject to the statutory right to file and amend a formal proof of claim prior to September 14, 2023, require each of the FDIC-C and the FDIC-R within ten days to articulate the specific factual and legal basis for any purported claim(s) against the amounts of the Debtor's Account Funds and set an expedited schedule for estimation of claims, if any, and determination of whether any such claims are subject to a right of setoff in any amount;

(e). order that the Court will not allow any amendment by the FDIC-C or the FDIC-R after September 14, 2023 to any proof of claim filed against the Debtor; and

(f).    set an expedited schedule for the trial of any proof of claim filed by the

FDIC-C or the FDIC-R, to commence no later than November 27, 2023.

## Jurisdiction and Venue

20.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is

a core proceeding pursuant to 28 U.S.C. § 157(b).

21.    The United States Supreme Court recently decided in *Lac du Flambeau of Lake

Superior Chippewa Indians* v. *Coughlin*, 599 U.S. __ (2023), that, pursuant to 11 U.S.C.

§ 106(a),[4] the United States – including any federal "agency" (*see* 11 U.S.C. § 101(27); slip op.

at 5) – abrogated its sovereign immunity in bankruptcy matters, including as to matters involving

the automatic stay.  *Id.*, slip op. at 3-4.  "[A]ll government creditors are subject to abrogation

under § 106(a)."  *Id.*, slip op. at 8.

22.    Furthermore, the FDIC-R has actively participated in the Chapter 11 case.  It has

filed a notice of appearance and request for notice, filed an objection to the Debtor's cash

management motion, participated in hearings, and sought affirmative relief from this Court to

possess the Debtor's tax refund checks.  Thus, the FDIC-R invoked and submitted to the

jurisdiction of the Court.

23.    Because the deadline for creditors to submit a claim in the FDIC-R's

administrative claims process is July 10, 2023, the Debtor must submit a protective claim with

the FDIC-R to preserve its rights.  Any such filing by the Debtor is not, and shall not be deemed

to be, acquiescence to the FDIC-R's position regarding jurisdiction, process, or in any other way

---

[4]   11 U.S.C. § 106(a) provides that "sovereign immunity is abrogated as to a governmental unit to the extent set
forth in this section" with respect to Sections 105, 106, 107, 108, 303, 346, 362, 363, 364, 365, 366, 502, 503,
505, 506, 510, 522, 523, 524, 525, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 722, 724, 726,
744, 749, 764, 901, 922, 926, 928, 929, 944, 1107, 1141, 1142, 1143, 1146, 1201, 1203, 1205, 1206, 1227,
1231, 1301, 1303, 1305, and 1327 of Title 11.

a waiver of the Court's exclusive jurisdiction to adjudicate this matter, including the claims asserted herein.

24.     Venue is proper pursuant to 28 U.S.C. § 1409.

25.     Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), the Debtor consents to entry of final orders or judgments by this Court.

### The Parties

26.     SVB Financial Group ("SVBFG" or the "Debtor") is the debtor and debtor in possession in the above-captioned Chapter 11 case.  The Debtor is a Delaware corporation established in 1999.  Prior to the events of March 2023 that led to the seizure of SVB on March 10, 2023 and the commencement of these bankruptcy proceedings shortly thereafter, SVBFG was a bank holding company and the ultimate corporate parent of the Bank.  The federal regulator of both the Debtor and the Bank was the Board of Governors of the Federal Reserve System.

27.     The FDIC is the agency of the United States government charged by law with, among other duties, administering the Federal Deposit Insurance Act and the federal bank deposit insurance system.  The Debtor sues the FDIC-C in its corporate capacity as the administrator of the Federal Deposit Insurance Act, and the FDIC-R in its capacity as Receiver for SVB and Bridge Bank.  The FDIC-C and the FDIC-R are separate and distinct juridical entities.

### Factual Allegations

A.     **Background**

28.     For 23 years, SVBFG owned SVB and a number of other affiliated SVB businesses, including an investment bank and a private wealth management business.  SVBFG deposited substantially all of its funds with the Bank.

29.     As of early March 2023, SVBFG had approximately $2.1 billion in three different deposit accounts maintained at SVB.  SVBFG had full and undisputed title to, and ownership of, these monies on deposit prior to on or about March 10, 2023.  This fact is uncontested.

30.     On or about March 10, 2023 (the "Closure Date"), the California Department of Financial Protection and Innovation ("DFPI") issued an order taking possession of SVB.  On the same day, DFPI appointed the FDIC-R to serve as Receiver for SVB.

31.     Also on the same day, the FDIC created the Deposit Insurance National Bank of Santa Clara.  All insured deposits of Silicon Valley Bank were transferred to this new bank.

32.     On March 12, 2023, the FDIC filed an application with the Office of the Comptroller of the Currency to establish the Bridge Bank.  The Office of the Comptroller of the Currency approved the application, and all deposits—insured and uninsured—were transferred to the Bridge Bank.  Depositors of SVB, including the Debtor, automatically became customers of the Bridge Bank.

33.     As of the Closure Date, the Debtor had approximately $2,115,958,220 in bank deposits at the Bank.

34.     No party disputes either the amount of the Debtor's deposits, nor that these deposits are in the Debtor's name, are the Debtor's property, and constitute the principal assets of the bankruptcy estate.

