1   Robert A. Sacks (SBN 150146)
    (sacksr@sullcrom.com)
2   Adam S. Paris (SBN 190693)
    (parisa@sullcrom.com)
3   Diane L. McGimsey (SBN 234953)
    (mcgimseyd@sullcrom.com)
4   **SULLIVAN & CROMWELL LLP**
    1888 Century Park East
5   Los Angeles, California 90067
    Telephone:     (310) 712-6600
6   Facsimile:     (310) 712-8800
    *Attorneys for Plaintiff SVB Financial Group*
7   [*Additional Counsel Listed on Signature Page*]

8                 **UNITED STATES DISTRICT COURT**

9               **NORTHERN DISTRICT OF CALIFORNIA**

10                      **SAN JOSE DIVISION**

11  SVB FINANCIAL GROUP,                    )   Case No.: 5:23-cv-06543-BLF
                                            )
12                          Plaintiff,      )   **PLAINTIFF SVB FINANCIAL GROUP'S**
                                            )   **OPPOSITION TO DEFENDANT**
13              v.                          )   **FEDERAL DEPOSIT INSURANCE**
                                            )   **CORPORATION, IN ITS CORPORATE**
14  FEDERAL DEPOSIT INSURANCE               )   **CAPACITY'S MOTION TO DISMISS**
    CORPORATION, in its corporate           )
15  capacity,                               )   The Honorable Beth Labson Freeman
                                            )
16                          Defendant.      )
                                            )
17

18

19

20

21

22

23

24

25

26

27

28

1

**<u>TABLE OF CONTENTS</u>**

2

**Page**

3  LEGAL STANDARD................................................................................2

4  STATEMENT OF FACTS .......................................................................3

5  ARGUMENT ...........................................................................................4

6  I.    12 U.S.C. § 1821(f) Does Not Bar SVBFG's Uninsured Deposit Claims.........................4

7  II.   SVBFG States a Plausible Turnover Claim Under 11 U.S.C. § 542 .................................9

8        A.    The Account Funds Are Estate Property ................................9

9        B.    FDIC-C Possesses SVBFG's Account Funds .......................................11

10       C.    FDIC-C Owes SVBFG an Enforceable Obligation ................................11

11       D.    FDIC-C Has Not Satisfied Its Obligation to Turn Over the Account Funds ........13

12 III.  SVBFG Alleges a Plausible Violation of the Automatic Stay Under 11 U.S.C.
13       § 362(a) ..........................................................................................14

14 IV.  SVBFG Plausibly States a Claim for Violation of Its Due Process Rights .....................15

15       A.    SVBFG Has a Property Interest in the Guaranteed Access to Its Account
            Funds ...........................................................................................15

16       B.    FDIC-C Violated SVBFG's Due Process Rights..................................16

17 V.    SVBFG Plausibly States a Claim for Declaratory Relief .................................19 (?)

1

**<u>TABLE OF CONTENTS</u>**

2

**Page**

LEGAL STANDARD ................................................................................ 2

STATEMENT OF FACTS ....................................................................... 3

ARGUMENT ........................................................................................... 4

I.     12 U.S.C. § 1821(f) Does Not Bar SVBFG's Uninsured Deposit Claims ........................ 4

II.    SVBFG States a Plausible Turnover Claim Under 11 U.S.C. § 542 ................................ 9

       A.    The Account Funds Are Estate Property ................................ 9

       B.    FDIC-C Possesses SVBFG's Account Funds ........................................ 11

       C.    FDIC-C Owes SVBFG an Enforceable Obligation ................................ 11

       D.    FDIC-C Has Not Satisfied Its Obligation to Turn Over the Account Funds ........ 13

III.   SVBFG Alleges a Plausible Violation of the Automatic Stay Under 11 U.S.C. § 362(a) ........................................................................................ 14

IV.   SVBFG Plausibly States a Claim for Violation of Its Due Process Rights ...................... 15

       A.    SVBFG Has a Property Interest in the Guaranteed Access to Its Account Funds ........................................................................................ 15

       B.    FDIC-C Violated SVBFG's Due Process Rights .................................... 16

V.    SVBFG Plausibly States a Claim for Declaratory Relief ........................................ 20

VI.   SVBFG Plausibly States an APA Claim in Count V ............................................. 21

       A.    Count V States a Final Agency Action ................................................ 21

       B.    Count V Is Not Duplicative of Count VI ............................................. 23

VII.  FDIC-C Is Not Immune to SVBFG's Estoppel Claim ........................................... 23

       A.    SVBFG May Assert a Claim for Promissory Estoppel Against FDIC-C ............. 24

       B.    SVBFG Has Pleaded the Elements of Promissory Estoppel ........................ 25

VIII. SVBFG Has Standing to Sue for FOIA Violation ............................................... 25

CONCLUSION ....................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams* v. *Sewell*,
  946 F.2d 757 (11th Cir. 1991) ......................................................................................15

*Aliotta* v. *Bair*,
  614 F.3d 556 (D.C. Cir. 2010) ......................................................................................24

*Ascom Hasler Mailing Sys., Inc.* v. *U.S. Postal Serv.*,
  815 F. Supp. 2d 148 (D.D.C. 2011) ..............................................................................24

*Augustine* v. *United States*,
  704 F.2d 1074 (9th Cir. 1983) ......................................................................................22

*Baum* v. *J-B Weld Co.*,
  2019 WL 6841231 (N.D. Cal. Dec. 16, 2019) ................................................................3

*Bennett* v. *Spear*,
  520 U.S. 154 (1997)......................................................................................................21

*Bowen* v. *Massachusetts*
  487 U.S. 879 (1988)......................................................................................................23

*In re Brown*,
  2022 WL 4390454 (Bankr. S.D.N.Y. Sept. 22, 2022)....................................................9

*Cabo Distrib. Co.* v. *Brady*,
  821 F. Supp. 601 (N.D. Cal. 1992) ..............................................................................19

*In re Calvin*,
  329 B.R. 589 (Bankr. S.D. Tex. 2005) ...........................................................................9

*In re Charter Co.*,
  913 F.2d 1575 (11th Cir. 1990) ....................................................................................10

*Cheng* v. *Speier*,
  609 F. Supp. 3d 1046 (N.D. Cal. 2022) ..........................................................................2

*Ching* v. *Mayorkas*,
  725 F.3d 1149 (9th Cir. 2013) ......................................................................................16

*Citizens Bank of Md.* v. *Strumpf*,
  516 U.S. 16 (1995)............................................................................................11, 14, 15

*City of Oakland* v. *Lynch*,
  798 F.3d 1159 (9th Cir. 2016) ......................................................................................23

-ii-

*City of Reno* v. *Netflix., Inc.,*
   52 F.4th 874 (9th Cir. 2022) ................................................................................20

*City of West Covina* v. *Perkins*,
   525 U.S. 234 (1999) ...........................................................................................18

*In re Cullen*,
   329 B.R. 52 (Bankr. N.D. Iowa 2005) ..............................................................14

*DeCell & Associates* v. *FDIC*,
   36 F.3d 464 (5th Cir. 1994) ...............................................................................19

*In re Diamond Foods, Inc. Sec. Litig.*,
   2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) ..................................................16

*EC Term of Years Tr.* v. *United States*,
   550 U.S. 429 (2007) .............................................................................................8

*Elec. Const. & Maint. Co.* v. *Maeda Pac. Corp.*,
   764 F.2d 619 (9th Cir. 1985) ...............................................................................3

*Erickson* v. *Pardus*,
   551 U.S. 89 (2007) ...............................................................................................3

*Espineli* v. *Toyota Motor Sales, U.S.A., Inc.*,
   2019 WL 3080808 (E.D. Cal. July 15, 2019) ...................................................23

*Eureka Fed. Sav. & Loan Assn.* v. *American Cas. Co.*,
   873 F.2d 229 (9th Cir. 1989) .............................................................................21

*Evers* v. *Astrue*,
   536 F.3d 651 (7th Cir. 2008) ...............................................................................8

*Farrah* v. *Monterey Transfer & Storage, Inc.*,
   555 F. Supp. 2d 1066 (N.D. Cal. 2008) ..............................................................3

*Fed. Hous. Admin., Region No. 4* v. *Burr*,
   309 U.S. 242 (1940) ...........................................................................................24

*Fed. Crop Ins. Corp.* v. *Merrill*,
   332 U.S. 380 (1947) ...........................................................................................25

*Foskaris* v. *Experian Info. Sols., Inc.*,
   2018 WL 3381394 (D. Nev. July 11, 2018) .......................................................8

*Glassey* v. *Amano Corp.*,
   2006 WL 889519 (N.D. Cal. Mar. 31, 2006) ...................................................10

*Gonzalez* v. *JAG Trucking, Inc.*,
   2019 WL 528441 (E.D. Cal. Feb. 11, 2019) .....................................................20

-iii-

*In re Gurga,*
   176 B.R. 196 (B.A.P. 9th Cir. 1994) .......................................................................................10

*Hague* v. *Comm. for Indus. Org.,*
   307 U.S. 496 (1939) ...............................................................................................................13

*In re Heller Ehrman LLP,*
   461 B.R. 606 (Bankr. N.D. Cal. 2011) ...................................................................................11

*In re Holden,*
   236 B.R. 156 (Bankr. D. Vt. 1999) .........................................................................................11

*Jablon* v. *United States,*
   657 F.2d 1064 (9th Cir. 1981) ................................................................................................24

*Johnson* v. *Williford,*
   682 F.2d 868 (9th Cir. 1982) ..................................................................................................25

*In re Keese,*
   671 F. Supp. 3d 1053 (C.D. Cal. 2023) .................................................................................10

*Kenston Mgmt. Co.* v. *Lisa Realty Co.,*
   137 B.R. 100 (Bankr. E.D.N.Y. 1992) ....................................................................................10

*Kershaw* v. *Resol. Tr. Corp.,*
   987 F.2d 1206 (5th Cir. 1993) ................................................................................................19

*In re Kids World of Am., Inc.,*
   349 B.R. 152 (Bankr. W.D. Ky. 2006) ...................................................................................10

*King* v. *St. Vincent's Hosp.,*
   502 U.S. 215 (1991) ...............................................................................................................13

