# EXHIBIT A



Updated April 23, 2024

# Bank Failures: The FDIC's Systemic Risk Exception

When Silicon Valley Bank (SVB) and Signature Bank failed, the Treasury Secretary, the Federal Deposit Insurance Corporation (FDIC), and the Federal Reserve (Fed) announced on March 12, 2023, that the FDIC would guarantee uninsured deposits at those banks under the statutory systemic risk exception to least-cost resolution (LCR; 12 U.S.C. §1823(c)(4)(G)). The FDIC insures deposits up to a statutory limit of $250,000. Currently, the FDIC projects that guaranteeing the uninsured deposits will cost the FDIC $16.3 billion. Under LCR, losses equal to that amount would have been borne by uninsured depositors. The two banks' combined estimated uninsured deposits were $231.1 billion in 2022. H.R. 4116, as ordered to be reported in the nature of a substitute in April 2024, would require the failed banks' regulator to report to Congress on supervision of the banks and would expand the scope of review by the Government Accountability Office (GAO) when the systemic risk exception is invoked.

## FDIC Least-Cost Resolution

When a bank fails, it does not enter the bankruptcy process like other businesses to resolve creditors' claims. Instead, it is taken into receivership by the FDIC, which takes control of the bank and resolves it through an administrative process. Costs to the FDIC associated with a resolution are funded by drawing on the FDIC's Deposit Insurance Fund, which is funded through assessments on banks and backed by the U.S. Treasury.

A banking crisis in the 1980s was more costly to the FDIC, and ultimately the taxpayer, because of the frequent use of regulatory forbearance—allowing troubled banks to stay open—which in many cases increased the losses that they suffered before they were ultimately shut down. In some cases, the FDIC used open bank assistance to provide funds or guarantees to troubled banks to keep them going rather than taking them into receivership.

Following the crisis, Congress reformed how the FDIC resolves banks in 1991 (P.L. 102-242). This act introduced prompt corrective action and LCR requirements as cornerstones of resolution. These two principles are intended to minimize resolution costs by ensuring that banks are resolved as quickly and inexpensively as possible. As such, uninsured depositors and other creditors can be repaid in a resolution only insofar as it is consistent with LCR, unless the systemic risk exception is invoked.

## What Is the Systemic Risk Exception?

Systemic risk is financial market risk that poses a threat to financial stability. In the case of SVB and Signature, policymakers were concerned that a run by uninsured depositors would spread to other banks, causing a broader financial crisis detrimental to the real economy.

Under the 1991 law, LCR can be waived under the systemic risk exception with five statutory requirements: (1) The Treasury Secretary, in consultation with the President and upon a written recommendation of at least two-thirds of the boards of the FDIC and Fed, determines LCR "would have serious adverse effects on economic conditions or financial stability" and the FDIC's actions would avoid or mitigate those effects. (2) Any loss to the FDIC must be repaid through a special assessment on banks by the FDIC. In levying this assessment, the FDIC need not follow normal deposit insurance assessment rates and may consider who benefited from the action and the effects on the banking industry (as amended by P.L. 111-22). (In this case, the FDIC levied the assessment on the 114 banks with over $5 billion in uninsured deposits.) (3) The Treasury Secretary must document the decision. (4) GAO must review the incident. (GAO released its review in April 2023.) (5) The Treasury Secretary must notify the congressional committees of jurisdiction within three days.

Before 1991, the FDIC considered several goals, including cost, in determining how to deal with a troubled bank. As such, LCR, even with the exception, represents a constraint on its pre-1991 authority. The FDIC can take a number of actions under the exception, but it can be used only in an FDIC receivership.

## Previous Uses of the Exception

Before 2023, GAO reported five planned uses of the systemic risk exception since 1991, all occurring between September 2008 (in the depths of the financial crisis) and March 2009.

1. **Wachovia.** The FDIC sought a buyer to prevent the imminent failure of Wachovia, the fourth-largest U.S. bank. Citigroup made an offer to acquire Wachovia under which the FDIC would partially guarantee $312 billion of Wachovia's assets using the systemic risk exception. The FDIC initially accepted this offer but subsequently rejected it in favor of a competing offer from Wells Fargo that required no FDIC assistance.
2. **Citigroup.** Concerned that Citigroup, the third-largest U.S. bank, would fail and exacerbate the financial crisis, policymakers decided to provide an assistance package involving the Fed, the FDIC, and the Troubled Asset Relief Program (TARP). As part of this package, the FDIC used its systemic risk exception to provide open bank assistance in the form of a partial asset guarantee for $306 billion of Citigroup's assets. This guarantee (joint with the Fed and TARP) never paid out, and the government received compensation in the form of stock and warrants.
3. **Bank of America.** A similar partial asset guarantee for $118 billion of assets was offered to Bank of America,

the second-largest bank, for similar reasons but was never finalized. Bank of America paid the government a termination fee to cancel the guarantee when financial market conditions stabilized. Unlike with Wachovia and Citigroup, the exception was invoked in anticipation of market pressure on Bank of America before it occurred.

