1  Robert A. Sacks (SBN 150146)
   (sacksr@sullcrom.com)
2  Adam S. Paris (SBN 190693)
   (parisa@sullcrom.com)
3  Diane L. McGimsey (SBN 234953)
   (mcgimseyd@sullcrom.com)
4  **SULLIVAN & CROMWELL LLP**
   1888 Century Park East
5  Los Angeles, California 90067
   Telephone:    (310) 712-6600
6  Facsimile:    (310) 712-8800
   *Attorneys for Plaintiff SVB Financial Group*
7  [*Additional Counsel Listed on Signature Page*]

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10                  **SAN JOSE DIVISION**

11  SVB FINANCIAL GROUP,              )    Case No.: 5:23-cv-06543-BLF
                                      )
12                      Plaintiff,    )    **PLAINTIFF SVB FINANCIAL GROUP'S**
                                      )    **SUPPLEMENTAL BRIEFING IN**
13            v.                      )    **SUPPORT OF OPPOSITION TO**
                                      )    **DEFENDANT FEDERAL DEPOSIT**
14  FEDERAL DEPOSIT INSURANCE         )    **INSURANCE CORPORATION, IN ITS**
    CORPORATION, in its corporate     )    **CORPORATE CAPACITY'S MOTION**
15  capacity,                         )    **TO DISMISS**
                                      )
16                      Defendant.    )
                                      )
17

18

19

20

21

22

23

24

25

26

27

28

1    Pursuant to the Court's Order on Supplemental Briefing, Plaintiff SVB Financial Group

2    ("SVBFG") submits this supplemental brief in opposition to the Motion to Dismiss filed by

3    Defendant Federal Deposit Insurance Corporation, in its corporate capacity ("FDIC-C").

**A.    The Treasury Secretary Has Sole Discretion to Determine Appropriate Action or Assistance for Uninsured Deposits Under the Systemic Risk Exception.**

6    Congress created a specific statutory mechanism for the "systemic risk exception" (SRE)

7    to address extraordinary financial circumstances, and it vested authority solely in the Secretary of

8    the Treasury under § 1823(c)(4)(G)(i) to authorize FDIC-C to "take other action or provide

9    assistance" unconstrained by the least cost resolution restrictions in § 1823(c)(4)(A) and (E).  The

10    determination to authorize the FDIC to take action and what action to take is for the Treasury

11    Secretary.  The Treasury Secretary's authority to make this extraordinary determination is not, as

12    FDIC-C now suggests, an "on/off switch" (see July 11, 2024 Hrg. Tr., at 38:16) that simply

13    authorizes administrators at the FDIC-C to then determine what action, if any, to take free of the

14    shackles of least cost resolution.

15    As with all statutes, one begins with the language of § 1823(c)(4)(G), which does not

16    support the bold interpretation urged by FDIC-C but makes clear that the determination of whether

17    to invoke systemic risk and the action or assistance to be taken to warrant that extraordinary action

18    is for the Secretary of the Treasury to make.  The title of the section begins "Emergency

19    determination by Secretary of Treasury."  12 USC § 1823(c)(4)(G)(i).  Each relevant subsection

20    of § 1823(c)(4)(G) refers to the "determination" by the Treasury Secretary:  Thus subsection (G)(i)

21    requires the Treasury Secretary to (1) first receive "written recommendation" from both FDIC-C's

22    board of directors and the Board of Governors of the Federal Reserve to exercise her authority

23    under the systemic risk exception, and consult with the President; (2) then "determine[] that the

24    Corporation's compliance with [§ 1823(c)(4)(A) and (E)] . . . would have serious adverse effects

25    on economic conditions or financial stability" and "that[] any action or assistance under this

26    subparagraph would avoid or mitigate such adverse effects."  Subsection (G)(iii) requires that the

27    Secretary document the Secretary's "determination under clause (i)" and retain that documentation

28    for GAO  review under clause (iv).  Under (G)(iv), the GAO must review and report to Congress

-1-

1    on the Secretary's "determination under clause (i)" that includes specifically "the basis for the
2    determination" and "the purpose for which any action was taken pursuant to such clause."  Finally,
3    under (G)(v), three days after making a "determination" the Treasury Secretary is required to
4    provide written notice to Congress that must "include a description of the basis for any
5    determination under clause (i)."

