1

2

3              UNITED STATES DISTRICT COURT

4              NORTHERN DISTRICT OF CALIFORNIA

5                    SAN JOSE DIVISION

6

7    SVB FINANCIAL GROUP,                    Case No.  23-cv-06543-BLF

8                    Plaintiff,

9          v.                                **ORDER GRANTING IN PART AND
                                             DENYING IN PART MOTION TO
10   FEDERAL DEPOSIT INSURANCE               DISMISS**
     CORPORATION,
11                                           [Re:  ECF No. 25]
                    Defendant.
12

13        On March 10, 2023, Silicon Valley Bank ("SVB") failed and was placed into receivership,

14   with the Federal Deposit Insurance Corporation ("FDIC") appointed as receiver.  On March 12,

15   2023, Secretary of the Treasury Janet Yellen invoked the Systemic Risk Exception, which

16   suspended the requirement that the FDIC resolve the failed bank in the least costly manner.

17   According to Plaintiff Silicon Valley Bank Financial Group ("SVBFG"), in invoking the Systemic

18   Risk Exception, Secretary Yellen and the FDIC made statements assuring that all depositors and

19   all deposits would be protected.  On March 16, 2023, SVBFG, the parent company of SVB and a

20   depositor with over $2.1 billion in deposits when the bank failed, lost access to over $1.9 billion in

21   its deposit accounts.

22        SVBFG brought several legal actions against the FDIC, seeking payment of or access to its

23   remaining account funds.  In this suit, SVBFG seeks recovery from the FDIC in its corporate

24   capacity ("FDIC-C").  Before the Court now is the FDIC-C's motion to dismiss SVBFG's

25   Complaint.  ECF No. 25 ("Mot.").  SVBFG opposes the motion.  ECF No. 55 ("Opp.").  The

26   FDIC-C filed a reply.  ECF No. 66 ("Reply").  The Court held a hearing on the motion on July 11,

27   2024, which continued on July 16, 2024.  ECF No. 68 ("7/11/24 Hr. Tr."); ECF No. 77 ("7/16/24

28   Hr. Tr.").  The Court also requested, and the parties provided, supplemental briefing on the scope

United States District Court
Northern District of California

of the Treasury Secretary's authority under the Systemic Risk Exception and whether and to what extent the FDIC-C may use the Deposit Insurance Fund for non-insurance purposes.  *See* ECF No. 81 ("FDIC-C Supp. Br."); ECF No. 82 ("SVBFG Supp. Br.").

For the reasons stated below, the Court GRANTS IN PART and DENIES IN PART the motion to dismiss.

## I.    BACKGROUND

### A.    Factual Background[1]

From 2000 until March 2023, SVBFG owned SVB and a number of other affiliated businesses.  ECF No. 1 ("Compl.") ¶ 30.  SVBFG was also a depositor at SVB and had approximately $2.1 billion in three different deposit accounts as of March 10, 2023.  *Id.* ¶ 31.

On March 10, 2023, SVB collapsed, and the California Department of Financial Protection and Innovation ("DFPI") took possession of the bank.  *See* Compl. ¶ 32.  On the same day, DFPI appointed the FDIC[2] to serve as receiver for SVB.  *Id.*  Also on the same day, the FDIC formed the Deposit Insurance National Bank of Santa Clara ("DINB") and transferred all insured deposits of SVB—that is, amounts up to the FDIC's standard $250,000 insurance limit, *see* 12 U.S.C. § 1821(a)(1)(E)—to the DINB.  *See* Compl. ¶¶ 33–34.  The FDIC announced that insured depositors would have full access to their insured deposits no later than the morning of March 13, 2023 and that uninsured depositors would receive an advance dividend within the next week and a receivership certificate for the remaining amount of their uninsured funds.  *See id.* ¶ 34; *see also* ECF No. 1-2 ("Compl. Ex. 1") at 3–4 (describing the FDIC's normal response to a bank failure, including for recovery of some portion of uninsured funds from the proceeds of the sale of a failed bank).  The announcement that uninsured depositors of SVB had not been fully protected precipitated the failure of Signature Bank, and led to the Department of the Treasury, the FDIC, and the Federal Reserve to assess the impact of the closures of SVB and Signature Bank on the American banking system and financial markets.  Compl. ¶¶ 39, 40.

On March 12, 2023, Secretary Yellen, upon the unanimous recommendations of the boards

---

[1] For purposes of this motion, the Court accepts as true all well-pled facts in SVBFG's Complaint.
[2] The FDIC in its capacity as receiver for Silicon Valley Bank is referred to as FDIC-R1.

United States District Court
Northern District of California

of both the Federal Reserve and the FDIC, and after consulting with the President of the United States, invoked the Systemic Risk Exception, codified at 12 U.S.C. § 1823(c)(4)(G).  Compl. ¶¶ 1, 41.  The Government Accountability Office's ("GAO") review of the invocation of the Systemic Risk Exception noted that the FDIC and Federal Reserve "found that a least-cost resolution of SVB and Signature Bank would intensify deposit runs and liquidity pressures on other U.S. banks" and "assessed that preserving unimpaired access to all uninsured deposits for SVB and Signature Bank would help mitigate adverse impacts to financial stability and the economy."  ECF No. 1-7 ("Compl. Ex. 6") at 29–30; *see also* Compl. ¶ 40.  On the same day that Secretary Yellen invoked the Systemic Risk Exception, the FDIC filed, and the Office of the Comptroller of the Currency ("OCC") approved, an application to establish Silicon Valley Bridge Bank ("SVBB").  Compl. ¶ 63.  The FDIC also rescinded the agreement transferring insured deposits to the DINB, the FDIC-R1 transferred all insured and uninsured deposits to SVBB, and the FDIC provided SVBB access to funds from the Deposit Insurance Fund to satisfy deposit liabilities.  *Id.* ¶ 64.  All customers of SVB, including SVBFG, automatically became customers of SVBB.  *Id.*  On March 13, 2023, the FDIC published a press release stating that it had completed the transfer of "all deposits—both insured and uninsured—and substantially all assets from the former Silicon Valley Bank [to SVBB] in an action designed to protect all depositors of Silicon Valley Bank."  ECF No. 1-8 ("Compl. Ex. 7") at 2; Compl. ¶ 65.  The press release also stated that "[d]epositors will have full access to their money" and that "[a]ll depositors of the institution will be made whole."  Compl. Ex. 7 at 2; Compl. ¶ 65.  When SVBB opened that same day, its frequently asked questions page stated that "[n]o one lost any money on deposit as a result of the closure of this bank.  All deposits, regardless of dollar amount, were transferred to [SVBB]."  ECF No. 1-9 ("Compl. Ex. 8") at 2.

In addition to the press release above, the FDIC, the Federal Reserve, and Secretary Yellen made a number of public statements that all deposits would be made available and all depositors would be made whole.  For example, on March 16, 2023, Secretary Yellen stated before the Senate Committee on Finance that "we worked with the Federal Reserve and FDIC to protect all depositors of the two failed banks.  On Monday morning, customers were able to access all of the

money in their deposit accounts so they could make payroll and pay the bills." Compl. ¶ 47. Similarly, on March 22, 2023, Secretary Yellen testified before the Senate Subcommittee on Financial Services and General Government Appropriations, stating "[w]e took actions to protect all depositors at the two failed institutions and provide additional liquidity for banks." *Id.* ¶ 50 (alteration in original); *see also id.* ¶ 51 (similar statement on March 23, 2023). On March 28, 2023, FDIC Chairman Martin J. Gruenberg stated before the Senate Committee on Banking, Housing, and Urban Affairs that, in invoking the Systemic Risk Exception, the FDIC, Federal Reserve, and Secretary of the Treasury determined "that the FDIC could use emergency systemic risk authorities under the Federal Deposit Insurance Act (FDI Act) to fully protect all depositors in winding down SVB and Signature Bank." *Id.* ¶ 52. On the same day and to the same committee, Federal Reserve Vice Chair for Supervision Michael S. Barr stated that "[t]he Federal Reserve, working with the Treasury Department and the [FDIC], took decisive actions . . . [that] demonstrate that we are committed to ensuring that all deposits are safe." *Id.* ¶ 53 (second and third alterations in original). On March 29, 2023, FDIC Chairman Gruenberg described to the House Committee on Financial Services "the facts and circumstances that prompted the decision to utilize the authority in the FDI Act to protect all depositors in those banks following these failures." *Id.* ¶ 54. On May 11, 2023, Acting Comptroller of the Currency and FDIC Director Michael J. Hsu stated at an FDIC board meeting that "[t]he purpose [of invoking the Systemic Risk Exception] was to protect all depositors, including uninsured depositors, following the failures of Silicon Valley Bank (SVB) and Signature Bank." *Id.* ¶ 55. On May 16, 2023, FDIC Chairman Gruenberg stated to the House Committee on Financial Services that "[f]ollowing the decision to fully protect all depositors in the resolution of both SVB and Signature Bank, there has been a moderation of deposit outflows at the publicly traded banks that were experiencing large outflows in the immediate aftermath of those failures." *Id.* ¶ 56 (alteration in original); *see also id.* ¶ 57 (similar statement to the Senate Committee on Banking, Housing, and Urban Affairs). On December 5, 2023, the FDIC Deputy Director for Resolution Readiness stated during a meeting of the FDIC's Systemic Resolution Advisory Committee that the Systemic Risk Exception "allowed us to protect all depositors of the failed banks, transfer those to fully operational bridge banks, and

1    provide some . . . assurance to the system broadly." *Id.* ¶ 58.  At the same meeting, Tim

2    Mayopoulos, the CEO of SVBB, described the invocation of the Systemic Risk Exception as "the

3    government's decision to protect all the deposits at Silicon Valley Bank, regardless of the nature

4    or size of those deposits." *Id.* ¶ 60.  Finally, the GAO Report on the invocation of the Systemic

5    Risk Exception noted repeatedly that the systemic risk invocation guaranteed all uninsured

6    deposits of all depositors of SVB.  *Id.* ¶ 61.

7         The deposits transferred from the FDIC to SVBB included SVBFG's account funds, which

8    included approximately $2,115,958,220 in deposits across three accounts.  Compl. ¶¶ 67–68.  Like

9    all other depositors, SVBFG was able to access its account funds in SVBB.  *Id.* ¶ 69.  On March

10   15 and 16, 2023, SVBFG withdrew approximately $180,000,000.  *Id.*  However, on March 16,

11   2023, SVBB began rejecting wire transfers because the FDIC-R1 instructed SVBB to place a hold

12   on SVBFG's accounts and restrict SVBFG's account funds from being withdrawn.  *Id.* ¶ 70.  The

13   FDIC-R1 then directed SVBB to assign SVBFG's deposit accounts and all associated assets and

14   liabilities to the FDIC-R1, and SVBB did so.  *Id.* ¶ 71.  As a result, when SVBFG lost access to its

15   account funds, those funds totaled approximately $1.93 billion.  *Id.* ¶ 74.

