Robert A. Sacks (SBN 150146)
(sacksr@sullcrom.com)
Adam S. Paris (SBN 190693)
(parisa@sullcrom.com)
Diane L. McGimsey (SBN 234953)
(mcgimseyd@sullcrom.com)
**SULLIVAN & CROMWELL LLP**
1888 Century Park East
Los Angeles, California 90067
Telephone:     (310) 712-6600
Facsimile:     (310) 712-8800

*Attorneys for Plaintiff SVB Financial Group*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

|  |  |
|---|---|
| SVB FINANCIAL GROUP, | Case No.: 5:23-cv-06543-BLF |
| Plaintiff, | **AMENDED COMPLAINT** |
| v. | |
| FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity, | |
| Defendant. | |

Plaintiff SVB Financial Group ("SVBFG") brings this Complaint against Defendant Federal Deposit Insurance Corporation ("FDIC"), in its corporate capacity ("FDIC-C"), and alleges as follows:

**INTRODUCTION**

1.      SVBFG is entitled to recover approximately $1,933,805,708.13 (the "Account Funds") that the FDIC-C has unlawfully withheld by defying the March 12, 2023 invocation of the systemic risk exception by Secretary of the Treasury Janet Yellen—made, as required by statute, upon the unanimous recommendations of the boards of both the Federal Reserve and the FDIC-C, and after consulting with the President of the United States.  The Secretary's invocation provided that the FDIC-C would pay *all* deposits of *all* depositors of the former Silicon Valley Bank after it had been closed by the California Department of Financial Protection and Innovation ("DFPI") just 2 days prior.

2.      The March 12, 2023 invocation by Secretary Yellen, which was an exercise of the statutory authority given exclusively to the Secretary of the Treasury by Congress, was publicly announced in a joint statement by the Secretary, Federal Reserve Board Chair Jerome Powell, and FDIC Chairman Martin Gruenberg.  The Secretary's decision, which was designed to calm uninsured depositors' fears in order to prevent runs on additional banks and protect the Nation's banking system from collapse, left no ambiguity:  it "fully protect[ed] *all* depositors" who "[would] have access to *all* of their money starting Monday, March 13."  The lawless acts now being carried out by administrators at the FDIC-C, in conjunction with employees of the FDIC acting pursuant to their direction on behalf of FDIC in its receivership capacity, are in direct contravention of the plain terms of the Treasury Secretary's invocation of the systemic risk exception and undermine the system the FDIC is supposed to be protecting.

3.      Consistent with the Treasury Secretary's determination and the public statement made by the heads of three of the Nation's most important agencies, the next day, March 13, the FDIC transferred all Silicon Valley Bank deposits, including the approximately $2.1 billion in SVBFG's accounts at Silicon Valley Bank, to a newly created bank, the Silicon Valley Bridge Bank, N.A. ("Bridge Bank").  As the FDIC-C itself publicly disclosed in announcing this action

1  pursuant to the Treasury Secretary's systemic risk determination, on March 13 it

2  > transferred *all* deposits—insured and uninsured— . . . to a newly created,

3  > full-service FDIC-operated 'bridge bank' in an action designed to protect *all*

4  > depositors of Silicon Valley Bank . . . .  The transfer of *all* deposits was completed

5  > under the systemic risk exception approved yesterday.  *All* depositors of the

6  > institution will be made whole . . . .  Any losses to the Deposit Insurance Fund to

7  > support uninsured depositors will be recovered by a special assessment on banks,

8  > as required by law.

9  In other words, all deposits of all depositors were transferred to Bridge Bank to carry out

10 Secretary Yellen's invocation of the systemic risk exception, which mandated the payment of *all*

11 deposits of *all* depositors of Silicon Valley Bank, including uninsured deposits, from the FDIC-

12 administered Deposit Insurance Fund, with any losses to be recouped from assessments on banks

13 whose payments fund the Deposit Insurance Fund.

14     4.     SVBFG's deposits appeared on the books and records of Bridge Bank, and

15 SVBFG, like other Silicon Valley Bank depositors, was granted full access to those funds

16 beginning on March 13.  During the next three days, SVBFG withdrew approximately $180

17 million of its deposit funds to pay ordinary-course obligations and to prepare for its bankruptcy

18 filing, but SVBFG left the vast bulk of its funds at Bridge Bank, in reliance on the public

19 pronouncements of Secretary Yellen and the FDIC itself that all depositors were protected and

20 the funds on deposit at Bridge Bank belonged to SVBFG.

21     5.     However, on Thursday, March 16, the FDIC as receiver for Silicon Valley Bank

22 ("FDIC-R1"), together with Bridge Bank—and at the direction, and with the direct participation,

23 of the FDIC-C—unexpectedly and unlawfully cut off SVBFG's access to its remaining

24 approximately $1.93 billion of funds at Bridge Bank.  The FDIC's act was tantamount to theft,

25 and was contrary to its public assurances that all depositors' funds at Bridge Bank were safe.

26 The FDIC acted without notice or disclosure of its conduct or the justification for it.

27     6.     Although the FDIC-C has worked together with the FDIC-R1 and Bridge Bank

28 (and later the FDIC as receiver for Bridge Bank ("FDIC-R2")) to seize and prevent the return of

-3-

SVBFG's funds, none of the FDIC-C, FDIC-R1 or FDIC-R2 has disclosed upon whose authority or at whose direction SVBFG's funds were withheld or actually taken, or what basis they had to do so at the time the funds were seized. Nor has anyone disclosed to SVBFG what basis the FDIC-C had for instructing (as explained below) the FDIC-R and Bridge Bank to withhold SVBFG's deposits so that they alone among all Silicon Valley Bank deposits should "bear loss," as though they were equity.

7.      Limited document discovery to date, however, shows that between at least March 13 and 17, 2023, the FDIC-C was *directly* involved in directing, overseeing and monitoring FDIC-R1's and Bridge Bank's efforts to, in contradiction with the Systemic Risk Determination, block SVBFG from accessing its funds at Bridge Bank, to assure, in the words of one senior FDIC-C administrator, that SVBFG's funds were "locked down" and would be available to "bear loss." Repeatedly, on multiple occasions, during days following the systemic risk invocation, senior FDIC-C administrators actively directed and oversaw FDIC-R1 and Bridge Bank personnel in placing holds on SVBFG's accounts at Bridge Bank, in stopping and calling back wire transfers that SVBFG initiated from its accounts, and assuring that SVBFG's "money" (in the words of an FDIC-C administrator) was taken from SVBFG and moved to an FDIC account. In directing FDIC-R1 and Bridge Bank to block SVBFG's access to its Account Funds, and to remove SVBFG's "money" from its accounts, FDIC-C administrators unquestionably exercised control over those Account Funds, aided by other FDIC employees acting on behalf of the FDIC-R1 and Bridge Bank.

8.      The FDIC-C's secretive conduct behind the scenes to direct FDIC-R1 and Bridge Bank to block SVBFG from accessing its Account Funds stands in contrast to its public conduct immediately after the invocation of the systemic risk exception. The FDIC-C initially complied with its publicly-announced mandate to provide SVBFG, like all other depositors of the former Silicon Valley Bank, with immediate access to all its funds formerly on deposit at Silicon Valley Bank when it made those funds available to SVBFG at Bridge Bank. But, behind the scenes, the FDIC-C immediately reversed course in directing FDIC-R1 and Bridge Bank to block access to SVBFG's funds without providing any authority or even an explanation for doing so, and

-4-

without informing SVBFG that it was doing so until after the fact.  The FDIC-C is responsible for the wrongful denial of SVBFG's access to or the taking of SVBFG's $1.93 billion starting on March 16, 2023, because it directed and authorized, and directly participated in the acts of, the FDIC-R1 and/or Bridge Bank to do so, and it has since refused, without justification, to restore SVBFG's access to its Account Funds, either directly or by instructing the FDIC-R1 or FDIC-R2 to do so.

9.    On March 17, 2023, SVBFG filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

10.    On June 26, 2023, in advance of filing an adversary proceeding in the Bankruptcy Court against the FDIC-C, SVBFG sent a letter to the FDIC-C demanding access to, or payment of, its $1.93 billion as required by the invocation of the systemic risk exception.  The FDIC-C did not even acknowledge receipt of the letter until months later—months after SVBFG had already sued the FDIC-C and only after the subject had been raised by the Bankruptcy Court overseeing that adversary proceeding during a conference.

11.    On July 9, 2023, SVBFG filed an adversary proceeding in the Bankruptcy Court seeking, among other things, to recover the $1.93 billion that the FDIC-C funded and transferred to Bridge Bank but then wrongly blocked access to or seized from SVBFG's accounts at Bridge Bank (the "Adversary Proceeding").  Approximately one month later, the FDIC-C moved to dismiss SVBFG's complaint, taking the position that SVBFG was required to file an administrative claim pursuant to 12 U.S.C. § 1821(f) to demand the Account Funds from the FDIC-C and await a decision before pursuing legal relief.  No court has ruled on the FDIC-C's motion, and the Adversary Proceeding remains pending.

12.    SVBFG made clear that its June 26, 2023 payment demand was not a claim for insured deposits under 12 U.S.C. § 1821(f) and instead was a demand for access to or payment of its *uninsured* Account Funds pursuant to the Treasury Secretary's invocation of the systemic risk exception.  Nevertheless, on September 14, 2023, the FDIC-C for the first time formally acknowledged SVBFG's June 26, 2023 payment demand and stated to the Bankruptcy Court that

it intended to treat SVBFG's June 26 letter as a deposit claim under 12 U.S.C. § 1821(f)—which it was not. On September 19, 2023, the FDIC-C submitted a letter to the Bankruptcy Court confirming the same. On October 20, 2023, the FDIC-C issued a letter to SVBFG stating that it was denying SVBFG's "claim." Prior to the FDIC-C's purported decision denying SVBFG's "claim," it had no communication with SVBFG about a claim or claims process of any kind, much less identification or discussion about an administrative or adjudicative process.

13.     In rejecting the June 26 payment demand, the FDIC-C contended that: (i) it has already satisfied its obligation to pay SVBFG the maximum deposit insurance amount of $250,000 set forth in section 1821(a)(1)(E); and (ii) the Treasury Secretary's invocation of the systemic risk exception "did not impose any legal obligation on [the] FDIC-C to pay SVBFG for its uninsured deposits or cause [the] FDIC-C to guarantee SVBFG's uninsured deposits."

14.     Apart from the fact that the FDIC-C has no actual or legitimate claims process related to Silicon Valley Bank or Bridge Bank, the various procedural and substantive excuses the FDIC-C has advanced are manufactured and baseless, and in all events, they provide no justification for engaging in self-help without any process by taking and continuing to withhold SVBFG's $1.93 billion, which should be restored to SVBFG as of March 16, 2023.

15.     *First*, by asserting that SVBFG was obligated to file a claim with the FDIC-C for its deposits, the FDIC-C has it backwards. SVBFG was initially provided with access to all its funds on March 13, 2023, like all other former Silicon Valley Bank depositors, pursuant to and as required by the Secretary of the Treasury's invocation of the systemic risk exception. The FDIC-C had no right to interfere with SVBFG's continued access to the Account Funds or to take SVBFG's deposits, much less do so as though they were akin to equity that is available to "bear loss." Indeed, SVBFG would not have retained its deposits at Bridge Bank, and neither would any other depositor have done so, had the Treasury Department, Federal Reserve, and FDIC together (or the FDIC-C alone) qualified the announced protection of all Silicon Valley Bank deposits in full with an ability to secretly withdraw the guarantee and eliminate the deposit, indiscriminately and without notice or due process, at any time while the deposit remained at

Bridge Bank.  The FDIC-C's actions are lawless and run afoul of the turnover obligations owed to SVBFG as debtor.

16.    *Second*, there is no dispute as to either SVBFG's ownership of, or the current amount of, the funds that were in SVBFG's accounts at Silicon Valley Bank or at Bridge Bank. The FDIC-C's pleaded bases for blocking access to and denying payment of the Account Funds are its contentions that (i) the Secretary of the Treasury's invocation of the systemic risk exception to protect all uninsured depositors of Silicon Valley Bank did not actually apply to SVBFG's deposits, even though that directly contravenes the clear language used by the Secretary and repeated by FDIC Chairman Gruenberg and the Federal Reserve Vice Chair of Supervision Michael Barr (among others); (ii) it can ignore the Secretary's determination and invocation, and its own Chairman's unequivocal statements, and can instead assert that the FDIC-C has the sole and unfettered discretion to determine, on a case-by-case basis, whether to pay any Silicon Valley Bank depositor the amount of its uninsured account funds; or (iii) SVBFG's funds can be taken because it believes FDIC-R1 may have claims against SVBFG. These are legal issues to be determined by a court, not by the FDIC-C itself, in a "claims" process it created solely for SVBFG and for the sole purpose of denying SVBFG's "claim."

