# EXHIBIT 4

# RESOLUTION OF FAILED INSTITUTIONS

**Abstract**

The timely and effective resolution of failed insured institutions is an important element in financial safety-net arrangements. Different exit strategies for such institutions may have considerably different cost implications for the deposit insurer and implications for other safety-net participants, the government, public, banking industry, and economy. Cooperation among the various safety-net participants, both before and after failure, is essential if timely and effective resolutions of failed institutions, particularly large insured institutions, are to be accomplished.

This paper was prepared in response to requests from representatives of numerous countries that participated in the Working Group's outreach programs. The purpose of the paper is to describe the main issues relating to the resolution of troubled institutions. The paper is not concerned with any questions relating to where in the financial safety net the authority for resolutions should reside. The responsibilities of deposit insurers for various aspects of resolution activity are likely to be country-specific, reflecting their particular mandates. However, regardless of the specific responsibilities of the deposit insurer in any particular country, the manner in which troubled institutions are resolved can have a major effect on the funding requirements and other aspects of the deposit insurer's operations.

# RESOLUTION OF FAILED INSTITUTIONS

The timely and effective resolution of failed insured institutions is an important element in financial safety-net arrangements. Different exit strategies for such institutions may have considerably different cost implications for the deposit insurer and implications for other safety-net participants, the government, public, banking industry, and economy. Cooperation among the various safety-net participants, both before and after failure, is essential if timely and effective resolutions of failed institutions, particularly large institutions, are to be accomplished.

This paper was prepared in response to requests from representatives of numerous countries that participated in the Working Group's outreach programs.[1] The purpose of the paper is to describe the main issues relating to the resolution of troubled institutions. The paper is not concerned with any questions relating to where in the financial safety net the authority for resolutions should reside. The responsibilities of deposit insurers for various aspects of resolution activity are likely to be country-specific, reflecting their particular mandates.[2] However, regardless of the specific responsibilities of the deposit insurer in any particular country, the manner in which troubled institutions are resolved can have a major effect on the funding requirements and other aspects of the deposit insurer's operations.

**Pre-Resolution Activity**

Before a troubled financial institution reaches the point where resolution is necessary, it generally has been the object of various efforts to strengthen its operations. Such actions may have included restructuring efforts that, in broad outline, are similar to resolution transactions, in that they involve a merger with, or acquisition by, a healthy institution. These efforts frequently are described as "private-sector" solutions and do not impose a cost on the deposit insurer or the government.

**Private-sector solutions**

Healthy institutions may be willing to combine with weaker ones in a number of situations. However, if financial inducements are required to attract an acquirer, such inducements in a private-sector transaction generally result from concessions made by creditors or owners of the troubled institution, rather than from outlays by the deposit

---

[1] This paper represents the work of the Subgroup on Failure Resolution, which is comprised of representatives from the United States (coordinator), France, Hungary, Italy, Japan, and the International Monetary Fund.

[2] The mandates of deposit insurance systems and the linkages of these mandates to the public-policy objectives, roles and responsibilities, and legal powers of the systems are discussed in the papers on structure and organisation and powers.

insurer. As a result, successful private-sector solutions may be viewed essentially as "no-cost resolutions" from the standpoint of the deposit insurer.

Owners and creditors of a troubled institution often have strong incentives to accomplish a merger or acquisition, because their losses generally will be greater if the institution continues to deteriorate and fails. On the other hand, they may be slow to acknowledge the seriousness of the institution's condition and reluctant to yield control of the institution, or make the concessions necessary for it to be an attractive acquisition or merger partner for a healthy institution. Owners of troubled institutions may have little incentive to explore private-sector solutions unless they perceive that the authorities may close the institution if such solutions cannot be arranged. As a result, private-sector solutions cannot always be accomplished without the active participation of the relevant safety-net participants even though the deposit insurer bears no cost.