**B.      The FDIC-C Invokes the Systemic Risk Exception to Guarantee All Bank Deposits.**

35.     On March 12, 2023, shortly after the Bank was placed into receivership, the FDIC-C, jointly with the Federal Reserve, unanimously recommended the application of the systemic risk exception to the least-cost resolution provision of the Federal Deposit Insurance Act.  The Secretary of the Treasury, after consultation with the President of the United States, adopted the recommendation and authorized application of the systemic risk exception under 12

U.S.C. § 1823(c)(4)(G) in order to assure the financial markets of the safety of deposits.  The

result of the invocation by Treasury was that the FDIC guaranteed all deposits at SVB—insured

and uninsured—such that all would be repaid in full.

36.     This was a unilateral decision by the United States Government that did not

require any mutual undertaking by any of the former SVB depositors (including the Debtor), and

in recognition that the FDIC-C could have chosen to offer less than full protection of all

depositors but did not do so.  In its "Preliminary Review of Agency Actions Related to March

2023 Bank Failures" published on April 28, 2023 (the "GAO Report"), the United States

Government Accountability Office noted that the Federal Reserve's analysis that led to the

invocation of the systemic risk exception concluded that "extending only partial protection to

uninsured depositors would have some beneficial effect, but allowing material losses on these

uninsured deposits still would result in significant adverse effects in the financial markets."

According to the GAO Report, the "Federal Reserve Board staff also indicated that by

authorizing FDIC to protect the uninsured deposits of these banks, the Deposit Insurance Fund

would incur some losses," that "the size of these losses was unknown," and that the "FDIC

would have to recover any losses incurred as a result of the systemic risk exception through one

or more special assessments."

37.     The FDIC-R's March 12, 2023 transfer of "all deposits—both insured and

uninsured—and substantially all assets of" SVB to Bridge Bank[5] took place after the invocation

of the systemic risk exception.  The FDIC represented that the transfer of all deposits to the

Bridge Bank was "an action designed to protect all depositors of Silicon Valley Bank," and

---

[5]     Press Release, FDIC, FDIC Acts to Protect All Depositors of the former Silicon Valley Bank, Santa Clara, California (Mar. 13, 2023), https://www.fdic.gov/news/press-releases/2023/pr23019.html.

"[d]epositors will have full access to their money beginning this morning, when Silicon Valley

Bridge Bank, N.A., the bridge bank, opens and resumes normal banking hours and activities. . ."[6]

38.     The FDIC's reference to all depositors of SVB has been reiterated many times by

senior United States Government officials.  On March 16, 2023, Secretary of the Treasury, Janet

Yellen, addressed the Senate Committee on Finance, explaining that Treasury "worked with the

Federal Reserve and FDIC to protect all depositors of the two failed banks [Silicon Valley Bank

and Signature Bank].  On Monday morning, customers were able to access all of the money in

their deposit accounts. . . ."[7]   On March 23, 2023, Secretary Yellen similarly stated to the Senate

Financial Services and General Government Subcommittee on Appropriations that "[w]e took

actions to protect all depositors at the two failed institutions . . . This was designed to mitigate

risks to the banking system."[8]   The GAO Report, which was based on (among other things)

interviews with Treasury, the FDIC and the Federal Reserve, described the FDIC's action as

protecting all depositors of SVB.  Acting Comptroller of the Currency and Director of the FDIC

Michael Hsu's statement at the May 11, 2023 FDIC Board meeting and Chairman of the Federal

Deposit Insurance Corporation Martin J. Gruenberg's May 16, 2023 testimony to the House

Committee on Financial Services further confirm the decision to protect all depositors of SVB

without exception.[9]

---

[6]     *Id.*

[7]     March 16, 2023 Testimony of Secretary of the Treasury Janet L. Yellen Before the Committee on Finance, U.S.
Senate, https://home.treasury.gov/news/press-releases/jy1348.

[8]     March 23, 2023 Testimony of Secretary of the Treasury Janet L. Yellen Before the Financial Services and
General Government Appropriations, U.S. House, https://home.treasury.gov/news/press-releases/jy1361.

[9]     May 11, 2023 Statement by Michael J. Hsu Acting Comptroller of the Currency at the FDIC Board Meeting,
https://www.occ.treas.gov/news-issuances/news-releases/2023/nr-occ-2023-43a.pdf; Remarks by Chairman
Martin J. Gruenberg on "Oversight of Prudential Regulators" before the Committee on Financial Services, U.S.
House, https://www.fdic.gov/news/speeches/2023/spmay1523.html.

39.     The transfer of "all deposits" to the newly created, FDIC-operated Bridge Bank included the transfer of all of SVBFG's Account Funds.

**C.      The FDIC Unlawfully Blocks the Debtor's Access to Its Account Funds Despite Repeatedly Acknowledging That All Uninsured Deposits Would Be Paid and Depositors Would Have "Full Access" to Their Money.**

40.     When Bridge Bank opened on March 13, 2023, it announced that depositors had "full access to their money," and that all existing and new deposits were protected by the FDIC. The FDIC reiterated this point in its FAQs posted on March 13, 2023: "IS MY MONEY SAFE? **Yes!**  No one lost any money on deposit as a result of the closure of this bank.  All deposits, regardless of dollar amount, were transferred to Silicon Valley Bank, N.A. [*i.e.*, Bridge Bank]."