*Koons Buick Pontiac GMC, Inc.* v. *Nigh,*
   543 U.S. 50 (2004) .................................................................................................................13

*Leite* v. *Crane Co.,*
   749 F.3d 1117 (9th Cir. 2014) ..................................................................................................2

*Mangindin* v. *Wash. Mut. Bank,*
   637 F. Supp. 2d 700 (N.D. Cal. June 18, 2009) .....................................................................21

*Mathews* v. *Eldridge,*
   424 U.S. 319 (1976) ...............................................................................................................20

*Menasha Corp.* v. *U.S. Dep't of Just.,*
   2012 WL 1034933 (E.D. Wis. Mar. 26, 2012) ......................................................................25

*Metro Cnty. Title, Inc.* v. *FDIC,*
   13 F.3d 883 (5th Cir. 1994) ...............................................................................................18, 19

-iv-

*Milano* v. *Richmond Hous. Auth.*,
  2018 WL 11472386 (N.D. Cal. Apr. 25, 2018) ..................................................................20

*Mullane* v. *Cent. Hanover Bank & Tr. Co.*,
  339 U.S. 306 (1950)...........................................................................................................18

*Nimon* v. *Resol. Tr. Corp.*,
  975 F.2d 240 (5th Cir. 1992) ........................................................................................18, 19

*Nolan* v. *Cleland*,
  686 F.2d 806 (9th Cir. 1982) ...............................................................................................8

*Nozzi* v. *Hous. Auth.*,
  806 F.3d 1178 (9th Cir. 2015) .......................................................................................15, 17

*O'Connor* v. *Uber Techs., Inc.*,
  82 F. Supp. 3d 1133 (N.D. Cal. 2015) .................................................................................3

*Okpalobi* v. *Foster*,
  244 F.3d 405 (5th Cir. 2001) ..............................................................................................21

*Oregon Nat. Desert Ass'n* v. *U.S. Forest Serv.*,
  465 F.3d 977 (9th Cir. 2006) ..............................................................................................22

*In re Orr*,
  234 B.R. 249 (Bankr. N.D.N.Y. 1999) ...........................................................................14, 15

*In re Patriot Coal Corp.*,
  631 B.R. 648 (Bankr. E.D. Mo. 2021)................................................................................10

*Perez* v. *Demore*,
  2001 WL 1042133 (N.D. Cal. Aug. 21, 2001) ...................................................................17

*Perry* v. *Sindermann*,
  408 U.S. 593 (1972)............................................................................................................16

*In re Process Am., Inc.*,
  588 B.R. 82 (Bankr. C.D. Cal. 2018)..................................................................................10

*R.I.L-R* v. *Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015)......................................................................................22

*Safe Air for Everyone* v. *Meyer*,
  373 F.3d 1035 (9th Cir. 2004) ..........................................................................................2, 3

*SEC* v. *Phan*,
  500 F.3d 895 (9th Cir. 2007) ................................................................................................3

*Shroyer* v. *New Cingular Wireless Servs., Inc.*,
  622 F.3d 1035 (9th Cir. 2010) ..............................................................................................3

-v-

*Skeets* v. *Johnson*,
   805 F.2d 767 (8th Cir. 1986) ................................................................16

*Skinner* v. *Mount. Lion Acquisitions, Inc.*,
   2014 WL 3853424 (N.D. Cal. Aug. 1, 2014) ......................................15

*In re Sonoma W. Med. Ctr., Inc.*,
   2021 WL 4944089 (Bankr. N.D. Cal. 2021)........................................10

*Sulit* v. *Schiltgen*,
   213 F.3d 449 (9th Cir. 2000) ................................................................25

*Town of Hempstead Emps. Fed. Credit Union* v. *Wicks*,
   215 B.R. 316 (E.D.N.Y. 1997) ............................................................15

*In re Turner Grain Merch., Inc.*,
   557 B.R. 147 (Bankr. E.D. Ark. 2016) ..................................................9

*United States* v. *Bormes*,
   568 U.S. 6 (2012) ..................................................................................8

*Wilson* v. *Comm'r*,
   705 F.3d 980 (9th Cir. 2013) ..................................................................8

*Wilton* v. *Seven Falls Co.*,
   515 U.S. 277 (1995)..............................................................................20

*Woodbridge Plaza* v. *Bank of Irvine*,
   815 F.2d 538 (9th Cir. 1987) ................................................................24

**Statutes**

5 U.S.C. § 704......................................................................................22, 23

12 U.S.C. § 1813(m)....................................................................................5

12 U.S.C. § 1817(i)......................................................................................5

12 U.S.C. § 1819......................................................................................24, 25

12 U.S.C § 1821(a)..................................................................................6, 7

12 U.S.C. § 1821(f)................................................................................5, 18

12 U.S.C. § 1823(c)(4)(G) ..............................................................6, 12, 13

**Other Authorities**

3 *Collier on Bankruptcy* ¶ 362.03 (16th ed. 2024) ....................................11

Cong. Rsch. Serv., *Bank Failures: The FDIC's Systemic Risk Exception*
   (Apr. 11, 2023)........................................................................................7

1

Fed. R. Civ. P. 57 .................................................................................................................20

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Plaintiff SVB Financial Group ("SVBFG") submits this opposition to the Motion to

2 Dismiss (ECF No. 25) (the "Motion"), filed by Defendant Federal Deposit Insurance Corporation,

3 in its corporate capacity ("FDIC-C").

4  On March 12, 2023, Treasury Secretary Janet Yellen—upon the unanimous

5 recommendation of the Boards of the Federal Reserve and the Federal Deposit Insurance

6 Corporation ("FDIC"), and after consultation with the President of the United States—invoked the

7 systemic risk exception under 12 U.S.C. § 1823(c)(4)(G) to fully protect all deposits of Silicon

8 Valley Bank ("SVB").  Aimed at quelling panic and further bank runs and assuring the public that

9 the national banking system would not fail, Secretary Yellen's invocation imposed upon FDIC-C

10 the obligation to provide all SVB depositors full access to their deposits, including SVBFG's

11 $1,933,805,708.13 in uninsured deposits (the "Account Funds").  FDIC-C admits that it at first

12 complied with that obligation by providing SVBFG with access to all of its deposits—initially

13 totaling $2.1 billion—in an account at Silicon Valley Bridge Bank, N.A. ("Bridge Bank"), an

14 institution that FDIC-C created, chartered, and operated for the very purpose of providing SVBFG

15 depositors with continuous access to all of their money.  (Mot. 4.)  But then, after SVBFG had

16 unfettered access to its funds for three days, FDIC-C suddenly prevented SVBFG from accessing

17 its Account Funds at Bridge Bank, withholding more than $1.93 billion (plus accumulated interest)

18 for more than a year, in derogation of Secretary Yellen's mandate.

19  On a motion to dismiss, FDIC-C must take all facts alleged in the Complaint as true and

20 cannot argue that it could satisfy its obligations under the systemic risk exception by transferring

21 SVBFG's funds to Bridge Bank and then immediately taking them back.  Nor can it argue that it

22 is immune from blame because other parties, such as Bridge Bank or the FDIC acting in its capacity

23 as the receiver of SVB ("FDIC-R1"), were responsible for SVBFG's loss of its Account Funds.

24 As a result of FDIC-C's conduct, SVBFG filed this action to seek relief from FDIC-C's illegal

25 withholding of SVBFG's Account Funds, which has deprived SVBFG of not only the $1.93 billion

26 on deposit but also more than $100 million in interest.

27  FDIC-C argues in its Motion that 12 U.S.C. § 1821(f)'s administrative process for

28 resolving claims for "payment of insured deposits" forecloses all but one of SVBFG's claims for

1   payment of its Account Funds that were guaranteed by the invocation of the systemic risk

2   exception. FDIC-C further asserts that the terms of Secretary Yellen's invocation of the systemic

3   risk exception gave FDIC-C absolute discretion to pick and choose which SVB depositors to pay,

4   whether to pay any of them anything at all, in what amounts, and at what time.

5       FDIC-C is wrong on both counts. First, section 1821(f) governs only claims for <u>insured</u>

6   deposits statutorily capped at $250,000, which have already been paid to SVBFG. It does not

7   apply to SVBFG's claims for its $1.93 billion in <u>uninsured</u> Account Funds. Second, FDIC-C does

8   not have unfettered discretion to ignore Secretary Yellen's determination to protect <u>all</u> depositors'

9   uninsured deposits and deny SVBFG access to its Account Funds. FDIC-C's argument to the

10  contrary ignores the terms of Secretary Yellen's systemic risk determination and is inconsistent

11  with FDIC-C's own conduct, especially given its admission that it initially complied with those

12  terms by providing all depositors, including SVBFG, with full access to their account funds at

13  Bridge Bank. (Mot. 2.) Third, SVBFG has more than plausible claims that FDIC-C must turnover

14  SVBFG's property, has violated the automatic stay, and has violated SVBFG's due process rights.

15  FDIC-C admits that it was only after making all deposits available to SVBFG at Bridge Bank that

16  it later acted with or authorized FDIC-R1 and/or Bridge Bank (now FDIC-R2) to take away

17  SVBFG's access to its deposits with no explanation. FDIC-C's remaining arguments are also

18  without merit. For all these reasons and those that follow, this Court should deny the Motion.

19                          <u>**LEGAL STANDARD**</u>

20      "When presented with a motion to dismiss under Rule 12(b)(1) for lack of subject matter

21  jurisdiction, a federal court must first distinguish between a 'facial attack' and a 'factual attack'"

22  on the plaintiff's jurisdictional allegations. *Cheng* v. *Speier*, 609 F. Supp. 3d 1046, 1050 (N.D.

23  Cal. 2022), *aff'd*, 2023 WL 4490352 (9th Cir. July 12, 2023). A facial challenge is one where "the

24  challenger asserts that the allegations contained in a complaint are insufficient on their face to

25  invoke federal jurisdiction." *Safe Air for Everyone* v. *Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

26  When a challenge to a court's jurisdiction is facial, the court "accept[s] the plaintiff's allegations

27  as true and draw[s] all reasonable inferences in the plaintiff's favor." *Leite* v. *Crane Co.*, 749 F.3d

28  1117, 1121 (9th Cir. 2014). A factual attack is one where the moving party relies on affidavits or

-2-

1  other evidence.  *Safe Air for Everyone*, 373 F.3d at 1039.  In those circumstances, the court "may

2  review evidence beyond the complaint," *id.*, but "in the absence of a full-fledged evidentiary

3  hearing, disputes in the facts pertinent to subject matter are viewed in the light most favorable to

4  the opposing party," *Farrah* v. *Monterey Transfer & Storage, Inc.*, 555 F. Supp. 2d 1066, 1068

5  (N.D. Cal. 2008).