4. **FDIC's Temporary Liquidity Guarantee Program.** To help banks remain liquid during the financial crisis, the FDIC created this two-part temporary program—the Debt Guarantee Program (DGP) and the Transaction Account Guarantee Program (TAG). Both programs were voluntary but automatic unless banks opted out. Under DGP, the FDIC guaranteed certain debt issued by banks between October 2008 and October 2009. Under TAG, the FDIC guaranteed non-interest-bearing deposit accounts (primarily owned by businesses and local governments) above the deposit limit. Both programs charged participating banks fees to cover potential costs.

5. **Public Private Investment Program (PPIP).** Treasury created the Legacy Loan Program within TARP's PPIP. Under this program, the FDIC would have partially guaranteed "legacy loans" acquired by PPIP. The program never progressed beyond a pilot phase.

Of the five cases, only the TAG program resulted in net costs to the FDIC. Assistance to Citigroup, Bank of America, and the DGP resulted in positive net income to the FDIC or the government as a whole. (A special assessment was not levied for TAG because its net income was considered jointly with the DGP.) In the cases of Wachovia, Bank of America, and PPIP, the proposed action never occurred. (See CRS Report R43413, *Costs of Government Interventions in Response to the Financial Crisis: A Retrospective*.)

None of these five episodes involved a bank in FDIC receivership. (Wachovia would have been an FDIC-assisted open bank transaction.) Although the exception was clearly intended to be a bank resolution tool, policymakers used the authority at the time to justify two crisis programs that were open to all banks, including healthy ones. In 2010, the Dodd-Frank Act (P.L. 111-203) limited the systemic risk exception to receiverships to rule out its future use for broadly based programs. It provided separate authority for future debt guarantee programs and temporary authority for a TAG program that was not renewed when it expired.

## Policy Issues

The systemic risk exception is a recognition by Congress that financial stability concerns sometimes trump the desire to minimize potential costs to the taxpayer. Financial crises impose economic costs that can far exceed resolution costs to the FDIC. Because systemic risk is unpredictable and fast moving, emergency tools such as the systemic risk exception have been crafted to give policymakers broad, discretionary powers to respond quickly to a range of potential risks. This way, financial conditions can be stabilized before a crisis spirals out of control. In this case, guaranteeing uninsured deposits may have prevented a broader deposit run that could have caused other banks to fail. Broad, discretionary powers come at a cost, however.

Policymakers may have "itchy trigger fingers" and intervene before the need has been proven. In this case, the failure of two mid-sized banks, in isolation, posed little risk to the economy or financial system. It may be that other banks could have fended off the pressure of withdrawals on their own and conditions could have stabilized.

The downside to intervening is the cost to the government and moral hazard—the concept that when individuals or businesses are protected from losses they will act more recklessly. In this case, SVB and Signature and their leadership and shareholders were not "bailed out," as the banks were closed, but uninsured depositors were. Congress set a deposit insurance limit in part because there is an expectation that depositors above the limit should be financially sophisticated enough to monitor their banks' riskiness (i.e., impose market discipline). By using the systemic risk exception, policymakers have signaled that banks and their uninsured depositors need be less concerned about risk taking going forward. (The systemic risk exception was not used to protect the banks' debtholders or shareholders, so debtholders at other banks arguably still have an incentive to monitor risk taking.)

Guaranteeing uninsured depositors also shifts the costs of the resolution to banks that did not fail. In a counterfactual where all deposits had been insured, banks including SVB and Signature would have pre-funded the deposit insurance fund ex ante to a size sufficient to absorb the costs of guaranteeing all deposits. Instead, those costs must be recouped ex post. But the FDIC is required to consider who benefited from the intervention when levying assessments.

A long-standing moral hazard concern is that some banks are "too big to fail," meaning that their failure could result in financial instability, which would result in government bailouts to prevent them. Although SVB and Signature were taken into receivership, the use of the systemic risk exception at two institutions that few previously believed were TBTF supports those concerns. In addition to moral hazard concerns, TBTF could potentially put small banks at a competitive disadvantage if uninsured depositors believe their deposits are safer at large banks because the systemic risk exception would be invoked only for a large bank.

The first use of the systemic risk exception since it was last amended in 2010 raises questions about whether additional legislative changes are warranted. Policymakers' discretion could be narrowed, but it might impede their ability to quickly and flexibly respond to a crisis. Nevertheless, the Dodd-Frank Act added more parameters to the Fed's emergency lending authority (12 U.S.C. §343) concerning when and how that authority should be used—and what should be reported to Congress—compared to the FDIC's exception. Those changes did not prevent the Fed from responding aggressively to the COVID-19 pandemic or from creating a new emergency program following the failures of SVB and Signature. Legislative changes to bank regulation or deposit insurance could also change the likelihood of the systemic risk exception being used again.

**Marc Labonte**, Specialist in Macroeconomic Policy

IF12378

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.