6         The requirement under (G)(i) that the Treasury Secretary determine that "any action or
7    assistance under this subparagraph would avoid or mitigate such adverse effects" is not an open-
8    ended grant of discretion to FDIC-C to do anything it chooses.  Because the circumstances that
9    lead the Secretary to determine the exigencies require invocation of systemic risk can be varied,
10   the reference to "any action or assistance" is an enabling provision to allow FDIC-C to undertake
11   the actions or provide the assistance that the Secretary determines to be appropriate under the
12   particular circumstances.  This is also clear from the other subsections of § 1823(c)(4)(G)
13   referenced above, which require the Treasury Secretary to document and explain the basis for her
14   determination, which of necessity requires an explanation of how and why the action being
15   recommended will "avoid or mitigate such adverse effects."  The reference to FDIC-C taking
16   "other action or provid[ing] assistance" in that same subsection is a reference to the action or
17   assistance in the prior sentence of what the Treasury Secretary determines to be done.

18        By contrast, other than the FDIC's board of directors' recommendation *to* the Treasury
19   Secretary whether to invoke systemic risk, there is no reference to FDIC-C determining anything
20   or having discretion to do anything other than execute the Treasury Secretary's determination.  In
21   fact, the FDIC-C's authority to "determine" anything appears in only one subsection of
22   § 1823(c)(4)(G)—subsection (G)(ii), which requires FDIC-C to recover the additional cost of the
23   Treasury Secretary's determination of systemic risk from the Deposit Insurance Fund and
24   authorizes it as it "determines to be appropriate" what special assessments to impose and on whom,
25   and to prescribe regulations to do so.  *See* 12 U.S.C. § 1823(c)(4)(G)(ii)(I)-(III).  The fact that
26   FDIC-C is given discretionary authority to carry out this specific task but not any others further
27   makes clear that it is the Treasury Secretary's determination of the action or assistance justifying
28   the extraordinary invocation of systemic risk to which FDIC administrators are bound.  These

*requirements* reflect Congress's clear intent to prohibit FDIC-C from exercising discretion to modify the "action" or "assistance" that the Treasury Secretary authorizes.

Events here make this clear. On March 12, Secretary Yellen, together with the Chairs of the Federal Reserve and the FDIC, explained that pursuant to the SRE, Silicon Valley Bank's "[d]epositors will have access to <u>all</u> their money…" and will be "fully" protected. (ECF No. 55-2.) (emphasis added).) On March 21, 2023—nine days after she invoked SRE—Secretary Yellen, in a public statement of which the Court may take judicial notice, *see DeHoog* v. *Anheuser-Busch*, 899 F.3d 758, 763 n.5 (9th Cir. 2018), explained in her own words that the federal government's:

> . . . recent actions have demonstrated our resolute commitment to take the necessary steps to <u>ensure that depositors' savings and the banking system remain safe</u>. Our approach had two main pillars. First, we worked with the Federal Reserve and FDIC <u>to protect all depositors in the resolutions of Silicon Valley Bank</u> and Signature Bank. The steps we took were not focused on aiding specific banks or classes of banks. Our intervention was <u>necessary to protect the broader U.S. banking system</u>. . . . I believe that <u>our actions reduced the risk of further bank failures that would have imposed losses on the Deposit Insurance Fund</u>, which is paid for through fees on insured banks.

(Mar. 21, 2023 Sec'y Yellen Remarks to American Bankers Ass'n (emphasis supplied) (attached hereto as Ex. 1).) If what the Secretary had done was act merely to give FDIC-C discretion to do what it determined to be appropriate, she could not have made a statement that her determination would protect all depositors because what would be done was not in her hands but within the discretion of FDIC-C.