16        On March 17, 2023, SVBFG filed a petition for relief under Chapter 11 of the Bankruptcy

17   Code and began operating as a debtor in possession.  Compl. ¶ 75.  On March 27, 2023, the OCC

18   closed SVBB, and the FDIC transferred substantially all of SVBB's assets to First-Citizens Bank

19   & Trust Company ("First Citizens") pursuant to a purchase and assumption agreement.  *Id.* ¶ 76.

20   The FDIC's letter to SVBB depositors, dated April 3, 2023, informed them that "[a]ll deposits [at

21   Silicon Valley Bank] were fully insured" and that "the full amount of your deposit was

22   transferred" to First Citizens.  *Id.* (alterations in original).

23        On June 26, 2023, SVBFG sent a letter to the FDIC-C demanding that the FDIC-C pay or

24   give SVBFG full access to all of its uninsured funds.  Compl. ¶ 83.  This demand was brought

25   pursuant to the invocation of the Systemic Risk Exception, rather than 12 U.S.C. § 1821(f).  *Id.*;

26   ECF No. 1-10 ("Compl. Ex. 9").  The FDIC-C did not respond to this demand until months later.

27   Compl. ¶ 83.  On July 9, 2023, SVBFG filed an adversary proceeding in the bankruptcy court in

28   connection with its Chapter 11 proceedings, captioned *SVB Financial Group v. Federal Deposit*

*Insurance Corp., et al.*, No. 23-01137 (MG) (Bankr. S.D.N.Y.).  Compl. ¶ 84.  SVBFG brought claims for turnover, violation of the automatic stay, and declaratory judgment.  *Id.*  The FDIC-C, FDIC-R1, and FDIC-R2[3] did not file proofs of claim against SVBFG in the bankruptcy proceeding.  *Id.* ¶ 85.  On August 11, 2023, all three FDIC entities filed Rule 12(b)(1) and 12(b)(6) motions to dismiss the adversary complaint.  *Id.* ¶ 87.  On the same day, the FDIC-R1 filed a motion to withdraw the reference to the Bankruptcy Court pursuant to 28 U.S.C. § 157(d).  *Id.* ¶ 88.  Judge John P. Cronan granted the motion to withdraw reference on December 13, 2023.  *Id.* ¶ 90; *see also In re SVB Fin. Grp.*, No. 23 CIV. 7218 (JPC), 2023 WL 8622521 (S.D.N.Y. Dec. 13, 2023).

On September 14, 2023, the bankruptcy court directed the FDIC-C to provide SVBFG with a statement, in writing, setting forth the applicable rules and procedures that applied to the FDIC-C's claims process under 12 U.S.C. § 1821(f).  Compl. ¶ 94.  On September 19, 2023, the FDIC-C sent SVBFG a letter, which characterized SVBFG's June 26 letter as a request for insurance coverage under § 1821(f) and notifying SVBFG that FDIC-C would provide a final determination regarding insurance coverage within 30 days.  *Id.* ¶ 95.  On October 20, 2023, the FDIC-C denied SVBFG's claim for insurance coverage because SVBFG had already withdrawn over $250,000 from its accounts at SVBB and because Secretary Yellen's invocation of the Systemic Risk Exception did not obligate the FDIC-C to follow a particular course of action.  *Id.* ¶¶ 97–98.

## B.    Procedural History

SVBFG filed this action against the FDIC-C on December 19, 2023.  *See* Compl.  In its Complaint, SVBFG brings eight claims for relief:  (I) declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.*, *id.* ¶¶ 105–10; (II) turnover of account funds pursuant to 11 U.S.C. § 542, *id.* ¶¶ 111–20; (III) violation of the automatic stay under 11 U.S.C. § 362(a), *id.* ¶¶ 121–23; (IV) violation of SVBFG's Fifth Amendment due process rights, *id.* ¶¶ 124–34; (V) review of "the FDIC-C's policy of exercising discretion to determine not to pay or provide access to uninsured deposits" under the Administrative Procedure Act ("APA"), *id.* ¶¶ 135–47; (VI) review of the

---

[3] The FDIC in its capacity as receiver for Silicon Valley Bridge Bank is referred to as FDIC-R2.

1  FDIC-C's § 1821(f) decision under the APA, *id.* ¶¶ 148–61; (VII) estoppel, *id.* ¶¶ 162–69; and

2  (VIII) failure to produce records under the Freedom of Information Act ("FOIA"), *id.* ¶¶ 170–75.

3          On March 5, 2024, SVBFG filed a lawsuit against the FDIC, in its capacity as receiver for

4  SVB ("FDIC-R1"), and the FDIC, in its capacity as receiver for SVBB ("FDIC-R2"). *See SVB*

5  *Financial Grp. v. Federal Deposit Insurance Corp., as Receiver for Silicon Valley Bank, et al.*,

6  No. 5:24-cv-01321-BLF (N.D. Cal.). On March 21, 2024, the Court granted a motion to relate the

7  case against the FDIC-R1 and the FDIC-R2 with this case. *See* ECF No. 38.

8  ## II.    LEGAL STANDARD

9  ### A.    Rule 12(b)(1)

10          "If the court determines at any time that it lacks subject-matter jurisdiction, the court must

11  dismiss the action." Fed. R. Civ. P. 12(h)(3). A party may challenge the Court's subject matter

12  jurisdiction by bringing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). "A

13  Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373

14  F.3d 1035, 1039 (9th Cir. 2004). In a facial attack, the movant asserts that the lack of subject

15  matter jurisdiction is apparent from the face of the complaint. *Id.*

16  ### B.    Rule 12(b)(6)

17          "A Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

18  claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation*

19  *Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d

20  729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts

21  as true all well-pled factual allegations and construes them in the light most favorable to the

22  plaintiff. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the

23  Court need not "accept as true allegations that contradict matters properly subject to judicial

24  notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or

25  unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)

26  (internal quotation marks and citations omitted). While a complaint need not contain detailed

27  factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to

28  relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

United States District Court
Northern District of California

7

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

In deciding whether to grant leave to amend, the Court must consider the factors set forth by the Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962), and discussed at length by the Ninth Circuit in *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003).  A district court ordinarily must grant leave to amend unless one or more of the *Foman* factors is present: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, or (5) futility of amendment.  *Eminence Capital*, 316 F.3d at 1052.  "[I]t is the consideration of prejudice to the opposing party that carries the greatest weight."  *Id.*  However, a strong showing with respect to one of the other factors may warrant denial of leave to amend.  *Id.*

## III.    REQUESTS FOR JUDICIAL NOTICE

A court generally cannot consider materials outside the pleadings on a motion to dismiss for failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(6).  A court may, however, consider items of which it can take judicial notice without converting the motion to dismiss into one for summary judgment.  *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994).  A court may take judicial notice of facts "not subject to reasonable dispute" because they are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201.  A court may additionally take judicial notice of "'matters of public record' without converting a Motion to Dismiss into a motion for summary judgment."  *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (quoting *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986)).  Under the incorporation by reference doctrine, courts may consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading."  *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)) (alteration in original).

The FDIC-C requests that the Court take judicial notice of SVBFG's court filings in the

United States District Court
Northern District of California

FDIC-R case and a Congressional Research Service Report titled *Bank Failures: The FDIC's Systemic Risk Exception*.  Reply at 3; FDIC-C Supp. Br. at 6–7; *see also* ECF No. 81-2 ("FDIC Supp. Br. Ex. A").  SVBFG requests that the Court take judicial notice of the statement of Secretary Yellen on March 21, 2023 to the American Bankers Association, which is contained in a Treasury Department press release.  SVBFG Supp. Br. at 3; *see also* ECF No. 82-1 ("SVBFG Supp. Br. Ex. 1").  Neither party opposes the other's request or objects to the authenticity of the identified documents.  Judicial notice of these documents is appropriate because each document is a matter of public record.  *See Strojnik v. Woodside Hotel Grp., LTD*, No. 20-CV-03204-BLF, 2021 WL 11696238, at *3 (N.D. Cal. Apr. 15, 2021) (taking judicial notice of filings in other cases); *Nat'l Urb. League v. Ross*, 508 F.Supp.3d 663, 678 n.2 (N.D. Cal. 2020) (taking judicial notice of government reports); *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 n.5 (9th Cir. 2018) (taking judicial notice of government press releases).  Accordingly, the Court GRANTS the parties' requests for judicial notice.

## IV.   DISCUSSION

The FDIC-C first argues that all of SVBFG's claims, except for Count VI for APA review of the FDIC-C's decision under § 1821(f) and Count VIII for violations of FOIA, are preempted by the comprehensive remedial scheme in § 1821(f).  Mot. at 7–11.  The FDIC-C argues in the alternative that SVBFG fails to state a claim for all non-FOIA claims other than Count VI.  *Id.* at 11–23.  Finally, the FDIC-C argues that the Court lacks jurisdiction over SVBFG's FOIA claim. *Id.* at 23–24.  The Court addresses each of FDIC-C's arguments.

### A.   Preemption

The FDIC-C first argues that the Court does not have jurisdiction over Counts I through V and Count VII because these claims are preempted by 12 U.S.C. § 1821(f).  Mot. at 7–11.  The FDIC-C argues that § 1821(f) is a precisely drawn, detailed statute that encompasses any claim regarding insurance coverage.  *Id.* at 9; FDIC-C Supp. Br. at 1–2.  The FDIC-C further argues that SVBFG's claims are demands for insurance coverage that fall under, and are thus preempted by, § 1821(f) because claims for payment out of the Deposit Insurance Fund are necessarily demands for insurance coverage.  *See* Mot. at 10.  SVBFG argues that § 1821(f) applies only to claims for

United States District Court
Northern District of California

United States District Court
Northern District of California

1    insured deposits, and its claim is for uninsured deposits.  Opp. at 5.  SVBFG argues that Secretary

2    Yellen's invocation of the Systemic Risk Exception does not grant the FDIC-C discretion to act

3    and as here invoked, mandates that the FDIC-C use the Deposit Insurance Fund to pay all

4    deposits, whether statutorily insured or not.  SVBFG Supp. Br. at 1–5; Opp. at 6.  SVBFG also

5    notes that the Deposit Insurance Fund is not limited to payment of insured deposits, as is clear in

6    the text of the statute and past invocations of the Systemic Risk Exception.  Opp. at 6–7; SVFG

7    Supp. Br. at 6–7.

8            When considering preemption, Federal courts have acknowledged the "well-established

9    principle that in most contexts, 'a precisely drawn, detailed statute pre-empts more general

10   remedies.'"  *Hinck v. United States*, 550 U.S. 501, 506 (2007) (quoting *EC Term of Years Tr. v.