17.    The FDIC-C's positions are without merit.  As a substantive matter, the Treasury Secretary's invocation of the systemic risk exception obligated the FDIC-C's Deposit Insurance Fund to pay **all** deposits of **all** depositors at Silicon Valley Bank and entitled SVBFG like all other depositors to receive its deposits.  The FDIC-C has no authority or discretion unilaterally to repudiate this commitment, prevent a depositor like SVBFG from accessing its deposit funds, or treat SVBFG's deposits like they are equity available to "bear loss."  The FDIC-C knows this, or else it would not have made the public statements it made or transferred all of SVBFG's uninsured deposits to Bridge Bank on March 13, 2023, in accordance with Secretary Yellen's determination and invocation.

18.    The Treasury Secretary did not leave it to the discretion of administrators at the FDIC to decide on a case-by-case basis which depositors to pay, in what amounts and at what time.  If that had been the case, the Secretary of the Treasury, the Chair of the Federal Reserve,

and the Chair of the FDIC would have stated as much in the March 12 public announcement of the Treasury Secretary's determination and invocation of a systemic risk exception because that announcement was made with the explicit purpose of communicating to depositors the parameters within which the federal government was willing to act to protect the nation's financial markets from crashing.  But that is not what the Treasury Secretary—or any other senior federal government official—said then or in the many months since.  Until the FDIC-C filed its motion to dismiss the Adversary Proceeding complaint on August 11, 2023, the government officials responsible for the recommendation to invoke and the actual invocation of the systemic risk exception repeatedly confirmed that the scope of the invocation protected **all** deposits of **all** depositors of the former Silicon Valley Bank based on the judgment that such action was necessary to stabilize the United States banking system and address the contagion that was spreading throughout the system.

19.     Furthermore, all of SVBFG's uninsured deposits were transferred to Bridge Bank as the Treasury Secretary dictated; those funds belonged to SVBFG and SVBFG had full access to them.  No action by the Treasury Secretary nor any statute provided the FDIC-C—or the FDIC-R1 or FDIC-R2—with any authority at all to simply take those funds from a demand deposit account at an operating national bank—which were not assets of Silicon Valley Bank or the FDIC as receiver for Silicon Valley Bank or the FDIC in any other capacity, but were assets belonging to SVBFG—away from SVBFG, as happened here.

20.     *Third*, putting aside the incongruity of the FDIC-C's position that SVBFG was obligated to file an administrative claim even though the conduct at issue is the FDIC-C blocking access to and/or taking SVBFG's deposit funds, the FDIC-C's position that SVBFG was required to exhaust the claims process for insurance coverage under 12 U.S.C. § 1821(f) before filing a complaint against the FDIC-C is simply wrong.  Section 1821(f) only applies to claims for "insured deposits"—*i.e.*, deposits insured up to $250,000 under 12 U.S.C. § 1821(a)—not the guarantee to provide SVBFG's $1.93 billion of uninsured funds that were in SVBFG's accounts.  SVBFG's claim to its $1.93 billion is not a claim for insurance coverage under section 1821(f), and it cannot be resolved through the FDIC-C's so-called administrative claims process,

-8-

1   assuming such a process existed for Silicon Valley Bank or Bridge Bank depositors, which it did

2   not and does not.

3       21.    *Finally*, even if SVBFG's claim is deemed a claim for insured deposits under

4   section 1821(f), the FDIC-C's alternative position that it need not comply with the directive that

5   **all** depositors be paid **all** their deposits, and that it has unfettered discretion to pay or not to pay

6   as administrators at the FDIC-C may determine for any reason and without any process

7   whatsoever, its denial of FDIC-C's demand for payment of the Account Funds is arbitrary,

8   capricious, an abuse of discretion and contrary to law.  Further, the so-called process by which

9   the FDIC-C purported to assess SVBFG's demand was a sham.

10      (a)  The FDIC-C has not identified a single former Silicon Valley Bank or Bridge

11  Bank depositor, other than SVBFG, that was required to file a claim with the FDIC-C to obtain

12  access to its funds, and the FDIC-C provided no notice of any FDIC-C claims process for Silicon

13  Valley Bank or Bridge Bank deposits.

14      (b)  The FDIC has not promulgated regulations governing a section 1821(f)

15  claims process, let alone defining its scope.  (*SVB Fin. Grp.* v. *FDIC*, No. 23-01137 (MG)

16  (Bankr. S.D.N.Y.) ("Adv. Dkt.") No. 80-1 at 2; Adv. Dkt. Sept. 14, 2023 Hr'g Tr. at 17:24-18:1.)

17      (c)  The FDIC-C never informed SVBFG that it—unlike all other depositors—

18  would be required to file a claim in its purported claims process before it may recover its

19  Account Funds.

20      (d)  The FDIC-C never provided any instructions to SVBFG (or any other Silicon

21  Valley Bank or Bridge Bank depositor) on when or how to submit a claim under section 1821(f),

22  and never identified what information a claim should include or how it would be evaluated.

23      (e)  The FDIC-C does not have even a single document identifying the existence,

24  scope, or procedures applicable to a section 1821(f) claims process for Silicon Valley Bank or

25  Bridge Bank depositors.

26      (f)  The FDIC-C did not afford SVBFG any opportunity to submit evidence or

27  arguments in support of a claim for its deposits.  SVBFG's only submission was its June 26,

28  2023 payment demand which, as the FDIC-C knows, was not intended as an administrative

-9-

claim.  To the contrary, the FDIC-C only asserted that it intended to treat that letter as a timely claim for insurance coverage on September 14, 2023, when the Bankruptcy Court raised due process concerns with the FDIC-C's failure to implement any regulations or define and follow any procedures with respect to its supposed section 1821(f) process.

22.    Even if the FDIC-C had the right to alter the scope of the Treasury Secretary's invocation through its claims process (it does not) or, contrary to every public statement, the Secretary's invocation actually left it wholly up to the FDIC-C to determine whether it would protect uninsured deposits at all, and if so, whom to pay and how much (again, it did not), the FDIC-C did not promulgate any regulations prescribing procedures for resolving SVBFG's claim, provide SVBFG any notice of the standards by which its claims would be evaluated, offer SVBFG any opportunity to submit supporting evidence or arguments, or provide any substantive rationale for deciding to take SVBFG's approximately $1.93 billion in uninsured account funds after it had properly provided access to the same uninsured Account Funds pursuant to, and in the days following, the invocation of the systemic risk exception.  Quite simply, even if a claim pursuant to 12 U.S.C. § 1821(f) were required, the FDIC-C's denial of SVBFG's section 1821(f) claim is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

23.    As alleged more fully below, SVBFG is entitled to judgment restoring its $1.93 billion as of the date its access was taken away, including interim earnings on those funds,  or a monetary judgment in the amount of $1.93 billion, plus prejudgment interest,[1] costs and fees.

## JURISDICTION AND VENUE

24.    This action arises under the laws of the United States, including, without limitation, the Federal Deposit Insurance Act, 12 U.S.C. § 1811 *et seq*., as amended, and the

---

[1]    SVBFG recognizes that the Court dismissed the claim for prejudgment interest without leave to amend but continues to include the allegations to preserve in the event of any appeal.

Administrative Procedures Act, 5 U.S.C. § 500 *et seq*., the Due Process Clause of the Fifth

Amendment to the United States Constitution, the United States Bankruptcy Code, 11

U.S.C. § 101 *et seq*., and the Freedom of Information Act, 5 U.S.C. § 552 *et seq*.  The Court,

therefore, has original jurisdiction over the asserted federal law claims pursuant to 28 U.S.C.

§§ 1331, 1334.  The Court has supplemental jurisdiction over the state law claim pursuant to 28

U.S.C. § 1367 because it is part of the same case or controversy.

25.    The improper conduct of the FDIC-C that is at issue in this action is already the

subject of the Adversary Proceeding.  SVBFG files this action so that it does not prejudice its

rights in the event it is determined that the FDIC-C has a valid section 1821(f) claims process

and that the FDIC-C's October 20, 2023 letter constitutes a valid denial of SVBFG's claim (both

of which SVBFG denies). SVBFG does not waive its position that it has valid claims against the

FDIC-C under the Bankruptcy Code for turnover of its $1.93 billion.

26.    Defendant FDIC-C is subject to suit in this Court.  Pursuant to 12 U.S.C.

§ 1819(a), the FDIC-C has the power to "[t]o sue and be sued."  This section constitutes a

general waiver of sovereign immunity.  Defendant is also subject to suit for the claims asserted

herein arising under the Bankruptcy Code, pursuant to the express waiver of sovereign immunity

for such claims in 11 U.S.C. § 106.

27.    Venue is proper under 28 U.S.C. § 1391(b) and § 1391(e)(1), as the Account

Funds were held at Silicon Valley Bank, which resided in this District, and following the closure

of Silicon Valley Bank, the FDIC-C created Bridge Bank, which also resided in this District, and

transferred all uninsured accounts, including SVBFG's accounts, to Bridge Bank.  Venue is also

proper under 12 U.S.C. § 1821(f)(4), which provides that a final determination of the FDIC-C

regarding a claim for insurance coverage "shall be a final agency action reviewable . . . by the

United States district court for the Federal judicial district where the principal place of business

of the depository institution is located."  Here, the FDIC-C has treated SVBFG's demand for

payment of the Account Funds as a claim under 12 U.S.C. § 1821(f) and has issued a final

determination on SVBFG's "claim," and the principal place of business of the depository

institution, Silicon Valley Bank, is located in this District.

-11-

**DIVISIONAL ASSIGNMENT**

28.     This action should be assigned to this Court's San Jose Division.  Under Rule 3-2 of this Court's Civil Local Rules, "[a] civil action arises in the county where . . . a substantial part of the property that is the subject of the action is situated," and all civil actions that arise in the County of Santa Clara "shall be assigned to the San Jose Division."

29.     Consistent with the Treasury Secretary's systemic risk determination, on March 13, 2023, the FDIC transferred the approximately $2.1 billion in SVBFG's accounts from Silicon Valley Bank to Bridge Bank.  On March 16, however, the FDIC unexpectedly and unlawfully cut off SVBFG's access to approximately $1.93 billion of SVBFG's remaining funds at Bridge Bank.  Because Bridge Bank, like Silicon Valley Bank, is headquartered in the County of Santa Clara, and SVBFG in this action seeks to restore approximately $1.93 billion of its funds that were at Bridge Bank when they were taken, a substantial part of the property that is the subject of the action is situated in the County of Santa Clara.  This action therefore arises in the County of Santa Clara and "shall be assigned to the San Jose Division."

**PARTIES**

30.     SVBFG is a Delaware corporation having its principal place of business at 387 Park Avenue South, New York, New York 10016.  Prior to the events that led to the seizure of Silicon Valley Bank on March 10, 2023, SVBFG was a bank holding company and the ultimate corporate parent of Silicon Valley Bank, which was headquartered in Santa Clara, California. SVBFG filed a petition for relief under Chapter 11 of the Bankruptcy Code on March 17, 2023, and is operating its businesses and managing its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On August 2, 2024, the bankruptcy court entered an order confirming SVBFG's plan of reorganization.

31.     The FDIC is an agency of the United States government charged by law with, among other duties, administering the Federal Deposit Insurance Act ("FDI Act") and the federal bank deposit insurance system.  SVBFG sues the FDIC in the instant proceeding in its corporate capacity as the agency charged with carrying out the Treasury Secretary's invocation of the systemic risk exception and administrator of the Deposit Insurance Fund.  The FDIC, acting in

-12-

1  its corporate capacity, also was responsible for, among other things, chartering and operating the

2  Bridge Bank ██████████████████████████████████████████

3  ████████████████████████████████████████████████

4  ████████████████████

5                        **BACKGROUND**

6  **I.    Closure of Silicon Valley Bank and Appointment of the FDIC as Receiver**

7         32.    From 2000 until March 2023, SVBFG owned Silicon Valley Bank and a number

8  of other affiliated businesses, including an investment bank and a private wealth management

9  business.  SVBFG deposited substantially all its funds with Silicon Valley Bank.