The legal authority of the responsible safety-net participants differs among countries and, in some countries, limits their ability to play a role in private-sector solutions for troubled institutions. In other cases, the safety-net participants may bear significant legal exposure to creditors dissatisfied by the terms of the merger or acquisition. In some countries, owners of troubled institutions may have taken legal action against the resolution authority for closing an institution and officials of the authority faced personal liability.[3] Such a legal environment may have the effect of permitting troubled institutions to continue to operate for lengthy periods of time and, therefore, may reduce incentives of owners of such institutions to find private-sector solutions.

In such cases, the responsible authority may only encourage or exert pressure on the troubled institution to initiate its own attempted solution. (Monitoring of the efforts of the bank is necessary to ensure that any "solution" does not include increased risk-taking.) In other countries, the legal authority is broader and may permit the appointment of administrators to replace the directors of the troubled institution and take over its operations. In some situations, credit may be advanced on a secured basis to meet the liquidity needs of the troubled institution while a solution is being sought.

Private-sector solutions require that action be taken early while acquirers are still willing to take over the troubled institution. They presuppose the existence of healthy institutions, which have the financial and managerial capabilities to combine with weaker ones and are acceptable to the authorities. Whether, and to what extent, foreign-owned banks are eligible to serve as acquirers are important factors in some countries. Well-developed arrangements for monitoring and overseeing such solutions are necessary. Also needed is a legal environment that balances creditor and shareholder rights with the authority of the safety-net participants to participate constructively in private-sector solutions.

---

[3] The report of the Study Group on Deposit Insurance indicated that holding employees of deposit insurers or other agencies liable for actions taken on behalf of their organisations was "a serious impediment to performance and to fulfiling mandates." The Study Group "recognised the advantages of statutory indemnification against legal liability that has been provided in some countries." Financial Stability Forum Working Group on Deposit Insurance, *A Consultative Process and Background Paper,* June 2000.

In countries where legal and other conditions are not conducive to private-sector solutions, troubled banks may continue to deteriorate and eventually will have to be resolved by the responsible authority, with deposit insurers bearing the cost.[4]

**Timing of action**

Private-sector solutions depend on early action to prevent further deterioration in the condition of the troubled bank; otherwise, healthy institutions may refuse to participate. Early action also may reduce resolution costs if the private-sector effort is unsuccessful and the institution has to be resolved. The experience of many countries has been that delay in addressing the problems of troubled institutions may make the avoidance of failure more difficult and may increase significantly the ultimate cost to the deposit insurer.

Some countries have adopted statutory provisions requiring early intervention or prompt corrective action for troubled institutions. Such provisions may be based on the capital position of the troubled institution or on other criteria, and require the responsible authority to restrict the activities of the institution and ultimately to terminate its operations according to some objective measure. In many cases these provisions were adopted to prevent the responsible authority from delaying action in the hope that external events would bring about an improvement in the institution's condition or for other reasons. Statutory prompt-corrective-action provisions that require certain actions by safety-net participants may make those actions less politically contestable.

On the other hand, some countries have concluded that such statutory provisions limit the discretionary authority of safety-net participants, which may be needed in periods of financial instability when a significant portion of the banking industry has been weakened, and actions taken with respect to one institution may destabilise other institutions. The trade-off between rules and discretion is a difficult issue, to which there appears to be no universal solution that is applicable to all countries.

**Information needs**

Another pre-resolution activity of major importance to deposit insurers is the maintenance of accessible asset and liability information in order to expedite the resolution of the institution and help ensure that depositors have prompt access to insured funds. This includes information that will identify the owners of deposit accounts and

---

[4] A resolution may be defined as a disposition plan for a failed institution, which is directed by the responsible safety-net authority, and is generally designed to reimburse fully or protect insured depositors while minimising costs to the deposit insurer. In most cases (other than open-bank assistance transactions), the troubled institution is closed and its license or charter is extinguished. Typically, resolutions involve costs to the insurer because the insurer's obligation to insured depositors exceeds net recoveries on the institution's assets. Private-sector solutions, as the term is used in this paper, involve no cost to the deposit insurer or government. Depending on the legal situation and other circumstances in the country, private-sector solutions are likely to be directed by, or have the significant participation of, owners or creditors of the troubled institution.

permit the aggregation of balances for purposes of determining the amount covered by insurance. It also includes asset information needed by the resolution and liquidation authorities for the valuation of assets, least-cost calculations, and formulation of asset disposition plans.