41.     At that time, the Debtor's three accounts that are the subject of this Complaint were maintained at Bridge Bank ("Debtor's Accounts").  The Debtor's Accounts are identified in the table set forth in ¶ 45 *infra*.

42.     For a time, the Debtor was able to access its accounts in the same manner as any former depositor of SVB and as it had prior to the Closure Date.  On March 15 and 16, 2023, the Debtor successfully initiated eight wire transfers from the Debtor's Accounts at Bridge Bank, in preparation for commencing this reorganization.

43.     On the evening of March 16, 2023, however, the Bridge Bank began to reject wire transfers that were previously and properly initiated, because the FDIC-R instructed Bridge Bank to place a hold on the Debtor's Accounts at Bridge Bank and restrict any monies from being withdrawn.  The FDIC-R instructed one or more Bridge Bank employees to contact the recipient banks for certain of the wires that had already cleared, and incorrectly inform them that the wires had been initiated in error and should be canceled.

44.     The FDIC-R directed the Bridge Bank to assign the Debtor's Accounts and all associated assets and liabilities to the FDIC-R, and the Bridge Bank complied with the FDIC-R's instruction.

45.     The balances of the Debtor's Accounts at Bridge Bank totaled approximately $1.93 billion as of March 16, 2023, when the Debtor lost access to its Accounts.  A schedule describing the Debtor's Accounts that are at-issue in this Complaint, as of March 16, 2023 and prior to amounts being swept or moved from the Debtor's Accounts by the FDIC-R, is listed in the table below:

| No. | Description | Account No.[10] | Balance |
|---|---|---|---|
| 1. | Operating Account | *5270 | $1,771,057,098 |
| 2. | Regulation W Account | *0822 | $143,593,718 |
| 3. | SVB Capital Operating Account | *6176 | $19,154,892.40 |

46.     SVBFG filed a petition for relief under Chapter 11 several hours later, early in the morning of March 17, 2023.

47.     On information and belief, on the same day the Bridge Bank, at the FDIC-R's direction, unwound approximately $6,222,681.93 in intercompany receivables/payables to the Debtor, in violation of the automatic stay.

48.     Notwithstanding the FDIC's clear undertaking to enable all depositors of SVB to access their deposits in full, the FDIC-R suspended the Debtor's access to its Account Funds and both the FDIC-R and the FDIC-C refused to pay the Account Funds to the Debtor.  The Debtor's

---

[10]     The last 4 digits of each Bank Account are listed.

repeated attempts to access its funds, and its demands for payment of the funds, have all been rejected by the FDIC-R and the FDIC-C.

49. The FDIC's basis for denying the Debtor payment of the Account Funds is not a lack of available funds. The FDIC's Deposit Insurance Fund has assets of $116.1 billion held and available to pay the FDIC-C's deposit insurance obligations. The FDIC may also draw on a line of credit with the United States Treasury, or borrow from the Federal Financing Bank and insured institutions if ever needed.[11] In addition, the FDIC-C is subrogated to the rights of the depositor against the FDIC-R to the extent of payments for insured amounts. 12 U.S.C. § 1821(g).

50. Moreover, because the FDIC-C, in conjunction with the Federal Reserve, the Treasury Department, and the President, declared that all uninsured deposits will be paid through the Deposit Insurance Fund, pursuant to the invocation of the systemic risk exception, the FDIC-C is not only entitled to, but as a matter of law ***must*** recover any loss to the Deposit Insurance Fund arising from such action through one or more special assessments on insured depository institutions. 12 U.S.C. § 1823(c)(4)(G)(ii). The statutory framework provides that in those instances where a systemic risk exception is invoked to protect uninsured deposits, those resulting losses are recovered by assessing the insured depository institutions.

51. On approximately May 22, 2023 the FDIC-C issued a Notice of Proposed Rulemaking, seeking comment on a proposed rule that would impose special assessments to recover the loss to the Deposit Insurance Fund "arising from the protection of uninsured depositors in connection with the systemic risk determination announced on March 12, 2023, following the closures of Silicon Valley Bank, Santa Clara, CA, and Signature Bank, New York,

---

[11]   FDIC Quarterly, 2023, Volume 17, Number 2, at 31; 12 U.S.C. § 1824.

NY, as required by the Federal Deposit Insurance Act." In connection with doing so, the FDIC again represented that the Account Funds—both insured and uninsured portions—are protected, as were all other depositors of SVB.

52. The FDIC-R has acknowledged that the FDIC-C is responsible, through the Deposit Insurance Fund, for the payment of the Account Funds. Nonetheless, ignoring its unequivocal statements to the contrary promising depositors with "full access" to their money, the FDIC-C has ignored the Debtor's demand that it be paid the full amount of its Account Funds. Instead, it appears the FDIC-C will only provide access to those funds, if ever, in amounts the FDIC-R determines are not subject to setoff by the FDIC-R, and then only after the FDIC-R makes that determination.

**D.  Neither the FDIC-C Nor the FDIC-R Has a Proper Right of Setoff Against the Account Funds.**

53. Neither the FDIC-C nor the FDIC-R has asserted any proper claim against the Debtor for its Account Funds to support a possible "setoff." Nor can either do so.