6      On a Rule 12(b)(6) motion, the court must "accept as true all of the factual allegations

7  contained in the complaint," *Erickson* v. *Pardus*, 551 U.S. 89, 94 (2007), and may dismiss a claim

8  "only where there is no cognizable legal theory," or there is an absence of "sufficient factual matter

9  to state a facially plausible claim to relief," *Shroyer* v. *New Cingular Wireless Servs., Inc.*, 622

10  F.3d 1035, 1041 (9th Cir. 2010).  While courts are not required to accept legal conclusions as true,

11  "the application of the law to the particular facts of the case" is "a mixed question of law and fact,"

12  which "is not something that can be determined at the 12(b)(6) stage."  *Baum* v. *J-B Weld Co.*,

13  2019 WL 6841231, at *8 (N.D. Cal. Dec. 16, 2019); *see also O'Connor* v. *Uber Techs., Inc.*, 82

14  F. Supp. 3d 1133, 1147 (N.D. Cal. 2015) ("[G]enerally a jury should decide ultimate questions

15  that involve the application of a legal standard to the facts."); *SEC* v. *Phan*, 500 F.3d 895, 908-09

16  (9th Cir. 2007) (recognizing that mixed questions of law and fact are typically left for the jury).

17      Dismissal under Rule 12(b)(6) is particularly inappropriate where, as here, the complaint

18  raises novel legal questions that are more appropriately resolved after the development of a full

19  factual record.  *See Elec. Const. & Maint. Co.* v. *Maeda Pac. Corp.*, 764 F.2d 619, 623 (9th Cir.

20  1985) ("The court should be especially reluctant to dismiss on the basis of the pleadings when the

21  asserted theory of liability is novel or extreme, since it is important that new legal theories be

22  explored and assayed in the light of actual facts rather than a pleader's suppositions.").

23              **STATEMENT OF FACTS**

24      SVBFG was a bank holding company that owned SVB and other affiliated businesses from

25  2000 until March 2023.  (Compl. ¶ 30.)  As of March 10, 2023, SVBFG had approximately

26  $2.1 billion in three deposit accounts maintained at SVB.  (*Id.* ¶ 31.)  On March 10, 2023, the

27  California Department of Financial Protection and Innovation took possession of SVB and

28  appointed FDIC-R1 as receiver for SVB.  (*Id.* ¶ 32.)  At the time SVB was closed, the FDIC was

-3-

1  also preparing for the potential failure of New York-based Signature Bank. (*Id.* ¶ 39.) Over the

2  weekend of March 11, the Department of the Treasury, the FDIC, and the Federal Reserve assessed

3  the impact of the closures of SVB and Signature Bank on the American banking system and

4  financial markets and concluded "that preserving unimpaired access to all uninsured deposits for

5  SVB and Signature Bank would help mitigate adverse impacts to financial stability and the

6  economy." (*Id.* ¶ 40.) Accordingly, on March 12, the Boards of the Federal Reserve and the FDIC

7  unanimously recommended that Secretary Yellen invoke the systemic risk exception to guarantee

8  payment of all uninsured deposits of SVB and Signature Bank. (*Id.* ¶ 41.) Secretary Yellen, after

9  consultation with President Biden, adopted the recommendation and invoked the systemic risk

10  exception pursuant to 12 U.S.C. § 1823(c)(4)(G) to guarantee all deposits of all depositors at SVB

11  and Signature Bank, without exception. (*Id.*) Consistent with Secretary Yellen's determination,

12  FDIC-C created Bridge Bank and transferred all deposits at SVB—including SVBFG's—to

13  Bridge Bank, where SVB depositors had full and immediate access to their funds beginning on

14  March 13. (*Id.* ¶ 67.) Like any other former SVB depositors, SVBFG was granted full access to

15  its Account Funds on March 13, and during the next three days, SVBFG withdrew approximately

16  $180 million of its deposit funds. (*Id.* ¶ 69.) However, on March 16, FDIC-C suddenly cut off

17  SVBFG's access to approximately $1.93 billion of its remaining funds at Bridge Bank, whether

18  by doing so itself—as the entity responsible for creating, chartering, and operating Bridge Bank—

19  or by instructing FDIC-R1 and/or -R2 to do so. (*Id.* ¶ 70-73.) FDIC-C has since continued to

20  refuse to restore SVBFG's access to its Account Funds. (*Id.* ¶ 107.)

21  <u>**ARGUMENT**</u>

22  **I.    12 U.S.C. § 1821(f) Does Not Bar SVBFG's Uninsured Deposit Claims**

23      FDIC-C argues that the Court lacks subject matter jurisdiction over Counts I, II, III, IV, V,

24  and VII because they "are foreclosed by the comprehensive remedial scheme in [12 U.S.C.]

25  § 1821(f)." (Mot. 8.) In so arguing, FDIC-C cites *Hinck* v. *United States*, 550 U.S. 501 (2007),

26  and *Savage Servs. Corp.* v. *United States*, 25 F. 4th 925 (11th Cir. 2022), for the proposition that

27  "when the legislature has attacked a specific problem" through "a detailed and precise remedy,"

28

-4-

1    courts "should generally assume that the law represents Congress's considered and exclusive
2    judgment on that issue." (*Id.*)

3    This argument fails because none of Counts I-V or VII presents a "specific problem" that
4    section 1821(f) addresses.    Section 1821(f) prescribes the administrative process to resolve
5    "claims for <u>insured deposits</u>."  12 U.S.C. § 1821(f)(2) ("The Corporation, in its discretion, may
6    require proof of claims to be filed and may approve or reject such <u>claims for insured deposits</u>."
7    (emphasis added)).  But "insured deposits" is not what any of Counts I-V and VII addresses.  They
8    seek relief solely with respect to SVBFG's <u>unsecured deposits</u>:  Count I seeks declaratory relief
9    regarding SVBFG's "<u>unsecured deposits</u>"; Count II and III seek turnover of SVBFG's "<u>unsecured</u>
10   <u>deposits</u>" and remedies for violation of the automatic stay stemming from SVBFG's refusal to pay
11   such <u>unsecured deposits</u>; Count IV alleges that FDIC-C violated SVBFG's Fifth Amendment
12   rights by unlawfully depriving it of its "<u>unsecured deposits</u>" without due process; Count V claims
13   that FDIC-C's exercise of its purported discretion in determining whether to "return SVBFG's
14   <u>unsecured deposits</u>" violates the Administrative Procedure Act ("<u>APA</u>"); and Count VII alleges
15   estoppel against FDIC-C based on its publicly announced promise to "guarantee any <u>unsecured</u>
16   <u>deposits</u>" of former SVB depositors.  (Compl. ¶¶ 110, 114, 123, 133, 144, 168. (emphasis added).)
17   Simply put, section 1821(f)'s claims process for <u>insured deposits</u> is inapplicable to any of these
18   six claims seeking relief on account of SVBFG's <u>unsecured deposits</u>.

19   FDIC-C asserts that section 1821(f) nevertheless "covers any claim for payment from the
20   Deposit Insurance Fund," even though the term "Deposit Insurance Fund" appears nowhere in
21   section 1821(f).  (Mot. 9.)  According to FDIC-C, because the actions taken pursuant to the
22   systemic risk exception are paid from the Deposit Insurance Fund, SVBFG's claims for its Account
23   Funds must be covered under section 1821(f).  FDIC-C's unsupported assertion is wrong.

24   *First*, the plain text of the Federal Deposit Insurance Act ("<u>FDIA</u>") provides that claims
25   subject to section 1821(f) are limited to "claims for insured deposits" not to exceed $250,000.  *See*
26   12 U.S.C. § 1821(f)(2).  Section 1813(m)(1) defines "the term '<u>insured deposit</u>'" to mean "the net
27   amount due to any depositor for deposits in an insured depository institution as determined under
28   sections 1817(i) and 1821(a) of this title."  Section 1817(i)(1), in turn, provides that "funds held

-5-

1    on deposit … shall be insured in an amount not to exceed the standard maximum deposit insurance

2    amount (as determined under section 1821(a)(1) of this title)," and section 1821(a)(1)(E) states

3    that "the term 'standard maximum deposit insurance amount' means $250,000." In this case, the

4    $250,000 insured portion of SVBFG's account is not at issue, as FDIC-C admits that it has in fact

5    already been paid. (Mot. 2.) Thus, the plain text of the statute alone is dispositive.

6        *Second*, if defying the expressly stated scope of section 1821(f) were not enough, FDIC-C's

7    contention that section 1821(f) applies contradicts the text of section 1823(c)(4)(G)'s systemic risk

8    provision. Typically, section 1823(c)(4)(E) bars FDIC-C from "increasing losses to the Deposit

9    Insurance Fund by protecting . . . depositors for more than the insured portion of deposits." But

10   when the Treasury Secretary invokes the systemic risk exception and determines that "any action

11   or assistance" under the systemic risk provision "would avoid or mitigate" serious adverse effects

12   on economic conditions or financial stability, section 1823(c)(4)(G) suspends subparagraph (E)'s

13   limitation and permits using the Deposit Insurance Fund for more than the payment of insured

14   deposits. 12 U.S.C. § 1823(c)(4)(G)(i) ("Notwithstanding subparagraphs (A) and (E) . . . .").

15       This is what Secretary Yellen did. In invoking the systemic risk exception under

16   section 1823(c)(4)(G), Secretary Yellen specifically mandated the payment of uninsured deposits

17   at SVB from the Deposit Insurance Fund. (Compl. ¶¶ 41-44.) But this invocation does not

18   increase the $250,000 statutory limit for insured deposits set by Congress in section 1813(m) and

19   convert uninsured deposits into insured deposits—nor could it. FDIC-C admits that SVBFG's

20   uninsured deposits did not become insured by virtue of the systemic risk invocation. (Mot. 13.)