Secretary Yellen made her "determination" underlying her invocation of SRE clear—that protecting "<u>all depositors</u>" was necessary to protect the U.S. banking system as a whole. Indeed, the GAO's April 2023 preliminary report containing the required discussion of the basis for the Secretary's determination noted that the Federal Reserve's analysis—with which the Treasury Secretary "concurred"—determined that "extending only partial protection to uninsured depositors" would not fully mitigate risks but instead "would result in significant adverse effects in the financial markets." (ECF No. 1-7 at 30.) SVBFG has sought these analyses in discovery but, FDIC-C has refused to produce them. In any event, if the Treasury Secretary determined that

-3-

1   only partial protection to uninsured depositors would be insufficient to "avoid or mitigate" adverse

2   risk under 1823(c)(4)(G)(ii), it would make no sense that following the invocation, FDIC-C had

3   discretion to take precisely such action that the Secretary determined to be insufficient.

4   Here, Secretary Yellen determined that it was necessary to "to protect all depositors,"

5   including all uninsured depositors, to prevent broad financial contagion. (Ex. 1.) Secretary Yellen,

6   therefore, authorized FDIC-C to give all uninsured depositors "access to all of their money starting

7   Monday, March 13." (Compl. ¶ 2.) Notwithstanding the Treasury Secretary's determination of

8   the "action or assistance" to uninsured depositors she authorized pursuant to § 1823(c)(4)(G)(i),

9   FDIC-C contends that the Treasury Secretary's invocation does nothing more than allow FDIC-C

10  administrators to exercise discretion under § 1823(c)(4)(G) to 'pick and choose' how to assist

11  uninsured depositors (if at all). That contention is untenable. If FDIC-C had such discretion, it

12  could have chosen to, *e.g.*,: (1) protect some, but not all, uninsured depositors; (2) provide only

13  25% guarantees to uninsured depositors (not full guarantees); or (3) guarantee uninsured deposits

14  at every FDIC-insured bank *except* for SVB. All of these alternatives presumably could be deemed

15  by FDIC-C to constitute "other action or . . . assistance . . . necessary to avoid or mitigate" financial

16  contagion. *Id*. § 1823(c)(4)(G)(i). Yet, on the facts SVBFG pleaded, none of these alternatives

17  would meet the requirement under § 1823(c)(4)(G) that the Treasury Secretary—not FDIC-C—

18  "determine" that the "action or assistance . . . would avoid or mitigate . . . adverse effects" of

19  complying with least cost resolution.

20  Further, it would be impossible for the Treasury Secretary to make an SRE determination

21  if she had no certainty about what specific action or assistance would then be undertaken by

22  FDIC-C. Conversely, if FDIC-C had the discretion it claims to have, it also would be free to

23  choose an action or form of assistance that the Treasury Secretary had not even considered or,

24  worse yet, one she had determined would not "avoid or mitigate" the risks of financial contagion,

25  including, as noted above, providing only partial protection to uninsured depositors.

26  These are absurd results that are inconsistent with Congress's statutory scheme vesting sole

27  authority with the Treasury Secretary. Accordingly, in construing the provision that FDIC-C "may

28  take other action or provide assistance under this section . . . as necessary to avoid or mitigate such

-4-

effects," the terms "other action or . . . assistance" that FDIC-C may take must be read to refer to the specific "action or assistance" that the Treasury Secretary has determined under § 1823(c)(4)(G)(i)(II) "would avoid or mitigate such adverse effects." This is a straightforward application of the "normal presumption that [] when Congress uses a term in multiple places within a single statute, the term bears a consistent meaning throughout." *Azar* v. *Allina Health Servs.*, 587 U.S. 566, 575 (2019); *United States* v. *Maciel-Alcala*, 612 F.3d 1092, 1098 (9th Cir. 2010).