11   United States*, 550 U.S. 429, 433 (2007)); *see also Savage Servs. Corp. v. United States*, 25 F.4th

12   925, 938 (11th Cir. 2022) (same).  The Supreme Court has found that "when Congress enacts a

13   specific remedy when no remedy was previously recognized, or when previous remedies were

14   'problematic,' the remedy provided is generally regarded as exclusive."  *Hinck*, 550 U.S. at 506.

15   A "precisely drawn, detailed statute" will preempt a more general remedy if the statute "provides a

16   forum for adjudication, a limited class of potential plaintiffs, a statute of limitations, a standard of

17   review, and authorization for judicial relief."  *Id.*

18           The parties do not dispute whether § 1821(f) is a precisely drawn, detailed statute that

19   would preempt more general remedies, and instead dispute whether SVBFG's claims are claims

20   for insurance coverage that fall under § 1821(f) and whether the invocation of the Systemic Risk

21   Exception changes the characterization of the SVBFG's claims.

22                   **i.   12 U.S.C. § 1821(f) and the Deposit Insurance Fund**

23           In 1989, Congress passed the Financial Institutions Reform, Recovery, and Enforcement

24   Act ("FIRREA") "in response to the crisis in the nation's banking and savings and loan

25   industries."  *Deutsche Bank Nat. Tr. Co. v. F.D.I.C.*, 744 F.3d 1124, 1128 (9th Cir. 2014) (quoting

26   *Sharpe v. F.D.I.C.*, 126 F.3d 1147, 1154 (9th Cir. 1997)).  "Its goal was to provide a detailed

27   regulatory framework so as to restore the financial integrity of the thrift industry's deposit

28   insurance fund and to provide funds from public and private sources to deal expeditiously with

failed depository institutions." *Betancourt v. F.D.I.C.*, 851 F.Supp. 126, 129 (S.D.N.Y. 1994) (internal quotation marks omitted) (quoting *Circle Industries, Div. of Nastasi-White, Inc. v. City Federal Sav. Bank*, 749 F.Supp. 447, 451 (E.D.N.Y.1990)).

Section 1821(f) governs the "[p]ayment of insured deposits" by the FDIC-C.  12 U.S.C. § 1821(f).  Section 1821(f)(1) states that, in liquidating or winding up of the affairs of an insured depository institution, the FDIC-C shall pay insured deposits, either by cash or making such funds available to a depositor in a new or another insured depository institution.  *Id.* at § 1821(f)(1). "Insured deposits" are defined as "the net amount due to any depositor for deposits in an insured depository institution as determined under sections 1817(i) and 1821(a) of this title." *Id.* § 1813(m)(1).  These sections state that deposits are insured up to "the standard maximum deposit insurance amount," which is $250,000.  *Id.* §§ 1817(i)(1), 1821(a)(1)(E).

Section 1821(f) also creates a process for "any claim for insurance coverage."  12 U.S.C. § 1821(f)(3).  Under the statute, "[i]n its discretion, the Corporation may promulgate regulations prescribing procedures for resolving any disputed claim relating to any insured deposit or any determination of insurance coverage with respect to any deposit."  *Id.*  Any determination by the FDIC-C regarding a claim for insurance coverage is "[a] final determination [and] shall be a final agency action reviewable in accordance with chapter 7 of Title 5 by the United States district court for the Federal judicial district where the principal place of business of the depository institution is located." *Id.* § 1821(f)(3), (4).  The statute of limitations for judicial review of a final determination regarding a claim for insurance coverage is 60 days after issuance of the determination.  *Id.* § 1821(f)(5).

The plain text of § 1821(f) is clear that it provides a remedy for claims "relating to any insured deposit or any determination of insurance coverage with respect to any deposit."  12 U.S.C. § 1821(f)(3).  The parties agree that SVBFG's claims are not claims "relating to any insured deposit" because SVBFG withdrew well over the $250,000 standard maximum deposit insurance amount.  *See* ECF No. 1-11 ("Compl. Ex. 10") at 2 (the FDIC-C's determination of insurance coverage pursuant to § 1821(f), which states that "SVBFG's insured deposit is statutorily defined not to exceed $250,000, and FDIC-C has satisfied its obligation to provide

deposit insurance by making that amount (and more) available to SVBFG in an account at [SVBB].”); Opp. at 6 (“In this case, the $250,000 insured portion of SVBFG’s account is not at issue.”).  The question then is whether SVBFG’s claims are related to “any determination of insurance coverage with respect to any deposit,” thus limiting SVBFG’s remedy to a claim under § 1821(f).  Section 1821(f) does not define “insurance coverage,” and it is at this point that the parties diverge.  The FDIC-C argues that claims for insurance coverage include claims for “any deposit,” whether insured or uninsured, and that the gravamen of SVBFG’s claims is that the FDIC-C as an insurer should use insurance funds from the Deposit Insurance Fund to pay for SVBFG’s deposits at the failed bank.  Mot. at 9–10; FDIC-C Supp. Br. at 1–4.  SVBFG argues that it seeks payment for uninsured deposits under the directive of the Treasury Secretary and the Deposit Insurance Fund may be used for non-insurance purposes.  Opp. 4–8; SVBFG Supp. Br. at 6–7.

The Court finds that SVBFG’s claims are not claims for “insurance coverage.”  “When Congress does not define a term, we ‘interpret the words consistent with their ordinary meaning at the time Congress enacted the statute.’”  *Chacon v. Wilkinson*, 988 F.3d 1131, 1134 (9th Cir. 2021) (quoting *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018)).  The ordinary meaning of the phrase “insurance coverage” contemplates the protection of depositors based on a statutory entitlement to deposit insurance and up to the statutory maximum of $250,000.  *See Insurance*, Black’s Law Dictionary (12th ed. 2024) (defining “deposit insurance” as “A federally sponsored indemnification program to protect depositors against the loss of their money, *up to a specified maximum*.” (emphasis added)); *see also Federal Deposit Insurance Corporation*, Black’s Law Dictionary (12th ed. 2024) (noting that the FDIC “insure[s] accounts up to $250,000”); ECF No. 1-2 (“Compl. Ex. 1”) (the FDIC’s Frequently Asked Questions page, which states that “[d]eposits are insured up to at least $250,000 per depositor, per FDIC-insured bank, per ownership category”).  SVBFG’s claims are not for insurance coverage because it seeks recovery that is distinct from the insured amounts to which it is entitled by statute.  In fact, SVBFG’s basis for seeking $1.9 billion in its account funds is not a claim that such funds are “insured” as they are defined or understood under the FIRREA.  Instead, SVBFG argues that it is entitled to such funds

on an independent basis—the invocation of the Systemic Risk Exception.  *See* Compl. ¶ 77 ("[T]he FDIC-C has continued to refuse to provide SVBFG with access to its remaining $1.93 billion in deposits, as it is required to do so under the systemic risk exception as invoked and determined by the Treasury Secretary."); *see also id.* ¶¶ 128, 145 (similarly claiming entitlement based on the Systemic Risk Exception).  The FDIC-C argues that such a claim remains a claim for "insurance coverage" because it is a claim for SVBFG's deposits, but the FDIC-C fails to square its argument with the ordinary meaning of "insurance coverage" under § 1821(f).

To the extent that the FDIC-C argues that any claim for payment of deposits from the Deposit Insurance Fund is necessarily a payment of insurance, the Court finds that this interpretation is contrary to the language of the statute and historical uses of the Deposit Insurance Fund.  First, the Court finds that the language of § 1821(a) does not limit uses of the Deposit Insurance Fund to "insurance purposes."  The Deposit Insurance Fund is "a pool of assets used to guarantee the safety of federally insured deposits."  *Bullion Servs., Inc. v. Valley State Bank*, 50 F.3d 705, 708 (9th Cir. 1995).  Section 1821(a)(4) establishes the Deposit Insurance Fund and mandates that the FDIC maintain and administer it, use it "to carry out its insurance purposes," and invest in it.  *See* 12 U.S.C. § 1821(a)(4)(A).  The statute also states that "[t]he Deposit Insurance Fund shall be available to the Corporation for use with respect to insured depository institutions the deposits of which are insured by the Deposit Insurance Fund."  *Id.* § 1821(a)(4)(B).  Although the FDIC-C argues that the language mandating that the FDIC use the Deposit Insurance Fund "to carry out its insurance purposes" limits any use of the Deposit Insurance Fund to insurance purposes, nothing in the statute states that insurance purposes are the *only* use for which the FDIC-C can use the Deposit Insurance Fund.  *See id.* § 1821(a)(4)(A)(ii).  Moreover, the statute has a provision titled "Uses" that specifies no such limitation and in fact empowers the FDIC to use the Deposit Insurance Fund "with respect to insured depository institutions the deposits of which are insured by the Deposit Insurance Fund."  *Id.* § 1821(a)(4)(B).  Finally, the statute enumerates certain "[l]imitations on use," none of which limits uses of the Deposit Insurance Fund to insurance purposes.  *See id.* § 1821(a)(4)(C).  Second, the Court finds that the Deposit Insurance Fund has been used for non-insurance purposes in the past.  For example, in

13

prior invocations of the Systemic Risk Exception in the middle of the 2008 financial crisis, the Deposit Insurance Fund was used to guarantee the assets of at-risk banks and to guarantee certain debts and non-interest bearing deposit accounts.  *See* FDIC-C Supp. Br. Ex. A at 2–3 (describing the use of the Deposit Insurance Fund to partially guarantee the assets of Wachovia in contemplation of an acquisition offer, to partially guarantee the assets of Citigroup in order to prevent the bank from failing and exacerbating the financial crisis, and to guarantee certain debts and deposit accounts under the Debt Guarantee Program and the Transaction Account Guarantee Program).  Because the language of § 1821 and past uses of the Deposit Insurance Fund indicate that uses of the Deposit Insurance Fund are not necessarily limited to insurance purposes, the fact that SVBFG seeks recovery of its account funds from the Deposit Insurance Fund does not make its claim for "insurance coverage."