10        33.    As of March 10, 2023, SVBFG had approximately $2.1 billion in three different

11 deposit accounts maintained at Silicon Valley Bank.  SVBFG had full and undisputed title to,

12 and ownership of, these deposits prior to on or about March 10, 2023.  This fact is uncontested.

13        34.    On March 10, 2023 (the "Closure Date"), the DFPI issued an order taking

14 possession of Silicon Valley Bank.  On the same day, DFPI appointed the FDIC-R1 to serve as

15 receiver for Silicon Valley Bank.

16        35.    Typically, when a bank is closed, the FDIC pays insurance to depositors up to the

17 insurance limit of $250,000 within a few days after the bank closure, by either making the funds

18 available through an account at another insured bank or by issuing a check to the depositor.  (Ex.

19 1 (Deposit Insurance FAQs).)  The FDIC acting as receiver for the closed bank then resolves the

20 assets of the closed bank, including resolving claims for uninsured deposits.  (*Id*.)  Depositors

21 with uninsured funds "may recover some portion of their uninsured funds from the proceeds

22 from the sale of failed bank assets," but "it can take several years to sell off the assets of a failed

23 bank.  As assets are sold, depositors who had uninsured funds usually receive periodic payments

24 (on a pro-rata 'cents on the dollar' basis)."  (*Id*.)  Payments on claims for uninsured deposits, or

25 other obligations of the failed institution, are designated by the FDIC as dividends.  (Ex. 2

26 (FDIC, Dividends from Failed Banks).)  According to the FDIC, "[c]ustomers with uninsured

27

28

1  deposits are sometimes issued advance dividends based on the estimated recovery value of the

2  failed institution's assets."  (Ex. 3 (FDIC Resolutions Handbook) at 28.)[2]

3       36.     On March 10, 2023, the day that Silicon Valley Bank was closed, the FDIC

4  created the Deposit Insurance National Bank of Santa Clara ("DINB") and transferred all insured

5  deposits of Silicon Valley Bank to the DINB.  The FDIC then announced that:

6            All insured depositors will have full access to their insured deposits

7            no later than Monday morning, March 13, 2023.  The FDIC will pay

8            uninsured depositors an advance dividend within the next week.

9            Uninsured depositors will receive a receivership certificate for the

10           remaining amount of their uninsured funds.  As the FDIC sells the

11           assets of Silicon Valley Bank, future dividend payments may be

12           made to uninsured depositors.

13 (Ex. 5 (Press Release, FDIC, FDIC Creates a Deposit Insurance National Bank of Santa Clara to

14 Protect Insured Depositors of Silicon Valley Bank).)  Consistent with this announcement, on

15 March 10, 2023, the Board of Directors of the FDIC issued a Resolution authorizing the Director

16 of Complex Institution Supervision & Resolution (or her designee) to credit depositors' accounts

17 with an estimated insurance deposit paid by the Deposit Insurance Fund and to approve the

18 payment by the FDIC-R1 of an advance dividend.

19     **II.     The Systemic Risk Exception**

20       37.     Under the Federal Deposit Insurance Corporation Improvement Act of 1991, the

21 FDIC is generally required to resolve failed banks by using the method that would be least costly

22 to the Deposit Insurance Fund.  Thus, the foregoing payment and dividend plan for insured

23

24 _____

25 [2]     The FDIC's "Resolution of Failed Institutions" further explains that, in general, only

26        insured depositors are fully reimbursed under a least-cost resolution and noting that in

27        "rare cases" the least-cost requirement "may result in the reimbursement or protection of

28        uninsured depositors."  (Ex. 4 (FDIC, Resolution of Failed Institutions) at 6 n.8.)

-14-

versus uninsured deposits was a lawful approach as of March 10, 2023; *i.e.*, for a bank failure in which a systemic risk exception has not been invoked and the normal failed bank resolution procedures apply.

38.     Congress allowed one exception to this least-cost resolution requirement, however: Where the Secretary of the Treasury, acting upon the written recommendation of not less than two-thirds of the members of the Board of Directors of the FDIC and the Board of Governors of the Federal Reserve System and after consulting with the President, determines that utilizing the least-cost resolution method "would have serious adverse effects on economic conditions or financial stability," and action or assistance under section 1823(c)(4)(G) "would avoid or mitigate such adverse effect," the Treasury Secretary may invoke the systemic risk exception to the least-cost resolution requirement.[3]  Any losses to the Deposit Insurance Fund associated with the invocation of the systemic risk exception are then required to be recovered through one or more special assessments on insured depository institutions, depository institution holding companies, or both.  12 U.S.C. § 1823(c)(4)(G)(i).  The Board of Directors of the FDIC approved a final rule to implement exactly such a special assessment "to recover the loss to the Deposit Insurance Fund (DIF) associated with protecting uninsured depositors following the closure of Silicon Valley Bank and Signature Bank" on November 16, 2023.

39.     Section 1823(c)(4)(G) does not define the specific form in which a decision to invoke the systemic risk exception must occur.  Rather, the scope of the exception is specifically defined by the Treasury Secretary's determination and invocation, which follows recommendations from the Boards of the Federal Reserve and the FDIC, and consultation with the President of the United States, and includes both a determination that using the least cost

---

[3]     There may be a question whether the Treasury Secretary can pick and choose among uninsured depositors and, if so, what criteria, if any, would be applicable. But that question is irrelevant here where the Treasury Secretary explicitly and deliberately chose to protect all uninsured deposits.

1  resolution method would "have serious adverse effects on economic conditions or financial

2  stability *and* that the action or assistance "would avoid or mitigate such adverse effects."  12

3  U.S.C. §§ 1823(4)(G)(i)(I) and (II).  This is because the systemic risk exception is intended to be

4  used only in extraordinary instances where the determination of the Nation's most senior

5  regulatory officials, rather than the ordinary discretion of administrators at the FDIC, is that such

6  invocation is essential to government policy and process given the severity of the situation.  As

7  the sponsor of the Federal Deposit Insurance Corporation Improvement Act explained,

8  >  [The] bill makes the situation in the United States more nearly

9  >  parallel to that in other countries. It leaves the Federal Reserve

10  >  Board with its current authority to take appropriate action to prevent

11  >  a collapse of the financial system.  But it takes such discretion away

12  >  from the FDIC.  The bill would refocus the FDIC on the narrower

13  >  task of administering and protecting the deposit insurance fund.

14  >  137 Cong. Rec. 4936 (1991) (statement of Sen. Donald Riegle, Jr.)

15      40.  Prior to March 2023 and unrelated to Silicon Valley Bank, the FDIC and Federal

16  Reserve recommended five potential emergency actions that would require a systemic risk

17  determination and invocation to permit the actions to be taken.  The Treasury Secretary invoked

18  the systemic risk exception with respect to three of those five recommended actions, each time,

19  in specifically proscribed ways.  In the first instance, the exception was invoked to partially

20  guarantee $312 billion of Wachovia Corporation's ("Wachovia") assets in connection with a

21  potential acquisition of Wachovia by Citigroup, Inc. ("Citigroup").  When Wachovia was

22  subsequently purchased by a different banking organization, Wells Fargo & Company, the FDIC

23  assistance that was contemplated pursuant to the systemic risk exception was no longer

24  applicable, and the FDIC was limited to its express statutory authority.  In the second instance,

25  the exception was invoked to authorize the establishment of the Temporary Liquidity Guarantee

26  Program, a market-wide program to guarantee certain debt issued by banks and to guarantee in

27  full non-interest-bearing deposit accounts held at participating banks and thrifts.  In the third

28

instance, the exception was invoked to provide a partial asset guarantee for $306 billion of Citigroup's assets.[4]

### III. The Treasury Secretary Invokes the Systemic Risk Exception to Guarantee All Uninsured Deposits at Silicon Valley Bank.

41.     The March 10, 2023 announcement that the FDIC would pay uninsured Silicon Valley Bank depositors an advance dividend did not calm the market as was intended.  As the FDIC itself explained, "[t]he announcement that the uninsured depositors of Silicon Valley Bank had not been fully protected reverberated through the financial markets on Friday and into the weekend and precipitated the failure of Signature Bank [a second bank unaffiliated with Silicon Valley Bank] . . . .  Following these developments, the bank regulatory agencies had significant concerns that uninsured depositors would withdraw funds rapidly from other banks."

42.     Over the weekend of March 11, 2023, the Department of the Treasury, the FDIC, and the Federal Reserve assessed the impact of the closures of Silicon Valley Bank and Signature Bank on the American banking system and financial markets.  According to the Government Accountability Office's ("GAO") statutorily required review of the invocation of the systemic risk exception ("GAO Report"), the FDIC and the Federal Reserve "found that a least-cost resolution of SVB and Signature Bank would intensify deposit runs and liquidity pressures on other U.S. banks," and that "the failure of the two banks would lead to even greater dislocations in deposit markets."  (Ex. 6 (GAO Report) at 29.)  The FDIC and the Federal Reserve also reported observing broader economic effects of the closures, including the risk that among many uninsured depositors were corporate entities that may not be able to make payroll

---

[4]     The two other potential emergency actions that were recommended by the Boards of the FDIC and Federal Reserve but did not result in a systemic risk invocation by the Secretary of the Treasury involved the potential provision of open bank assistance to Bank of America Corporation and the creation of a Legacy Loans Program under which the FDIC would provide certain guarantees on financing used by public-private investment funds to purchase troubled assets from financial institutions.

-17-

or pay their suppliers.  (*Id.* at 30.)  The Federal Reserve and the FDIC concluded "that preserving unimpaired access to all uninsured deposits for SVB and Signature Bank would help mitigate adverse impacts to financial stability and the economy."  (*Id.*)

43.     Accordingly, on March 12, 2023, the FDIC-C, jointly with the Federal Reserve, unanimously recommended to the Treasury Secretary that she invoke the systemic risk exception to the least-cost resolution provision of the FDI Act to protect the national banking system.  The Treasury Secretary, after consultation with the President of the United States, adopted the recommendation and invoked the systemic risk exception under 12 U.S.C. § 1823(c)(4)(G), to guarantee that all deposits at Silicon Valley Bank—insured and uninsured—would be paid in full and that depositors would have immediate and uninterrupted access to ***all*** of their funds.

44.     The Treasury Secretary could have chosen to have the FDIC-C provide less than full protection of all depositors, but, on the recommendation of the FDIC and Federal Reserve, did not do so.  In fact, the GAO Report noted that the Federal Reserve staff specifically analyzed extending only partial protection of uninsured depositors, but the staff concluded that extending less than 100 percent protection would be insufficient to calm the turmoil at the time, as "extending only partial protection to uninsured depositors would have some beneficial effect, but allowing material losses on these uninsured deposits still would result in significant adverse effects in the financial markets."  (*Id.* at 30-31.)  In the face of this record, the FDIC-C's current position that its administrators have the unbridled discretion to decide which depositors to protect and in what amounts, is simply absurd.

45.     The determination to use the Deposit Insurance Fund to pay all deposits of all Silicon Valley Bank depositors was a unilateral decision by the United States Government that did not require any mutual undertaking by any of the former Silicon Valley Bank depositors (including SVBFG).

46.     As a result of the invocation of the systemic risk exception, SVBFG, like all other Silicon Valley Bank depositors, had an entitlement to continued access to all of its deposits, to be funded by the FDIC-C through the Deposit Insurance Fund to the extent necessary.

**IV.    The Systemic Risk Exception Invoked on March 12, 2023, Is Consistently and Correctly Described by the Treasury Secretary, the FDIC, and Other Banking Regulators as Applicable to All Silicon Valley Bank Depositors and Deposits.**

47.    Over the ensuing days and months, the FDIC, Chairman Gruenberg, and numerous other senior government officials made public statements—including to the American public, Congress and the Bankruptcy Court—confirming that the systemic risk exception covered all uninsured deposits of all Silicon Valley Bank depositors.  These statements conclusively reflect the Secretary's and FDIC's state of mind and intention as to what the Secretary had authorized and directed in invoking the systemic risk exception.