Maintaining such information in accessible form involves a cost to the institution. As the financial viability of the institution diminishes, the accuracy of its records also may diminish. As a result, enforcement of record-keeping requirements may be needed.

Finally, deposit insurers and resolution authorities need to be notified promptly of an impending failure if the commitment to insured depositors is to be met expeditiously. Ideally, the deposit insurer should be notified well in advance of the date of failure so that preparatory work can proceed on a timely basis.

**Resolution Options for Failed Institutions**

If private-sector solutions have not been successful, a determination is typically made that an institution has failed. This determination should be made on the basis of well-defined criteria by a safety-net participant with the authority to act for this purpose. Criteria used in different countries include determinations that an institution is insolvent, has capital below some critical level, is operating in an unsafe-and-unsound manner or fails to meet some other established standard that defines failure. With respect to the latter, some countries require action by safety-net participants when the institution is unable to repay funds received from the public according to the legal, regulatory and contractual conditions governing their payback.[5] Such determinations may be made by the chartering or licensing authority, the court system, through action to terminate deposit insurance, by the governing bodies of the institution, or by a general meeting of shareholders. These procedures are generally followed by some type of resolution transaction that usually involves a financial loss to the deposit insurer.[6]

This section of the paper will examine: (1) the objectives that guide resolution strategy; (2) types of resolution transactions; (3) procedures for selecting resolution methods and acquirers of failed institutions; and (4) the staffing of resolution activities.

**Guiding objectives**

A general objective that guides resolution strategies in most countries is to act quickly so that insured depositors have prompt access to their funds and the value of the failed institution's assets is preserved to the extent possible. More-specific objectives generally can be grouped under three headings. First, resolution activity may take as its primary objective the disposition of failed institutions in a manner that minimises resolution costs.

---

[5] This is, in general, the standard used by the European Community to trigger intervention by the deposit-guarantee scheme. In some countries, a similar rule triggers a deposit payout. See the paper on depositor reimbursement.
[6] If an institution is resolved while it still has positive equity on a market-value basis, the deposit insurer may be able to avoid a loss.

Second, in particular situations, resolution strategies may be designed to avoid problems associated with failures of large and complex institutions. Third, resolution strategies may seek to avoid interruptions in the provision of banking services in particular markets or regions.

Which of these objectives is primary in any particular situation is spelled out in the statutes of some countries. For example, the statute may require that all resolution transactions must meet a least-cost test, except in specified types of situations where certain other considerations may prevail. Such statutory provisions are generally designed to set boundaries on the discretion of resolution authorities to choose among resolution methods.

*Least cost*

As used in this paper and applied in the resolution policies of many countries, the term "least cost" refers to the cost of meeting the deposit insurer's commitment to the depositors of an individual failed institution, taking into account the projected proceeds from the disposition of the institution's assets. Countries that utilise cost tests in resolution activity generally do so in order to provide an objective means of choosing among resolution methods and to foster transparency and accountability in the resolution process. As noted later in this paper, however, resolution activity may be guided by other considerations in some situations.

A least-cost resolution is one that results in the lowest cost to the deposit insurer and/or the government.[7] In general, only insured depositors are fully reimbursed or protected under a strict least-cost resolution.[8]

A less-stringent cost test that has been used in some countries is that the resolution cost associated with a particular resolution method must be less than the cost of a liquidation and reimbursement of depositors' claims (also referred to as a deposit payout). This test often permits resolution methods that fully reimburse or protect uninsured depositors and other creditors.

The difference between the two tests bears emphasis. Least cost means literally that the chosen resolution method must be the *least expensive to the deposit insurer of all possible resolution methods.* The less-stringent cost test means that the chosen method merely has to be *less expensive than the cost of a liquidation and reimbursement of depositors' claims.*

---

[7] The cost of resolving failed institutions is bourne in the first instance by the deposit insurer. However, the deposit insurer must be reimbursed if it is to stay in business, generally through premiums paid by insured institutions. The insured institutions may pass on part of the cost—for example, through lower interest rates to depositors. In general, it may be concluded that, for the most part, the public ultimately bears the cost of resolving failed institutions.