54. *First,* there is a lack of the mutuality required to support any setoff by the FDIC-C, which is the entity responsible through the Deposit Insurance Fund for the payment of the Account Funds based on the invocation of the systemic risk exception. As demonstrated by the following chart, there is no mutuality because the claim by the Debtor for payment of the full amount of its Account Funds is against the FDIC-C, whereas any theoretical claim against the Debtor based on its affiliation and arrangements with SVB could only be asserted by the FDIC-R. As the FDIC has acknowledged and repeatedly relied upon in litigation, the FDIC-C and FDIC-R are separate juridical entities.

Claim **by** Debtor

Debtor ⟶ FDIC-C

Claim **against** Debtor

Debtor ⟵ FDIC-R

55.     *Second*, the FDIC (together with the Federal Reserve) invoked the "systemic risk
exception" under 12 U.S.C. § 1823(c)(4)(G) to make *all* deposit account holders whole.  Having
taken regulatory action to protect *all* deposit holders, the FDIC-R may not lawfully treat the
uninsured deposits of one particular deposit holder—the Debtor—in a disparate manner without
any basis in the systemic risk determinations authorized by the Secretary of the Treasury, and in
violation of the Bankruptcy Code.

56.     *Third*, there is no right of setoff for contingent claims, and neither the FDIC-C nor
the FDIC-R has identified or explained any claim it believes it may have against the Debtor that
would justify withholding *any* portion of the Account Funds, much less the immediate "setting
off" of nearly $2 billion of the Debtor's Account Funds and core estate assets.

**E.     The FDIC Contends the Debtor Must File an Administrative Claim to Adjudicate
        the FDIC-R's Purported "Claims" Against the Debtor.**

57.     There is no dispute as to either the Debtor's ownership of, or current amount of,
the Account Funds.  The FDIC seeks to shield its actions to prevent the Debtor from accessing its
Account Funds from review by the Bankruptcy Court by insisting that the Debtor must file a
claim in the FDIC-R's administrative claims process in order to recover its Account Funds.  The
administrative claims process provides the FDIC-R 180 days to determine in its discretion
whether to allow or disallow a claim.  In this process, the Debtor has no right to appear, be heard,
be informed of the FDIC-R's positions that might support disallowance, or file materials in
support of its claims in response to the FDIC-R's positions.  If the Debtor's claim is disallowed,

the FDIC-R would require the Debtor to initiate a new lawsuit in the United States District Court to gain access to its Account Funds.[12]

58.     The FDIC-R takes this position even though the FDIC-R's refusal to provide the Debtor with access to the Account Funds has nothing to do with any question of the Debtor's ownership of those Account Funds or their amount—*i.e.*, the sole focus of a FIRREA deposit claim—but is solely based upon a purported right of "setoff" that is wholly dependent on the existence and value of theoretical claims that the FDIC-R may ultimately assert ***against*** the Debtor, none of which has yet been asserted and none of which is properly the subject of the FDIC-R's administrative claims process.

59.     The situation with respect to the FDIC-C is even more perplexing and inexplicable.  The FDIC-R's claim process does not even purport to involve claims against the FDIC-C, yet the FDIC-C refuses to honor its obligation to the Debtor in deference to the FDIC-R's insistence that the Debtor participate in the FDIC-R's administrative claims process.

60.     Even if the FDIC-R could articulate a viable claim for setoff against the Debtor and/or its Account Funds, the FDIC-R must do so in this Court, where the Court may assess any such claim alongside all other proper creditor claims.  A right of setoff simply provides a creditor with secured status to the extent the creditor has a mutual, prepetition claim against the Debtor. To the extent the FDIC-R has any right of setoff, it would be dependent on, among other things, the value of a claim it has as a creditor of the Debtor, to the extent allowed by this Court.  The FDIC-R's administrative claims process is not the proper place to adjudicate any claim ***against*** the Debtor or to determine the extent to which any such claim may give rise to a right of setoff against what is an undisputed $1.93 billion estate asset.

---

[12]    Ex. A, Notice to Discovered Claimant to Present Proof of Claim (May 2, 2023).

61.     The FDIC-R only has the statutory authority to determine claims against the receivership. 12 U.S.C. § 1821(d)(4),(5). By its express terms the FDIC's administrative claims process does not apply to claims against the Debtor. The FDIC-R's own "Notice to Discovered Claimant to Present Proof of Claim" states that the process applies to "claims against the Failed Institution." The FDIC's information page, "When a Bank Fails – Facts for Depositors, Creditors, and Borrowers" distinguishes between depositors, such as the Debtor, and creditors, which includes "all trade creditors, employees, taxing entities, and any other creditors who may be owed money by the failed bank." The FDIC's Failed Bank Information for Silicon Valley Bank, Santa Clara, CA, includes a section for "Filing Claims" that is limited to "Creditors" and directs *creditors* that "provided a service or product, leased space, furniture, or equipment" to Silicon Valley Bank or Bridge Bank and have not been paid to submit a claim.

62.     In addition, although the FDIC is statutorily authorized to require proof of claims to be filed for claims for insured deposits, 12 U.S.C. § 1821(f)(2), the FDIC elected not to do so here. The FDIC-R's instructions for filing a claim state: "Claims for insured deposits are claims against the FDIC in its corporate capacity as deposit insurer – not against the Receiver." The FDIC's Claims Portal states that a depositor does not need to register if "[a]nother bank assumed all of the deposits from your old bank," which is what happened here. The FDIC-R's contact email for its administrative claims process makes clear that the process is not intended for depositors:  NonDepClaimsDal@FDIC.gov.