21   Instead, the invocation of the systemic risk exception protected <u>all</u> deposits at SVB, including

22   uninsured deposits, regardless of any losses to the Deposit Insurance Fund. (Compl. ¶¶ 39-44.)

23   Notably, the Board of the FDIC approved a final rule on November 16, 2023, implementing a

24   special assessment on insured depository institutions "to recover the loss to the Deposit Insurance

25   Fund . . . associated with protecting uninsured depositors following [SVB's] closure." (*Id.* ¶ 82.)

26       *Third*, FDIC-C cites section 1821(a)(4)(A)(ii) for the proposition that section 1821(f)

27   "covers any claim for payment from the Deposit Insurance Fund." (Mot. 9.) Section 1821(a)(4)(A)

28   merely establishes the Deposit Insurance Fund; it does not purport to set limits on its use or

-6-

1    transform any use of the Fund into payment of an "insured deposit." The statute says nothing even

2    to suggest that any payment from the Deposit Insurance Fund constitutes payment of an "insured

3    deposit." The very next subparagraph, which sets out the Deposit Insurance Fund's "Uses," further

4    provides that "[t]he Deposit Insurance Fund shall be available to the Corporation <u>for use with</u>

5    <u>respect to insured depository institutions</u> the deposits of which are insured by the Deposit

6    Insurance Fund." 12 U.S.C. § 1821(a)(4)(B) (emphasis added). In other words, the Deposit

7    Insurance Fund may be used with respect to any <u>insured depository institution</u>, which are those

8    entities "the deposits of which are insured by the [Fund]," and nothing in the "Uses" provision of

9    the Deposit Insurance Fund limits its use only to reimbursing <u>insured deposits</u>. Nor do any of the

10   "Limitation[s] on use" set forth in section 1821(a)(4)(C) restrict the use of the Deposit Insurance

11   Fund to payment of only insured deposits—and even if any did (which none do), the enumerated

12   limitations expressly do not apply upon invocation of the systemic risk exception pursuant to

13   section 1823(c)(4)(G). *See* 12 U.S.C. § 1821(a)(4)(C) ("Notwithstanding any provision of law

14   other than section 1823(c)(4)(G) of this title . . . .").

15        *Fourth*, prior invocations of the systemic risk exception also confirm that a payment is not

16   a "payment of insured deposits" under section 1821(f) merely because it is paid from the Deposit

17   Insurance Fund. The Treasury Secretary invoked the systemic risk exception on three prior

18   occasions. (Compl. ¶ 38.) In all three prior occasions, costs to the FDIC associated with the

19   invocations of the systemic risk exception were to be paid by drawing from the Deposit Insurance

20   Fund. (Cong. Rsch. Serv., *Bank Failures: The FDIC's Systemic Risk Exception* (Apr. 11, 2023)

21   (overviewing the "previous uses of the [systemic risk] exception").) Even FDIC-C cannot argue

22   those intended actions—*i.e.*, entering into a loss-sharing agreement with Citigroup to help facilitate

23   Citigroup's acquisition of Wachovia's banking operations; establishing a program to guarantee

24   certain unsecured debt and non-interest-bearing transaction accounts at insured depository

25   institutions; and entering into a loss-sharing agreement on a pool of Citigroup's assets to protect

26   against large losses on those assets—would comprise a payment of an "insured deposit."

27        *Fifth*, the cases FDIC-C cites in its Motion are inapposite. Most of FDIC-C's cases stand

28   for the uncontroversial proposition that when Congress has provided a specific remedy for a

-7-

1   specific claim, a plaintiff may not seek other remedies for the same claim.  *See EC Term of Years*

2   *Tr.* v. *United States*, 550 U.S. 429, 435 (2007) (claim against the IRS for wrongful levy preempts

3   "the same challenge" through a general tax-refund claim); *Nolan* v. *Cleland*, 686 F.2d 806, 814-15

4   (9th Cir. 1982) (because "Title VII provides the exclusive judicial remedy for claims of

5   discrimination in federal employment," the same claim cannot be made under the Due Process

6   Clause); *Evers* v. *Astrue*, 536 F.3d 651, 657 (7th Cir. 2008) (due process and APA claims

7   unavailable because Contract Dispute Act "provide[s] final and exclusive resolution of all disputes

8   arising from government contracts covered by the statute"); *Foskaris* v. *Experian Info. Sols., Inc.*,

9   2018 WL 3381394, at *4 (D. Nev. July 11, 2018) (declaratory relief not permitted because the

10  "stated remedies" in the Fair Credit Reporting Act "are exclusive").  FDIC-C's other cases merely

11  establish that a plaintiff may not supplement a statute with specific provisions from a different

12  statute.  *See Wilson* v. *Comm'r*, 705 F.3d 980, 990 (9th Cir. 2013) (The "special statutory review

13  process" for a tax court to review petitions for equitable relief under 28 U.S.C. § 6015(f) precludes

14  "the usual APA procedures"); *United States* v. *Bormes*, 568 U.S. 6, 15 (2012) (Little Tucker Act's

15  "less stringent" immunity waiver does not apply to a claim under the Fair Credit Reporting Act).

16          Unlike the cited cases, here, Counts I-V and VII, which seek payment of the uninsured

17  Account Funds guaranteed by Secretary Yellen's action under section 1823(c)(4)(G), do not

18  constitute the "same challenge" as claims for <u>insured deposits</u> under <u>section 1821(f)</u> for an amount

19  "not to exceed" $250,000.  Nor is SVBFG seeking to supplement section 1821(f)'s process with

20  specific provisions from a different statute.  Section 1821(f) does not apply to SVBFG's uninsured

21  deposit claims at all.

22          *Finally*, FDIC-C seizes on SVBFG's protective proof of claim filed in FDIC-R1's

23  administrative proceeding, stating that SVBFG demanded that FDIC-C pay its deposits pursuant

24  to the invocation of the systemic risk exception "and" section 1821(f).  (No. 23-01137 (MG)

25  (Bankr. S.D.N.Y.), Dkt. No. 52 at 15 n.5.)  Counts I-V and VII allege that they are claims for

26  uninsured deposits that are <u>not</u> subject to section 1821(f), and FDIC-C may not use a non-public

27  filing that SVBFG made on a protective basis to preserve all of its potential rights of recovery <u>with</u>

28  <u>a separate government entity</u> to controvert SVBFG's well-pleaded allegations <u>in this case</u>.

-8-

**II.     SVBFG States a Plausible Turnover Claim Under 11 U.S.C. § 542**

FDIC-C argues that the Complaint fails to state a turnover claim under section 542 of the Bankruptcy Code because the Account Funds (1) are not property of the estate; (2) are not in FDIC-C's "possession, custody, or control"; and (3) are not "matured, payable on demand, or payable on order."  (Mot. 11.)  None of FDIC-C's arguments is persuasive.

**A.  The Account Funds Are Estate Property**

FDIC-C argues that SVBFG's turnover claim should be dismissed because it disputes that it has any legal obligation to pay the Account Funds.  FDIC-C's argument misses the point.  There is no dispute as to:  (1) SVBFG's proper title of the Account Funds; (2) their amount; (3) that Secretary Yellen invoked the systemic risk exception to guarantee "all deposits" of "all depositors" of SVB; or (4) that the Account Funds were made available to SVBFG in its account at Bridge Bank.  (Compl. ¶¶ 4, 31, 62.)  *See In re Calvin*, 329 B.R. 589, 596 (Bankr. S.D. Tex. 2005) ("[B]ecause the Bank is an entity that owed a debt [i.e., bank deposit] that was property of the estate and payable on demand, the Bank was required pursuant to § 542(b) to pay such debt to . . . the trustee . . . pursuant to § 542(b)."); *In re Turner Grain Merch., Inc.*, 557 B.R. 147, 150 (Bankr. E.D. Ark. 2016) ("[B]anks are obligated to turnover account funds to the trustee pursuant to Section 542(b)." (collecting cases)).

The only "dispute" over the turnover claim is the import of the systemic risk exception: whether, as a matter of law, FDIC-C must turn over the Account Funds to SVBFG following Secretary Yellen's determination, and after having done so, whether FDIC-C had any right to take those funds back from SVBFG.  This dispute does not convert SVBFG's turnover claim for an undisputed sum into a claim for disputed property for purposes of SVBFG's turnover claim.  *See In re Brown*, 2022 WL 4390454, at *21 (Bankr. S.D.N.Y. Sept. 22, 2022) ("That [defendant] disputes the existence of the debt does not alter the Court's conclusion that the Trustee is entitled to a payment … pursuant to section 542(b)."); *Kenston Mgmt. Co*. v. *Lisa Realty Co*., 137 B.R. 100, 107 (Bankr. E.D.N.Y. 1992) ("[F]or an action to be a turnover proceeding, it is not relevant that . . . the defendant[s] dispute the existence of the debt by, perhaps, denying the complaint's allegations."); *In re Patriot Coal Corp.*, 631 B.R. 648, 658 (Bankr. E.D. Mo. 2021) (same); *In re*

-9-

1   *Kids World of Am., Inc.*, 349 B.R. 152, 163 (Bankr. W.D. Ky. 2006) (same).  Here, the Complaint

2   alleges (and FDIC-C does not contest) that "there is no dispute as to either SVBFG's ownership

3   of, or the current amount of, the funds that were in SVBFG's accounts" at SVB.  (Compl. ¶ 14.)

4       Moreover, even if the Account Funds were deemed to be disputed property (and they are

5   not), courts in the Ninth Circuit have recently held that disputed property <u>is</u> subject to turnover

6   under section 542(b).  *E.g.*, *In re Keese*, 671 F. Supp. 3d 1053, 1058 n.1 (C.D. Cal. 2023)

7   ("Whether turnover motions can involve disputed property is the subject of a longstanding split of

8   authority.  The Court finds more persuasive the decisions of California bankruptcy courts

9   that . . . found that the plain language of [section] 542 does not contain such a limitation."); *In re*

10  *Process Am., Inc.*, 588 B.R. 82, 101 (Bankr. C.D. Cal. 2018) ("§ 542(b) makes no requirement that

11  the debt be undisputed.  [Defendant]'s authority does not support a finding that a turnover can

12  never involve the return of disputed funds."); *In re Sonoma W. Med. Ctr., Inc.*, 2021 WL 4944089,

13  at *7 (Bankr. N.D. Cal. 2021) (adopting the reasoning of *In re Process Am., Inc.*).