The FDIC-C's "sole discretion" set out in § 1823(c)(4)(F) to make "[a]ny determination which the Corporation may make under this paragraph" also cannot be read to contravene the "action or assistance" authorized by the Treasury Secretary under § 1823(c)(4)(G)(i). As noted above, § 1823(c)(4)(G)(i) does not provide that the FDIC-C make any "<u>determination</u>" whatsoever as to the "action or assistance" approved by the Treasury Secretary thereunder. In addition, the placement of § 1823(c)(4)(G) and its legislative history make clear that § 1823(c)(4)(F) applies <u>only</u> to FDIC's actions under sections 1823(c)(4)(A)-(D), each of which expressly requires the FDIC-C to make specific "determinations" to ensure that it is complying with least cost resolution. The genesis of the "sole discretion" language is the House companion bill introduced on November 19, 1991, H.R. 3768, 102nd Cong. (1991), which amended the Senate bill to, among other things, (1) <u>add</u> the "sole discretion" provision in § 1823(c)(4)(F) with respect to the FDIC-C's least-cost resolution determinations, and (2) <u>remove</u> the SRE provision in § 1823(c)(4)(G) altogether. 137 Cong. Rec. H10778 (1991). Only subsequently did the Committee of Conference recommend a version of the bill that added back the SRE in § 1823(c)(4)(G) from the Senate Bill. This legislative history shows that Congress <u>never</u> intended for § 1823(c)(4)(F) to apply to FDIC-C's execution of the Treasury Secretary's systemic risk determinations under § 1823(c)(4)(G). Indeed, given that the House added the "sole discretion" provision only at the same time that it <u>eliminated</u> the SRE provision from the Senate Bill, the House clearly did not intend that FDIC-C be allowed to use the "sole discretion" provision to vastly expand the systemic risk exception even further.

Prior invocations of the SRE likewise support the view that the Treasury Secretary has sole discretion to determine what actions must be taken pursuant to an invocation of the SRE. Each prior invocation involved particularized relief targeted at addressing specific, identified risks to

-5-

1    the financial stability of the nation's banking system. (Compl. ¶ 38.) Were the SRE simply an

2    "on/off" switch that releases FDIC-C from the least cost framework, one would not expect that

3    every invocation of the SRE has been accompanied by announcement of a specific set of actions

4    FDIC has been authorized to take.

5    **B.    SVBFG's Claims Are Not for "Insurance Coverage," and the Deposit Insurance**
     **Fund May Be Used for Non-Insurance Purposes.**

6

7        There is no statutory or case law authority for FDIC-C's contention that SVBFG's claims

8    constitute "claim[s] for insurance coverage" subject to § 1821(f) because SVBFG seeks payment

9    from the DIF. (*See* Opp. at 5-8.) With respect to whether, and to what extent, FDIC-C may use

10   the DIF for non-insurance purposes, Congress has set out the authorized uses and prohibitions for

11   the DIF in § 1821 ("Insurance Funds") and § 1823 ("Corporation Monies"). Use of the DIF

12   pursuant to § 1821(f) to provide "insurance coverage" for "insured deposits" is only one of several

13   permitted uses for the DIF. In addition, § 1823 authorizes FDIC-C to use the DIF for other non-

14   insurance purposes, including providing assistance to insured depository institutions to avoid

15   adverse outcomes — including by guaranteeing uninsured deposits — and to facilitate mergers.

16       ***DIF Prescriptions and Prohibitions.*** Under § 1821(a)(4)(B) ("Uses"), "[t]he Deposit

17   Insurance Fund shall be available to the Corporation for use with respect to insured depository

18   institutions the deposits of which are insured by the Deposit Insurance Fund."

19   Section 1821(a)(4)(A) further provides that "[t]here is established the Deposit Insurance Fund,

20   which the Corporation shall . . . use to carry out its insurance purposes, in the manner provided by

21   this subsection." Neither of these sections, however, purports exclusively to set out the allowed

22   uses or prohibitions for the DIF. Section 1821(a)(4)(C) sets out "[l]imitations on use" of the DIF,

23   but only narrowly prohibits the use of the DIF to "benefit any shareholder or affiliate" of an insured

24   depository institution, except as provided under the § 1823(c)(4)(G) systemic risk exception.