The FDIC-C also argues SVBFG's claim is necessarily for insurance coverage because other courts have adjudicated claims for amounts in excess of insurance maximums under § 1821(f).  *See* FDIC-C Supp. Br. at 1–2 ("[C]ourts regularly adjudicate claims under § 1821(f) by depositors of failed banks seeking larger deposit payments than the amount that FDIC-C administrative determined were insured deposits."); *see also* Reply at 2–3 (similar).  However, the FDIC-C refers the Court to an inapposite line of cases in which courts addressed whether the FDIC-C's determination pursuant to § 1821(f) that certain funds were not insured was arbitrary and capricious.  *See, e.g.*, *Aviva Life & Annuity Co. v. F.D.I.C.*, 654 F.3d 1129, 1131 (10th Cir. 2011); *Nimon v. Resol. Tr. Corp.*, 975 F.2d 240, 245–46 (5th Cir. 1992); *Lambert v. F.D.I.C.*, 847 F.2d 604, 605 (9th Cir. 1988); *Tam v. F.D.I.C.*, 830 F.Supp.2d 850, 860 (C.D. Cal. 2011); *Erickson v. F.D.I.C.*, No. 09-06111 MMM (AJWX), 2010 WL 11596560, at *1 (C.D. Cal. Mar. 10, 2010).  In none of those cases did the court have occasion to consider whether the claim was for "insurance coverage" because the claim was unquestionably for insurance coverage.  In each case, the plaintiffs argued that their funds were insured because the FDIC-C allegedly misapplied the relevant statutory maximum by either misclassifying the plaintiffs' accounts or misattributing ownership of the accounts at issue.  *See, e.g.*, *Nimon*, 975 F.2d at 245–46 (the plaintiffs' claim was that funds in excess of the coverage limit were owned by a different depositor and thus should be

separately insured); *Erickson*, 2010 WL 11596560, at \*1 (the plaintiffs' claim was that the amount determined to be in excess of the insurance amount was fully insured because the FDIC incorrectly identified the ownership of the three accounts at issue and/or improperly combined different accounts). SVBFG's claims in this case are distinct—SVBFG does not argue that the $1.9 billion to which it is allegedly entitled are payable as insured funds, but rather that it is entitled to the funds under the Treasury Secretary's invocation of the Systemic Risk Exception. *See, e.g.*, Compl.

The FDIC-C argues that SVBFG's claim is artful pleading that cannot avoid preemption and would open the floodgates of litigation against the FDIC-C for "uninsured deposits." FDIC-C Supp. Br. at 2–4. The Court disagrees. SVBFG's claims are more than just artful pleading because, as the Court discussed above, SVBFG's claims are substantively distinct from claims for insurance coverage. SVBFG argues that it is entitled to money on a basis distinct from its statutory entitlement to deposit insurance: the invocation of the Systemic Risk Exception. For a similar reason, the FDIC-C's argument that finding against preemption would allow "every depositor of a failed bank" to bring a claim against the FDIC-C is not accurate. *See* FDIC-C Supp. Br. at 3 (emphasis omitted). This case presents a very rare circumstance in which the Treasury Secretary has invoked the Systemic Risk Exception regarding the resolution of a bank in FDIC receivership and a depositor has claimed an entitlement based on the representations of the Treasury Secretary and the FDIC when the Systemic Risk Exception was invoked. *See SVB Fin. Grp.*, 2023 WL 8622521, at \*10 (acknowledging that "the Secretary of Treasury's invocation of a statutory exception [has] never before . . . been invoked in analogous circumstances"). Under normal circumstances, a depositor seeking to recover uninsured funds has no basis to claim an entitlement to such funds and would not be able to bring a plausible claim against the FDIC-C outside of § 1821(f). Thus, the Court finds that SVBFG's claims are not artfully pled to avoid preemption nor would finding against preemption create a flood of litigation against FDIC-C for uninsured deposits.

Finally, to the extent that the FDIC-C argues that SVBFG conceded that its claim is for insurance coverage under § 1821(f), the Court finds that SVBFG did not make any such

1    concession.  SVBFG invoked both the Systemic Risk Exception and § 1821(f) in its proof of claim

2    with the FDIC-R1, and to the extent that it invoked § 1821(f), SVBFG appears to have done so to

3    preserve its rights.  *See* 24-1321 ECF No. 1-8 ¶ 20 ("The Debtor has demanded that the FDIC-C,

4    pursuant to its obligations under 12 U.S.C. § 1821(f) and the terms of its invocation of a systemic

5    risk exception, pay the Debtor . . . ."); *see also* Opp. at 8 (noting that SVBFG made the filing "on a

6    protective basis to preserve all of its potential rights of recovery").

7           Accordingly, the Court finds that § 1821(f) does not preempt the very specific non-FOIA

8    claims brought by SVBFG in this unique circumstance.  The next question is whether the

9    Systemic Risk Exception changes this analysis.

10                  **ii.    The Systemic Risk Exception**

11          SVBFG argues that, in invoking the Systemic Risk Exception, Secretary Yellen "mandated

12   the payment of uninsured deposits at SVB from the Deposit Insurance Fund."  Opp. at 6.  The

13   FDIC-C argues that nothing in the text of the Systemic Risk Exception authorizes claims against

14   the FDIC-C outside of the § 1821(f) administrative process and, to the extent that SVBFG claimed

15   recovery of funds under the Systemic Risk Exception, the FDIC-C reviewed this claim in its

16   § 1821(f) determination.  Reply at 4.  At the hearing on the motion to dismiss, the FDIC-C further

17   argued that the invocation of the Systemic Risk Exception gives it discretion to deem funds

18   insured for purposes of dealing with SVB's failure and that, once the Systemic Risk Exception is

19   invoked, any distinction between insured and uninsured deposits goes away.  7/11/24 Hr. Tr. at

20   10:15–18, 12:22–23.  In supplemental briefing, SVBFG argues that the language of the Systemic

21   Risk Exception, *see* 12 U.S.C. § 1823(c)(4)(G), is clear that the Treasury Secretary has sole

22   authority to determine what action the FDIC takes after the Secretary invokes the Systemic Risk

23   Exception.  SVBFG Supp. Br. at 1–6.  The FDIC-C argues in its supplemental brief that once the

24   Treasury Secretary invokes the systemic risk exception, the FDIC-C has the authority to determine

25   what further action is necessary.  FDIC-C Supp. Br. at 5–7.

26          The FDIC's assistance to insured depository institutions is governed by § 1823(c).  Section

27   § 1823(c)(4)(A) subjects the FDIC to a "least-cost resolution" requirement under which the FDIC

28   must ensure that the total amount of expenditures and obligations incurred by the FDIC in

United States District Court
Northern District of California

connection with the exercise of its authority "is the least costly to the Deposit Insurance Fund of all possible methods for meeting the Corporation's obligation under this section."  12 U.S.C. § 1823(c)(4)(A)(ii).  The statute also requires that the FDIC "may not take any action . . . that would have the effect of increasing losses to the Deposit Insurance Fund by protecting—(I) depositors for more than the insured portion of deposits . . . or (II) creditors other than depositors."  *Id.* § 1823(c)(4)(E).  The Systemic Risk Exception is an exception to the requirements of subsections (A) and (E).  Section 1823(c)(4)(G) states that:

> Notwithstanding subparagraphs (A) and (E), if, upon the written recommendation of the Board of Directors (upon a vote of not less than two-thirds of the members of the Board of Directors) and the Board of Governors of the Federal Reserve System (upon a vote of not less than two-thirds of the members of such Board), the Secretary of the Treasury (in consultation with the President) determines that--

>> (I) the Corporation's compliance with subparagraphs (A) and (E) with respect to an insured depository institution for which the Corporation has been appointed receiver would have serious adverse effects on economic conditions or financial stability; and

>> (II) any action or assistance under this subparagraph would avoid or mitigate such adverse effects,

>>> the Corporation may take other action or provide assistance under this section for the purpose of winding up the insured depository institution for which the Corporation has been appointed receiver as necessary to avoid or mitigate such effects.

*Id.* § 1823(c)(4)(G)(i).

The parties offer differing interpretations of § 1823(c)(4)(G) with respect to whether the subparagraph vests authority in the Secretary to determine the actions of the FDIC after the invocation of the Systemic Risk Exception or whether that authority is vested in the FDIC.  The Court need not reach this question of statutory interpretation because it is irrelevant to the issue of preemption for two reasons.  First, regardless of whether the statute vests the Treasury Secretary or the FDIC with authority to determine the FDIC's actions, the Complaint plausibly alleges that the decision to protect all depositors and all deposits of SVB was made by the Treasury Secretary as an exercise of her authority.  The only facts before the Court are press releases and public

17

United States District Court
Northern District of California

1    statements which could plausibly be interpreted as evidence that the decision was made by the

2    Treasury Secretary.  These press releasees and public statements represent that the Treasury

3    Secretary, the Federal Reserve, and the FDIC worked together without identifying what decisions

4    were made by which party.  *See id.* ¶ 46 (Secretary Yellen's March 16, 2023 statement that "we

5    worked with the Federal Reserve and the FDIC to protect all depositors of the failed banks"); *id.*

6    ¶ 51 (Secretary Yellen's March 23, 2023 statement that "Treasury worked with the Federal

7    Reserve and the FDIC to take decisive and forceful actions"); *id.* ¶ 53 (Federal Reserve Vice Chair

8    for Supervision Barr stating that "[t]he federal Reserve, working with the Treasury Department

9    and the [FDIC], took decisive actions"); *id.* ¶ 55 (FDIC Director Hsu stating that "the U.S.

10   government invoked the systemic risk exception"); SVBFG Supp. Br. Ex. 1 (Secretary Yellen's

11   March 21, 2023 statement that "we worked with the Federal Reserve and FDIC to protect all

12   depositors").  On a motion to dismiss, the Court must view these facts in the light most favorable

13   to SVBFG.  In doing so, the Court may reasonably infer from these allegations that the decision to

14   protect all depositors and all deposits was made by the Treasury Secretary and pursuant to her

15   authority.