48.    On March 13, 2023, the FDIC issued a press release titled "FDIC Acts to Protect All Depositors of the Former Silicon Valley Bank, Santa Clara, California."  The release states that "[t]he transfer of all the deposits was completed under the systemic risk exception approved yesterday.  All depositors of the institution will be made whole."[5]  (Ex. 7 (Press Release, FDIC, FDIC Acts to Protect All Depositors of the former Silicon Valley Bank).)  The transfer properly included all of SVBFG's deposits.

49.    On March 16, 2023, in a statement before the Senate Committee on Finance, Treasury Secretary Yellen stated that "we worked with the Federal Reserve and FDIC to protect all depositors of the two failed banks.  On Monday morning, customers were able to access all of the money in their deposit accounts so they could make payroll and pay the bills."  On Monday, March 13, 2023, SVBFG was among the depositors able to access all of the money in its deposit accounts.

---

[5]    The release states that "[s]hareholders and certain unsecured debt holders will not be protected."  This statement merely indicated that neither shareholders nor unsecured debt holders would receive relief in those capacities.  Neither shareholders nor unsecured debt holders who separately maintained deposit accounts at Silicon Valley Bank were carved out—with respect to these deposits—from the terms of the Treasury Secretary's systemic risk exception invocation.

-19-

50. On March 20, 2023, in an objection to the Bankruptcy Court in relation to SVBFG's motion for entry of an order authorizing SVBFG to continue to use its cash management system (the "Cash Management Motion"), counsel for the FDIC-R1 stated: "[t]o the extent that the FDIC agrees that any amount is due to the Debtor (and unavailable for setoff), such amount will be paid *in full* through the Deposit Insurance Fund." (*See In re SVB Fin. Grp.*, No. 23-10367 (MG) (Bankr. S.D.N.Y.) ("Ch. 11 Case") Dkt. No. 33 at ¶ 16 (emphasis added).)

51. On March 21, 2023, counsel for the FDIC-R1 repeated this in a hearing before the Bankruptcy Court on the aforementioned objection, asserting that "there was not a specific carve out in the [March 13, 2023] press release for [SVBFG's] deposits . . . . [T]o the extent [SVBFG's] claim is allowed and is not subject to set off or has been reduced by amounts that may be entitled to set off, that claim would be paid by the deposit insurance fund. And that deposit insurance fund is backed by the full faith and credit of the United States." (Ch. 11 Case Mar. 21, 2023 Hr'g Tr. at 56:22-57:21.) When the U.S. Trustee, a federal bankruptcy watchdog, stated the U.S. Trustee would only be comfortable with the Bankruptcy Court granting the Cash Management Motion if "any claims relating to the deposits . . . are guaranteed by the FDIC through the full faith and credit of the United States" (*id.* at 85:14-17), counsel for the FDIC assured the Bankruptcy Court that "to the extent [SVBFG's] deposit claim is determined to be valid, to the extent not subject to setoff, it will be paid by what's call the DIF, the Deposit [Insurance] Fund, which is backed by the full faith and credit of the United States." (*Id.* at 86:21-25.)

52. On March 21, 2023, in remarks to the American Bankers Association, Secretary Yellen explained that:

> . . . recent actions have demonstrated our resolute commitment to take the necessary steps to ensure that depositors' savings and the banking system remain safe. Our approach had two main pillars. First, we worked with the Federal Reserve and FDIC to protect all depositors in the resolutions of Silicon Valley Bank and Signature Bank. The steps we took were not focused on aiding specific banks or classes of banks. Our intervention was necessary to protect the broader U.S. Banking system. . . . I believe that our actions reduced the risk of further bank failures that would have imposed losses on the Deposit Insurance Fund, which is paid for through fees on insured banks.

(March 21, 2023 Sec'y Yellen Remarks to American Bankers Ass'n (emphasis supplied).)

53.     On March 22, 2023, in testimony before the Senate Subcommittee on Financial Services and General Government Appropriations, Secretary Yellen stated, "[w]e took actions to protect all depositors at the two failed institutions and provide additional liquidity for banks."

54.     On March 23, 2023, in a statement before the House Subcommittee on Financial Services and General Government Appropriations, Secretary Yellen stated, "[t]wo weeks ago, we learned of problems at two banks that could have had significant impacts on the broader banking system and the American economy.  In the days that followed, Treasury worked with the Federal Reserve and the FDIC to take decisive and forceful actions to strengthen public confidence in the U.S. banking system.  We took actions to protect all depositors at the two failed institutions and provide additional liquidity for banks.  This was designed to mitigate risks to the banking system."

55.     On March 28, 2023, in a statement before the Senate Committee on Banking, Housing, and Urban Affairs, FDIC Chairman Martin J. Gruenberg stated, "[a]fter careful analysis and deliberation, the Boards of the FDIC and the Federal Reserve voted unanimously to recommend, and the Treasury Secretary, in consultation with the President determined, that the FDIC could use emergency systemic risk authorities under the FDI Act to fully protect all depositors in winding down SVB and Signature Bank."

56.     On the same day, in a statement before the Senate Committee on Banking, Housing, and Urban Affairs, Federal Reserve Vice Chair for Supervision Michael S. Barr stated that "[t]he Federal Reserve, working with the Treasury Department and the Federal Deposit Insurance Corporation (FDIC), took decisive actions . . . [that] demonstrate that we are committed to ensuring that all deposits are safe."

57.     On March 29, 2023, in a statement before the House Committee on Financial Services, FDIC Chairman Gruenberg stated, "[m]y testimony today will describe the events leading up to the failure of SVB and Signature Bank and the facts and circumstances that prompted the decision to utilize the authority in the FDI Act to protect all depositors in those banks following these failures."

58.    In the same statement Chairman Gruenberg stated, "[a]t SVB, the depositors protected by the guarantee of uninsured depositors included not only small and mid-size business customers but also customers with very large account balances.  The ten largest deposit accounts at SVB held $13.3 billion, in the aggregate." ██████████████████████ ████████████████████████████████████████████████████████ ███████████

59.    On May 11, 2023, Acting Comptroller of the Currency and FDIC  Director Michael J. Hsu stated at an FDIC board meeting, "[i]n March, the U.S. government invoked the systemic risk exception to the least cost resolution requirement for failing banks.  The purpose was to protect all depositors, including uninsured depositors, following the failures of Silicon Valley Bank (SVB) and Signature Bank."

60.    On May 16, 2023, in a statement before the House Committee on Financial Services, FDIC Chairman Gruenberg stated that "[f]ollowing the decision to fully protect all depositors in the resolution of both SVB and Signature Bank, there has been a moderation of deposit outflows at the publicly traded banks that were experiencing large outflows in the immediate aftermath of those failures."

61.    On May 18, 2023, FDIC Chairman Gruenberg again referred to "the decision to fully protect all depositors in the resolution of both SVB and Signature Bank" in a statement before the Senate Committee on Banking, Housing, and Urban Affairs.

62.    On December 5, 2023, during a meeting of the FDIC's Systemic Resolution Advisory Committee, Ryan Tetrick, FDIC Deputy Director for Resolution Readiness, stated that the systemic risk exception "allowed us to protect all depositors of the failed banks, transfer those to fully operational bridge banks, and provide some . . . assurance to the system broadly."

63.    On the same day, at the same event, FDIC Chairman Gruenberg acknowledged that had the FDIC elected to pay an advance dividend rather than recommending that the Treasury Secretary invoke the systemic risk exception to protect all uninsured deposits, "depositors could get back 90 percent or maybe more of their deposits," but "the judgment was,

-22-

1    at the time, that anything less than 100 percent really had the potential to perpetuate and

2    exacerbate the contagion effect."

3        64.    Also during the December 5, 2023 Systemic Risk Resolution Advisory

4    Committee meeting, Tim Mayopoulos—who served as the Chief Executive Officer of Bridge

5    Bank and oversaw operations of Bridge Bank beginning on March 13, 2023, when all of

6    SVBFG's Account Funds were transferred to Bridge Bank and made available to SVBFG—

7    described the invocation of the systemic risk exception as "the government's decision to protect

8    all the deposits at Silicon Valley Bank, regardless of the nature or size of those deposits."

9        65.    The statutorily required GAO Report, which was based on documents and

10    interviews with FDIC, Federal Reserve and Treasury staff, repeatedly reiterated, no fewer than

11    eight times, that the systemic risk invocation guaranteed all uninsured deposits of all depositors

12    of Silicon Valley Bank.

13        66.    In summary, on numerous occasions and in numerous venues—including sworn

14    Congressional testimony and statements to the Bankruptcy Court—the three responsible agencies

15    consistently affirmed that all deposits of all depositors were covered by the systemic risk

16    exception.  In marked contrast, not until the FDIC sought to divest SVBFG of its Account Funds

17    did the FDIC maintain that "all" could mean "less than all."

18

19    **V.    The FDIC Unlawfully Blocks SVBFG's Access to Its Account Funds Despite Repeatedly Acknowledging That All Uninsured Deposits Would Be Paid and Depositors Would Have "Full Access" to Their Money.**

20

21        67.    The same day that the Secretary of the Treasury authorized the invocation of the

22    systemic risk exception, the FDIC filed an application with the Office of the Comptroller of the

23    Currency (the "OCC") to establish Bridge Bank, and the OCC approved the application.

24        68.    Although between March 10 and March 12, 2023, it was contemplated that

25    Silicon Valley Bank depositors would receive an immediate advance dividend and a receivership

26    certificate for their uninsured deposits, following and as a result of the invocation of the systemic

27    risk exception, the FDIC neither provided such an advance dividend nor sent a receivership

28    certificate to SVBFG or to any other depositor with uninsured account funds.  Instead, the FDIC

    rescinded the agreement transferring insured deposits to the DINB, caused the FDIC-R1 to

transfer all deposits at Silicon Valley Bank—insured and uninsured, alike—to Bridge Bank, provided, or provided access to, funds from the Deposit Insurance Fund to satisfy all deposit liabilities, and depositors of Silicon Valley Bank, including SVBFG, automatically became customers of Bridge Bank, which was not itself in receivership at that time.

69.    On March 13, 2023, the FDIC published its own independent press release stating that its March 12, 2023 transfer of "all deposits—both insured and uninsured—and substantially all assets of" Silicon Valley Bank to Bridge Bank was "an action designed to protect all depositors of Silicon Valley Bank," and "[d]epositors will have full access to their money beginning this morning, when Silicon Valley Bridge Bank, N.A., the bridge bank, opens and resumes normal banking hours and activities."  (Ex. 7.)

70.    Moreover, when Bridge Bank opened on March 13, 2023, it announced that depositors had "full access to their money," and that all existing and new deposits were protected by the FDIC.  The FDIC reiterated this point in its FAQs posted to its website on March 13, 2023:

> IS MY MONEY SAFE?  **Yes!**  No one lost any money on deposit
> as a result of the closure of this bank.  All deposits, regardless of
> dollar amount, were transferred to Silicon Valley Bank, N.A. [*i.e.*,
> Bridge Bank].

(Ex. 8 (FDIC Bridge Bank FAQs).)

71.    The transfer of "all deposits" to the newly created, FDIC-operated Bridge Bank included the transfer of all SVBFG's Account Funds.  Thus, pursuant to the systemic risk determination, SVBFG was treated like all other depositors of Silicon Valley Bank, and it was provided with access to all its deposits on March 13, 2023, as the Secretary of the Treasury determined and multiple senior government officials, including FDIC Chairman Gruenberg, represented and testified would be the case for all depositors.

72.    At that time, SVBFG's Account Funds were maintained in three accounts that are identified in the table set forth in ¶ 95 *infra*.  Those accounts contained approximately

1  $2,115,958,220 in bank deposits that had previously been held at Silicon Valley Bank and were

2  subsequently transferred to Bridge Bank.

3       73.     Following the transfer of its deposits to Bridge Bank, SVBFG was able to access

4  its accounts in the same manner as any former depositor of Silicon Valley Bank and as it had

5  prior to the Closure Date.  On March 15 and 16, 2023, SVBFG successfully initiated eight wire

6  transfers from SVBFG's Account Funds at Bridge Bank, withdrawing approximately $180

7  million, *i.e.*, monies well in excess of the $250,000 deposit insurance limit.

8       74.     However, without explanation or warning, on the evening of March 16, 2023,

9  everything changed.  On March 16, Bridge Bank rejected wire transfers that were properly

10  initiated because the FDIC-R1—at the direction of senior FDIC-C employees—instructed Bridge

11  Bank not to release any of the Account Funds and to call back any wire transfers that SVBFG

12  had initiated from its accounts.