[8] In rare cases, a strict least-cost requirement may result in the reimbursement or protection of uninsured depositors if the acquirer of a failed institution makes a bid high enough to compensate, or more than compensate, the deposit insurer for absorbing losses that would otherwise be bourne by the uninsured depositors.

Resolution costs generally are measurable on an estimated basis, although in some countries the necessary information may not be readily available. The chief information necessary to make least-cost calculations includes: the amount of insured deposits, estimated net recoveries on assets, off-balance-sheet assets and liabilities, claims of uninsured depositors and other creditors (including claims arising from litigation and off-balance-sheet liabilities), and any premium that may be offered by a potential acquirer of the failed bank. Essentially the same information is required to meet either of the two cost tests. Using appropriate rates to discount future cash flows to present values takes account of variations in risk and timing among different resolution and asset disposition methods.[9]

An implicit assumption in cost-test calculations is that the resolution of one failed institution will not affect the cost of subsequently resolving other institutions. This is most likely to be true in countries where occasional bank failures are regarded as a normal occurrence and the failed bank does not represent a major proportion of the banking industry. The cost test also may not adequately take into account potential nonfinancial costs such as the legal exposure of the resolution authority in certain resolution transactions.

*Large-bank failures*

Large institutions often have been resolved in ways that are not designed primarily to minimise resolution costs, as defined in this paper, because of their perceived special significance from the standpoint of maintaining financial stability or for other reasons. In such cases, the safety-net participants sometimes have protected uninsured depositors, other creditors, and even shareholders. As noted in the paper on moral hazard, some of these practices may weaken market discipline and increase moral hazard. Providing more generous protection to particular institutions also may be perceived to be unfair to shareholders of banks that are resolved by least-cost methods. As is frequently the case, a trade-off exists between the discipline provided by the least-cost objective and efforts to avoid the effects of large-institution failures.

Failures of large banks often have been treated differently than failures of small banks in a variety of economic and financial scenarios. In some countries, the statutes specify the circumstances under which the objective of avoiding the potential destabilising effects of large-bank failures may override least-cost considerations. In this regard, the report of the Study Group on Deposit Insurance stated that "deposit insurance systems are not designed to cope with systemic financial crises by themselves. The resolution of systemic crises requires broad, coordinated government action."[10]

---

[9] See the paper on claims and recoveries. Discounting future cash flows to present values is useful particularly because of differences in the timing of recoveries and expenses associated with asset disposition and because of differences in risk among asset types.

[10] Financial Stability Forum Working Group on Deposit Insurance, *A Consultative Process and Background Paper,* June 2000, page 16.

*Avoiding interruptions in banking services in particular markets or regions*

Safety-net participants may seek to avoid interruptions in the provision of banking services in particular markets or regions. Such an interruption may occur where alternative banking facilities are not readily available and if the institution is resolved through a deposit payout—generally because a merger with, or acquisition by, a healthy institution cannot be arranged. The failing institution may have little franchise or "going-concern" value, its market area may be economically unattractive to potential acquirers or merger partners, the institution may pose unusual risks that acquirers are reluctant to assume, or there may be institutional or legal barriers to potential acquirers or merger partners. Accommodating customers of such institutions through the resolution process may require more-costly resolution methods than otherwise would be undertaken.[11] Once again, the resolution authorities may be confronted by a trade-off between competing objectives and choices among these objectives may be governed by statute.

**Types of resolution transactions**

Once it is determined that an institution has failed, or is in danger of failing, and private-sector solutions have not been successful, there are basically three options for its resolution. The institution can be liquidated, sold, or assisted to prevent its failure.