63.     It would make no sense to adjudicate FDIC-R's claims in its administrative process because it would entail the Debtor having somehow to disprove the FDIC-R's claims without knowing what those claims are. Putting aside that in this instance the FDIC-R is holding

the Debtor's assets as hostage, in the ordinary course, if the FDIC-R believes it has claims

against a third party, it must bring an action to recover on those claims.

64.     It is no different here, except that because the Debtor is in a Chapter 11

proceeding, the FDIC-R must file a proof of claim in the Chapter 11 case, and the court in which

the FDIC-R must adjudicate its claims is this Court.  Where, as here, the Debtor has direct claims

to recover estate assets against the FDIC, supported by the Deposit Insurance Fund, and the only

basis to contest ownership of those assets is the FDIC-R's purported claims against the Debtor—

those core claims must be brought in this Court, to be adjudicated and prioritized alongside all

creditor claims.  This Court, and only this Court, can assess and value the claims that the FDIC-R

maintains entitle it to assert setoff rights against the Debtor's assets, and prioritize any rights of

setoff that may exist in connection with its prioritization of the claims of other creditors of the

Debtor's estate.

## Causes of Action

### Count I
### Turnover of the Account Funds Pursuant to Section 542 of the Bankruptcy Code Against the FDIC-C

65.     The Debtor re-alleges and incorporates by reference the allegations contained in

paragraphs 1 through 64 as if fully set forth herein.

66.     The Account Funds constitute property of the Debtor's estate under Section

541(a) of the Bankruptcy Code.

67.     Section 542(b) of the Bankruptcy Code provides, in relevant part, that "an entity

that owes a debt that is property of the estate and that is matured, payable on demand, or payable

on order, shall pay such debt to, or on the order of, the trustee. . . ."

68.     As set forth in the proceeding paragraphs, the Secretary of the Treasury, based on

the recommendation of the FDIC-C and the Federal Reserve, invoked the systemic risk exception

pursuant to which the FDIC committed to guarantee all deposits, insured and uninsured, at SVB, including the Debtor's approximately $1,933,555,708.13 in uninsured Account Funds and provided for "full access" to those funds.

69. On June 26, 2023, the Debtor demanded that the FDIC-C provide it with access to the full amount of its uninsured deposits by no later than Tuesday, June 27, 2023. Contrary, however, to the Government's unequivocal public statements, the FDIC-C continues to refuse to make payment on any of the Account Funds from the Deposit Insurance Fund, or elsewhere.

70. The Account Funds constitute a debt the FDIC-C owes to the Debtor's estate, that is property of the estate and that is matured, payable on demand, or payable on order.

71. The FDIC-C has no current, proper "setoff" right under any Title 12 statute, regulations, common law, or any other applicable statute, law or contract with respect to the Debtor's Account Funds, including because any potential claims are contingent and because there is no mutuality of obligations.

72. The Debtor's Account Funds are therefore subject to turnover pursuant to Section 542 of the Bankruptcy Code and Bankruptcy Rule 7001.

73. Pursuant to Section 542 of the Bankruptcy Code, Defendant FDIC-C is required immediately to return to Debtor and/or cause the FDIC-R, to the extent the FDIC-R has taken any actions to prevent the payment of such funds, to cease taking such actions such that the Account Funds may be paid immediately to the Debtor.

**Count II**
**Turnover of the Account Funds Pursuant to Section 542 of the Bankruptcy Code Against the FDIC-R**

74.     The Debtor re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 68 as if fully set forth herein.

75.     In the alternative, if the Account Funds are not owed by the FDIC-C, they are a debt the FDIC-R owes to the Debtor's estate, that is property of the estate and that is matured, payable on demand, or payable on order.

76.     The Debtor has properly demanded that the FDIC-R pay to the Debtor the full amount of its Account Funds, and the FDIC-R has refused to do so.

77.     The FDIC-R has no current, proper "setoff" right under any Title 12 statute, regulations, common law, or any other applicable statute, law or contract with respect to the Debtor's Account Funds, because any potential claims are contingent and the FDIC-R has not identified the basis for or amount of any such potential claim.

78.     The Debtor's Account Funds are therefore subject to turnover pursuant to Section 542 of the Bankruptcy Code and Bankruptcy Rule 7001.

79.     Pursuant to Section 542 of the Bankruptcy Code, Defendant FDIC-R is required immediately to return the Account Funds to the Debtor.

**Count III**
**Violation of the Automatic Stay Under 11 U.S.C. § 362(a) Against the FDIC-C and FDIC-R**

80.     The Debtor re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 64 as if fully set forth herein.

81.     As set forth in the preceding paragraphs, the automatic stay of Section 362 of the Bankruptcy Code came into effect automatically by statute immediately upon the Debtor's filing

of its voluntary petition for relief under Chapter 11 and the FDIC-C and the FDIC-R have received notice of the automatic stay in this case.

82.     The FDIC-R has acknowledged it is bound by the automatic stay and previously submitted to the jurisdiction of the Court.

83.     By transferring and refusing to release any of the Account Funds to the Debtor, and/or to pay to the Debtor the amount of those Account Funds, the FDIC-R and the FDIC-C have violated and continue to violate the automatic stay applicable to the Debtor and its assets wherever located pursuant to Section 362(a), Title 11, United States Code.