14      FDIC-C ignores these recent, in-circuit authorities and instead relies on inapposite,

15  decades-old cases.  In *Glassey* v. *Amano Corp.*, 2006 WL 889519, at *4 (N.D. Cal. Mar. 31, 2006),

16  one of FDIC-C's principal authorities, the court dismissed plaintiff's turnover claim because the

17  Federal Tort Claims Act precluded jurisdiction over the plaintiff's fraud claim against the

18  government—not because the claim involved disputed property.  FDIC-C next relies on the *dicta*

19  in *In re Gurga*, 176 B.R. 196 (B.A.P. 9th Cir. 1994), to argue that a turnover claim must involve

20  undisputed property.  (Mot. 11.)  But *In re Gurga* "otherwise focuses on whether arbitration clauses

21  must be enforced in noncore proceedings," and courts have rejected reliance on the same *dicta* that

22  FDIC-C cites here.  *In re Process Am., Inc.*, 588 B.R. at 101; *see also In re Sonoma W. Med. Ctr.,*

23  *Inc.*, 2021 WL 4944089, at *7 (following the "persuasive" reasoning of *In re Process*'s rejection

24  of *In re Gurga*'s *dicta*).  Other cases, while inconsistent with recent authority in this Circuit, at

25  most stand for the proposition that "[t]urnover proceedings are not to be used to liquidate <u>disputed</u>

26  <u>contract claims</u>."  *In re Charter Co.*, 913 F.2d 1575, 1579 (11th Cir. 1990) (emphasis added); *see*

27  *also In re Heller Ehrman LLP*, 461 B.R. 606, 608 (Bankr. N.D. Cal. 2011) ("A suit by a debtor

28  against a non-creditor arising out of breach of contract . . . is not a turnover action.").  Because this

-10-

1  turnover claim is not a breach of contract claim, and the amount of the Account Funds are not

2  disputed, these cases are inapplicable too.

3  **B.  FDIC-C Possesses SVBFG's Account Funds**

4  FDIC-C cites *Citizens Bank of Maryland* v. *Strumpf*, 516 U.S. 16 (1995), to argue that

5  SVBFG has no Account Funds, and therefore, FDIC-C has no funds to turnover.  (Mot. 12).

6  *Strumpf*, however, supports SVBFG's turnover claim.  In *Strumpf*, the Court acknowledged that

7  "a bankrupt's debtors" have an obligation to turnover estate property under section 542(b), but that

8  obligation is limited "to the extent that such debt may be offset under section 553."  516 U.S. at

9  20.  Unlike *Strumpf*, FDIC-C does not purport to justify its withholding of the Account Funds on

10  the basis of any alleged setoff claim (it has asserted none in any fora), but instead prevents SVBFG

11  from accessing all of its $1.93 billion.  *See In re Holden*, 236 B.R. 156, 163 (Bankr. D. Vt. 1999);

12  3 *Collier on Bankruptcy* ¶ 362.03 (16th ed. 2024) ("It is also clear that the administrative account

13  hold found to be permissible in *Strumpf* is limited to creditors who have setoff rights.").

14  To the extent that FDIC-C argues the Account Funds were never transferred to, or assumed

15  by, FDIC-C, that assertion disputes the Complaint's factual allegations—improper on a motion to

16  dismiss—and FDIC-C already conceded in its Motion that it possessed the Account Funds, had

17  control over them, and facilitated their transfer to Bridge Bank, which FDIC-C created, chartered,

18  and operated.  (*See* Mot. 14.)

19  **C.  FDIC-C Owes SVBFG an Enforceable Obligation**

20  FDIC-C owes SVBFG an enforceable obligation to provide access to its Account Funds.

21  FDIC-C again concedes that "[t]he press releases and other public statements SVBFG recites state

22  that FDIC-C would act to 'protect' insured and uninsured depositors and provide them 'access' to

23  their accounts on March 13, 2023," and that "FDIC-C did precisely that . . . by making [SVBFG's]

24  deposits available at Bridge Bank."  (Mot. 14.)  FDIC-C also admits that the "transfer was

25  completed under the systemic risk exception approved by the Secretary of the Treasury."  (*Id.* at

26  1.)

27  FDIC-C asserts that it "discharged" its obligations by transferring SVBFG's deposits to

28  Bridge Bank.  (Mot. 14.)  While FDIC-C's position seems to be that if the deposits were accessible

1  to SVBFG for even a nanosecond that would satisfy FDIC-C's obligations, the Complaint alleges

2  that (1) FDIC-C chartered and operated Bridge Bank; (2) all of SVBFG's funds were in SVBFG's

3  account at Bridge Bank and accessible to SVBFG as of March 13, 2023; (3) Bridge Bank was not

4  in receivership; (4) FDIC-C took or participated in taking the funds from SVBFG without notice;

5  and (5) without FDIC-C's acquiescence and approval, SVBFG's access to its Account Funds

6  would not have been terminated.  The "obligation" FDIC-C correctly identifies but improperly

7  purports to have discharged was to make the full measure of SVBFG's uninsured deposits

8  available to SVBFG, and nothing gave FDIC-C the authority to determine after three days that it

9  was free to take those Account Funds away from SVBFG.  Inasmuch as FDIC-C claims that it has

10 "discretion" under section 1823(c)(4)(F) to selectively deny SVBFG's access to its Account Funds

11 after it transferred the deposits to SVBFG's account at Bridge Bank, the statutory text makes clear

12 that FDIC-C possesses no such authority.

13         Section 1823(c)(4)(F) provides that "[a]ny determination which <u>the Corporation may make</u>

14 <u>under this paragraph</u> shall be made in the sole discretion of the Corporation."  (emphasis added).

15 The invocation of a systemic risk exception to pay all uninsured depositors of SVB was made by

16 Secretary Yellen, <u>not</u> FDIC-C, pursuant to section 1823(c)(4)(G).  Unlike sections 1823(c)(4)(A)-

17 (E), which involve determinations by, and limitations on, FDIC-C in effectuating the least-cost

18 resolution of an insured depository institution, section 1823(c)(4)(G) applies to an "[e]mergency

19 determination <u>by [the] Secretary of the Treasury</u>."  (emphasis added).  FDIC-C's only discretion

20 within section 1823(c)(4)(G) is in making a "written recommendation" to the Secretary on whether

21 to invoke the systemic risk exception at all.  12 U.S.C. § 1823(c)(4)(G)(i).  FDIC-C did so, when

22 its Board and the Federal Reserve unanimously recommended that Secretary Yellen invoke the

23 systemic risk exception.  Nothing in section 1823(c)(4)(F), which applies only to "determination[s]

24 which <u>the Corporation</u> may make" (emphasis added),  grants FDIC-C discretion to undo or ignore

25 Secretary Yellen's determination.

26         Moreover, section 1823(c)(4)(G) specifies that "the Secretary of the Treasury [may]

27 determine[]" to invoke the systemic risk exception only "in consultation with the President" and

28 "upon the written recommendation of the Board of Directors [of the FDIC] and the Board of

-12-

1    Governors of the Federal Reserve System." 12 U.S.C. § 1823(c)(4)(G)(i). Because

2    sections 1823(c)(4)(F) and (G) "stand and must be read together," it is unreasonable to interpret

3    subparagraph (F) as granting FDIC discretion to <u>undo</u> or otherwise <u>countermand</u> the Secretary's

4    determination in view of the multilayered, interdepartmental process required in subparagraph (G).

5    *Hague* v. *Comm. for Indus. Org.*, 307 U.S. 496, 530 (1939); *King* v. *St. Vincent's Hosp.*, 502 U.S.

6    215, 221 (1991) ("[W]e do nothing more . . . than follow the cardinal rule that a statute is to be

7    read as a whole . . . since the meaning of statutory language, plain or not, depends on context.");

8    *Koons Buick Pontiac GMC, Inc.* v. *Nigh*, 543 U.S. 50, 63 (2004) ("[T]here is no canon against

9    using common sense in construing laws as saying what they obviously mean.").

10          Whatever discretion FDIC-C had was limited to its decision to recommend that Secretary

11   Yellen invoke the systemic risk exception. Nothing FDIC-C cites in section 1823 or elsewhere

12   gives FDIC-C the discretion to, after transferring SVBFG's deposits to Bridge Bank, make them

13   available only briefly and suddenly, without notice, take away those Account Funds or authorize

14   FDIC-R1 and/or FDIC-R2 to do so.

15   **D.  FDIC-C Has Not Satisfied Its Obligation to Turn Over the Account Funds**

16          FDIC-C asserts that the payment of insured deposits "fully discharge[s] [it] from any

17   obligation it owed SVBFG" because section 1822(b) provides that "[p]ayment of an insured

18   deposit to any person by the Corporation shall discharge the Corporation." (Mot. 14.) FDIC-C

19   omits the remainder of section 1822(b), which provides that "[p]ayment of an insured deposit to

20   any person by the Corporation shall discharge the Corporation ... <u>to the same extent that payment</u>

21   <u>to such person by the depository institution in default would have discharged it from liability for</u>

22   <u>the insured deposit</u>." (emphasis added). In other words, FDIC-C's payment of SVBFG's $250,000

23   insured deposit only discharges it to the extent of the insured deposit. Section 1822(b) does not

24   "discharge" FDIC-C's obligations to SVBFG pursuant to Secretary Yellen's invocation with

25   respect to SVBFG's $1.93 billion in uninsured deposits. In any event, FDIC-C ignores the factual

26   allegations of the Complaint that after paying SVBFG its insured and uninsured deposits, it

27   wrongly took away SVBFG's Account Funds, which are uninsured deposits.