25       ***Use of DIF for "Insurance Coverage" and Non-"Insurance Coverage" Purposes.*** To

26   ascertain specific allowed uses for the DIF, one must look to other provisions in §§ 1821 and 1823.

27   *First*, under § 1821(f), FDIC-C may use the DIF to pay "insured deposits" at insured depository

28   institutions — where "insured deposit" is defined under §§ 1813(m), 1817(i), and 1821(a)(1)(E)

-6-

1    as "the net amount due to any depositor for deposits in an insured depository institution," but "not

2    to exceed the standard maximum deposit insurance amount" of $250,000.  (*See* Opp. at 5-6.)  This

3    is the sole specified use of the DIF that constitutes "insurance coverage."

4            *Second*, under § 1823(c), the DIF may be used to (1) "make loans to, to make deposits in,

5    to purchase the assets or securities of, to assume the liabilities of, or to make contributions to, any

6    insured depository institution" in order to, *e.g.*, "prevent the default of such insured depository

7    institution"; or (2) "purchase . . . assets of," "make loans" to, or "guarantee" insured depository

8    institution in order to, *e.g.*, "facilitate a merger or consolidation" and "facilitate . . . the sale of . . .

9    assets."  12 U.S.C. § 1823(c)(1)-(2)(A).  As set forth in SVBFG's Opposition (at 7), all three prior

10   invocations of SRE involved drawing from the DIF for these non-"insurance coverage" purposes.

11           *Finally*, FDIC-C's discretion under § 1823(c) is restricted by §§ 1823(c)(4)(A) and (E) —

12   which provide that FDIC-C must make a "least-cost resolution" determination before taking any

13   action pursuant to § 1823(c), and "may not take any action . . . with respect to any insured

14   depository institution that would have the effect of increasing losses to the Deposit Insurance Fund

15   by protecting . . . depositors for more than the insured portion of deposits."  Instead, Congress

16   granted the Treasury Secretary the sole, exclusive power to authorize FDIC-C to ignore section

17   1823(c)(4)(A) and (E)'s restrictions under § 1823(c)(4)(G)(i).  That is precisely what happened

18   here.  As FDIC Chairman Martin J. Gruenberg has conceded, pursuant to § 1823(c)(4)(G)(i), "the

19   Treasury Secretary, in consultation with the President determined that the FDIC could use

20   emergency systemic risk authorities . . . to fully protect all depositors in winding down SVB and

21   Signature Bank."  (Compl. ¶ 52 (emphases added); *see id*. ¶¶ 56-57.)

22           **FDIC-C's Denial Letter.**  FDIC-C's letter denying SVBFG's purported 1821(f) claim

23   acknowledges that insurance coverage is statutorily capped at $250,000 under 12 U.S.C.

24   § 1821(a)(1)(E) and thus FDIC-C "satisfied its obligation under 12 U.S.C. § 1821(f)(1) to provide

25   SVBFG with access to its insured deposits."  (ECF No. 1-11 at 10.)  But as this Court correctly

26   noted at the July 12 hearing, FDIC-C's argument is circular by stating that SVBFG must make a

27   § 1821(f) claim for payment of its uninsured deposits but there can be no coverage for such

28   deposits because insurance coverage is capped at $250,000.

1     Dated:  July 19, 2024                        Respectfully submitted,

2                                                  */s/ Robert A. Sacks*
                                                   Robert A. Sacks
3                                                  Adam S. Paris
                                                   Diane L. McGimsey
4                                                  **SULLIVAN & CROMWELL LLP**
                                                   1888 Century Park East
5                                                  Los Angeles, California 90067
                                                   Telephone:    (310) 712-6600
6                                                  Facsimile:     (310) 712-8800

7                                                  Sverker K. Hogberg
                                                   **SULLIVAN & CROMWELL LLP**
8                                                  550 Hamilton Avenue
                                                   Palo Alto, California 94301
9                                                  Telephone:    (650) 461-5600
                                                   Facsimile:     (650) 461-5700
10
                                                   *Attorneys for Plaintiff SVB Financial Group*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28