16           Second, even assuming that the statute vests the FDIC with authority to determine the

17   appropriate action, none of the facts before the Court show that the actions taken pursuant to the

18   Systemic Risk Exception characterized the payment of deposits in excess of the $250,000

19   statutory maximum as payments of insurance coverage, and SVBFG has plausibly alleged that the

20   payment of such deposits remained the payment of "uninsured" amounts.  The Complaint

21   identifies press releases and public statements by Secretary Yellen, the Federal Reserve, and the

22   FDIC representing that "all the deposits" would be made available and "[a]ll depositors of the

23   institution will be made whole."  Compl. ¶ 46 (The FDIC's March 13, 2023 press release stating

24   that "[a]ll depositors of the institution will be made whole."); *see also id.* ¶¶ 47, 50, 51 (similar

25   statements by Secretary Yellen that all depositors would be protected); *id.* ¶¶ 52, 54, 56, 57

26   (similar statements by FDIC Chairman Gruenberg); *id.* ¶ 53 (similar statement by Federal Reserve

27   Vice Chair for Supervision Barr); *id.* ¶ 55 (similar statement by Acting Comptroller of the

28   Currency and FDIC Director Hsu).  Moreover, some of those press releases continued to

acknowledge that some deposits, though made available, were "uninsured." *See, e.g.*, *id.* ¶ 65 (an FDIC press release stating that "all deposits—both insured and uninsured" were made available at SVBB); *see also id.* ¶ 55 (Hsu noting that "[t]he purpose [of the Systemic Risk Exception] was to protect all depositors, including uninsured depositors"). The FDIC-C also acknowledged that SVBFG's "insurance coverage" was statutorily capped at $250,000. *See* Compl. Ex. 10 at 1. Viewing these facts in the light most favorable to SVBFG, the Court may reasonably infer that the invocation of the Systemic Risk Exception and actions taken pursuant to it did not change the characterization of deposits in excess of the statutory maximum as insured, as opposed to uninsured.

*       *       *

Accordingly, the FDIC-C's motion to dismiss the non-FOIA claims other than Count VI as preempted is DENIED.

### B.     Plausibility of Non-FOIA Claims

The FDIC-C next argues that Counts II through V and VII are not plausible. The Court addresses each claim in turn.

#### i.     Turnover Claim (Count II)

Count II of the Complaint seeks turnover of SVBFG's "Account Funds" under § 542(b) of the Bankruptcy Code. Section 542(b) states:

> an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

11 U.S.C. § 542(b). "To prevail on a claim for turnover, a plaintiff must demonstrate '(1) the property is in the possession, custody or control of another entity; (2) the property can be used in accordance with the provisions of section 363; and (3) the property has more than inconsequential value to the debtor's estate.'" *In re Brown*, No. 18-10617 (JLG), 2022 WL 4390454, at *20 (Bankr. S.D.N.Y. Sept. 22, 2022) (quoting *Gletzer v. Soshkin (In re Brizinova)*, 588 B.R. 311, 327 (Bankr. E.D.N.Y. 2018)).

The FDIC-C raises four arguments why SVBFG fails to state a plausible turnover claim: (1) the FDIC-C disputes the obligation and turnover proceedings cannot involve a disputed obligation; (2) the FDIC-C does not possess SVBFG's account funds and any deposit liability remains with FDIC-R1; (3) the FDIC-C does not owe an enforceable obligation because its actions under the Systemic Risk Exception are discretionary; and (4) to the extent that FDIC-C owes an enforceable obligation, it fulfilled its obligation.  Mot. at 11–14.

a.  Whether Turnover Claims Can Involve Disputed Obligations

The FDIC-C argues that disputed property and disputed debts are not subject to turnover under § 542 and that the FDIC-C disputes the obligation at issue in this case.  Mot. at 11–12. SVBFG argues that a dispute over the existence of a debt does not make the debt "disputed property" and, even if it did, disputed property is still subject to turnover under § 542(b).  Opp. at 9–11.

Whether turnover claims can involve disputed property or debts is the subject of a longstanding split of authority among courts.  *See In re Keese*, 671 F.Supp.3d 1053, 1058 n.1 (C.D. Cal. 2023).  On one hand, some courts have found that turnover claims cannot be brought when the claims involve the return of disputed funds.  *See, e.g.*, *In re Gurga*, 176 B.R. 196, 199 (B.A.P. 9th Cir. 1994).  On the other hand, other courts have found that § 542 does not limit turnover claims to those seeking undisputed funds.  *See, e.g.*, *Keese*, 671 F.Supp.3d at 1058 n.1.

Upon review of these authorities, the Court finds persuasive the more recent set of cases and adopts their reasoning.  *See Keese*, 671 F.Supp.3d at 1058 n.1; *In re Process Am., Inc.*, 588 B.R. 82, 101 (Bankr. C.D. Cal. 2018); *In re Sonoma W. Med. Ctr., Inc.*, No. 18-10665 RLE, 2021 WL 4944089, at *7 (Bankr. N.D. Cal. Oct. 22, 2021).  In *Keese*, *Process Am.*, and *Sonoma W.*, California federal courts have expressly considered the split in authority and have held that the plain language of § 542 does not require a debt be undisputed in order to bring a turnover claim. *See, e.g.*, *Process Am.*, 588 B.R. at 101 ("§ 542(b) makes no requirement that the debt be undisputed.").  The Court also finds that the case law cited by the FDIC-C not only does not consider the split in authority, but is distinguishable.  For example, *In re Gurga*, the primary case on which the FDIC-C relies, was considered and rejected by both California bankruptcy courts to

consider the split because *Gurga* is "fundamentally a case regarding jurisdiction" and its

consideration of whether a turnover claim could involve disputed funds was dicta.  *See Sonoma W.*

*Med. Ctr.*, 2021 WL 4944089, at *7; *Process Am.*, 588 B.R. at 101.  Similarly, although the court

in *Glassey v. Amano* stated that "turnover is not intended as a remedy to determine disputed rights

of parties to property," the court ultimately rejected the turnover claim at issue in that case because

it lacked jurisdiction over the claim.  *Glassey v. Amano Corp.*, No. C-05-01604RMW, 2006 WL

889519, at *4 (N.D. Cal. Mar. 31, 2006), *aff'd*, 285 F. App'x 426 (9th Cir. 2008).  Finally, the

FDIC-C's remaining cases stand for the inapplicable proposition that a plaintiff cannot disguise a

breach of contract claim as a turnover claim.  *See In re Heller Ehrman LLP*, 461 B.R. 606, 607–08

(Bankr. N.D. Cal. 2011) ("Whatever the label, this is not an action for turnover of estate property;

it is an action to recover an account receivable, for breach of contract and quantum meruit."); *In re*

*Charter Co.*, 913 F.2d 1575, 1579 (11th Cir. 1990) (similar).

### b.  Whether the FDIC-C Is in Possession of "Account Funds"

The FDIC-C first argues that SVBFG's "Account Funds" are not actual funds but are

deposit liabilities owed by SVB to SVBFG.  Mot. at 12.  The FDIC-C also argues that it does not

possess and never possessed SVBFG's deposit liabilities and that those deposit liabilities remain

solely with FDIC-R1.  *Id.*  SVBFG argues that the FDIC-C's reliance on *Citizens Bank of*

*Maryland v. Strumpf* is misplaced because that case supports SVBFG's turnover claim, and

SVBFG has adequately alleged that the FDIC-C controls its account funds.  Opp. at 11 (discussing

*Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995)).

As an initial matter, the Court agrees with the FDIC-C's characterization of SVBFG's

"Account Funds" as deposit liabilities, rather than actual funds.  However, the FDIC-C fails to

clearly argue why this distinction would defeat a turnover claim.  The FDIC-C cites *Strumpf* for

the proposition that a bank's temporary hold on a bankrupt depositor's checking account "'was

neither a taking of possession of [the bankrupt depositor's] property nor an exercising of control

over it' because a bank does not store a depositor's money."  Mot. at 12 (alteration in original)

(quoting *Strumpf*, 516 U.S. at 21).  However, *Strumpf* merely held that a bank's temporary refusal

to pay deposit liabilities did not violate the automatic stay provision of the Bankruptcy Code.

*Strumpf*, 516 U.S. at 21.  It did not hold, as the FDIC-C appears to imply, that deposit liabilities are not property of the estate or that a bank is not an entity for purposes of the turnover provision. *See* 11 U.S.C. § 542(b).  Moreover, to the extent that the FDIC-C makes such an argument, the Court disagrees.  The Court finds persuasive the analysis of *In re Calvin*, which directly addressed whether a bank is an entity and whether a bank account is a debt that is property of the estate under § 542(b) and answered both questions in the affirmative.  *See In re Calvin*, 329 B.R. 589, 595–96 (Bankr. S.D. Tex. 2005); *see also Sonoma W. Med. Ctr.*, 2021 WL 4944089, at *7 (finding that funds held in a bank account were property of the estate).

The problem with SVBFG's Complaint is that it fails to adequately allege that SVBFG's deposit liabilities are in the possession, custody, or control of the FDIC-C, as opposed to the FDIC-R1.  The Complaint states that SVBB rejected SVBFG's wire transfers "because *the FDIC-R1* instructed Bridge Bank to place a hold on SVBFG's accounts."  Compl. ¶ 70 (emphasis added).  The Complaint further states that "[t]he *FDIC-R1* also directed Bridge Bank to assign SVBFG's deposit accounts and all associated assets and liabilities to the *FDIC-R1*."  *Id.* ¶ 71 (emphasis added).  However, the FDIC-C and the FDIC-R1 are legally distinct entities, so SVBFG must allege facts showing that the FDIC-C has possession, custody, or control of SVBFG's deposit liabilities.  *See Bullion Servs., Inc. v. Valley State Bank*, 50 F.3d 705, 709 (9th Cir. 1995) ("Because FDIC Corporate and FDIC Receiver perform two different functions and protect wholly different interests, courts have been careful to keep the rights and liabilities of these two entities legally separate.").  At no point does the Complaint allege that the deposit liabilities were transferred to the FDIC-C or that the FDIC-C ever exercised control over them.  The Complaint's only allegations that might suggest that the FDIC-C has possession, custody, or control of SVBFG's deposit liabilities are that "[u]pon information and belief, the actions of the FDIC-R1 were undertaken with the knowledge of employees of the FDIC-C and could not have been undertaken without their acquiescence" and that the FDIC-C permitted the denial of SVBFG's Account Funds.  *Id.* ¶¶ 72–73.  These conclusory allegations are not adequate to state a claim because SVBFG points to no well-pled facts that would support them, and the Court finds that it cannot reasonably infer that these allegations are true based on the facts before it.  *See Blantz v.*

1    *California Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 926 (9th Cir.