13       75.     With the knowledge and approval of FDIC-C employees, the FDIC-R1 also

14  directed Bridge Bank to assign SVBFG's deposit accounts and all associated assets and liabilities

15  to the FDIC-R1, and Bridge Bank complied with the FDIC-R1's instruction, even though

16  SVBFG's funds at Bridge Bank did not belong to FDIC-R1.

17       76.     The actions of the FDIC-R1 and Bridge Bank were undertaken with the

18  knowledge, and at the direction, of employees of the FDIC acting on behalf of the FDIC-C, and

19  could not have been undertaken without their acquiescence.  As limited discovery has shown,

20  between March 13 and 17, 2023, multiple, senior employees at FDIC-C actively oversaw and

21  directed FDIC employees acting on behalf of FDIC-R1 and employees of the Bridge Bank in

22  placing holds on SVBFG's accounts, blocking outgoing wire transfers from SVBFG's accounts,

23  and calling back wire transfers that SVBFG had already initiated from its accounts.  The actions

24  of the FDIC-C, FDIC-R1, and Bridge Bank were unauthorized, including because the uninsured

25  deposits that comprised the balance of SVBFG's deposit accounts at Bridge Bank were not assets

26  of the FDIC-R1, because the actions violated the terms of the systemic risk exception invoked by

27  the Treasury Secretary, and because the FDIC-C had no right to direct the removal of SVBFG's

28  Deposit Funds from its demand deposit accounts simply so that they might "bear loss."

77. The FDIC-C's direct and sustained involvement in directing and overseeing FDIC-R1 and Bridge Bank began from the very outset. On March 13, 2023, the day after the Treasury Secretary invoked the systemic risk exception, the Acting Deputy General Counsel of the FDIC, Richard Penfield Starke, instructed FDIC-C employees Audra L. Cast, Deputy Director of the Division of Resolutions and Ryan Tetrick, Deputy Director of Resolution Readiness, not to release funds from SVBFG's deposit account. Ms. Cast forwarded that email with the subject "HC Deposit" — referring to "Holding Co" or SVBFG — to Janine D. Henkes, Receiver-in-Charge for Silicon Valley Bank and Sharon E. Kelley, a Senior Financial Management Analyst at FDIC-R1.

78. Shortly after receiving the email from Ms. Cast, Ms. Kelley forwarded the email to Kevin E. Coston, a Senior Financial Management Analyst at FDIC-R1, who identified what he believed to be a "Holding Co acct" and confirmed the instructions that FDIC-R1 had received from FDIC-C: "I will try to run down the employee who can place a Hold on the deposit system." The instruction was then sent to a Bridge Bank employee to actually implement the hold.

79. Over the ensuing days, FDIC-R1 and Bridge Bank employees identified additional SVBFG deposit accounts and continued placing holds on those accounts. On March 15, 2023, after the holds on SVBFG's accounts had been implemented, Shivali Nangia, Assistant Director at FDIC-R1, forwarded an email to Ms. Cast and Mr. Starke, providing an update to the FDIC-C on the efforts to block SVBFG's access to its accounts. The email, titled "Silicon Financial Group Holding Company Accounts," listed six SVBFG accounts at Bridge Bank containing account funds belonging to SVBFG totaling $2,124,484,896.51. Ms. Nangia informed Ms. Cast and Mr. Starke that "[t]his is what we have on hold for SVB HC."

80. Between March 15 and 16, 2023, FDIC-C and FDIC-R1 personnel continued to exchange emails multiple times per day concerning the holds on SVBFG's accounts, confirming and ensuring that SVBFG's access to the accounts had been frozen, and that any outgoing wire transfers that SVBFG sought to initiate were blocked. These emails repeatedly show senior FDIC-C administrators demanding information from FDIC-R1 personnel about the status of

-26-

1   SVBFG's accounts and then directing that those accounts be "locked down" to prevent SVBFG

2   from accessing them.

3       81.    On March 16, 2023, FDIC-C employee Ryan Tetrick was forwarded Ms.

4   Nangia's March 15, 2023 email listing SVBFG's accounts at Bridge Bank.  That email copied,

5   among others, Mr. Mayorga (FDIC-R1), Ms. Nangia (FDIC-R1), and Ms. Cast (FDIC-C).

6   Although some of the intervening correspondence is redacted, the portions that are not redacted

7   show that Mr. Tetrick repeatedly sought information from Mr. Mayorga about SVBFG's

8   accounts to ensure that all of SVBFG's accounts were frozen and that all of SVBFG's wires were

9   being stopped or called back.

10       82.    In an email sent on March 16, Mr. Tetrick demanded that Mr. Mayorga provide

11   him with a status update on SVBFG's Account Funds and sought reassurance that FDIC-R1 had

12   confiscated those funds: "What do we know about this? Are these deposits still in the

13   receivership?"  Mr. Mayorga responded that SVBFG's accounts had been "[t]ransferred into the

14   bridge."  Mr. Mayorga also informed Mr. Tetrick that "[w]e held the deposits that were identified

15   yesterday but there was an in process payment . . . in the amount of $59,566.38. We're verifying

16   balances today and closing them into a FDIC GL. . . . I will provide balances when verified."  In

17   response, Mr. Tetrick asked Mr. Mayorga to provide additional information about SVBFG's

18   accounts to ensure that nothing was being missed—"It would be good to confirm the balances as

19   of the date of close too"—to which Mr. Mayorga quickly responded by providing updated

20   balances for SVBFG's accounts.

21       83.    Later the same day, Mr. Mayorga provided Mr. Tetrick with a further update

22   regarding SVBFG's accounts.  This time, Mr. Mayorga informed Mr. Tetrick that "it was found

23   that there were other accounts tied to SVB Financial group and holds were then immediately

24   placed on these other accounts, along with identifying a line of credit."  Mr. Mayorga, however,

25   reported that "[i]t appears that between 3/13/23 and 3/15/23 a wire for $9,737,773 went out on

26   3/14/23. As mentioned before, we are in the process of having the bank debit the accounts and

27   moving into the FDIC GL."  Mr. Tetrick replied to thank Mr. Mayorga for his efforts to lock

28   down SVBFG's accounts: "Very helpful. Thank you Luis."

84.    Later that day, Mr. Tetrick sent another email to Mr. Mayorga, again congratulating him on carrying out FDIC-C's instructions to block SVBFG's access to its accounts, instructing him to keep FDIC-C apprised of any developments, and emphasizing FDIC-C's wishes that SVBFG's accounts were to be completely blocked: "BTW – great work on this please keep this group (and others who should be added) posted on anything new you learn or if any of the facts change. *Want to be certain this money is locked down and can bear loss*." Mr. Tetrick's instructions to Mr. Mayorga once again show that FDIC-C was unquestionably calling the shots in the ongoing efforts to deprive SVBFG of its Account Funds at Bridge Bank and that FDIC-R personnel were following the directions they received from FDIC-C and, as instructed, were providing regular updates about their efforts to comply with FDIC-C's instructions.

85.    Mr. Tetrick's reference to ensuring that SVBFG's money "can bear loss," also demonstrates that the FDIC-C had already determined, without identifying a legal basis, not to ever return SVBFG's Account Funds.  Indeed, Mr. Tetrick's email making this statement—along with many of the other email communications where he was directing personnel and receiving updates from them on their efforts to confiscate what in his own words was SVBFG's "money"—were copied to Cathy Davis, Chief of FDIC-C's Claims Section, who ultimately signed the October 20, 2023 letter many months later notifying SVBFG that the FDIC-C was rejecting SVBFG's "claim".

86.    On March 17, 2023—after SVBFG had filed for bankruptcy— ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

-28-



1 ████████████████████████████████████████████████████

2 ███████████████████████████████████████████████

3 █████████████████████████████████████████████

4 ██████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ████████████████████████████ █████████████████████

7 █████████████████████████████████████████████████████

8 █████████████████████████ This email exchange was also copied to, among others, Cathy

9 Davis, who sent the letter denying SVBFG's demand for return of its funds.

10      91.     As these emails show, FDIC-C was responsible for directing, overseeing,

11 monitoring, and participating in ongoing efforts to deprive SVBFG of its Account Funds.  In so

12 doing, FDIC-C demonstrated its exercise of control over the disposition of SVBFG's Account

13 Funds—or in the words of Mr. Tetrick of the FDIC-C, SVBFG's "money."

14      92.     While discovery will ultimately reveal the FDIC's precise movement and

15 treatment of SVBFG's Account Funds, directed by the FDIC-C and undertaken with the

16 assistance of the FDIC-R, it appears that the FDIC did not merely place a hold on SVBFG's

17 funds but affirmatively sought to permanently take those funds away from SVBFG; as of March

18 31, 2023, SVBFG's account statements showed debits by the FDIC for the full balance of each

19 account, leaving the ending balances at zero.

20      93.     Thus, acting pursuant to the FDIC-C's instructions and with its approval, as an

21 accounting matter at least, it appears, as referenced above, that the FDIC-R removed SVBFG's

22

23 _____

24 [6] ████████████████████████████████████████████████

25 ████████████████████████████████████████████

26 █████████████████████████████████████████████████

27 ████████████████████████████████████████████████

28 ████████████████████████████████

1  funds from SVBFG's accounts at Bridge Bank and put them into an FDIC general ledger

2  account, purporting to zero out the balance in SVBFG's accounts.

3      94.    The FDIC-C also is responsible for permitting this unlawful denial of access to

4  and/or unlawful taking of SVBFG's Account Funds in its capacity as the entity responsible for

5  applying to the OCC to charter and operating Bridge Bank, and ensuring the payment of all

6  uninsured deposits pursuant to the invocation of the systemic risk exception.  Prior to placing

7  Bridge Bank in receivership on March 27, 2023 upon the transfer of most of its assets and

8  liabilities to another bank (described below), Bridge Bank was operated under the control of the

9  FDIC-C.  As Mr. Mayorga confirmed to Mr. Tetrick of the FDIC-C in a March 16, 2023 email

10 exchange, at the time SVBFG's access to its Account Funds was cut off, its accounts had been

11 "transferred into the bridge" from the FDIC-R1.  As the emails referenced above, reflect, the

12 removal of SVBFG's funds from its accounts at Bridge Bank was directed by FDIC-C.

13 Consequently, in addition to its own independent liability and other liability that exists as a

14 matter of law, the FDIC-C is also responsible for any deficiency in the liquidation value of

15 Bridge Bank or SVB.

16     95.    The FDIC-C has continued unlawfully to refuse to provide SVBFG with its

17 Account Funds despite due demand.  SVBFG's Account Funds at Bridge Bank totaled

18 approximately $1.93 billion as of March 16, 2023, when SVBFG's access to them was taken

19 away.  Below is a schedule describing SVBFG's accounts and the Account Funds that are at

20 issue in this Complaint, as of March 16, 2023, and prior to amounts being swept or moved from

21 SVBFG's accounts by the FDIC-C or the FDIC-R1 acting with the express or tacit authorization

22 of the FDIC-C.

23

24

25

26

27

28

| No. | Description | Account No.[7] | Balance |
|---|---|---|---|
| 1. | Operating Account | *5270 | $1,771,057,098 |
| 2. | Regulation W Account | *0822 | $143,593,718 |
| 3. | SVB Capital Operating Account | *6176 | $19,154,892.40 |

96.     SVBFG filed a petition for relief under Chapter 11 of the Bankruptcy Code in the early morning of March 17, 2023.  At that point, SVBFG obtained all rights of a debtor in possession, including its pre-petition rights to recover its deposits as a matter of state and federal law and the benefits and protections of the automatic stay granted by 11 U.S.C. § 362.

97.     On March 27, 2023, the OCC closed Bridge Bank, and the FDIC transferred substantially all Bridge Bank's assets to another bank, First-Citizens Bank & Trust Company ("First Citizens"), pursuant to a purchase and assumption agreement.[8]  Following this transfer, the FDIC mailed a letter to former Bridge Bank depositors on or around April 3, 2023, informing them that "[a]ll deposits [at Silicon Valley Bank] were fully insured" by the FDIC-C, and that "the full amount of your deposit was transferred" to First Citizens.[9]  SVBFG's Account Funds were expressly excluded from the transfer to First Citizens.

---

[7]     The last 4 digits of each Bank Account are listed.