The relevant terminology may differ among countries, and there are many variations of these basic resolution options. For example, an institution in one country is currently being resolved through a deposit payout in an open-bank scenario, with liquidity support provided on a secured basis from the deposit insurer. In this paper, the various resolution methods are grouped under three headings: liquidation and reimbursement of depositors' claims; purchase-and-assumption transactions (sales); and open-bank financial assistance. Existing bankruptcy/insolvency and other laws may influence heavily the choice of resolution methods. Such laws vary considerably among countries and, in some cases, may make a particular resolution method difficult to implement. Because of the special significance of banks and bank failures, countries may wish to review bankruptcy/insolvency laws from the standpoint of whether such laws facilitate the orderly exit of troubled institutions.

*Liquidation and reimbursement of depositors' claims (deposit payout)*

Reimbursement of depositors' claims may be accomplished by the deposit insurer directly paying depositors their insured balances or by transferring the accounts to another institution that makes the insured balances available to the depositors.[12] The institution is closed (license or charter extinguished) and the assets and uninsured claims are

---

[11] For example, open-bank assistance may be used to keep the institution operating and thereby avoid an interruption in the provision of banking services and undue inconvenience or hardship for customers of the failed institution.

[12] Another alternative that has been used in some countries is to charter a new, limited-life bank to handle the reimbursement of depositors. Deposit payouts are discussed in detail in the paper on depositor reimbursement.

transferred to a receiver for liquidation and settlement.[13] As suggested above, liquidation generally is selected as the resolution method because an acquisition of, or merger with, the failed bank is unattractive to other parties.

*Purchase-and-assumption transactions (sales)*

In a purchase-and-assumption (P&A) transaction, a healthy institution[14] assumes some or all of the obligations, and purchases some or all of the assets, of the failed institution. P&As can be structured so that the acquirer assumes all deposits, insured deposits, or is offered an opportunity to bid for both. Where discretion exists, the decision whether to protect uninsured as well as insured depositors is perhaps the most crucial decision to be made in a P&A transaction.[15]

A number of other decisions also have to be made in structuring a P&A. First, the eligibility of various potential acquirers must be determined, as is the case in any other acquistion. Clearly, acquirers must be healthy institutions or a group of investors with sufficient resources to acquire and operate the failed institution and qualified management. In addition, whether and to what extent foreign institutions are eligible, are important questions in some countries, and may involve issues of control, competition with domestic lenders, as well as funding considerations.

Second, decisions have to be made regarding the assets to be offered to the acquirer. Typically, these include performing loans and other good-quality investments. Whether nonperforming and other risky investments are included depends frequently on the capability of the acquirer and whether loss-sharing or other financial inducements are offered, as discussed below. Assets not sold to the acquirer at resolution are usually passed on to the receiver for liquidation.

Variants of a purchase-and-assumption transaction include the "bridge bank" or other interim arrangement, which have been used primarily for failures of large and complex institutions. In a bridge bank or similar interim transaction, the responsible safety-net participant takes ownership or control of the failed institution and operates it for a period of time. Control may be exercised directly through outright ownership of the failed

---

[13] The receiver may be a separate public or private entity or may be the deposit insurer in some countries. See the paper on powers.

[14] Rather than an operating institution, the acquirer may be a group of investors with a bank license or charter.

[15] The bid offered in a P&A represents the difference between the obligations assumed by the acquirer and the value of the assets purchased and the amount of cash provided by the deposit insurer. Because the difference between the obligations and the value of the assets may be considerable, the deposit insurer must offer cash or a loan to fill the "hole." The winning bidder is the one willing to accept the least amount of cash or loans from the deposit insurer. In general, the same procedure applies in insured-deposit transactions as well as total-deposit P&As, with the obvious difference that the amounts of obligations assumed by the acquirer are different. If a strict least-cost test, as defined in the text, applies, and bidders may bid for both insured and total deposits, the bid for total deposits will win only if it is sufficient to cover the loss that would otherwise be bourne by the uninsured depositors and also exceeds bids for only insured deposits.

institution by the resolution authority, or indirectly through a separate body or organisation.[16]

The chief objectives of a bridge or similar interim arrangement are to prevent further deterioration of the institution, give the safety-net participants more time to seek a permanent resolution, and provide potential acquirers a greater opportunity to review the loan portfolio and other operations of the institution. As a result, acquirers may offer higher bids, leading to lower resolution costs, than if the institution were resolved immediately after failure. A bridge bank may be used for transactions that fully protect only insured depositors or in transactions that provide various degrees of protection to other depositors and creditors.