### Count IV
### Declaratory Judgment Pursuant to 28 U.S.C. § 2201 *et seq.*

84.     The Debtor re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 64 as if fully set forth herein.

85.     The FDIC-C has refused to pay the Debtor any portion of its Account Funds from the Deposit Insurance Fund, and the FDIC-R has denied the Debtor access to its Account Funds, both seemingly because the FDIC claims the ability to "setoff" monies that may be owed by the Debtor to the FDIC-R, based on claims the FDIC-R has not yet articulated or proven.

86.     No such claim to these Account Funds today exists—nor could one as a matter of law.  The FDIC-R has not asserted any claim against the Debtor and, unless and until it does so, it may not assert a right of setoff in any amount against the Account Funds.

87.     Moreover, any claim giving rise to a right of setoff against the Account Funds must be limited to amounts for which there is a mutuality of obligation, not the entire amount in the Debtor's Accounts.

88.     There is no mutuality of obligation between a claim of the Debtor against the FDIC-C and a claim of the FDIC-R against the Debtor, because the FDIC-C and the FDIC-R are separate juridical entities.

89.     Accordingly, because the FDIC-C and the FDIC-R continue adversely to withhold and/or possess Debtor's Account Funds, there is an actual controversy between the parties ripe for judicial resolution.

90.     The Debtor respectfully requests that the Court declare that (i) the FDIC-R has no claim or right that would permit the unilateral exercise of a "setoff" against the Account Funds and, (ii) the FDIC-C has no claim or right that would permit the unilateral exercise of a "setoff" against the Account Funds.  In the alternative, to the extent the Court finds the FDIC-C or the FDIC-R has a valid right of setoff, the Debtor requests that the Court declare that any right of setoff against the Account Funds is limited to amounts for which there is mutuality of obligation between the Debtor and each of the FDIC-R or the FDIC-C, respectively.

91.     In the alternative, to the extent the Court finds the FDIC-R has a valid claim or claims that would justify the exercise of a right of setoff, the Debtor requests that the Court (i) determine the amount of any such setoff, and (ii) declare that either the FDIC-C or FDIC-R immediately turn over any excess funds to the Debtor.

**Reservation of Rights**

92.     The Debtor specifically reserves all rights to bring any and all other causes of action that it may maintain against Defendants including, without limitation, causes of action arising out of the same transactions as set forth in this Complaint, to the extent discovery in this action or further investigation by the Debtor reveals the existence of such further causes of action.  The Debtor also specifically reserves the right to file a protective administrative proof of

claim with the FDIC-R for recovery of its deposit Account Funds, without waiving any of its rights hereunder, whether at law or equity.

## **Prayer for Relief**

WHEREFORE, the Debtor respectfully requests that the Court enter judgment in the Debtor's favor as follows:

(a).    Order the FDIC-C to cease and desist from the ongoing violation of the automatic stay of Section 362(a) of the Bankruptcy Code, and require the FDIC-C immediately to pay to the Debtor the full amount of the Account Funds, plus interest;

(b).    In the alternative, to the extent the Court determines that there is a valid legal claim giving rise to a right of setoff, require the FDIC-C to place in a Court-supervised, interest-bearing account the amount of Account Funds sufficient to satisfy the potential setoff, and immediately turn over to the Debtor any Account Funds plus interest in excess of such amount;

(c).    Order the FDIC-R to cease and desist from the ongoing violation of the automatic stay of Section 362(a) of the Bankruptcy Code, and to the extent the obligation to pay the Debtor the amount of the Account Funds is deemed to be an obligation of the FDIC-R, require the FDIC-R immediately to pay to the Debtor the full amount of the Account Funds plus interest or, to the extent the Court determines that there is a valid legal claim giving rise to a right of setoff, require the FDIC-R to place in a Court-supervised, interest-bearing account the amount of Account Funds sufficient to satisfy the potential setoff, and immediately turn over to the Debtor any Account Funds plus interest in excess of such amount;

(d).     Declare that the FDIC-C has no valid legal claims against the Debtor that
         would permit it the exercise of a "setoff" right against the amounts of the
         Debtor's Account Funds;

(e).     Declare that the FDIC-R has no valid legal claims against the Debtor that
         would permit it the exercise of a "setoff" right against the amounts of the
         Debtor's Account Funds;

(f).     In the alternative, to the extent the Court is not prepared to find that either
         the FDIC-C or the FDIC-R has no valid legal claims against the Debtor
         that would permit the exercise of a "setoff" right against the amounts of
         the Debtor's Account Funds, subject to the statutory right to file and
         amend a formal proof of claim prior to September 14, 2023, require the
         FDIC-C and/or the FDIC-R within ten days to articulate the specific
         factual and legal basis for any claim(s) against the amounts of the Debtor's
         Account Funds; set a schedule for the estimation of any offset claim; and
         require the turnover to the Debtor of any portion of the Account Funds in
         excess of the Court's valuation of the claim(s) against the Debtor that the
         Court determines may lawfully be setoff;

(g).     Order that the Court will not allow any amendment by the FDIC after
         September 14, 2023 to any proof of claim filed by the FDIC against the
         Debtor;

(h).     Award pre- and post-judgment interest on the amounts of the Account
         Funds;

(i).  Determine that the FDIC-C and FDIC-R have violated the automatic stay, and award damages to the Debtor and other relief as a result thereof, in an amount to be proven at trial, to commence no later than November 27, 2023;

(j).  Grant preliminary and permanent injunctive relief consistent with this Prayer; and

(k).  Grant such other relief as is just and proper.