28

**III.    SVBFG Alleges a Plausible Violation of the Automatic Stay Under 11 U.S.C. § 362(a)**

FDIC-C violated the automatic stay provisions of sections 362(a)(1) and (a)(3) of the Bankruptcy Code by cutting off SVBFG's access to the Account Funds, removing the Account Funds from an operating national bank, and wrongly claiming that SVBFG was subject to the supposed claims process under section 1821(f) to recover its Account Funds.  FDIC-C argues that SVBFG cannot state a claim for violation of the automatic stay under section 362(a)(3) because it did not "plead the existence of an undisputed property interest over which FDIC-C" is exercising control.  (Mot. 15.)  As discussed above, the Account Funds are property of SVBFG's bankruptcy estate, and FDIC-C's denial of SVBFG's access to the Account Funds is an "act … to exercise control over property of the estate" prohibited by section 362(a)(3).  *See, e.g.*, *In re Cullen*, 329 B.R. 52, 58 (Bankr. N.D. Iowa 2005) (finding that defendant violated the automatic stay because it "deliberately placed an indefinite hold on [debtor]'s [bank] accounts"); *In re Orr*, 234 B.R. 249, 255 (Bankr. N.D.N.Y. 1999) ("To conclude that an entity … is entitled to maintain a freeze or hold on a debtor's account indefinitely without seeking relief from the automatic stay would make [the stay provisions] superfluous.").

FDIC-C's relies on *Strumpf* to argue that there was no violation of the automatic stay because the Account Funds are only deposit liabilities.  FDIC-C's reliance on *Strumpf* is misplaced.  *Strumpf* held that a <u>temporary</u>, "administrative hold" that a bank placed on the chapter 13 debtor's checking account, only up to the amount of the debtor's defaulted loan amount—and "only while it sought relief under [section] 362(d) from the automatic stay"—did not constitute a post-petition setoff in violation of automatic stay.  *Strumpf*, 516 U.S. at 19.

Unlike *Strumpf*, FDIC-C does not purport to withhold funds only temporarily while it seeks relief from the Court under section 362(d).  The hold at issue in *Strumpf* lasted a matter of days.  *See id.* at 18.  Here, FDIC-C has deprived SVBFG of access to $1.93 billion in deposits for fourteen months and counting, with no end in sight.  *Compare id.* at 21 ("[P]etitioner's temporary refusal to pay was neither a taking of possession of respondent's property nor an exercising of control over it."), *with In re Orr*, 234 B.R. at 255 (explaining that credit union's freeze of debtor's deposits for two months, without seeking relief from automatic stay, was not a "temporary" freeze under

-14-

1    *Strumpf* and violated section 362(a)), *and Town of Hempstead Emps. Fed. Credit Union* v. *Wicks*,

2    215 B.R. 316, 319 (E.D.N.Y. 1997) ("applying the rules enunciated in *Strumpf*," four-month hold

3    on debtor's bank account constituted a violation of the automatic stay.)

4         FDIC-C contends that it is not liable for violating the automatic stay because, supposedly,

5    it was FDIC-R1 (not FDIC-C) that wrongfully cut off SVBFG's access to its Account Funds.  (Mot.

6    12.)  But that raises a factual dispute.  The Complaint alleges that FDIC-C worked together with

7    FDIC-Rs to withhold SVBFG's Account Funds and that no funds could have been removed from

8    SVBFG's account at Bridge Bank, which was under FDIC-C control, without FDIC-C

9    participation or approval.  (*See*, *e.g.*, Compl. ¶¶ 5-6, 72, 77.)  FDIC-C cannot brush aside these

10   well-pleaded factual allegations at the pleadings stage.  *See, e.g.*, *Skinner* v. *Mount. Lion*

11   *Acquisitions, Inc.*, 2014 WL 3853424, at *3 (N.D. Cal. Aug. 1, 2014).

12   **IV.    SVBFG Plausibly States a Claim for Violation of Its Due Process Rights**

13        SVBFG plausibly pleads that it has a property interest protected by due process in the

14   guaranteed access to its uninsured deposits, and FDIC-C violated SVBFG's constitutional rights

15   by cutting off its access without affording SVBFG any due process.

16        **A.  SVBFG Has a Property Interest in the Guaranteed Access to Its Account Funds**

17        Secretary Yellen's invocation of the systemic risk exception gave SVBFG a property

18   interest in its uninsured deposits at SVB—which is an entitlement protected by procedural due

19   process.  Property interests protected by due process "include anything to which a plaintiff has a

20   'legitimate claim of entitlement.'"  *Nozzi* v. *Hous. Auth.*, 806 F.3d 1178, 1191 (9th Cir. 2015).

21   Property interests in government benefits protected by due process are not "limited by a few rigid,

22   technical forms," but "[r]ather, 'property' denotes a broad range of interests that are secured by

23   'existing rules or understandings,'" and "[a] person's interest in a benefit is a 'property' interest

24   for due process purposes if there are such rules or mutually explicit understandings that support

25   his claim of entitlement to the benefit and that he may invoke at a hearing."  *Perry* v. *Sindermann*,

26   408 U.S. 593, 601 (1972).  Thus, courts have found that even informal administrative guidance

27   documents, such as policy manuals, can create a property interest subject to due process.  *See, e.g.*,

28   *Adams* v. *Sewell*, 946 F.2d 757, 764 (11th Cir. 1991) ("Personnel Policy Manual" created a

-15-

1   property interest in continued employment for county employees), *overruled on other grounds by*

2   *McKinney* v. *Pate*, 20 F.3d 1550 (11th Cir. 1994); *Skeets* v. *Johnson*, 805 F.2d 767, 770 (8th Cir.

3   1986) (employee handbook can create property interest "if it reflects a *de facto* policy of

4   established guidelines to be followed prior to dismissal")

5          Whether a plaintiff has a legitimate claim of entitlement to public benefits giving rise to a

6   property interest protected by due process is determined largely by whether the grant of the

7   entitlement "is couched in mandatory terms." *Ching* v. *Mayorkas*, 725 F.3d 1149, 1155 (9th Cir.

8   2013).  Here, Secretary Yellen's systemic risk determination gave SVBFG a "legitimate claim of

9   entitlement" to the guaranteed access to all of its deposits at SVB, giving rise to a property interest

10  protected by due process.  The Secretary's determination was "couched in mandatory terms"—she

11  unequivocally stated that her action "fully protects all depositors.  Depositors will have access to

12  all of their money starting Monday, March 13." (Sacks Decl. Ex. 1.[1])  As discussed above, FDIC-

13  C has no discretion to contravene this clear mandate.

14       **B.   FDIC-C Violated SVBFG's Due Process Rights**

15         Putting aside that FDIC-C had no discretion to withhold SVBFG's uninsured deposits in

16  the first place, FDIC-C violated SVBFG's due process rights by failing to provide SVBFG with

17  any process before denying SVBFG's access to its uninsured deposits.  The procedural process

18  due to protect a property interest is determined through a three-part inquiry:

19              First, courts must look at the nature of the interest that will be

20              affected by the official action, and in particular, to the "degree of

21              potential deprivation that may be created."  Second, courts must

22              consider the "fairness and reliability" of the existing procedures and

23              the "probable value, if any, of additional procedural safeguards."

24  _____

25  [1] SVBFG requests that the Court judicially notice the Joint Statement by the Department of the

26  Treasury, Federal Reserve, and FDIC, dated March 12, 2023, which is attached as Exhibit 1 to the

27  Sacks Declaration as a document incorporated by reference in the Complaint.  *See In re Diamond*

28  *Foods, Inc. Sec. Litig.*, 2012 WL 6000923, at *16 (N.D. Cal. Nov. 30, 2012).

1    Finally, courts must assess the public interest, which "includes the
2    administrative burden and other societal costs that would be
3    associated with" additional or substitute procedures.

4    *See Nozzi*, 806 F.3d at 1192-93 (quoting *Mathews* v. *Eldridge*, 424 U.S. 319 (1976)).  All three
5    factors show that FDIC-C violated SVBFG's due process rights.

6    *First*, the private interest and degree of potential deprivation here is high.  There is
7    $1.93 billion at stake in the Account Funds, which is SVBFG's most significant asset.  Depriving
8    SVBFG of its Account Funds would be "very serious" to its distressed state.  *See*, *e.g.*, *Nozzi*, 806
9    F.3d at 1193 (finding an effective increase in rent for Section 8 beneficiaries was a deprivation
10   that could be "very serious" to those depending on Section 8 benefits).

11   *Second*, the fairness and reliability of existing procedures depends on "whether the
12   procedures provided to [SVBFG] risked erroneous deprivation of" its right to the benefits of the
13   Secretary's invocation of the systemic risk exception.  *See id*.  Here, SVBFG was afforded no
14   procedures.  This total absence of process clearly risked (and resulted in) improper deprivation of
15   SVBFG's property right in its Account Funds, *see*, *e.g.*, *Perez* v. *Demore*, 2001 WL 1042133, at *7
16   (N.D. Cal. Aug. 21, 2001), particularly given that FDIC-C had already made clear in litigation that
17   it did not intend to provide those funds to SVBFG even before it made a determination of SVBFG's
18   administrative "claim."  (*See, e.g.*, No. 23-01137 (MG) (Bankr. S.D.N.Y.), Dkt. No. 50 ¶ 55.)

19   Indeed, the complete absence of any process in this case is startling.  On March 13, 2023,
20   SVBFG's Account Funds were transferred to Bridge Bank, and SVBFG was able to access those
21   funds for approximately three days when, with no notice or explanation, SVBFG's access to its
22   Account Funds was cut off.  FDIC-C did not inform SVBFG what had been done to its Account
23   Funds or why, or what claim it should file or with whom if it disagreed.  On June 26, 2023, SVBFG
24   wrote a letter to FDIC-C, demanding that FDIC-C pay SVBFG its Account Funds.  (Compl. ¶ 8.)
25   FDIC-C did not even acknowledge receipt of the demand.  Instead, it ignored SVBFG's demand
26   for nearly three months and only provided SVBFG with written acknowledgment of the demand
27   on September 19, 2023, after the Bankruptcy Court raised due process concerns with FDIC-C's
28   failure to provide any notice or process.  (*Id*. ¶¶ 10, 19(f).)

-17-

Even then, SVBFG was not provided any process around FDIC-C's stated intention in September to treat SVBFG's July letter as an administrative "claim." SVBFG also was not given any opportunity to submit evidence in support of its "claim," was not asked for any additional information or allowed to present any argument, and it was not told how its "claim" would be determined or by whom or on what basis as required by due process. *See Mullane* v. *Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *City of West Covina* v. *Perkins*, 525 U.S. 234, 242 (1999) ("[N]otice of the procedures for protecting one's property interests may be required when those procedures are arcane and are not set forth in documents accessible to the public."). Then, one month later, FDIC-C summarily denied SVBFG's claim.