2    2013) (holding that an allegation stating that "on information and belief" a defendant directed the

3    actions of other defendants is conclusory and insufficient to state a claim).  In addition, these

4    allegations conflict with SVBFG's allegations that the FDIC-R1 directed SVBB to place a hold on

5    SVBFG's accounts and to assign those accounts to the FDIC-R1.

6         In light of SVBFG's failure to adequately allege that the FDIC-C has possession, custody,

7    or control of SVBFG's deposit liabilities, the Court DISMISSES Count II for failure to state a

8    claim.

9                    c.   Whether the FDIC-C Owes an Enforceable Obligation

10        The FDIC-C argues that it does not owe SVBFG an enforceable legal obligation because

11   the invocation of the Systemic Risk Exception is a grant of discretion to the FDIC-C rather than a

12   mandate of particular action.  Mot. at 12–13.  SVBFG argues that the Secretary of the Treasury

13   dictates what action the FDIC-C can take after invoking the Systemic Risk Exception.  Opp. at

14   11–13.

15        The Court need not finally resolve this issue now.  Although the legislative history

16   suggests that the broad discretion vested in the FDIC under § 1823(c)(4)(F), where the FDIC is

17   bound by the least cost resolution requirement, does not apply to situations where § 1823(c)(4)(G)

18   comes into play, the Court will need a more developed factual record in order to determine

19   whether an enforceable obligation was created when the Systemic Risk Exception was invoked.

20   SVBFG has plausibly alleged that the Treasury Secretary made the determination to protect all

21   deposits and all depositors, whether insured or uninsured, thus not calling into question the effect

22   of any statutory discretion the FDIC-C may have.  Although the FDIC-C argues that it was the

23   agency that determined the scope of relief available to depositors, the Complaint tells a different

24   story and parsing the language of the statute without the benefit of a developed record is not

25   warranted.  SVBFG has plausibly alleged an enforceable obligation.

26                   d.   Whether the FDIC-C Satisfied Its Obligations

27        The FDIC-C argues that, to the extent that the press releases and public statements in the

28   Complaint describe an enforceable obligation, the FDIC-C satisfied this obligation by making

deposits available at SVBB.  Mot. at 14.  The FDIC-C also argues that, under § 1822(b), a

payment of an insured deposit discharges the FDIC-C.  *See id.*  SVBFG argues that the FDIC-C is

only discharged to the extent of the insured deposit under § 1822(b), and the Complaint

adequately alleged that the FDIC-C failed to fulfill its obligations.  Opp. at 13.  The FDIC-C

responds that, once the entire amount of SVBFG's deposits were made available at SVBB, the

FDIC-C was discharged from liability, and it was the FDIC-R1 that prevented SVBFG's access to

its account funds.  Reply at 5–7.

The parties' arguments with respect to whether the FDIC-C satisfied its obligations

ultimately turn on whether SVBFG has adequately alleged that the FDIC-C, as opposed to the

FDIC-R1, was responsible for SVBFG's injury.  For the reasons stated in Part IV.C.i.b, *supra*, the

Court finds that SVBFG has not adequately alleged that the FDIC-C was responsible for SVBFG's

loss of access to its account funds and DISMISSES Count II on this basis.

*          *          *

For the reasons stated above, the FDIC-C's motion to dismiss SVBFG's turnover claim is

GRANTED.  At the continued hearing on the motion to dismiss, SVBFG identified further facts

that it could allege to show that FDIC-C is an entity that owes a debt that is property of the estate.

In light of this representation, the Court finds that amendment is not futile, and Count II is

DISMISSED WITH LEAVE TO AMEND.

### ii.    Automatic Stay Claim (Count III)

"When a debtor files a petition for bankruptcy, the Bankruptcy Code protects the debtor's

interests by imposing an automatic stay on efforts to collect prepetition debts outside the

bankruptcy forum."  *City of Chicago, Illinois v. Fulton*, 592 U.S. 154, 156 (2021).  SVBFG argues

that the FDIC-C violated § 362(a)(1) and (a)(3).  Opp. at 14.  In relevant part, § 362(a)(1) states

that the automatic stay is applicable to "the commencement or continuation . . . of a judicial,

administrative, or other action proceeding against the debtor that was or could have been

commenced before the commencement of the case under this title."  11 U.S.C. § 362(a)(1).

Similarly, § 362(a)(3) states that the automatic stay is applicable to "any act to obtain possession

of property of the estate or of property from the estate or to exercise control over property of the

1    estate." *Id.* § 362(a)(3).  The FDIC-C argues that the refusal to pay SVBFG's deposit liabilities

2    does not constitute a violation of the automatic stay and that the FDIC-C never assumed SVBFG's

3    deposit liabilities.  Mot. at 15.  SVBFG argues that it has alleged that the FDIC-C violated the

4    automatic stay provision because the FDIC-C cut off SVBFG's access to the account funds and

5    removed them from SVBB and claimed that SVBFG was subject to the claims process under

6    § 1821(f) to recover its funds.

7            As the Court found above in Part IV.C.i.b, *supra*, the fact that SVBFG's claim is for

8    deposit liabilities rather than actual funds does not mean that SVBFG's deposit liabilities are not

9    property of the estate.  However, SVBFG's automatic stay claim is not plausible for two reasons.

10   First, SVBFG fails to adequately allege that the FDIC-C, as opposed to the FDIC-R1, retains

11   possession of SVBFG's deposit liabilities.  *See* Compl. ¶¶ 70–71 (stating that the FDIC-R1

12   directed SVBB to place a hold on SVBFG's accounts and to transfer the deposit accounts to

13   FDIC-R1).  Second, even if SVBFG could adequately allege that the FDIC-C had possession of

14   SVBFG's deposit liabilities, SVBFG fails to adequately allege that any of the FDIC-C's actions

15   violated the automatic stay provision.  To the extent that SVBFG argues that the FDIC-C violated

16   the automatic stay by cutting off SVBFG's access to its funds at SVBB, this action occurred

17   before SVBFG filed for bankruptcy and thus before the automatic stay came into effect.  *Compare*

18   *id.* ¶ 70 (alleging that the FDIC-R1 placed a hold on SVBFG's accounts on March 16, 2023), *with*

19   ¶ 75 (alleging that SVBFG filed its Chapter 11 petition on March 17, 2023).  Moreover, SVBFG

20   has failed to allege any facts that would show that the act of cutting off SVBFG's access to funds

21   at SVBB was an administrative action against the debtor that "continu[ed]" such that it would

22   violate the automatic stay provision at § 362(a)(1).  As such, SVBFG's claim for violation of the

23   automatic stay relies on the FDIC-C's alleged retention of SVBFG's deposit liabilities and thus is

24   an act to "exercise control over property of the estate."  *See* 11 U.S.C. § 362(a)(3).  However, the

25   Supreme Court has held "that mere retention of property does not violate § 362(a)(3)."  *See*

26   *Fulton*, 592 U.S. at 156.  In *Fulton*, the City of Chicago impounded the debtors' vehicles.  *Id.* at

27   157.  After the debtors filed for bankruptcy, they requested their vehicles, the City refused, and the

28   bankruptcy court held that the City's refusal violated the automatic stay, a holding that the

United States District Court
Northern District of California

Seventh Circuit affirmed.  *Id.*  The Supreme Court reversed.  *Id.* at 161.  In doing so, the Supreme Court considered the structure and history of the Bankruptcy Code.  *Id.* at 160–61.  Importantly, the Supreme Court found that, if § 362(a)(3) applied to the retention of property, this reading would render superfluous the turnover provision at § 542(a) and would also create contradictory commands between the two sections.  *Id.* at 160.  The Court finds that this case falls under *Fulton* because SVBFG merely alleges that the FDIC-C has retained its property.  Although this might be the basis of a turnover claim, it is not also the basis for a claim of the violation of the automatic stay.  SVBFG argues that anything beyond a brief and temporary retention of property violates the automatic stay.  Opp. at 14–15.  However, SVBFG not only fails to analyze or address *Fulton*, but it relies on *Strumpf* and bankruptcy court decisions that predate *Fulton* by over 20 years.  *Fulton* is not limited to brief or temporary retentions of property, so the Court cannot apply such a limitation here.

Accordingly, the FDIC-C's motion to dismiss SVBFG's automatic stay claim is GRANTED.  Because SVBFG's automatic stay claim relies on the FDIC-C's retention of property, the Court finds that amendment would be futile in light of *Fulton*.  Accordingly, Count III is DISMISSED WITHOUT LEAVE TO AMEND.

### iii.    Due Process Claim (Count IV)

"The Due Process Clause of the Fourteenth Amendment imposes procedural constraints on governmental decisions that deprive individuals of liberty or property interests."  *Nozzi v. Hous. Auth. of City of Los Angeles*, 806 F.3d 1178, 1190 (9th Cir. 2015), *as amended on denial of reh'g and reh'g en banc* (Jan. 29, 2016).  To prevail on a procedural due process claim, the plaintiff "must establish the existence of '(1) a liberty or property interest protected by the Constitution; (2) a deprivation of that interest by the government, [and] (3) a lack of process.'"  *Blumenkron v. Multnomah Cnty.*, 91 F.4th 1303, 1314 (9th Cir. 2024) (alteration in original) (quoting *Shanks v. Dressel*, 540 F.3d 1082, 1090 (9th Cir. 2008)).

First, the FDIC-C argues that it did not deprive SVBFG of any interest because it was the FDIC-R1, rather than the FDIC-C, that placed the hold on SVBFG's accounts.  Mot. at 16.  For the reasons stated above, the Court finds that SVBFG has failed to adequately allege that it was

United States District Court
Northern District of California

1   the FDIC-C, as opposed to the FDIC-R1, that deprived SVBFG of any protected property interest.