[8]     Following the OCC closing Bridge Bank, the FDIC was appointed to act as the receiver for Bridge Bank ("FDIC-R2").  This was 11 days after SVBFG's Account Funds were taken away.

[9]     The notice makes clear that there was no claims process for Silicon Valley Bank or Bridge Bank depositors.  The notice states that "[a]ll deposits were fully insured and transferred to FIRST-CITIZENS BANK & TRUST COMPANY, RALEIGH, NC," but "if you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at [First Citizens], you may request a review of the FDIC's determination in the United States District Court where the Failed Institution was located."

-32-

98.     Notwithstanding the Secretary of the Treasury's invocation of the systemic risk exception to provide all depositors of Silicon Valley Bank with immediate access to the full amount of their uninsured deposits, as of March 16, 2023, the FDIC-C took away SVBFG's access to its deposits, or authorized the FDIC-R1 and/or Bridge Bank wrongly to do so, in contravention of the obligations imposed upon it by the Treasury Secretary's invocation.  Since March 16, 2023, the FDIC-C has continued to refuse to provide SVBFG with access to its remaining $1.93 billion in deposits, as it is required to do under the systemic risk exception as invoked and determined by the Treasury Secretary.

99.     To the extent the FDIC-R1 and/or FDIC-R2 have blocked SVBFG's access to its Account Funds, the FDIC-C has impermissibly directed, authorized, overseen, and enabled them to do so, and their actions do not excuse the FDIC-C's obligation pursuant to the Treasury Secretary's determination to provide SVBFG with access to the full amount of its Account Funds.

100.     The FDIC-C's basis for denying SVBFG payment of the Account Funds is not a lack of available funds.  Indeed, the full amount of SVBFG's uninsured deposits at Silicon Valley Bank were made available to SVBFG at Bridge Bank before access to those funds was impeded for reasons having nothing to do with the FDIC-C's ability to fund them.  In any event, the FDIC-C's Deposit Insurance Fund has assets of approximately $119.3 billion held and available to pay the FDIC-C's deposit obligations, including all liability relating to SVBFG's Account Funds.  Further, as promised, the FDIC-C funded the uninsured claims of depositors holding larger balances at Silicon Valley Bank than SVBFG.

101.     Moreover, as a result of the invocation of the systemic risk exception, the FDIC-C is not only entitled to, but as a matter of law *must*, recover any loss to the Deposit Insurance Fund arising from such action through one or more special assessments on insured depository institutions.  12 U.S.C. § 1823(c)(4)(G)(ii).  The statutory framework provides that in those instances where a systemic risk exception is invoked, whether to protect uninsured deposits or otherwise, any resulting losses are recovered by assessing the insured depository institutions.  As

-33-

1  Chairman Gruenberg has informed Congress, the cost to the fund will be borne by 113 banking

2  institutions, and 95% of the cost will be borne by institutions with assets over $50 billion.

3       102.    In connection with this obligation, on or about approximately May 22, 2023, the

4  FDIC-C issued a Notice of Proposed Rulemaking, seeking comment on a proposed rule that

5  would impose special assessments to recover the loss to the Deposit Insurance Fund "arising

6  from the protection of uninsured depositors in connection with the systemic risk determination

7  announced on March 12, 2023, following the closures of Silicon Valley Bank, Santa Clara, CA,

8  and Signature Bank, New York, NY, as required by the FDI Act."  In connection with the

9  proposed rulemaking, the FDIC again represented that all deposits previously held at Silicon

10  Valley Bank—both insured and uninsured portions—were protected.

11       103.    On November 16, 2023, the Board of Directors of the FDIC approved a final rule

12  to implement the special assessment "to recover the loss to the Deposit Insurance Fund (DIF)

13  associated with protecting uninsured depositors following the closure of Silicon Valley Bank and

14  Signature Bank."  Notably, in a November 16, 2023 memorandum from the FDIC Director of the

15  Division of Insurance and Research to the FDIC Board of Directors, the FDIC again described

16  the scope of the systemic risk exception as enabling "[t]he full protection of depositors, rather

17  than imposing losses on uninsured depositors."

18  **VI.    SVBFG Commences the Adversary Proceeding Against the FDIC.**

19       104.    On June 26, 2023, SVBFG sent a letter to the FDIC-C demanding that the FDIC-

20  C pay or give SVBFG full access to all its uninsured funds as required by the Treasury

21  Secretary's invocation and determination of the systemic risk exception.  The demand was made

22  pursuant to the invocation of the systemic risk exception—not 12 U.S.C. § 1821(f)—because it is

23  a demand for uninsured deposits and section 1821(f) only applies to insured deposits, *i.e.*,

24  deposits up to $250,000.  The FDIC-C did not respond to, or even acknowledge receipt of,

25  SVBFG's demand until months after it was sent.  (Ex. 9 (June 26 Letter to FDIC).)

26       105.    On July 9, 2023, SVBFG filed the Adversary Proceeding in the Bankruptcy Court

27  in connection with the bankruptcy proceeding, captioned *SVB Financial Group* v. *Federal*

28  *Deposit Insurance Corp.*, *et al.*, No. 23-01137 (MG) (Bankr. S.D.N.Y.)  As to the FDIC-C,

-34-

1    SVBFG asserts a turnover claim pursuant to 11 U.S.C. § 542 and Rule 7001 of the Federal Rules

2    of Bankruptcy Procedure, seeking to compel the FDIC-C to honor its legal obligation under the

3    systemic risk determination to repay SVBFG's deposits at Silicon Valley Bank from the Deposit

4    Insurance Fund.  (Adv. Dkt. No. 1 ¶¶ 65-73.)  SVBFG also asserts claims in the alternative

5    against the FDIC-R1 and the FDIC-R2.  (*Id.* ¶¶ 74-79.)  SVBFG also asserts a claim against all

6    three FDIC entities for violation of the automatic stay under 11 U.S.C. § 362(a) for refusing to

7    pay SVBFG the amount of the Account Funds, and for declaratory judgment pursuant to 28

8    U.S.C. § 2201 *et seq.*, seeking a declaration that the FDIC-C has no right of setoff against the

9    amount of the Account Funds or, in the alternative, that any right of setoff is limited to amounts

10   for which there is mutuality of obligation between SVBFG and the FDIC-C or between SVBFG

11   and the FDIC-R1 or FDIC-R2.  (*Id.* ¶¶ 80-81, 83-91.)

12        106.    The deadline for the FDIC, FDIC-R1 and FDIC-R2 to file proofs of claim against

13   SVBFG in the bankruptcy proceeding expired on September 14, 2023, and the FDIC-C  filed no

14   claims.[10]  The FDIC-C's October 20 letter does not identify any claims it has against SVBFG or

15   identify any alleged right of setoff as a basis to refuse to pay SVBFG the $1.93 billion in

16   remaining Account Funds.  (Ex. 10 (FDIC, October 20 Denial).)

17        107.    All the claims asserted in the Adversary Proceeding were properly brought before

18   the Bankruptcy Court, which has subject matter and personal jurisdiction.  Sovereign immunity

19   has been waived, and no administrative exhaustion was required for the claims asserted.  The

20   turnover and automatic stay claims are explicit rights under the Bankruptcy Code and are within

21   the Bankruptcy Court's core jurisdiction.  Nevertheless, in as much as the FDIC-C disputes the

22   jurisdictional bases for the claims made in the Adversary Proceeding, SVBFG re-asserts them

23   here (along with additional claims based on the FDIC's October 20 letter) with a full reservation

24   of rights as to its ability to proceed with the Adversary Proceeding.

25

26   _____

27   [10]     The FDIC-R1 and FDIC-R2 also did not file proofs of claims against SVBFG in the

28        bankruptcy proceeding.

108.    On August 11, 2023, all three FDIC entities filed Rule 12(b)(1) and 12(b)(6) motions in the Bankruptcy Court seeking to dismiss the adversary complaint.  For their jurisdictional argument, all three FDIC entities take the position that under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), no federal court has subject matter jurisdiction over any of the claims asserted as to any of the FDIC entities unless and until SVBFG exhausts the statutory FIRREA claims process applicable to depositors with claims against banks in receivership.  (*See* Adv. Dkt. No. 28 (FDIC-R1 Mot.) at 1-3; Adv. Dkt. No. 25 at 1-2 (FDIC-C Mot.) at 1-5; Adv. Dkt. No. 32 (FDIC-R2 Mot.) at 2-4.)  Likewise, the FDIC entities assert that even if the claims process had been exhausted, only the United States District Court for this District would have jurisdiction over claims against the FDIC-C, and only the District Court for this District or the District Court for the District of Columbia would have jurisdiction over claims against the FDIC-R1 or FDIC-R2 pursuant to FIRREA.  (*Id*.)  The FDIC entities also argue that under Rule 12(b)(6), in any event, SVBFG's turnover, automatic stay, and declaratory judgment claims should be dismissed because the claim amounts are "disputed." (*Id*.)

109.    On the same day it filed its motion to dismiss, the FDIC-R1 filed a motion to withdraw the reference in the Bankruptcy Court pursuant to 28 U.S.C. § 157(d).  (Adv. Dkt No. 30.)  That motion was docketed in the United States District Court for the Southern District of New York and assigned to Judge John P. Cronan on August 15, 2023.  (*SVB Fin. Grp.* v. *FDIC*, No. 23-cv-07218 (JPC) (S.D.N.Y.) ("S.D.N.Y. Dkt.") No. 1.)  On August 15, 2023, the FDIC-C and FDIC-R2 filed non-substantive joinders to the FDIC-R1's motion to withdraw the reference.  (*See* S.D.N.Y. Dkt. Nos. 3, 4.)

110.    On September 14, 2023, the Bankruptcy Court ordered that a hearing on all pending motions in the Adversary Proceeding was "adjourned sine die until such time after [the District Court] decides the [motion to withdraw the reference]."  (Adv. Dkt. No. 78.)  Thus, the motions to dismiss have not been addressed.

111.    On December 13, 2023, Judge Cronan granted the motion to withdraw the reference.

-36-

**VII.** **The FDIC-C Decides to Treat SVBFG's Demand for Payment of Uninsured Deposits as a Claim for Insured Deposits Under 12 U.S.C. § 1821(f) and Denies the "Claim."**

112.    The FDIC has not promulgated any regulations concerning the submission of uninsured deposit claims, and the FDIC webpage providing "Failed Bank Information for Silicon Valley Bank, Santa Clara, CA" does not contain any information concerning the submission of an uninsured deposit claim against the FDIC-C.  Instead, the website only contains information concerning how to file a claim against the FDIC-R1 or FDIC-R2 "[i]f you or your company provided a service or product, leased space, furniture or equipment to SVB or Bridge Bank." The official claims email address for the FDIC-R1 and FDIC-R2 claims process— NonDepClaimsDal@FDIC.gov—also makes clear that the claims process described therein does not apply to deposit claims.

113.    The FDIC-C also never sent SVBFG or any other Silicon Valley Bank or Bridge Bank depositor any documentation regarding the FDIC-C's supposed section 1821(f) claims process for uninsured funds formerly deposited at Silicon Valley Bank, including any information concerning any rules or procedures governing the section 1821(f) claims process or the standard by which the FDIC-C would make its determination.  And the FDIC-C did not offer SVBFG the opportunity to either submit any evidence or make oral or written submissions in support of its supposed section 1821(f) "claims," notwithstanding the fact that SVBFG never submitted any evidence in support of its "claim" because its June 26, 2023 letter was never intended to be treated as a section 1821(f) claim.

114.    In response to discovery requests in the Adversary Proceeding seeking documents concerning the FDIC-C's supposed uninsured deposit claim process, the FDIC-C initially refused to produce any information concerning its supposed claims process.

115.    On September 14, 2023, SVBFG and the FDIC-C participated in a discovery conference in the Bankruptcy Court to discuss the FDIC-C's refusal to produce any information concerning its so-called section 1821(f) deposit claim process, or even to confirm or to deny whether any information about any such process even exists.  During the hearing, the Bankruptcy Court raised due process concerns after counsel for the FDIC-C confirmed that the FDIC-C had not promulgated any rules or regulations governing its claims process and had not provided

SVBFG with any information whatsoever concerning its claims process.  The Bankruptcy Court directed the FDIC-C to provide SVBFG with a statement, in writing, setting forth the applicable rules and procedures that applied to the FDIC-C's claims process.