Provisions for maintaining the liquidity of the institution during the bridge-bank period may be necessary. If the institution remains too long under official control it may lose value as customers seek alternative providers of banking services and important operations wind down. In some cases, the authorities may be tempted to put the resolution process "on hold" once they have control of the institution. The vehicle potentially could be used to postpone a permanent solution unduly, with the likely results that the value of the institution might deteriorate further and the cost of a permanent solution might increase. As a result, some countries have limited the length of time that a bridge bank may remain in operation.

*Open-bank assistance*

Assistance may be provided to an operating institution that is in danger of failing. This assistance may take the form of a direct capital infusion, purchase of troubled assets, loans to the institution, or loss-sharing arrangements. The deposit insurer or other authority that provides the assistance may (in some countries must) retain ownership rights in the restructured institution. Additional capital from outside investors and replacement of managers and directors may be required. Uninsured depositors and certain other creditors generally are fully protected, although shareholders may bear significant losses. Subordinated debtholders also may suffer losses, although in some countries such a result might expose the deposit insurer to significant legal exposure from dissatisfied creditors. Open-bank assistance has been provided mainly to large institutions when it was believed that closing the institution and imposing losses on uninsured depositors and other creditors would pose significant risks for financial markets and the economy.

Open-bank assistance has certain consequences deemed to be undesirable in some countries. The institution's bondholders and shareholders retain some bargaining power in dealing with the authorities, which could cause undue delay in completing the transaction. In some countries, assistance to an operating institution is regarded as a

---

[16] In some countries a bridge-bank transaction is a type of closed-bank P&A transaction, in which the responsible authority becomes the temporary owner of the institution, pending a permanent solution. In at least one country, on the other hand, the bridge bank is controlled by an independent board of directors that adheres to corporate-governance principles in order to ensure the preservation of the institution's value.


subsidy.[17]  Deposit insurers or the resolution authorities in some countries may be empowered and expected to recover any financial assistance they have provided.  In other countries, it is expected that open-bank transactions will involve a cost; the resolution authority may recover part of the assistance that it provided if it retains ownership rights and the assisted institution prospers.

In a closed-bank transaction, claims of bondholders and shareholders typically pass to the receiver.  Depending on the legal system, closed-bank transactions also may have other advantages over open-bank assistance.[18]  Finally, small institutions that may be ineligible for open-bank assistance, may believe they are treated unfairly.

**Procedures for selecting and implementing resolution methods**

The procedures for selecting and implementing resolution methods vary among different countries.  For example, the procedures that may be used effectively in a particular country are likely to depend on the number of potential acquirers, the frequency of bank failures, public attitudes toward bank failures, the stage of development of asset markets, and other matters.  This section discusses only those issues that are likely to be common among a number of countries.

*Assets offered for sale*

When a financial institution fails and is offered for sale, various decisions must be made with respect to the nature and amount of the assets offered.  These may include the failed institution's total assets, high-quality assets, or pools of similar assets.  If low-quality assets are offered for sale, consideration may be given to loss-sharing arrangements between the acquirer and the resolution authority, or to put-back provisions that allow the acquirer to return assets within specified periods at specified prices.  Branch systems may be offered in their entirety, in clusters of branches, or as individual offices.

Although the theoretical range of possibilities is wide, practical considerations may limit the choices in many countries.  Some alternatives are highly labor-intensive and may not be feasible where the deposit insurer or other responsible authority has a limited staff. Countries that have undeveloped markets for troubled assets may seek to pass such assets to the acquirer of the failed institution and may have to offer substantial inducements to compensate for the risk undertaken by the acquirer.  On the other hand, some countries have established centralised asset-liquidation agencies that purchase risky assets from

---

[17] The subsidy element is most apparent in open-bank transactions that provide some degree of protection for shareholders.  At the other extreme, least-cost resolutions fully reimburse only insured depositors. Uninsured depositors and other stakeholders are reimbursed only to the extent of net-asset recoveries applied according to the priority ranking established by statute.  (See the paper on depositor priority.)