Dated: July 9, 2023
New York, New York

Robert Sacks /NHS

Robert A. Sacks
James L. Bromley
Adam S. Paris
Christian P. Jensen
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
E-mail: bromleyj@sullcrom.com
        dietdericha@sullcrom.com
        jensenc@sullcrom.com

Diane L. McGimsey (*pro hac vice* pending)
**SULLIVAN & CROMWELL LLP**
1888 Century Park East
Los Angeles, CA 90067
Telephone:  (310) 712-6600
Facsimile:  (310) 712-8800
E-mail: sacksr@sullcrom.com
        parisa@sullcrom.com
        mcgimseyd@sullcrom.com

*Counsel for Debtor*
*and Debtor-in-Possession*

# EXHIBIT A

**FDIC**

**Federal Deposit Insurance Corporation**
600 North Pearl Street, Suite 700, Dallas, TX  75201

Division of Resolutions and Receiverships

**May 2, 2023**

**SVB FINANCIAL GROUP**
**387 PARK AVENUE SOUTH**
**NEW YORK, NY 10016**

SUBJECT:    **10542 – Silicon Valley Bridge Bank, N.A.**
**Santa Clara, CA –** In Receivership
Closing Date: **March 27, 2023**
Claims Bar Date: **July 10, 2023**

<u>**NOTICE TO DISCOVERED CLAIMANT TO PRESENT PROOF OF CLAIM**</u>

Dear Claimant:

On **March 27, 2023** (the "Closing Date"), the **Office of the Comptroller of the Currency** closed **Silicon Valley Bridge Bank, N.A.** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation ("FDIC") as Receiver (the "Receiver").

The Receiver has discovered that you may have a claim against the Failed Institution.  If you do not have a claim against the Failed Institution, please disregard this notice.

**Published Notice/Claims Bar Date:**  The Receiver has published a notice in one or more newspapers stating that the Failed Institution was closed and that any claims against the Failed Institution must be filed **on or before July 10, 2023** (the "Claims Bar Date").

**How to File Your Claim:**  In order for the Receiver to consider your claim you must submit the properly completed Proof of Claim Form along with the supporting documentation to the Receiver by the Claims Bar Date.  You may submit your claim on-line, by mail, or by fax.

Please visit https://resolutions.fdic.gov/claimsportal/s/ to file a claim online and for other helpful services you can perform electronically.  When possible, it is recommended that claims be submitted to the FDIC on-line.

If you choose to file your claim via the mail, it is recommended that you send it by U.S. certified mail or a commercial delivery service that can provide you with a receipt of delivery.

To fax a claim you should contact a claims agent at the telephone number listed at the bottom of this letter to obtain a fax number.

**Your claim must be filed with the Receiver on or before the Claims Bar Date.**

**Filing After the Claims Bar Date:** Failure to file your claim on or before the Claims Bar Date will result in disallowance by the Receiver and the disallowance will be final. 12 U.S.C. 1821(d)(5)(C)(i).

**Time for Receiver to Determine Your Claim:** The Receiver has 180 days from the date it receives your claim to determine whether to allow or to disallow your claim.

**If Your Claim is Disallowed or You Do Not Receive a Timely Notice of Disallowance:** Pursuant to 12 U.S.C. Section 1821(d)(6), if the Receiver notifies you of the disallowance of your claim or if you do not receive a notice of disallowance on or before the end of the 180-day period, you have the right to file a lawsuit on your claim (or continue any lawsuit commenced before the appointment of the Receiver). Your lawsuit must be filed within 60 days after the date of the notice of disallowance by the Receiver OR within 60 days after the end of the 180-day period, **whichever is earlier**. You must file your lawsuit either in the United States District (or Territorial) Court for the District where the Failed Institution's principal place of business was located or in the United States District Court for the District of Columbia. The Receiver will not consent or agree to further administrative review of your disallowed claim. 12 U.S.C. 1821(d)(7)(A).

**Lawsuits:** If you do not file a lawsuit (or continue any lawsuit commenced before the appointment of the Receiver) before the end of the 60-day period, the disallowance of your claim will be final and you will have no further rights or remedies with respect to your claim. 12 U.S.C. Section 1821(d)(6)(B)(ii).

**Insured Deposit Claims:** Claims for insured deposits are claims against FDIC in its corporate capacity as deposit insurer - not against the Receiver. If any portion of your claim is for an insured deposit, your rights differ from the rights described in the preceding paragraphs. An insured depositor's rights are set forth in 12 U.S.C. Section 1821(f). Please contact a claims agent at the below phone number for deposit claims inquiries.

**Note to Class Claimants:** By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver.

If you have any questions about this letter, please contact the undersigned at **(972) 761-8677.**


Sincerely,


CLAIMS AGENT
Claims Department


Enclosures: Proof of Claim Form, Instructions

## Instructions for filing Form FDIC 7200/19, Proof of Claim, and Supporting Documentation

**INSTRUCTIONS: The following fields <u>MUST</u> be completed in order for your Proof of Claim (POC) to be considered.** (The numbers correspond with those located on the Proof of Claim.)