FDIC-C's contention that its purported section 1821(f) "process" satisfied due process is not credible. Section 1821(f) permits FDIC-C to implement formal procedures or standards for determining claims for payment of insured deposits. *See* 12 U.S.C. § 1821(f)(3). Section 1821 is not relevant because SVBFG seeks recovery of the <u>uninsured</u> deposits. Moreover, even if section 1821(f) applied, FDIC-C's contention that because it has discretion whether to promulgate formal regulations under section 1821(f), it does not need to provide any process at all is wrong. (Mot. 17.) Nothing in section 1821(f) allows FDIC-C to ignore the Constitution's due process requirements and afford SVBFG with <u>no</u> process at all. Indeed, the series of Fifth Circuit cases that FDIC-C relies on acknowledge that FDIC-C must still provide adequate process even in the absence of formal regulations. *See*, *e.g.*, *Nimon* v. *Resol. Tr. Corp.*, 975 F.2d 240, 247-48 (5th Cir. 1992) (analyzing whether "informal procedures" that the Resolution Trust Corporation ("<u>RTC</u>") followed provided adequate due process in the absence of formal regulations governing insurance dispute); *see also Metro Cnty. Title, Inc.* v. *FDIC*, 13 F.3d 883, 887 (5th Cir. 1994) (same).

*Nimon* makes clear that the relevant inquiry is whether the process provided was appropriate under the circumstances. 975 F.2d at 247. There, the court found the RTC's informal process for resolving the plaintiff's claim satisfied due process because the plaintiff was given the

-18-

1   opportunity to consult with RTC personnel with the authority to correct a mistaken determination

2   of their claim, and submitted a statement of facts for the RTC to consider.  *Id*. at 243, 247-48.

3   Similarly, in *Metro County*, the Fifth Circuit rejected the plaintiff's due process challenge because

4   the plaintiff "received a hearing, albeit informal, as well as a formal administrative appeal."  13

5   F.3d at 887.  In *Kershaw*, the court did not substantively discuss the plaintiff's due process claim,

6   but the plaintiff there was permitted to submit information to the RTC to support the claim.  *See*

7   *Kershaw* v. *Resol. Tr. Corp.*, 987 F.2d 1206, 1208-10 (5th Cir. 1993)).  And in *DeCell & Associates*

8   v. *FDIC*, 36 F.3d 464 (5th Cir. 1994), the court held it could not "entertain a due process claim"

9   because the plaintiff had not submitted a formal deposit insurance claim to FDIC-C.

10       Here, by contrast, SVBFG was not even afforded this minimal level of due process:

11  FDIC-C provided no information as to how or when to make a claim or what it should include;

12  after ignoring it for months, FDIC-C treated a letter that was not intended to be a claim as a

13  "claim"; and it then rejected that "claim" without speaking with SVBFG or giving it any

14  opportunity to submit evidence.  There was no opportunity for SVBFG to respond and supplement

15  the record after an initial determination like in *Nimon*, no correspondence directly between counsel

16  about the claim like in *Kershaw*, and no informal hearing like in *Metro County*.

17       The "probable value . . . of additional safeguards" here, such as providing SVBFG with the

18  opportunity to respond to and be heard, is substantial—both to prevent FDIC-C from wrongfully

19  denying SVBFG's access based on limited or incomplete information and to create a proper

20  administrative record for a court to review on appeal.  *See, e.g.*, *Cabo Distrib. Co.* v. *Brady*, 821

21  F. Supp. 601, 610 (N.D. Cal. 1992) (noting that "the probable value . . . of additional procedural

22  safeguards" is high when the agency "has no written procedures or substantive criteria to govern"

23  its decision, and the plaintiff was not offered an opportunity to challenge the agency's decision in

24  the form of a "simple pronunciamiento").  The Court need look no further than the perfunctory

25  administrative record that FDIC-C filed on April 1, 2024 (Dkt. No. 45) to conclude that procedural

26  safeguards were required to ensure that SVBFG received due process with respect to FDIC-C's

27  confiscation of its $1.93 billion.  Particularly given that FDIC-C has not identified any other SVB

28  depositor who has been required to submit a "claim," the burden of providing additional

-19-

procedures—*i.e.* more than none at all—is necessarily low in comparison to SVBFG's substantial

interest in accessing its Account Funds.  To the extent that there are any factual disputes at the

pleading stage about the extent and sufficiency of process or otherwise, the Court must take the

Complaint's allegations as true and draw inferences in SVBFG's favor.  *See Milano* v. *Richmond*

*Hous. Auth.*, 2018 WL 11472386, at *3 (N.D. Cal. Apr. 25, 2018) (denying motion to dismiss

where "the record at this early stage" with respect to *Mathews* factors "is insufficient for the Court

to determine whether they support Plaintiff's position.").

## V.    SVBFG Plausibly States a Claim for Declaratory Relief

FDIC-C contends that declaratory relief is "foreclosed" when another adequate remedy

exists.  (Mot. 22.)  That is a clear misstatement of the Federal Rules, which expressly provide that

"[t]he existence of another adequate remedy does not preclude a declaratory judgment that is

otherwise appropriate."  Fed. R. Civ. P. 57.  The advisory notes to Rule 57 explain that "declaratory

relief is alternative or cumulative and not exclusive or extraordinary."  Fed. R. Civ. P. 57 Advisory

Committee Notes.  Courts therefore have "substantial discretion" in deciding whether to grant

declaratory relief.  *Wilton* v. *Seven Falls Co.*, 515 U.S. 277, 286 (1995).

"Given the discretionary character of declaratory relief, the decision whether to entertain a

declaratory-judgment action in one case is not a precedent in another case in which the facts are

different." *See Gonzalez* v. *JAG Trucking, Inc.*, 2019 WL 528441, at *5 (E.D. Cal. Feb. 11, 2019).

FDIC-C cites four cases—*City of Reno* v. *Netflix*, *Okpalobi* v. *Foster*, *Mangindin* v. *Wash. Mut.*

*Bank*, and *Pelletier* v. *United States*—but makes no attempt to explain how those cases show

declaratory relief is an inappropriate form of relief under the facts alleged here.  (Mot. 21-22.)

Nor could it.  *Netflix* involved whether a federal court had federal question jurisdiction

through the Declaratory Judgment Act to issue a declaration that Netflix and Hulu were subject to

Nevada's video service law.  *See* 52 F.4th 874, 878-79 (9th Cir. 2022).  *Okpalobi* involved an

attempt to use the Declaratory Judgment Act to sidestep the Eleventh Amendment's restriction on

suits against state actors and obtain relief in federal court when the underlying cause of action was

premised on a Louisiana state statute.  *See* 244 F.3d 405, 421-424 (5th Cir. 2001) (en banc).

*Mangindin* simply held that a district court has discretion to grant declaratory judgment when it

-20-

1  was similar to the relief sought under other causes of action, not that declaratory relief is foreclosed

2  when there are other overlapping causes of action.  637 F. Supp. 2d 700, 707-08 (N.D. Cal. June 18,

3  2009).  In *Pelletier*, the court dismissed only "any <u>independent</u> Declaratory Judgment claim"—*i.e.*

4  a declaratory judgment claim for which there was no underlying cause of action.  *See* 2013 WL

5  425874, at *5 (D. Colo. Feb. 4, 2013) (emphasis added).

6       Declaratory relief is appropriate here because SVBFG's claim for declaratory relief is

7  intertwined with its other underlying causes of action, it seeks clarity on issues even FDIC-C

8  acknowledges must be determined, and it does not seek to create jurisdiction in this court where it

9  would not otherwise exist.  It will (1) "serve a useful purpose in clarifying and settling the legal

10  relationships in issue"; and (2) "terminate and afford relief from the uncertainty, insecurity, and

11  controversy giving rise to the proceeding."  *Eureka Fed. Sav. & Loan Assn*. v. *American Cas. Co.*,

12  873 F.2d 229, 231 (9th Cir. 1989).  The declaratory relief that SVBFG seeks will do so by

13  determining (a) whether FDIC-C's purported section 1821(f) claims process governs SVBFG's

14  claims for uninsured deposits; (b) whether Secretary Yellen's invocation of the systemic risk

15  exception obligates FDIC-C to pay (or provide access to) SVBFG the full amount of its Account

16  Funds; and (c) whether, having provided SVBFG with full access to its Account Funds, FDIC-C

17  has authority to take those funds away from SVBFG.

18  **VI.**    **SVBFG Plausibly States an APA Claim in Count V**

19       FDIC-C argues that SVBFG's APA claim in Count V "should be dismissed because it fails

20  to challenge final agency action and impermissibly duplicates the § 1821(f) claim in Count VI."

21  (Mot. 18.)  FDIC-C is mistaken.

22      **A.  Count V States a Final Agency Action**

23       SVBFG has adequately pleaded final agency action in the Complaint.  Final agency action

24  must "(1) mark the consummation of the agency's decision making process [and] must not be of a

25  merely tentative or interlocutory nature; and (2) be one by which rights or obligations have been

26  determined, or from which legal consequences will flow."  *Bennett* v. *Spear*, 520 U.S. 154, 177

27  (1997).  In determining finality, courts "focus on the practical and legal effects of the agency

28  action," as the finality requirement for judicial review of agency action "must be interpreted in a

-21-

1    pragmatic and flexible manner." *Oregon Nat. Desert Ass'n* v. *U.S. Forest Serv.*, 465 F.3d 977,

2    982 (9th Cir. 2006).

3          Here, the Complaint alleges that "FDIC-C [] adopted a purported policy pursuant to which

4    it exercises discretion in determining which uninsured deposits of former Silicon Valley Bank

5    depositors are guaranteed to be paid" pursuant to the systemic risk invocation.  (Compl. ¶ 136.)