2           Second, the FDIC-C argues that SVBFG does not have a constitutionally protected

3   property interest because the Systemic Risk Exception did not create an enforceable obligation to

4   pay SVBFG its deposit liabilities.  Mot. at 16–17.  SVBFG argues the invocation of the Systemic

5   Risk Exception was couched in mandatory terms that gave rise to SVBFG's property interest

6   because press releases and public statements by the Treasury Secretary, the Federal Reserve, and

7   the FDIC stated that all depositors would be fully protected.  Opp. at 15–16.  "Supreme Court

8   'cases recognize that a benefit is not a protected entitlement if government officials may grant or

9   deny it in their discretion.'"  *Ching v. Mayorkas*, 725 F.3d 1149, 1155 (9th Cir. 2013) (quoting

10  *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005)).  "Instead, '[a] reasonable

11  expectation of entitlement is determined largely by the language of the statute and the extent to

12  which the entitlement is couched in mandatory terms.'"  *Id.* (quoting *Wedges/Ledges of*

13  *California, Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 62 (9th Cir. 1994)).  Informal administrative

14  process documents, such as policy manuals, can create a property interest subject to due process

15  protection.  *See, e.g.*, *Adams v. Sewell*, 946 F.2d 757, 764 (11th Cir. 1991) ("The County's

16  Personnel Policy Manual creates a property interest in continued employment for County

17  employees, who may be discharged only for 'violation of rules, unsatisfactory performance or

18  conduct.'"), *overruled on other grounds by McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994);

19  *Skeets v. Johnson*, 805 F.2d 767, 770 (8th Cir. 1986), *on reh'g*, 816 F.2d 1213 (8th Cir. 1987)

20  ("An employee handbook can create a property interest if it reflects a de facto policy of

21  established guidelines to be followed prior to dismissal.").  For similar reasons to those stated in

22  Part IV.A.ii and Part IV.B.i.c, *supra*, the Court finds that SVBFG has alleged sufficient facts for

23  the Court to reasonably infer that the invocation of the Systemic Risk Exception created an

24  entitlement and that the decision to protect all depositors and all deposits was made under the

25  authority of the Treasury Secretary, as opposed to an exercise of the FDIC-C's discretion.

26  Although the Treasury Secretary's documentation of the Systemic Risk Exception is not before the

27  Court, SVBFG has pointed to press releases and public statements that state, without qualification,

28  that all depositors would be protected and that all deposits would be made available.  *See, e.g.*,

*United States District Court*
*Northern District of California*

1    Compl. ¶¶ 46, 47, 50–54, 56, 57.  These press releases also represent that the invocation of the

2    Systemic Risk Exception was a joint action by the Treasury Secretary, the Federal Reserve, and

3    the FDIC.  *See, e.g.*, *id.* ¶¶ 46, 51, 53, 55; SVBFG Supp. Br. Ex. 1.  The Court accepts these facts

4    as true and views them in the light most favorable to SVBFG.  In doing so, the Court may

5    reasonably infer from these allegations that when invoking the Systemic Risk Exception, the

6    Treasury Secretary used mandatory language that created a property interest in SVBFG's account

7    funds and that this interest was created by the Treasury Secretary's exercise of authority, rather

8    than any discretion on the part of the FDIC-C.

9         Finally, the FDIC-C argues that SVBFG has failed to allege a lack of process because

10   SVBFG was afforded process under § 1821(f).  Mot. at 17.  SVBFG argues that it was not

11   provided adequate process because it has alleged that the FDIC-C did not respond to its letter

12   demanding its account funds and did not give SVBFG an opportunity to submit evidence or

13   present argument in support of its claim.  Opp. at 17–18.  In evaluating a procedural due process

14   claim, Courts consider the factors identified in *Mathews v. Eldridge*, 424 U.S. 319 (1976): "(1) the

15   private interest affected; (2) the risk of erroneous deprivation through the procedures used, and the

16   value of additional procedural safeguards; and (3) the government's interest, including the burdens

17   of additional procedural requirements."  *Diamond S.J. Enter., Inc. v. City of San Jose*, 100 F.4th

18   1059, 1069 (9th Cir. 2024) (quoting *Yagman v. Garcetti*, 852 F.3d 859, 864 (9th Cir. 2017)).

19   First, SVBFG's interest is significant, as it alleges that the FDIC-C deprived it of over $1.9 billion.

20   *See Nimon v. Resol. Tr. Corp.*, 975 F.2d 240, 247 (5th Cir. 1992) (acknowledging that a

21   deprivation of $100,000 was significant).  Second, the Court finds that SVBFG has alleged

22   sufficient facts for the Court to reasonably infer that the FDIC-C's procedures created a risk of

23   erroneous deprivation and that additional safeguards would be valuable.  SVBFG alleges that it

24   wrote a letter to the FDIC-C demanding payment of the account funds, that the FDIC-C did not

25   acknowledge the letter until after the Bankruptcy Court raised due process issues, and that the

26   FDIC-C construed SVBFG's request as for insurance coverage under § 1821(f) and summarily

27   denied the request.  *See* Compl. ¶¶ 83, 94, 95, 97; Compl. Ex. 10.  When accepted as true and

28   construed in the light most favorable to SVBFG, the Court finds that it may reasonably infer that

United States District Court
Northern District of California

28

1   the FDIC-C's process with respect to SVBFG's request created a high risk of erroneous

2   deprivation and that additional safeguards would have been valuable.  Based on these allegations,

3   it appears that the FDIC-C took SVBFG's demand letter, which did not make any mention of

4   § 1821(f) and requested the payment of "the uninsured deposits of SVB," and shoehorned it into

5   the § 1821(f) process for claims regarding insurance coverage.  *See* Compl. Ex. 9.  In doing so, the

6   FDIC-C did not provide SVBFG with any opportunity to make arguments or present evidence and

7   the FDIC-C summarily denied its request.  For purposes of this motion to dismiss, the Court finds

8   that these allegations are sufficient to state a claim for deprivation of SVBFG's due process rights.

9   *See Milano v. Richmond Hous. Auth. of Contra Costa Cnty.*, No. 16-CV-03246-JSW, 2018 WL

10   11472386, at *3 (N.D. Cal. Apr. 25, 2018) (denying a motion to dismiss in part because "the

11   record at this early stage is insufficient for the Court to determine whether [the second and third

12   *Mathews* factors] support Plaintiff's position").  Finally, neither party has addressed the

13   government's interest in this case.

14       Accordingly, the FDIC-C's motion to dismiss SVBFG's due process claim is GRANTED

15   because SVBFG fails to allege that the FDIC-C was the government entity that deprived SVBFG

16   of its property interest.  For similar reasons as above, the Court finds that amendment may not be

17   futile, and Count IV is DISMISSED WITH LEAVE TO AMEND.

18       **iv.    Standalone APA Claim (Count V)**

19       SVBFG's Count V challenges a "purported policy pursuant to which [the FDIC-C]

20   exercises discretion in determining which uninsured deposits of former Silicon Valley Bank

21   depositors are guaranteed to be paid pursuant to the Treasury Secretary's determination and

22   invocation of the systemic risk exception."  Compl. ¶ 136.  The FDIC-C argues that this claim

23   must be dismissed because it does not challenge a final agency action and, to the extent that this

24   claim challenges the FDIC-C's determination under § 1821(f), it is duplicative of Count VI.  Mot.

25   at 18–20.  SVBFG argues that the FDIC-C's purported policy is a final determination because it

26   constituted the consummation of the FDIC-C's decision-making process and legal consequences

27   affecting SVBFG's rights flowed from the decision.  Opp. at 21–22.

28       The APA states that "[a]gency action made reviewable by statute and final agency action

United States District Court
Northern District of California

29

for which there is no other adequate remedy in a court are subject to judicial review."  5 U.S.C. § 704.  In the Ninth Circuit, the final agency action requirement has been treated as jurisdictional. *San Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 571 (9th Cir. 2019); *see also Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1161 (9th Cir. 2018); *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 266 (9th Cir. 1990) ("'[F]inal agency action' is a jurisdictional requirement imposed by [5 U.S.C. § 704].").

"It is axiomatic that Plaintiffs must identify an 'agency action' to obtain review under the APA."  *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1010–11 (9th Cir. 2021) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61–62 (2004)).  The Ninth Circuit has noted that an agency action must be "circumscribed and discrete, such as a rule, order, license, sanction or relief."  *Id.* (cleaned up) (quoting *Norton*, 542 U.S. at 62).  In addition, two conditions must be satisfied for an agency action to be final: (1) "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

The Court finds that SVBFG has failed to allege a final agency action.  SVBFG cannot rely on its allegations of the FDIC-C's "purported policy pursuant to which it exercises discretion," Compl. ¶ 136, because this allegation is merely a "broad programmatic attack" and "generalized complaint" that other courts have found does not constitute a final agency action.  *See e.g.*, *Whitewater Draw*, 5 F.4th at 1010–12 (finding no agency action where plaintiffs characterized DHS operations in regulating various times of immigration as "programs"); *Bark v. United States Forest Serv.*, 37 F.Supp.3d 41, 50 (D.D.C. 2014) ("Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." (alteration in original) (quoting *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C.Cir.2006))).  Moreover, SVBFG fails to identify any document, statement, or other facts that would show the existence of this "purported policy" or that this policy marked the consummation of the FDIC-C's decision-making process.  Instead,

30

SVBFG implicitly requests that the Court infer from the FDIC-C's treatment of SVBFG that the FDIC-C has a purported policy of exercising discretion.  The Court cannot infer from allegations affecting the plaintiff that an agency has a broader policy, let alone one that is reviewable under the APA.  *See Pearl River Union Free Sch. Dist. v. King*, 214 F.Supp.3d 241, 260 (S.D.N.Y. 2016) ("[T]his is not a case where a policy of some kind was plainly adopted . . . rather, at best, Plaintiff has alleged that Defendants took certain action with respect to it and asks the Court to surmise therefrom the existence of a broader policy.  That is, however, not enough for purposes of § 704." (internal citation omitted)).

SVBFG argues that legal consequences flowed from this purported policy because SVBFG's rights were affected, but the legal consequences to which SVBFG refers flowed from the FDIC-C's October 20, 2023 determination pursuant to § 1821(f).  *See* Opp. at 22; Compl. Ex. 10.  Neither party contests that the FDIC-C's § 1821(f) determination was a final agency action, and any reliance on the § 1821(f) determination for Count V would make Count V duplicative of Count VI (the claim for APA review of the § 1821(f) determination).  At the hearing, counsel for SVBFG noted that Count V is not duplicative of Count VI because it challenges a different action and would result in a different administrative record than Count VI.  7/16/24 Hr. Tr. at 36:5–37:11.  To the extent that SVBFG is using its Count V to expand the administrative record, that request is better brought as a motion to seek discovery outside of the administrative record rather than bringing a standalone claim based on inadequate allegations of final agency action.

Accordingly, the FDIC-C's motion to dismiss SVBFG's standalone APA claim is GRANTED.  The Court finds that there is a possibility, albeit a remote one, that SVBFG could amend to save its claim.  Any amendment must identify a final agency action separate from the denial of the § 1821(f) claim.  Count V is DISMISSED WITH LEAVE TO AMEND.

### v.   Estoppel Claim (Count VII)

The Complaint does not specify whether SVBFG brings a claim under an equitable estoppel theory or a promissory estoppel theory.  *See* Compl. ¶¶ 162–69.  In its opposition, SVBFG clarified that its claim is for promissory estoppel.  Opp. at 23–25.