116.    At the direction of the Bankruptcy Court, on September 19, 2023—almost three months after SVBFG sent its June 26, 2023 letter demanding access to or payment of its uninsured Account Funds—the FDIC-C sent SVBFG a letter, characterizing "[SVBFG's] June 26, 2023 letter as a timely claim for insurance coverage with respect to a deposit under 12 U.S.C. § 1821(f)" and stating that "the FDIC-C is working to provide [SVBFG] a final determination regarding insurance coverage within 30 days of the date of this letter."  (Adv. Dkt. No. 80-1 at 2.)

117.    Following the discovery conference with the Bankruptcy Court, the FDIC-C also agreed to produce documents in response to SVBFG's request that it produce documents describing the FDIC's claims process.  The FDIC-C, however, produced only a printout of 12 U.S.C. § 1821—again admitting that it has no process.  In response to discovery seeking communications with SVBFG and with other Silicon Valley Bank depositors reflecting instructions for submitting a deposit claim, the FDIC-C produced only (i) its September 19, 2023 letter to SVBFG acknowledging SVBFG's June 26, 2023 letter and purporting to characterize SVBFG's demand for payment as a claim under section 1821(f), and (ii) a notice to all depositors of Bridge Bank that Bridge Bank had been closed and all Bridge Bank deposits transferred to First Citizens (which made no reference to any supposed administrative claims process under section 1821(f)).

118.    On October 20, 2023, well in advance of any determination from either the FDIC-R1 or FDIC-R2 regarding SVBFG's protective proofs of claims for access to its Account Funds, the FDIC-C denied SVBFG's supposed "claim" for its Account Funds.  The purported basis of the denial was twofold.  First, the FDIC-C asserted that because SVBFG was able to withdraw more than $250,000 from its accounts at Bridge Bank between March 13 and March 15, 2023, the "FDIC-C has satisfied its obligation under 12 U.S.C. § 1821(f)(1) to provide SVBFG with access to its insured deposits."  (Ex. 10 at 9.)  The FDIC-C's denial letter was signed by Cathy

-38-

1   Davis, one of the FDIC-C employees who, as the emails referred to above reflect, was involved

2   in divesting SVBFG of its Account Funds in March 2023.

3        119.    Second, ignoring the FDIC's own public proclamations, as well as public

4   statements and testimony to Congress by Secretary Yellen, Chairman Gruenberg, and other

5   senior government officials, the FDIC-C claimed that the Treasury Secretary's invocation of the

6   systemic risk exception did not obligate the FDIC-C to follow any particular course of action, but

7   rather authorized the FDIC-C to exercise unfettered discretion in determining actions to take,

8   including whether to pay any uninsured deposit claims, whose claims to pay, and in what

9   amounts, notwithstanding the terms of the systemic risk exception (and the repeated public

10  announcements of the same) that **all** deposits and **all** depositors would be protected.  The FDIC-

11  C acknowledged that it treated SVBFG differently by protecting uninsured deposits of other

12  Silicon Valley Bank depositors, but it failed to offer any explanation as to why SVBFG was

13  afforded different treatment, or why the Treasury Department, Federal Reserve Board, and FDIC

14  announced to the world that all uninsured deposits would be protected and senior government

15  officials reiterated this multiple times if that was not what was intended or required by the

16  Treasury Secretary's invocation of the systemic risk exception.  Section 1823(c)(4)(G) does not

17  contemplate, and has never been used as, a two-step process in which, first, the Secretary of the

18  Treasury simply determines to invoke the systemic risk exception and, second, the FDIC then

19  determines how and to what extent the invocation would be applied, a process that would subvert

20  the requirement that the decision be made at the highest level of the government.

21       120.    Under section 1821(f)(4), the FDIC-C's denial of SVBFG's claims is "a final

22  agency action reviewable in accordance with chapter 7 of title 5 by the United States district

23  court." 12 U.S.C. § 1821(f)(4).

24       121.    In order to seek relief from the FDIC-C's illegal withholding or taking of

25  SVBFG's Account Funds and to protect SVBFG's rights pursuant to section 1821(f), assuming

26  *arguendo* that such section applies at all to SVBFG's "claim" against the FDIC-C, SVBFG

27  commenced the present action.

28

## VIII. The FDIC-C Fails to Provide SVBFG with Information Concerning the Invocation of the Systemic Risk Exception.

122.    As discussed above, the FDIC-C has taken the position in the Bankruptcy Proceeding that the Treasury Secretary's invocation of the systemic risk exception provides the FDIC-C with unfettered discretion to complete the resolution of Silicon Valley Bank, including by ignoring the Treasury Secretary's guarantee of all deposits of all depositors in order to block SVBFG's access to or refuse to pay SVBFG's Account Funds.  Yet to date, the FDIC-C has failed to produce documents describing the scope and terms of the Treasury Secretary's systemic risk invocation in response to a Rule 2004 subpoena served in the Bankruptcy Proceeding, requests for production of documents served in the Adversary Proceeding, a Freedom of Information Act request, discovery requests in this action, and as part of its production of what it describes as the administrative record relating to its denial of the SVBFG demand that it has characterized as an administrative claim.

123.    On June 29, 2023, SVBFG submitted a Freedom of Information Act ("FOIA") Request to the FDIC-C seeking records regarding the FDIC Board's decision to recommend the invocation of the systemic risk exception, including any documentation relating to the recommendation and the staff memorandum prepared by the Federal Reserve staff recommending the systemic risk exception.

124.    On July 26, 2023, the FDIC-C sent SVBFG a letter acknowledging that FOIA "allows an agency twenty business days from its receipt of a request to make its determination," but noting that pursuant to 5 U.S.C. § 552(a)(6)(B), "in the case of unusual circumstances, the FOIA provides for an extension of the determination period by an additional ten days."

125.    The FDIC-C failed to substantively respond to SVBFG's FOIA request within the time period required by 5 U.S.C. § 552, and in fact, has failed to respond to date, over five months after the request was sent.

1

## **<u>CLAIMS FOR RELIEF</u>**

2

3

### **Count I**
### **Declaratory Judgment Under 28 U.S.C. § 2201 *et seq.***

4     126.    SVBFG re-alleges and incorporates by reference the allegations contained in the

5     foregoing paragraphs as if fully set forth herein.

6     127.    On March 12, 2023, the Secretary of the Treasury invoked the systemic risk

7     exception to guarantee all insured and uninsured deposits of Silicon Valley Bank.  Thereafter, the

8     FDIC, Chairman Gruenberg, Secretary Yellen, and counsel for the FDIC-R1, as well as

9     numerous other senior government officials, made statements to the American public, to

10    Congress, and to the Bankruptcy Court confirming that the Treasury Secretary's invocation

11    protected all deposits of all depositors of Silicon Valley Bank with the intention of avoiding a

12    national banking crisis by convincing Silicon Valley Bank stakeholders, including depositors and

13    others, that all deposits of all depositors were 100% safe at Bridge Bank.  SVBFG and SVBFG's

14    stakeholders relied on those statements, as intended by the FDIC and others, and kept SVBFG's

15    uninsured deposits at Bridge Bank.

16    128.    Notwithstanding the clear terms of the Treasury Secretary's invocation of the

17    systemic risk exception as publicly described multiple times, including by the FDIC, the FDIC-C

18    has refused to provide SVBFG with access to and/or has refused to pay to SVBFG the remainder

19    of its uninsured Account Funds from the Deposit Insurance Fund.

20    129.    SVBFG is not required to submit or prove a claim under 12 U.S.C. § 1821(f)

21    because the Account Funds are not insured funds under the terms of section 1821.

22    130.    Because the FDIC-C continues adversely to withhold access to or payment of

23    SVBFG's Account Funds and to require SVBFG to prove a claim under section 1821(f), there is

24    an actual controversy between the parties ripe for judicial resolution.

25    131.    SVBFG respectfully requests that the Court declare that (i) the uninsured Account

26    Funds are not subject to section 1821(f); (ii) the FDIC-C has no right to, and is estopped from

27    attempting to, ignore the Treasury Secretary's invocation and determination of the systemic risk

28    exception to protect all uninsured deposits; and (iii) the FDIC-C must restore SVBFG's deposit

accounts, including all interest earned on the Account Funds since the date the Account Funds were blocked or taken.

**Count II**
**Turnover of the Account Funds Pursuant to Section 542**
**of the Bankruptcy Code Against the FDIC-C**

132.    SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

133.    The Account Funds constitute property of SVBFG's estate under section 541(a) of the Bankruptcy Code.

134.    Section 542(b) of the Bankruptcy Code provides, in relevant part, that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee . . . ."

135.    The Secretary of the Treasury, based on the recommendation of the FDIC-C and the Federal Reserve, invoked the systemic risk exception to guarantee all deposits, insured and uninsured, at Silicon Valley Bank and provided for "full access" to those funds.  This includes the SVBFG's approximately $2.1 billion in uninsured deposits that existed at the time of the Secretary of the Treasury's action, and the approximately $1,933,555,708.13 in uninsured Account Funds that remained when SVBFG's access to its Account Funds, then held at Bridge Bank, was taken away on or about March 16, 2023.

136.    The FDIC-C has unlawfully taken away SVBFG's Account Funds and/or directed, authorized, and acted together with the FDIC-R1 and/or FDIC-R2 to do so.

137.    The FDIC-C continues unlawfully to refuse to provide SVBFG access to or payment of its Account Funds.

138.    On October 20, 2023, in response to SVBFG's June 26, 2023 letter demanding that the FDIC-C restore SVBFG's access to, or pay to SVBFG, the Account Funds, the FDIC-C confirmed in writing that it was refusing to pay SVBFG its Account Funds.

139.    The Account Funds constitute a debt the FDIC-C owes to SVBFG's estate, which is property of the estate and is matured, payable on demand, or payable on order.  Indeed, the FDIC-C itself regards the Account Funds as equivalent to SVBFG's "money."

-42-

140.    SVBFG's Account Funds are therefore subject to turnover pursuant to section 542 of the Bankruptcy Code and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

141.    Pursuant to section 542 of the Bankruptcy Code, FDIC-C is required to immediately return to SVBFG its Account Funds.

**Count III**
**Violation of the Automatic Stay Under Section 362(a)**
**of the Bankruptcy Code**

**[*Intentionally Omitted*]**

**Count IV**
**Violation of SVBFG's Fifth Amendment Due Process Rights**

142.    SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

143.    The Fifth Amendment's Due Process Clause protects against the government's deprivation of property without adequate due process.

144.    The FDIC-C refuses to provide SVBFG complete access to its Account Funds on the basis that the Treasury Secretary's invocation of the systemic risk exception "did not impose any legal obligation on [the] FDIC-C to pay SVBFG for its uninsured deposits or cause [the] FDIC-C to guarantee SVBFG's uninsured deposits."  (Ex. 10 at 9-11.)

145.    However, the Treasury Secretary's invocation of the systemic risk exception to guarantee *all* deposits, insured and uninsured, of *all* depositors of Silicon Valley Bank, as jointly announced by the Treasury, FDIC, and Federal Reserve on March 12, 2023, created a property interest protected by due process.

146.    The FDIC has reiterated many times—publicly, to Congress and otherwise—that the purpose and effect of the systemic risk exception was to guarantee all deposits of all Silicon Valley Bank depositors.  The history of the analysis and deliberations leading to the recommendations of the FDIC and the Federal Reserve and the action by the Treasury Secretary is that consideration of a less than complete guarantee for all depositors was considered and rejected.  And in describing and quantifying the level of uninsured deposits being guaranteed by the Treasury Secretary's action, the FDIC has included the uninsured deposits of SVBFG.  By

-43-

contrast, the FDIC has produced no documents or information as part of the purported administrative record or otherwise suggesting that SVBFG's Account Funds were excluded from the Treasury Secretary's action or that the FDIC was granted discretion to pick and choose which uninsured Silicon Valley Bank depositors to protect, including to treat SVBFG differently than all other depositors.

147.    SVBFG has a claim of entitlement to the Account Funds because the Treasury Secretary's invocation and determination unequivocally guaranteed all deposits of all depositors, including SVBFG and its uninsured deposits, would be paid by the Deposit Insurance Fund. Consequently, SVBFG's interest in its Account Funds is a property interest in a government benefit that the FDIC-C cannot unilaterally deprive SVBFG without adequate due process.