[18] Depending on the legal situation in different countries, open-bank transactions may have certain other disadvantages compared with a closed-bank transaction.  In the open-bank case, certain contingent liabilities may be retained by the assisted institution and become potentially payable in cash; in a closed-bank transaction such liabilities would pass to the receiver and be payable as a nondeposit creditor claim. Furthermore, in some countries, certain burdensome leases and contracts may be abrogated without penalty in a closed-bank transaction.

failing and other institutions for subsequent disposition. Countries with a small number of insured institutions and infrequent failures may not have first-hand experience in choosing among complex alternatives.

*Competitive bidding versus negotiated sales*

Selections among alternative resolution methods and, if the failed institution is sold, among potential acquirers may be made through a competitive auction process or by private negotiation with the acquirers. Competitive bidding has the advantage of greater transparency and higher prices in some cases, but may not be necessary or useful if there is only a small number of potential acquirers. In such countries, direct negotiations between the responsible safety-net participant and the few eligible acquirers may produce the best results.

*Providing information to potential acquires*

In principle, the greater the information available to potential acquirers, the less expensive the resolution is likely to be to the deposit insurer. Absence of relevant information may induce potential acquirers to offer very low bids in order to protect themselves against risks that they are unable to evaluate properly. Although maximum availability of information may be advantageous to the deposit insurer, there may be a conflict with bank-secrecy laws that protect the confidentiality of information before the actual closing of the institution. In some countries, potential acquirers must enter into confidentiality agreements in order to have access to such information.

*Marketing failed institutions*

A failed institution may be marketed publicly or privately. Widespread marketing makes the process more transparent and may increase the number of bidders. However, in countries with only a limited number of eligible domestic acquirers and/or restrictions on entry by foreign banks, public marketing may not serve a useful purpose. Moreover, if the public is not prepared for bank failures, widespread marketing may have unfavourable public reactions. Marketing an institution before failure may also cause liquidity problems. Once again, country-specific circumstances are likely to shape marketing efforts.

**Staffing considerations**

When financial-institution failures occur in waves, the deposit insurer and other safety-net participants face staffing challenges. Government work rules may preclude the hiring of temporary employees to handle peak workloads. In such situations, outside contractors may be engaged. Alternatively, another financial institution may assume the deposit-payout and asset-liquidation functions for a particular failure for a fixed period on a fee basis. If outside contractors or agents are used extensively, provisions should be made for their oversight to ensure that the activities of the contractor or agent are closely

aligned with the objectives of the deposit insurer and conflict-of-interest rules are in place and enforced.

**Conclusions**

The timely and effective resolution of failed institutions is an important element in financial safety-net arrangements. Different strategies for resolving failures may have considerably different cost implications to the deposit insurer and different implications for other safety-net participants, the government, public, banking industry, and economy. Cooperation among the various safety-net participants, both before and after failure, is necessary if timely and effective resolutions of failed banks, particularly large banks, are to be accomplished.

In some situations private-sector solutions may be used to accomplish mergers and acquisitions of troubled institutions, although often with the involvement of the responsible safety-net participant. If such solutions are not feasible or successful, resolution of the institution is necessary, generally at a cost to the deposit insurer. Resolution strategies are guided by a number of objectives: minimise costs, address large-bank failures, and avoid interruptions of financial services. Which objective is primary in particular situations is governed by statute in some countries.

Three main resolution options are available: the troubled institution may be liquidated, sold, or assisted to prevent its failure. Numerous variations of these main options are used in different countries. Procedures for resolving troubled banks and staffing requirements also are likely to differ in various countries, depending on the frequency of failures, the number of qualified acquirers, the availability of developed markets for assets, public attitudes toward bank failures, and other factors.