1. **SSN/TAX ID NO.** The Claimant's tax identification number (if a company) or his/her Social Security Number (if an individual).
2. **NAME OF PERSON COMPLETING THE PROOF OF CLAIM.** Self-explanatory.
3. **NAME OF THE CLAIMANT.** This is the person or entity actually making the claim. This may be you or another person or entity on whose behalf you are authorized to file the claim.
4. **AMOUNT OF CLAIM.** The dollar amount of the claim.
5. **DESCRIPTION OF CLAIM.** Detailed description of what is being claimed (e.g., the invoice number, type of service being claimed, account number, etc.). Additional information may be attached.
6. **SIGNATURE.** The signature of the person completing the POC. Include your title if you are filing this POC on behalf of the Claimant.
7. **DATE.** Date the form is signed.
8. **FIRM.** If you are filing this POC on behalf of the Claimant, include the name of your company or firm, if applicable.
9. **ADDRESS.** The address (including City, State, and ZIP code) of the individual completing this POC.
10. **TELEPHONE NUMBERS.** Telephone number of the individual completing this POC.

## <u>REQUIRED SUPPORTING DOCUMENTATION</u>

- <u>Claims for Goods Purchased by the Failed Institution</u>: You must enclose a copy of the purchase order or other correspondence from the Failed Institution requesting the goods, a copy of your invoice, and a receipt signed by the Failed Institution (or other evidence) indicating that the goods were received.

- <u>Claims for Services Rendered</u>: You must enclose a copy of the correspondence or signed initial contract sent by the Failed Institution to request your services and an invoice. In the case of law firms (or other professional firms) retained by the Failed Institution, enclose an itemized invoice detailing charges accruing prior to failure. For appraisal services, enclose proof that the appraisal was completed.

- <u>Other Types of Claims</u>: You must enclose a copy of documents that substantiate the nature and amount of the claim. While you may enclose a copy of the complaint that you filed with a court, this alone is not sufficient to establish your claim.

## <u>SUBMITTING YOUR CLAIM</u>

There are three ways to submit your claim:

- Please visit https://resolutions.fdic.gov/claimsportal/s/ to file a claim online and for other helpful services you can perform electronically. Submitting your claim via the FDIC web site is convenient, secure, and inexpensive, and will also help to expedite the handling of your claim
- Fax by calling a claims agent using the phone number in the enclosed letter.
- Via mail to the following address: **600 North Pearl Street, Suite 700, Dallas, TX 75201** If you choose this option, we recommend you send it by U.S. certified mail or a commercial service that can provide you with a receipt of delivery. **Please do not send originals.**

**NOTE**: If you choose to file by mail, it is very important that the Proof of Claim be the top document of your mailing. The bar code allows for the automated creation of your claim file when the Proof of Claim is read or scanned into our system. There is no need for a cover letter.

Page down to access form FDIC 7200/19

**Claimant ID: NS10542007041, Barcode Value: FD65505728ME1OO6I5DO, Fund: 10542**

### Federal Deposit Insurance Corporation
### as Receiver for
### Silicon Valley Bridge Bank, N.A., Santa Clara, CA

## PROOF OF CLAIM

1. SSN/Tax ID No. _____

2. The undersigned _____
   *(Name of person completing the Proof of Claim)*

   hereby states that the subject Financial Institution, now in liquidation ("Failed Institution"), is indebted

3. to _____ (the "Claimant") in the sum of
   *(Name of Claimant)*

4. $ _____

5. Description of Claim

The undersigned further states that no part of said debt has been paid, that the Claimant has given no endorsement or assignment of the same or any part thereof, and that there is no set-off or counterclaim, or other legal or equitable defense to said claim or any part thereof.

6. NAME _____  7. DATE _____
   *(Name, Title, and Signature of person completing the Proof of Claim )*

8. FIRM _____
   *(if applicable)*

9. ADDRESS _____
   *( City, State, and ZIP Code)* _____

10. TELEPHONE NUMBER(S) _____

The penalty for knowingly making or inviting reliance on a false, forged, or counterfeit statement, document, or thing for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation is a fine of not more than $1,000,000 or imprisonment for not more than 30 years or both (18 U.S.C. Section 1007).

**IMPORTANT NOTE:** The bar code at the top of this Proof of Claim is unique to this claim and may not be re-used for other claims which you may have or by other potential claimants. If you have other unrelated claims, you must file a separate Proof of Claim with its own unique bar code. Additional Proof of Claim forms may be found on the FDIC web site or obtained by mail at the respective addresses indicated in the Instructions. Re-use of this Proof of Claim may result in processing delays or the rejection of your claim.

### PRIVACY ACT STATEMENT

The FDIC is authorized to request this information from you by 12 U.S.C. § 1819, 1821, and Executive Order 9397. The purpose for collecting the information is to support the administration of claims against the failed financial institution. Furnishing the requested information is voluntary, but failure to provide the requested information in whole or in part may delay or prohibit the processing of your claim. The information provided by individuals is protected by the Privacy Act, 5 USC 552(a). The information may be furnished to third parties as authorized by law or used according to any of the routine uses described in the FDIC Insured Financial Institution Liquidation Records (30-64-0013) System of Records. This System of Records is available for review at www.fdic.gov/regulations/laws/rules/2000-4050.html#200030–64–0013. If you have questions or concerns about the collection or use of the information, you may contact the FDIC's Chief Privacy Officer at Privacy@fdic.gov.

FDIC 7200/19 (12-12)