6    The Complaint also alleges numerous legal consequences that flowed from FDIC-C's unlawful

7    exercise of discretion, including interference with SVBFG's property rights, violation of the

8    Bankruptcy Code's protections, and infringement of SVBFG's due process rights.  (*Id.* ¶¶ 105-75.)

9    Even in FDIC-C's telling, its exercise of discretion allowed it to transfer insured and uninsured

10   deposits to Bridge Bank (Mot. 12), the legal consequence of which supposedly was  that "FDIC-C

11   was statutorily discharged from any further obligation to SVBFG" (*id.* at 24).

12         FDIC-C puts much emphasis on the Complaint's purported omission of any "written rules,

13   orders, or even guidance" documents setting forth FDIC-C's challenged policy, seeming to suggest

14   that its action is beyond judicial review simply because it has not published any rules or framework

15   for its action pursuant to the systemic risk exception.  (*Id.* at 18.)  But FDIC-C's own failure to

16   publish rules does not insulate its action from judicial review, and the law is clear that SVBFG

17   need not identify any such documents to adequately plead an APA claim.  *See* 5 U.S.C. § 704

18   (requiring only a "final agency action for which there is no other adequate remedy in a court" for

19   judicial review under the APA); *see also R.I.L-R* v. *Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C.

20   2015) ("Agency action . . . need not be in writing to be final and judicially reviewable.").

21         Moreover, FDIC-C has continuously obstructed SVBFG from obtaining any documents

22   concerning its decision-making process or applicable policies.  At the pleadings stage, it is

23   inappropriate to dismiss Count V when FDIC-C is withholding the very evidence of FDIC-C's

24   final action that it claims SVBFG lacks.  *See Augustine* v. *United States*, 704 F.2d 1074, 1077

25   (9th Cir. 1983) ("[W]here the jurisdictional issue and substantive issues are so intertwined that the

26   question of jurisdiction is dependent on the resolution of factual issues going to the merits, the

27   jurisdictional determination should await a determination of the relevant facts on either a motion

28   going to the merits or at trial.").  Discovery on these issues and others should precede any ruling

-22-

1  on SVBFG's claims.  *Espineli* v. *Toyota Motor Sales, U.S.A., Inc.*, 2019 WL 3080808, at *2 (E.D.

2  Cal. July 15, 2019).

3        **B.  Count V Is Not Duplicative of Count VI**

4        Contrary to FDIC-C's contention (Mot. 19), Count VI is not duplicative of Count V.

5  Counts V and VI concern different final agency actions.  Count V addresses FDIC-C's adoption

6  of a policy to exercise discretion to determine which uninsured deposits of former SVB depositors

7  are guaranteed—which is arbitrary and capricious as it contravenes Secretary Yellen's

8  unambiguous mandate to guarantee <u>all</u> deposits at SVB.  (Compl. ¶¶ 141, 144.)  In contrast,

9  Count VI challenges FDIC-C's denial of SVBFG's "claim," including its failure to establish or

10  follow any process at all for the resolution of SVBFG's claim for uninsured deposits and its bad

11  faith, pretextual denial of SVBFG's claim.  (*Id.* ¶¶ 91-98, 149-61.)

12        None of the cases FDIC-C cites supports its position.  *Bowen* v. *Massachusetts* held, in

13  relevant part, that 5 U.S.C. "§ 704 does not provide additional judicial remedies in situations where

14  the Congress has provided special and adequate review procedures."  487 U.S. 879, 903 (1988).

15  SVBFG is not seeking "additional" or "duplicate" judicial remedies—SVBFG is seeking the

16  remedy afforded to it under sections 702 and 706 of the APA for review of two distinct final agency

17  actions—the adoption of an agency policy and, separately, the arbitrary and capricious application

18  of that policy to SVBFG.  Likewise, *City of Oakland* v. *Lynch* merely held that judicial review

19  under the APA was precluded because the government's decision to file a forfeiture action was

20  committed to agency discretion by law and because the forfeiture action did not constitute final

21  agency action.  798 F.3d 1159, 1164-67 (9th Cir. 2016).  Here, for the reasons described above,

22  the systemic risk exception gives FDIC-C no discretion to seize SVBFG's uninsured deposits, and

23  FDIC-C's decision constitutes final agency action.

24  **VII.    FDIC-C Is Not Immune to SVBFG's Estoppel Claim**

25        FDIC-C argues that estoppel claims may not be asserted against FDIC-C, and even if they

26  could be, SVBFG has failed to allege the necessary elements for an estoppel claim.  (Mot. 20-21.)

27  To the contrary, SVBFG has adequately pleaded a claim for promissory estoppel.

28

-23-

### A.  SVBFG May Assert a Claim for Promissory Estoppel Against FDIC-C

FDIC-C cites the Ninth Circuit's opinion in *Jablon* v. *United States*, 657 F.2d 1064 (9th Cir. 1981), for the proposition that promissory estoppel claims may not be made against federal agencies.  (Mot. 20.)  But the court in *Jablon* noted only that it found no "precedent in this circuit" that would allow a claim for promissory estoppel against the United States <u>absent a waiver of sovereign immunity</u>.  *Id.* at 1069-70.  The FDIC, however, has expressly waived sovereign immunity from claims brought against it.  Under 12 U.S.C. § 1819, the FDIC has the power "[t]o sue and be sued, and complain and defend, by and through its own attorneys, in any court of law or equity, State or Federal."  And in a case decided after *Jablon*—unmentioned by FDIC-C—the Ninth Circuit specifically held that "[t]he 'sue-and-be-sued' language of 12 U.S.C. § 1819 (Fourth) is a general waiver of sovereign immunity from claims brought against the FDIC."  *Woodbridge Plaza* v. *Bank of Irvine*, 815 F.2d 538, 542-43 (9th Cir. 1987).

A waiver of sovereign immunity through a sue-and-be-sued clause renders federal agencies like FDIC-C liable to claims of promissory estoppel.  In *Ascom Hasler Mailing Systems, Inc.* v. *U.S. Postal Service*, 815 F. Supp. 2d 148 (D.D.C. 2011), the court determined that a promissory estoppel claim could be maintained against the Postal Service even though it was a federal agency, because the Postal Reorganization Act granted the Postal Service the power to sue and be sued and therefore waived the agency's sovereign immunity from such a claim.  The court found no authority prohibiting contract implied-in-law claims against federal agencies like the Postal Service, which it described as having "a high degree of independence from other offices of the government, including the express authority to enter into and perform contracts in its own name, as well as the authority to execute instruments, and determine the character of, and necessity for, its expenditures."  *Id.* at 159-60.  FDIC-C possesses identical powers.  It is "an independent federal agency," *see, e.g.*, *Aliotta* v. *Bair*, 614 F.3d 556, 558 (D.C. Cir. 2010), with the power to "make contracts" and to prescribe bylaws "regulating the manner in which its general business may be conducted, and the privileges granted to it by law may be exercised and enjoyed," 12 U.S.C. § 1819, *see also Fed. Hous. Admin., Region No. 4* v. *Burr*, 309 U.S. 242, 245 (1940) ("[W]hen Congress launche[s] a governmental agency into the commercial world and endow[s] it with

-24-

1  authority to 'sue or be sued,' that agency is not less amenable to judicial process than a private

2  enterprise under like circumstances would be.").

3      *Federal Crop Insurance Corporation* v. *Merrill*, 332 U.S. 380 (1947), also does not support

4  FDIC-C's position because it does not involve sovereign immunity and instead addresses a

5  regulation that prohibited the fulfillment of promises by local agents of a federal agency.  Here,

6  there is no comparable regulation prohibiting FDIC-C from honoring SVBFG's uninsured deposit

7  claim; FDIC-C has simply chosen not to do so.  Likewise, *OPM* v. *Richmond* deals with the

8  Appropriations Clause and whether a claim for money from the Treasury may be paid without an

9  appropriation made by law, 496 U.S. 414, 424-27 (1990), which is likewise inapplicable here.

10      **B.  SVBFG Has Pleaded the Elements of Promissory Estoppel**

11      FDIC-C nowhere argues that SVBFG has not adequately pleaded the elements of a claim

12  for <u>promissory</u> estoppel and therefore concedes the issue.  The two cases cited by FDIC-C discuss

13  only the elements necessary for a claim against the government of <u>equitable</u> estoppel, not

14  <u>promissory</u> estoppel.  *See Sulit* v. *Schiltgen*, 213 F.3d 449, 454 (9th Cir. 2000); *Johnson* v.

15  *Williford*, 682 F.2d 868, 871 (9th Cir. 1982).  SVBFG's claim is one for promissory estoppel.

16  **VIII.    SVBFG Has Standing to Sue for FOIA Violation**

17      FDIC-C contends that SVBFG lacks standing to sue for violation of the Freedom of

18  Information Act ("<u>FOIA</u>") because SVBFG's FOIA request was made by counsel for SVBFG.

19  (Mot. 33-34.)  Because FDIC-C had notice that the FOIA request submitted by counsel was made

20  on behalf of SVBFG (*see* Sacks Decl. Exs. 2, 3), SVBFG has standing to sue FDIC-C for violations

21  of FOIA, *see Menasha Corp.* v. *U.S. Dep't of Just.*, 2012 WL 1034933, at *3 (E.D. Wis. Mar. 26,

22  2012).  But rather than burden the Court with an academic fight, SVBFG has simply made another

23  FOIA request that expressly identifies SVBFG.  SVBFG therefore voluntarily withdraws Count

24  VIII.

25                      **<u>CONCLUSION</u>**

26      For the foregoing reasons, the Court should deny FDIC-C's Motion.

27

28

-25-

1    Dated:    May 20, 2024                         Respectfully submitted,

2                                                   /s/ Robert A. Sacks
                                                    Robert A. Sacks
3                                                   Adam S. Paris
                                                    Diane L. McGimsey
4                                                   **SULLIVAN & CROMWELL LLP**
                                                    1888 Century Park East
5                                                   Los Angeles, California 90067
                                                    Telephone:     (310) 712-6600
6                                                   Facsimile:     (310) 712-8800

7                                                   Sverker K. Hogberg
                                                    **SULLIVAN & CROMWELL LLP**
8                                                   550 Hamilton Avenue
                                                    Palo Alto, California 94301
9                                                   Telephone:     (650) 461-5600
                                                    Facsimile:     (650) 461-5700
10
                                                    *Attorneys for Plaintiff SVB Financial Group*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28