The FDIC-C argues that promissory estoppel is not available against the federal

government.  Mot. at 20–21.  SVBFG argues that the FDIC-C is subject to suit because the sue-and-be-sued language of 12 U.S.C. § 1819 is a general waiver of sovereign immunity that renders the FDIC-C liable to claims of promissory estoppel.  Opp. at 24–25.  The Supreme Court has described a two-step process for determining whether a federal agency can be subject to substantive liability: First, the Court must determine whether there is a waiver of sovereign immunity for actions against the FDIC.  Second, the Court must look to the substantive claim to see whether Congress intended it to apply to the FDIC.  *See U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 743 (2004).

First, the Court finds that there is a waiver of sovereign immunity for actions against the FDIC.  The Ninth Circuit has held that "[t]he 'sue-and-be-sued' language of 12 U.S.C. § 1819 (Fourth) is a general waiver of sovereign immunity from claims brought against the FDIC." *Woodbridge Plaza v. Bank of Irvine*, 815 F.2d 538, 542–43 (9th Cir. 1987).  Section 1819 states that the FDIC has the power "[t]o sue and be sued, and complain and defend, by and through its own attorneys, in any court of law or equity, State or Federal."  12 U.S.C. § 1819 (Fourth); *see also F.D.I.C. v. Meyer*, 510 U.S. 471, 481 (1994) (interpreting substantially similar language to be a general waiver of sovereign immunity and allowing constitutional tort claims against the Federal Savings and Loan Insurance Corporation).

Second, the Court finds that promissory estoppel claims are meant to reach the FDIC.  On this inquiry, the Court finds persuasive *Ascom Hasler Mailing Systems v. U.S. Postal Service*.  In *Ascom*, the court noted that case law expressed doubt about whether claims of "contract implied-in-law," which includes claims of promissory estoppel, could be made against the United States. *See Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv.*, 815 F.Supp.2d 148, 159 (D.D.C. 2011). However, the court held that contract implied-in-law claims are intended to reach USPS because USPS was granted "'a high degree of independence from other offices of the [g]overnment,' including the express authority 'to enter into and perform contracts' in its own name, as well as the authority to 'execute instruments, and determine the character of, and necessity for, its expenditures.'"  *Id.* at 160 (alteration in original) (first quoting *Flamingo Indus.*, 540 U.S. at 746; then quoting 39 U.S.C. § 401(3)).  This is also true of the FDIC.  The FDIC is also "an

1   independent federal agency," *Aliotta v. Bair*, 614 F.3d 556, 558 (D.C. Cir. 2010), that is

2   authorized by statute "[t]o make contracts" and "regulat[e] the manner in which its general

3   business may be conducted," 12 U.S.C. § 1819 (Third) (Sixth).  Accordingly, the Court finds that

4   promissory estoppel claims are also intended to reach the FDIC.

5          The FDIC-C does not engage with either step of the *Flamingo Industries* analysis and

6   instead cites cases that stand for the general proposition that promissory estoppel claims against

7   the government are disfavored. Mot. at 20–21; Reply at 14.  However, the Court finds that the

8   FDIC-C's argument and the cases on which it relies are unpersuasive because they fail to address

9   the relevant legal standard.

10         The FDIC-C also argued that SVBFG has failed to plausibly allege two necessary elements

11  of an estoppel claim.  Mot. at 21.  SVBFG argues that the FDIC-C's argument appears to apply to

12  equitable estoppel claims, and the FDIC-C has not argued that SVBFG failed to allege the

13  elements of a *promissory* estoppel claim.  Opp. at 25.  In reply, the FDIC-C argues that its

14  argument also applies to promissory estoppel.  Reply at 14.  The Court finds that the FDIC-C has

15  forfeited its argument that SVBFG failed to allege the elements of promissory estoppel.  The

16  FDIC-C clearly understood the difference between promissory estoppel and equitable estoppel in

17  drafting its opening brief.  *See* Mot. at 20.  However, the FDIC-C did not identify the type of

18  estoppel to which it referred in arguing that SVBFG did not plausibly allege the elements of an

19  estoppel claim.  Moreover, the FDIC-C cited only cases that addressed equitable estoppel, as

20  opposed to promissory estoppel, in support of its argument.  *See id.* at 21 (citing *Sulit v. Schiltgen*,

21  213 F.3d 449, 454 (9th Cir. 2000); *Johnson v. Williford*, 682 F.2d 868, 871 (9th Cir. 1982)).

22  Based on the structure of the FDIC-C's opening brief, the Court understands its argument to be

23  that SVBFG failed to allege the elements of an equitable estoppel claim.  Accordingly, the FDIC-

24  C's attempt to apply this argument to promissory estoppel in its reply brief is a new argument that

25  has been forfeited, and the Court will not consider it.  *See Autotel v. Nevada Bell Tel. Co.*, 697

26  F.3d 846, 852 n.3 (9th Cir. 2012) ("[A]rguments raised for the first time in a reply brief are

27  waived." (alteration in original) (quoting *Turtle Island Restoration Network v. U.S. Dep't of*

28  *Commerce*, 672 F.3d 1160, 1166 n.8 (9th Cir.2012))).

United States District Court
Northern District of California

1    Accordingly, the FDIC-C's motion to dismiss SVBFG's promissory estoppel claim is

2    DENIED.

3         **vi.    Declaratory Judgment Claim (Count I)**

4    The FDIC-C argues that SVBFG's declaratory judgment claim is subsumed by SVBFG's

5    APA and due process claims and should be dismissed to the extent that it is an independent claim.

6    Mot. at 21–22.  The FDIC-C also argues that SVBFG is not entitled to the declaratory judgment it

7    seeks.  *Id.* at 22–23.  In particular, the FDIC-C argues that SVBFG cannot request prejudgment

8    interest from the FDIC.  *Id.* at 23.  SVBFG agrees that its claim for declaratory relief is

9    "intertwined with its other underlying causes of action" but argues that the declaratory judgment

10   claim is appropriate because such relief is discretionary and SVBFG does not seek to use

11   declaratory relief to create jurisdiction that would not otherwise exist.  Opp. at 20–21.

12   It is well-established that declaratory judgment is not an independent cause of action, but

13   an equitable remedy.  *See Brown v. Transworld Sys., Inc.*, 73 F.4th 1030, 1038 (9th Cir. 2023)

14   (noting that a requests for declaratory and injunctive relief are not stand-alone claims); *City of

15   Reno v. Netflix, Inc.*, 52 F.4th 874, 878 (9th Cir. 2022) ("[T]he Declaratory Judgment Act does not

16   provide an affirmative cause of action where none otherwise exists.").  The parties agree that

17   SVBFG's request for declaratory relief is tied to its other claims for relief and thus will rise or fall

18   with the plausibility of those claims.  In fact, every request made under the declaratory judgment

19   claim is for relief that SVBFG would get through one of its other claims.  *See* Compl. ¶ 110.

20   Perhaps Count I is simply an inartfully pled request for declaratory relief, but the Court does not

21   see why this makes the Count I independently implausible.  In fact, the FDIC-C's arguments for

22   dismissal of SVBFG's claims for declaratory relief simply reiterate the substantive arguments that

23   the FDIC-C made in support of preemption, to dismiss the turnover claim, and to dismiss the

24   estoppel claim.  Accordingly, the Court will not dismiss SVBFG's claims on this basis.

25   However, the Court agrees with the FDIC-C that SVBFG's request for prejudgment

26   interest must be dismissed.  Under the longstanding "no-interest rule," "[i]n the absence of express

27   congressional consent to the award of interest *separate from a general waiver of immunity to suit*,

28   the United States is immune from an interest award."  *In re Nat'l Sec. Agency Telecomms. Recs.*

United States District Court
Northern District of California

*Litig.*, No. C 07-0109 VRW, 2010 WL 11475732, at *13 (N.D. Cal. Dec. 21, 2010) (emphasis added) (quoting *Library of Congress v. Shaw*, 478 US 310, 314 (1986)).  "One exception to this rule applies, however, where the government agency has 'cast off the cloak of sovereignty and assumed the status of a private commercial enterprise.'" *Far W. Fed. Bank, S.B. v. Off. of Thrift Supervision-Dir.*, 119 F.3d 1358, 1366 (9th Cir. 1997) (quoting *Shaw*, 478 U.S. at 317 n.5).  The Ninth Circuit has held "that sovereign immunity bars an award of interest against the FDIC.  Congress has not expressly waived the FDIC's immunity against prejudgment interest, nor does the FDIC fall under the exception of the government's waiver [of] immunity when it operates as a commercial enterprise." *Battista v. F.D.I.C.*, 195 F.3d 1113, 1120 (9th Cir. 1999).  Thus, although the FDIC's "sue-and-be-sued" clause operates as a general waiver of sovereign immunity, that waiver does not extend to an award of interest.

Accordingly, the FDIC-C's motion to dismiss SVBFG's claim for declaratory judgment is GRANTED to the extent it seeks dismissal of the request for prejudgment interest and DENIED in all other respects.  SVBFG's request for prejudgment interest is DISMISSED WITHOUT LEAVE TO AMEND.

### C.     FOIA Claim

The FDIC-C moved to dismiss SVBFG's FOIA claim, arguing that the Court lacked jurisdiction because the FOIA request at issue was made by Robert Sacks and did not indicate that it was made on behalf of SVBFG.  Mot. at 23–24.  SVBFG voluntarily withdrew its FOIA claim.  Opp. at 25.  Accordingly, the Court GRANTS the FDIC-C's motion to dismiss the FOIA claim (Count VIII) WITHOUT LEAVE TO AMEND.

## V.     ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that the motion to dismiss (ECF No. 25) brought by Defendant the Federal Deposit Insurance Corporation, in its corporate capacity, is GRANTED IN PART and DENIED IN PART.

1.     The FDIC-C's motion to dismiss is DENIED to the extent it argues that SVBFG's non-FOIA claims are preempted.

2.     The request for prejudgment interest in Count I is DISMISSED WITHOUT

LEAVE TO AMEND.  The motion to dismiss Count I is DENIED with respect to all other requests for declaratory relief.

3.    Counts II, IV, and V are DISMISSED WITH LEAVE TO AMEND.

4.    The motion to dismiss Count VII is DENIED.

5.    Counts III and VIII are DISMISSED WITHOUT LEAVE TO AMEND.

6.    SVBFG may file an amended complaint that addresses the deficiencies identified in above within 21 days of the date of this Order, subject to reasonable extension by motion or stipulation.


Dated:  August 8, 2024

_____

BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

36