148.    As alleged above, the FDIC-C directed, oversaw and, together with FDIC-R, directly participated in the process of depriving SVBFG of its Account Funds.  It instructed that the Account Funds be held, it oversaw and monitored the steps taken to "lock down" SVBFG's funds, it sought reversal of wires that had been made by SVBFG from Bridge Bank, and it approved of the steps taken to remove the Account Funds from SVBFG's accounts at Bridge Bank into some sort of FDIC general ledger account.

149.    The FDIC-C has never provided a substantive rationale for treating SVBFG differently than other depositors by depriving and/or directing, authorizing, and acting together with the FDIC-R1 and/or FDIC-R2 to deprive SVBFG of access to or payment of its Account Funds, or by providing SVBFG with access to approximately $180 million of its account funds but not the remainder of the uninsured Account Funds.

150.    The FDIC-C also has not afforded SVBFG *any* procedural due process with respect to its refusal to pay SVBFG its Account Funds.  The FDIC-C never informed SVBFG that it—unlike all other depositors—would be required to do *anything* to have unobstructed access to its deposits, whether insured or uninsured.  Nor did the FDIC-C inform SVBFG that it would not be able to access its deposits before SVBFG was blocked from accessing the Account Funds on or about March 16, 2023.  Nor thereafter did the FDIC-C provide any explanation for why SVBFG's Account Funds were blocked, provide any sort of procedures or process for

-44-

appealing that decision or for resolving SVBFG's demand to access its Account Funds, provide SVBFG any notice of the standards by which its demand would be evaluated, or offer SVBFG any opportunity to submit supporting evidence or arguments.

151.    As set forth above, it was only after SVBFG filed an adversary complaint against the FDIC-C *and* the Bankruptcy Court overseeing the Adversary Proceeding raised due process concerns with the FDIC-C's failure to implement any regulations or define, disclose, or follow any procedures with respect to its supposed section 1821(f) process that the FDIC-C informed SVBFG that it was treating its June 26, 2023 demand for payment as a timely deposit insurance claim.  And when it denied that "claim" in October 2023, the denial was signed by one of the very FDIC-C officials who had, unknown to SVBFG, been involved in March 2023 taking the Account Funds away from SVBFG in the first place.

152.    The FDIC-C cannot rely on its purported claims process under section 1821(f) as providing adequate due process for the denial of SVBFG's *uninsured* Account Funds because section 1821(f) only applies to claims for insured deposits.

153.    In addition, the FDIC-C's purported section 1821(f) claims process is inadequate because the FDIC-C never promulgated regulations governing a section 1821(f) claims process, especially for uninsured deposits (which are not covered by the statutory process for insured deposits), never informed SVBFG that it—unlike all other depositors—would be required to file a claim in its purported claims process, and never provided any instructions to SVBFG—or any other depositor—on how to submit a claim under section 1821(f) or the standards by which any such claim would be evaluated.

154.    SVBFG respectfully requests that the Court find that the FDIC-C's refusal to provide SVBFG with access to, or to pay SVBFG, its Account Funds is unlawful because it violated SVBFG's Fifth Amendment Due Process rights, and issue injunctive relief prohibiting the FDIC-C from continuing to deny SVBFG access to its Account Funds.

**Count V**
**The FDIC-C's Policy Exercising Discretion to Determine**
**Not to Pay or Provide Access to Uninsured Deposits Is Contrary to Law,**
**in Excess of Statutory Authority, and Arbitrary and Capricious**
**Under 5 U.S.C. §§ 702, 706(2)**

**[*Intentionally Omitted*]**

**Count VI**
**Review of Final Agency Action Under 5 U.S.C. § 706**

155.     SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

156.     SVBFG asserts this claim in the alternative, without prejudice to its position that section 1821(f) is not applicable, and the FDIC-C did not act pursuant to a legitimate section 1821(f) process.

157.     Pursuant to 12 U.S.C. § 1821(f)(4), "[a] final determination by the Corporation regarding any claim for insurance coverage shall be a final agency action reviewable in accordance with" the Administrative Procedure Act, 5 U.S.C. §§ 701-706.  Under the Administrative Procedure Act, the reviewing court must set aside the FDIC-C's determination if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

158.     The Treasury Secretary's invocation of the systemic risk exception to protect all depositors and all deposits of Silicon Valley Bank vested SVBFG with a property interest in all its uninsured deposits, irrespective of the liquidation value of Silicon Valley Bank as of the date of the receivership or the level of value derived from the receivership's monetization of Silicon Valley Bank's assets.

159.     The FDIC-C's denial of SVBFG's claims for its uninsured deposits under the rubric of a purported section 1821(f) process for insured deposits was arbitrary and capricious because the denial lacks due process and fair notice and is contrary to the terms of the systemic risk exception approved by the Secretary of the Treasury, which the FDIC-C has no discretion or authority to alter or ignore.

160.    The FDIC-C has not established any rules or procedures governing the submission or adjudication of uninsured deposit claims for Silicon Valley Bank or Bridge Bank depositors, including even the most basic guidelines governing the resolution of a depositor's claim, such as (i) how a claimant may submit a valid claim against the FDIC-C for insurance coverage, (ii) the deadline by which a claimant must submit a valid claim against the FDIC-C for insurance coverage, (iii) the standard under which a claim for insurance coverage is reviewed, (iv) what evidence the FDIC-C may or may not consider in making its determination, or (v) what rights a depositor has throughout the claims process.

161.    The FDIC-C initially provided SVBFG full access to its Account Funds at Bridge Bank as required by the terms of the Treasury Secretary's March 12, 2023 determination and invocation of the systemic risk exception, but then blocked access to and/or took away SVBFG's Account Funds without notice or explanation and in defiance of its obligations pursuant to the Secretary of the Treasury's systemic risk determination.[11]

162.    The FDIC-C failed to notify SVBFG that, unlike every other depositor of Silicon Valley Bank and contrary to public pronouncements and testimony by the Secretary of the Treasury, Federal Reserve Board, and the FDIC-C, SVBFG would not be afforded full access to its Account Funds that had been transferred to Bridge Bank or that SVBFG's Account Funds at Bridge Bank were subject to seizure by the FDIC-C.

163.    The FDIC-C failed to notify SVBFG that it would require SVBFG to submit a claim in its unidentified process to obtain its uninsured Account Funds, or information about when or how to do so.

---

[11]    Had SVBFG known that the FDIC was going to unlawfully rescind its promise to guarantee all deposits, SVBFG would have sought to transfer its accounts to another financial institution on March 13, along with many other Silicon Valley Bank depositors who withdrew their uninsured funds when Bridge Bank opened on March 13, 2023.

164.    The FDIC-C provided SVBFG with no information whatsoever concerning its supposed section 1821(f) claims process.

165.    The FDIC-C did not give SVBFG an opportunity to submit evidence in support of its demand for access to, or payment of, its uninsured Account Funds.

166.    In the absence of even a scintilla of fair notice or due process, the FDIC-C's denial of SVBFG's claims for access to or payment of the Account Funds is the epitome of arbitrary and capricious.

167.    The FDIC-C continues to withhold payment from SVBFG, contravening federal law, the Treasury Secretary's statutory authority, its own recommendations and a myriad of public announcements by senior government officials, including the Chairman of the FDIC-C, that the Treasury Secretary's determination and invocation of the systemic risk exception protected all deposits of all depositors of Silicon Valley Bank.  Consequently, the FDIC-C's denial of SVBFG's "deposit claim" must be set aside as arbitrary, capricious, and an abuse of discretion.

168.    In light of the foregoing, SVBFG requests that this Court hold unlawful and set aside the FDIC-C's denial pursuant to 5 U.S.C. § 706, without affording any deference to the FDIC-C's whims.

**Count VII**
**Estoppel**

169.    SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

170.    The FDIC-C's March 10, 2023 announcement that uninsured depositors would receive an advance dividend within the next week and would receive a receivership certificate for the remaining amount of their uninsured funds did not sufficiently calm the markets and instead "precipitated the failure of Signature Bank."

171.    On March 12, 2023, the Treasury Secretary invoked the systemic risk exception to directly address the imminent risk of a continued run on Nation's banking system by large corporate borrowers withdrawing significant amounts of uninsured deposits.  The Treasury

Secretary's invocation and determination of a systemic risk exception was announced in a joint statement with the FDIC and the Federal Reserve, which clearly and unambiguously stated that the Treasury Secretary's invocation of the systemic risk exception guaranteed that all deposits of all depositors of Silicon Valley Bank would be fully protected. The FDIC-C reiterated this in its own statement released on March 13, 2023, announcing that all deposits of the former Silicon Valley Bank had been transferred to Bridge Bank and that all depositors would have full and immediate access to the funds in their accounts beginning that morning.

172.    The FDIC-C's promise was designed to prevent a bank run that could have affected public confidence in and the soundness of the Nation's banking system, and that might occur if depositors withdrew their funds out of a fear that they were at risk. Thus, the public statements assuring all depositors that their funds were safe and that all depositors would be fully protected were specifically designed to induce reliance by depositors, including SVBFG, to keep their funds at Bridge Bank. The FDIC-C not only intended that its public statements be relied upon, but reasonably should have expected SVBFG and other depositors to rely on its guarantee to protect all of their uninsured Account Funds.

173.    In reliance on the announced guarantee of all deposits of all depositors of Silicon Valley Bank and Bridge Bank records which in fact showed that all of SVBFG's deposits were transferred to Bridge Bank on March 13, 2023, SVBFG did not attempt to withdraw or transfer all of its uninsured deposits out of Bridge Bank, even though it could have done so, as SVBFG had access to its funds for three days after the funds were transferred to Bridge Bank.

174.    In the months following the Treasury Secretary's invocation of the systemic risk exception on the FDIC-C's recommendation, among the recommendation of other government entities, FDIC-C representatives repeatedly confirmed that all deposits and all depositors were protected.

175.    If the FDIC-C's position is that it has complete discretion to determine whether to guarantee any uninsured deposits of former Silicon Valley Bank depositors and in what amounts, its statements on March 12 and 13 concerning the terms of the systemic risk exception and

depositors' complete access the full amount of their deposit accounts, as well as numerous

similar statements by Chairman Gruenberg, were knowingly and egregiously false.

176.     SVBFG has suffered damages from its reasonable reliance on the FDIC-C's

public announcement that the Treasury Secretary's systemic risk invocation and determination

protected all deposits of all Silicon Valley Bank depositors, which resulted in SVBFG being

unable to access its approximately $1.93 billion in deposits when SVBFG's access to its Account

Funds was blocked.

**Count VIII**
**Failure to Produce Records Under the Freedom of Information Act**

[***Intentionally Omitted***]

**<u>PRAYER FOR RELIEF</u>**

NOW, THEREFORE, Plaintiff SVBFG prays for judgment and relief against

Defendant FDIC-C as follows:

a.     Judgment in SVBFG's favor and against Defendant FDIC-C on all causes of
action alleged herein;

b.     An order declaring that SVBFG owns the Account Funds and is entitled to
possession thereof;

c.     An order enjoining the FDIC-C and all affiliated entities acting in concert with the
FDIC-C from refusing to provide SVBFG with access to the Account Funds;

d.     An order restoring SVBFG's Account Funds, together with all interim earnings on
those funds since SVBFG was deprived of access to them;

e.     An order directing the FDIC-C to pay and turn over to SVBFG the full amount of
its Account Funds;

f.     An order declaring and holding unlawful and setting aside the FDIC-C's denial of
SVBFG's "claims" for insurance coverage under 12 U.S.C. § 1821(f) and
requiring the FDIC-C to pay to SVBFG the full amount of the Account Funds;

g.     An order declaring SVBFG's claims to be valid and proven against the Deposit
Insurance Fund;

h.    An award of pre- and post-judgment interest on the amounts of the Account Funds;

i.    An award of SVBFG costs and attorneys' fees as may be permitted by law; and

j.    An award to SVBFG of such other relief as may be just.

Dated:    August 29, 2023

/s/ Robert A. Sacks
Robert A. Sacks
Adam S. Paris
Diane L. McGimsey
**SULLIVAN & CROMWELL LLP**
1888 Century Park East
Los Angeles, California 90067
Telephone:    (310) 712-6600
Facsimile:    (310) 712-8800

Sverker K. Hogberg
**SULLIVAN & CROMWELL LLP**
550 Hamilton Avenue
Palo Alto, California 94301
Telephone:    (650) 461-5600
Facsimile:    (650) 461-5700

*Attorneys for Plaintiff SVB Financial Group*