# EXHIBIT 6



**United States Government Accountability Office**

Report to the Committee on Financial Services, House of Representatives

**April 2023**

# BANK REGULATION

# Preliminary Review of Agency Actions Related to March 2023 Bank Failures



**April 2023**

# BANK REGULATION

## Preliminary Review of Agency Actions Related to March 2023 Bank Failures

Highlights of GAO-23-106736, a report to the Committee on Financial Services, House of Representatives

## Why GAO Did This Study

Silicon Valley Bank and Signature Bank failed during March 10–12, 2023. At the time of closure, they were among the 30 largest U.S. banks. The failures raised questions about bank management, federal supervision, and the events leading to regulators' decisions to use emergency authorities.

This report examines (1) bank-specific factors that contributed to the failures, (2) supervisory actions regulators took leading up to the failures, (3) the basis for the systemic risk determinations Treasury made, and (4) factors the Federal Reserve and Treasury considered to establish and provide credit protection for the Bank Term Funding Program and the use of the program to date.

GAO reviewed relevant laws and regulations, agency testimonies, and prior GAO reports. GAO also analyzed regulatory financial data from 2018–2022 for the two failed banks and a peer group of banks. GAO reviewed agency documents (including examination records, communications, and analyses on the systemic risk exception and the Bank Term Funding Program). GAO also interviewed Treasury, FDIC, Federal Reserve, and Federal Reserve Bank of San Francisco staff. GAO conducted this audit from March to April 2023. GAO will further explore these issues in upcoming work and may report additional findings and relevant information.

View GAO-23-106736. For more information, contact Michael E. Clements at (202) 512-8678 or clementsm@gao.gov.

## What GAO Found

Risky business strategies along with weak liquidity and risk management contributed to the recent failures of Silicon Valley Bank and Signature Bank. In both banks, rapid growth was an indicator of risk. In 2019–2021, the total assets of Silicon Valley Bank and Signature Bank grew by 198 percent and 134 percent respectively—far exceeding growth for a group of 19 peer banks (33 percent growth in median total assets). To support their rapid growth, the two banks relied on uninsured deposits, which can be an unstable source of funding because customers with uninsured deposits may be more likely to withdraw their funds during times of stress. Additionally, Silicon Valley Bank was affected by rising interest rates and Signature Bank had exposure to the digital assets industry. The banks failed to adequately manage the risks from their deposits.

In the 5 years prior to 2023, regulators identified concerns with Silicon Valley Bank and Signature Bank, but both banks were slow to mitigate the problems the regulators identified and regulators did not escalate supervisory actions in time to prevent the failures.

- The Federal Reserve Bank of San Francisco rated Silicon Valley Bank as satisfactory up until the bank received its first large bank rating in 2022. The Reserve Bank downgraded Silicon Valley Bank in June 2022 and began working on an enforcement action in August 2022. However, it did not finalize the action before the bank failed.
- The Federal Deposit Insurance Corporation (FDIC) took multiple actions to address supervisory concerns related to Signature Bank's liquidity and management, but did not substantially downgrade the bank until the day before it failed.

GAO has longstanding concerns with escalation of supervisory concerns, having recommended in 2011 that regulators consider adding noncapital triggers to their framework for prompt corrective action (to help give more advanced warning of deteriorating conditions). The regulators considered noncapital triggers, but have not added them to the framework, thus missing a potential opportunity to take early action to address deteriorating conditions at banks.

On March 12, 2023, the Secretary of the Treasury approved the systemic risk exception, which authorized FDIC to guarantee insured and uninsured deposits of the two banks. FDIC and the Federal Reserve Board assessed that not guaranteeing the uninsured deposits likely would have resulted in more bank runs and negatively affected the broader economy. The Secretary of the Treasury concurred with this assessment and made the determinations.

After determining that additional banks might need support and to minimize financial contagion, the Federal Reserve created the Bank Term Funding Program on March 12, 2023. The program provides eligible banks with additional liquidity by allowing the 12 Reserve Banks to provide loans of up to 1 year. Federal Reserve staff documented how the program met the requirements for an emergency lending facility under section 13(3) of the Federal Reserve Act, and Treasury approved the program. As of April 19, 2023, outstanding advances under the program were approximately $74 billion.

_____ **United States Government Accountability Office**

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| | Background | 4 |
| | Risky Business Strategies along with Weak Liquidity and Risk Management Contributed to the Recent Bank Failures | 11 |
| | Regulators Did Not Escalate Supervisory Actions in Time to Mitigate Key Risks Associated with the Bank Failures | 17 |
| | Treasury and Regulators Identified the Risk of Contagion to Support the Systemic Risk Exception Determinations | 28 |
| | Federal Reserve Considered Economic and Statutory Factors in Establishing the Bank Term Funding Program | 32 |
| | Agency Comments | 35 |
| Appendix I | Status of Resolution Plans for Silicon Valley Bank and Signature Bank | 36 |
| Appendix II | Timeline of Key FDIC Actions Associated with Silicon Valley Bank and Signature Bank Receivership | 38 |
| Appendix III | Timeline of Key Actions to Invoke Systemic Risk Exception for Silicon Valley Bank and Signature Bank | 39 |
| Appendix IV | GAO Contact and Staff Acknowledgments | 40 |

Tables

| | | |
|---|---|---|
| | Table 1: Types of Supervisory Concerns Issued by Federal Banking Regulators | 6 |
| | Table 2: Uniform Financial Institutions Rating System (CAMELS) Ratings for Silicon Valley Bank, 2018–2023 | 17 |
| | Table 3: Federal Reserve Supervisory Findings Issued to Silicon Valley Bank, 2018–2023 | 18 |
| | Table 4: Large Financial Institution Ratings for Silicon Valley Bank Financial Group, 2022–2023 | 21 |
| | Table 5: Uniform Financial Institutions Rating System (CAMELS) Ratings for Signature Bank, 2018–2023 | 23 |

Table 6: FDIC Supervisory Actions Issued to Signature Bank, 2018–2023    25

Table 7: Key Actions Associated with Invoking Systemic Risk Exception for Silicon Valley Bank and Signature Bank, March 9–13, 2023    28

Table 8: Key Actions Associated with FDIC Receivership of Silicon Valley Bank and Signature Bank, March 9–13, 2023    38

Table 9: Key Actions Associated with Invoking Systemic Risk Exception for Silicon Valley Bank and Signature Bank, March 9–13, 2023    39

Figures

Figure 1: Overview of Steps Regulators May Take to Invoke Systemic Risk Exception    8

Figure 2: Total Assets of Silicon Valley Bank and Signature Bank and Median Total Assets for Peers, 2018–2022    12

Figure 3: Uninsured Deposits to Total Assets for Silicon Valley Bank and Signature Bank and Median Uninsured Deposits to Total Assets for Peers, 2018–2022    14

## Abbreviations

| | |
|---|---|
| BTFP | Bank Term Funding Program |
| CAMELS | capital adequacy, asset quality, management, earnings, liquidity, and sensitivity to market risk |
| FDI Act | Federal Deposit Insurance Act |
| FDIC | Federal Deposit Insurance Corporation |
| FDICIA | Federal Deposit Insurance Corporation Improvement Act of 1991 |
| FRBSF | Federal Reserve Bank of San Francisco |
| Federal Reserve | Board of Governors of the Federal Reserve System |
| IDI | insured depository institution |
| MRA | matters requiring attention |
| MRIA | matters requiring immediate attention |
| PCA | prompt corrective action |
| SVB | Silicon Valley Bank |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC 20548**

April 28, 2023

The Honorable Patrick McHenry
Chairman
The Honorable Maxine Waters
Ranking Member
Committee on Financial Services
House of Representatives

Between March 10 and March 12, 2023, state banking supervisors closed Silicon Valley Bank (SVB) and Signature Bank and named the Federal Deposit Insurance Corporation (FDIC) as receiver for both banks. At the time of closure, SVB was the 16th largest U.S. bank and Signature Bank the 29th largest. Both banks had significantly large proportions of uninsured deposits.

On March 12th, the Secretary of the Treasury—based on unanimous recommendations of the FDIC Board of Directors and the Board of Governors of the Federal Reserve System (Federal Reserve),[1] and in consultation with the President—invoked the systemic risk exception to the least-cost resolution provision of the Federal Deposit Insurance Act (FDI Act).[2] This decision allowed FDIC to guarantee deposits in excess of the standard maximum deposit insurance amount of $250,000 at the two failed banks. As of March 28, 2023, FDIC estimated the cost to the Deposit Insurance Fund of resolving SVB to be $20 billion and for

---

[1]The Federal Reserve System consists of the Board of Governors of the Federal Reserve System and is divided into 12 Federal Reserve Districts, with each district served by a regional Reserve Bank. In various places in this report, we specify Federal Reserve Board staff, Federal Reserve Bank of San Francisco staff, or the Federal Reserve System to clarify the relevant parties involved in a given action or statement.

[2]12 U.S.C. § 1823(c)(4)(G).

Signature Bank to be $2.5 billion.[3] Also on March 12th, the Federal Reserve created the Bank Term Funding Program (BTFP), backstopped by Treasury, to provide liquidity to eligible depository institutions.

The failure of these two banks has raised questions from the public and members of Congress about bank management and the supervision of the banks. It has also raised questions about the events from March 10th through March 12th that led to regulators' use of the systemic risk exception and the Federal Reserve's establishment of the credit facility under section 13(3) of the Federal Reserve Act.[4]

You asked us to review the events surrounding the bank failures and provide an interim report of our findings by April 28, 2023. This report examines (1) bank-specific factors that may have contributed to the failures of Silicon Valley Bank and Signature Bank; (2) supervisory actions regulators took leading up to the bank failures; (3) immediate events before the two systemic risk determinations on March 12, 2023, including steps Treasury, FDIC, and the Federal Reserve took to invoke the systemic risk exception, and the basis for each determination; and (4) factors the Federal Reserve and Treasury considered to establish and backstop BTFP, respectively, and the use of the program as of April 19, 2023.

Separately, the FDI Act requires GAO to review and report to Congress on each systemic risk determination made by the Secretary of the Treasury.[5] Also, under the authority provided to GAO in the Dodd-Frank Wall Street Reform and Consumer Protection Act, GAO can study credit facilities authorized by the Board of Governors under section 13(3) of the Federal Reserve Act to assist Congress with its oversight

---

[3]The Deposit Insurance Fund is funded by assessments levied on insured banks and savings associations and is used to cover all deposit accounts (such as checking and savings) at insured institutions, up to the insurance limit. According to FDIC, approximately $19.2 billion of the estimated total cost of $22.5 billion for the resolutions is attributable to the cost of covering uninsured deposits pursuant to the two systemic risk determinations. By statute, FDIC must recover such losses through special assessments and plans to do so through notice-and-comment rulemaking that the FDIC Board will consider in May 2023. As a result, the $19.2 billion in losses incurred to cover uninsured deposits will not directly affect the Deposit Insurance Fund balance. FDIC noted that these loss estimates are subject to significant uncertainty and are likely to change.

[4]12 U.S.C. § 343(3).

[5]12 U.S.C. 1823(c)(4)(G).

responsibilities.[6] We plan to further examine these and other issues related to the two bank failures in upcoming GAO studies.

For the first objective, we analyzed regulatory financial data from 2018–2022 for the two failed banks and assessed their condition relative to a peer group of banks. We analyzed the most recently available financial and regulatory annual data from S&P Capital IQ Pro, which provides comprehensive data on financial institutions. For example, we compared indicators of financial health, such as uninsured deposits to total assets, for the failed banks to those of the peer group of banks. We relied on our prior data reliability assessments and verified that the data collection process had not changed by reviewing documentation and information provided by S&P Capital IQ Pro. We determined that the financial information we used was sufficiently reliable for assessing the institutions' financial condition.

For the first and second objectives, we reviewed Federal Reserve and FDIC examination manuals, Federal Reserve Bank of San Francisco (FRBSF) and FDIC examination records, and bank management responses to supervisory concerns related to the two failed banks for the period from January 2018 through March 2023. We requested and received the Federal Reserve's and FDIC's examination schedules; scope, conclusion, and summary memorandums; supervisory letters and reports of examination; management responses; and documentation of any informal enforcement actions for SVB and Signature Bank.

Given our expedited time frames for reporting, we focused our review on supervisory activities related to the banks' liquidity and risk management because these were the key factors the regulators and our own preliminary analyses identified as contributors to the banks' failures. We did not review examination materials related to several other areas the regulators examined, such as information technology, the Bank Secrecy Act, consumer compliance, or the Community Reinvestment Act. For this review, we did not request the regulators' detailed workpapers or assess the regulators' adherence to their examination policies and procedures. In addition, we did not include the actions of state regulators in the scope of the report. Our findings about SVB's and Signature Bank's failures are preliminary and may not capture all contributing factors. We plan to

---

[6]31 U.S.C. § 714(f).

further examine FRBSF and FDIC supervisory decision-making and other related issues in an upcoming GAO review.

For the third objective, we reviewed FDIC's and the Federal Reserve's recommendations and supporting analyses and the subsequent determinations by the Secretary of the Treasury to invoke the systemic risk exception for the two bank failures. We did not evaluate FDIC's, the Federal Reserve's, or Treasury's analyses and conclusions.

For the fourth objective, we reviewed the Federal Reserve's and Treasury's summary memorandums and analyses related to the establishment and backstop of BTFP. We also reviewed Federal Reserve statistics on the program's use as of April 19, 2023. We did not evaluate the Federal Reserve's or Treasury's analyses and conclusions.

For all the objectives, we reviewed relevant laws, such as the FDI Act and the Federal Reserve Act; regulations on emergency lending authority and resolution plans; and agency testimonies. We interviewed staff from FDIC, the Federal Reserve, FRBSF, and Treasury. We also reviewed relevant prior GAO reports.

We conducted this performance audit from March 21, 2023 to April 28, 2023 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

## Bank Regulators

Each insured bank in the United States is primarily supervised by one of three federal banking regulators. The Federal Reserve and FDIC are two of them.[7]

- The Federal Reserve supervises state-chartered banks that are members of the Federal Reserve System, bank holding companies

[7]The Office of the Comptroller of the Currency is the other federal banking regulator. For more information on federal banking supervision, see GAO, *Bank Supervision: Regulators Improved Supervision of Management Activities but Additional Steps Needed,* GAO-19-352 (Washington, D.C.: May 14, 2019).

and any nondepository institution subsidiaries of a bank holding company, and savings and loan holding companies and any subsidiaries (other than depository institutions) of a savings and loan holding company, Edge Act and agreement corporations, and the U.S. operations of foreign banks.

- FDIC supervises insured state-chartered banks that are not members of the Federal Reserve System, state-chartered savings associations, and insured state-chartered branches of foreign banks.

In addition, state-level bank regulatory agencies supervise banks chartered at the state level.

## Bank Supervision

The purpose of federal banking supervision is to help ensure that banks operate in a safe and sound manner and comply with federal laws and regulations for the provision of banking services. Federal banking supervision also looks beyond the safety and soundness of individual banks to promote the stability of the financial system as a whole.

Bank regulators promulgate rules to implement banking laws, supervise banks to ensure their safety and soundness and compliance with those rules, and issue formal and informal enforcement actions to those that do not comply. Banking regulators supervise most banks through off-site monitoring and on-site examinations. Regulators use off-site systems to monitor the financial condition of an individual bank and the banking system as a whole between on-site examinations.[8] To oversee large, complex banks, including bank holding companies, bank examiners conduct ongoing examination activities that target specific functional areas or business lines at the institutions based on their examination strategy, the institution's risk profile, and the extent of supervisory concern during the supervisory cycle. Regulators discuss such activities with bank management throughout the year and incorporate them into the final full-scope examination report issued at the end of the supervisory cycle.

Bank examiners review and evaluate an institution's condition using the Uniform Financial Institutions Rating System, also known as CAMELS (capital adequacy, asset quality, management, earnings, liquidity, and

---

[8]Regulators generally are required to conduct a full-scope, on-site examination of each bank they supervise at least once during each 12-month period, although the examination cycle may be extended to 18 months for certain smaller, well-managed banks under certain conditions.

sensitivity to market risk).[9] At the end of the supervisory cycle, a report of examination is issued to the institution that may include supervisory concerns, which a bank is expected to address within specific time frames.

Regulators employ progressive enforcement regimes to address supervisory concerns (see table 1). If the bank does not respond to the concern in a timely manner, the regulators may take informal or formal enforcement action, depending on the severity of the circumstances. Informal enforcement actions include obtaining a bank's commitment to implement corrective measures under a memorandum of understanding. Formal enforcement actions include issuance of a cease-and-desist order or assessment of a monetary penalty.

**Table 1: Types of Supervisory Concerns Issued by Federal Banking Regulators**

| Supervisory concern level | Federal Deposit Insurance Corporation | Board of Governors of the Federal Reserve System |
| --- | --- | --- |
| Concern resolved in normal course | Supervisory recommendation | Matter requiring attention |
| Serious concern that demands immediate board attention | Supervisory recommendation, listed as matter requiring board attention | Matter requiring immediate attention |
| Lack of adequate institution response to serious concern that demands immediate response or certain legal standard(s) triggered | Informal or formal action | Informal or formal action |

Source: GAO. | GAO-23-106736

## Systemic Risk Exception

Congress enacted the Federal Deposit Insurance Corporation Improvement Act of 1991 (FDICIA) in response to the savings and loan

---

[9]In an examination, a depository institution is rated on each CAMELS component and then given a composite rating, which generally bears a close relationship to the component ratings. However, the composite is not an average of the component ratings. The component and the composite ratings are scored on a scale of 1 (best) to 5 (worst). Regulatory actions typically correspond to the composite rating, with regulatory actions generally increasing in severity as ratings become worse.

and commercial bank crisis.[10] FDICIA amended the FDI Act by establishing a rule requiring FDIC to follow the least costly approach when resolving an insured depository institution.[11] Under the rule, FDIC generally must resolve a troubled insured depository institution using the method expected to have the least cost to the Deposit Insurance Fund. In addition, FDIC generally cannot use the fund to protect uninsured depositors and creditors who are not insured depositors if such protection would increase losses to the fund.

To make a least-cost determination, FDIC must (1) consider and evaluate all possible resolution alternatives by computing and comparing their costs on a present-value basis, and (2) select the least costly alternative on the basis of the evaluation.

FDIC generally has resolved failed or failing banks using three methods: (1) directly paying depositors the insured amount of their deposits and disposing of the failed bank's assets (deposit payoff and asset liquidation); (2) selling only the bank's insured deposits and certain other liabilities, and some of its assets, to an acquirer (insured deposit transfer); and (3) selling some or all of the failed bank's deposits, certain other liabilities, and some or all of its assets to an acquirer (purchase and assumption). According to FDIC officials, they have most commonly used purchase and assumption, because it is often the least costly and disruptive alternative.

FDICIA also amended the FDI Act to create an exception to the least-cost resolution requirement, and in 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act narrowed that exception. Under what is known as the systemic risk exception, FDIC may act to wind up an insured depository institution for which it has been appointed receiver without complying with the least-cost rule if compliance would have "serious adverse effects on economic conditions or financial stability"— that is, would cause systemic risk—and if such action would "avoid or mitigate such adverse effects." For instance, FDIC could provide debt or deposit guarantees that protect uninsured depositors and creditors, who

---

[10]Between 1980 and 1990, a record 1,020 thrifts failed at an estimated cost of about $100 billion to the Federal Savings and Loan Insurance Corporation that insured thrift deposits, leading to its demise. During this same period, commercial banks also failed at record rates—a total of 1,315 federally insured banks were closed or received financial assistance from FDIC. In response, two laws were enacted—FDICIA and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989.

[11]12 U.S.C. § 1823(c)(4).

otherwise might suffer losses under a least-cost method. FDIC may act under the exception only under the process specified in the statute (see fig. 1).

**Figure 1: Overview of Steps Regulators May Take to Invoke Systemic Risk Exception**



Legend:
FDIC = Federal Deposit Insurance Corporation
FDI Act = Federal Deposit Insurance Act
Federal Reserve Board = Board of Governors of the Federal Reserve System

Source: GAO. | GAO-23-106736

The systemic risk exception requires FDIC to recover any resulting losses to the Deposit Insurance Fund by levying one or more emergency special assessments on insured depository institutions, depository institution holding companies, or both, as FDIC determines appropriate.[12]

Finally, the systemic risk exception includes requirements that serve to ensure accountability for regulators' use of this provision. The Secretary of the Treasury must notify Congress in writing of any systemic risk exception determination and must document each determination and

---

[12]To levy a special assessment on depository institution holding companies, FDIC must have the concurrence of the Secretary of the Treasury. 12 U.S.C. § 1823(c)(4)(G)(ii)(I).

|  | retain the documentation for GAO review. GAO must report its findings to Congress. |
|---|---|
| **Emergency Lending Authority** | Under section 13(3) of the Federal Reserve Act, the Federal Reserve Board can authorize Reserve Banks to extend credit to a broad range of borrowers during unusual and exigent circumstances.[13] In 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act added restrictions to the Federal Reserve's section 13(3) authority.[14] The act required the Federal Reserve Board to implement any future emergency lending through facilities with broad-based eligibility designed for the purpose of providing liquidity to the financial system and not to aid a failing financial company, and required the approval of the Secretary of the Treasury prior to establishing a facility. Additionally, the act required the Federal Reserve Board to promulgate a rule governing the use of section 13(3) emergency lending authority—which it did on December 18, 2015, by amending Regulation A.[15] |

## March 2023 Failed Banks

|  |  |
|---|---|
| Silicon Valley Bank | SVB was a state-chartered commercial bank and a member of the Federal Reserve System that was founded in 1983 and headquartered in Santa Clara, California. It was the main bank subsidiary of the SVB Financial Group (SVB's holding company).[16] The bank primarily served entrepreneur clients in technology, healthcare, and private equity. The bank's deposits were mostly linked to businesses financed through venture capital. The bank expanded into banking and financing for venture capital, and added products and services to maintain clients as they matured from their startup phase. SVB had assets of about $209 billion and about $175 billion in total deposits at year-end 2022. |

[13]Federal Reserve Banks typically lend to banks through discount window programs based on established statutory criteria. 12 U.S.C. § 347b(a). The discount window allows eligible institutions to borrow money, usually on a short-term basis, at an above-market rate to meet temporary liquidity shortages. During the 2007–2009 financial crisis, the Federal Reserve Board invoked its section 13(3) authority to create emergency programs to stabilize financial markets and avert the failures of a few individual institutions.

[14]Pub. L. No. 111-203, § 1101, 121 Stat. 1376, 2113 (2010).

[15]Extensions of Credit by Federal Reserve Banks, 80 Fed. Reg. 78959, amending 12 C.F.R. Part 201 (Regulation A). Regulation A governs extensions of credit by Federal Reserve Banks.

[16]The company provided commercial and retail banking services and other financial services in the United States and internationally.

The California Department of Financial Protection and Innovation served as SVB's state regulator. The Federal Reserve was the primary federal regulator for the bank and SVB Financial Group. SVB Financial Group also had a UK subsidiary subject to UK laws and regulations and a few other foreign branches, subsidiaries, and affiliates in other countries subject to the laws of those countries.

On March 10, 2023, the California Department of Financial Protection and Innovation closed SVB citing inadequate liquidity and insolvency, and FDIC was simultaneously appointed receiver of the bank. In its role as receiver, FDIC initially transferred all insured deposits to Deposit Insurance National Bank of Santa Clara and later transferred all deposits and a significant balance of the assets to a bridge bank, Silicon Valley Bridge Bank N.A.[17]

Signature Bank

Signature Bank was a state-chartered nonmember commercial bank founded in 2001 and headquartered in New York, New York. The bank offered commercial deposit and loan products, and until 2018, focused primarily on multifamily and other commercial real estate banking products and services. In 2018 and 2019, the bank launched services to the private equity industry, such as lending to venture capital companies. Signature Bank also conducted a significant amount of business with the digital assets industry. The bank had total assets of about $110 billion and about $89 billion in total deposits at year-end 2022.

As a state-chartered commercial bank, the New York State Department of Financial Services regulated Signature Bank. FDIC was the primary federal regulator.

On March 12, 2023, the New York State Department of Financial Services closed Signature Bank and appointed FDIC as receiver. In its role as receiver, FDIC transferred all deposits and a significant balance of the assets to a bridge bank, Signature Bridge Bank, N.A.

---

[17]Under the FDI Act, FDIC may create a deposit insurance national bank to ensure that customers have continued access to their insured funds.

# Risky Business Strategies along with Weak Liquidity and Risk Management Contributed to the Recent Bank Failures

## Failed Banks Grew Rapidly and Relied on Less Stable Funding

**Rapid growth.** From December 2018 to December 2022, SVB's total assets more than tripled from $56 billion to $209 billion, and Signature Bank's total assets more than doubled from $47 billion to $110 billion (see fig. 2).[18] From 2019 through 2021, SVB and Signature Bank grew faster than a group of peer banks.[19] The total assets of SVB and Signature Bank grew by 198 percent and 134 percent, respectively. In contrast, the median total assets for the group of peer banks increased by 33 percent in the same period.

---

[18]Throughout this report, we rounded dollars to the nearest billion and percentages to the nearest percentage point.

[19]Our analysis compared SVB and Signature Bank to a group of 19 banking institutions with reported deposit balances and that each had total assets between $100 and $250 billion at year-end 2022.

**Figure 2: Total Assets of Silicon Valley Bank and Signature Bank and Median Total Assets for Peers, 2018–2022**



Source: GAO analysis of S&P Capital IQ Pro data.  |  GAO-23-106736

Note: Our analysis compared Silicon Valley Bank and Signature Bank to a group of 19 banking institutions with reported deposit balances that each had total assets between $100 and $250 billion at year-end 2022.

Rapid growth can be an indicator of risk in a bank's business. Regulators are concerned with whether a bank's risk-management practices can maintain pace with rapid growth. According to FRBSF and FDIC examination documents we reviewed, regulators identified issues related to SVB and Signature Bank's rapid growth and risk-management practices.[20] In prior work, we identified aggressive growth strategies using nontraditional, riskier funding as a factor in bank failures.[21]

**Less stable funding.** SVB and Signature Bank reported increasing levels of uninsured deposits, which can be an unstable source of funding for

---

[20]FRBSF identified such issues at SVB in its 2020 examination. FDIC identified such issues at Signature Bank in its 2019 examination.

[21]See GAO, *Financial Institutions: Causes and Consequences of Recent Bank Failures,* GAO-13-71 (Washington, D.C.: Jan. 3, 2013).

banks. SVB and Signature Bank relied on uninsured deposits to support their rapid growth. At the end of 2021, SVB and Signature Bank reported uninsured deposits to total assets at 80 percent and 82 percent, respectively. Uninsured deposits can be unstable because customers with uninsured deposits may be more likely to withdraw their funds during times of stress. In 2019, an FDIC official said in a speech that elevated levels of uninsured deposits could pose risks to regional banks.[22]

Moreover, since 2018, SVB and Signature Bank reported a significantly higher percentage of uninsured deposits to total assets than the median for a group of peer banks (see fig. 3). The two banks' higher reliance on uninsured deposits may indicate a long-standing concentration of risk. In 2018–2022, SVB's uninsured deposits to total assets ranged from 70 to 80 percent, and Signature Bank's uninsured deposits to total assets ranged from 63 to 82 percent. In contrast, during the same time period, the median uninsured deposits to total assets for a group of peer banks ranged from 31 to 41 percent—approximately half that of SVB and Signature Bank.

---

[22]Martin J. Gruenberg, Member, Board of Directors of the Federal Deposit Insurance Corporation, "An Underappreciated Risk: The Resolution of Large Regional Banks in the United States," remarks to The Brookings Institution Center on Regulation and Markets (Washington, D.C.: Oct. 16, 2019).



**Figure 3: Uninsured Deposits to Total Assets for Silicon Valley Bank and Signature Bank and Median Uninsured Deposits to Total Assets for Peers, 2018–2022**

Source: GAO analysis of S&P Capital IQ Pro data.  |  GAO-23-106736

Note: Our analysis compared Silicon Valley Bank and Signature Bank to a group of 19 banking institutions with reported deposit balances that each had total assets between $100 and $250 billion at year-end 2022.

## Weak Liquidity and Risk Management Contributed to Bank Failures

### Liquidity and Risk Management at SVB

According to Federal Reserve Board and FRBSF staff and their examination documents, SVB failed due to ineffective risk management, including the management of its deposits and assets. FRBSF documents stated that SVB's risk-management framework was not commensurate with the bank's size and complexity. SVB's business strategy focused on serving the growing technology and venture capital sector. According to FRBSF staff, these depositors held large cash balances for payroll and operating expenses. FRBSF staff said the business strategy resulted in increasing uninsured deposits from that sector and created a concentrated client base. Federal Reserve officials said SVB did not

manage the risk from its liabilities, noting that the deposits were highly concentrated and could be volatile.

Our review of FRBSF examination documents for SVB found that FRBSF identified issues related to the concentration of SVB's deposits and funding structure as early as 2018. In particular, FRBSF documents note the potential volatility of SVB's deposits could pose liquidity risks. Additionally, in 2021, FRBSF identified key deficiencies in liquidity risk management for SVB, including modeling of its deposit outflows during stress and testing of its contingent funding plan.

SVB also was affected by rising interest rates. The bank had invested in longer-term securities to generate yield against its deposits.[23] As interest rates rose, SVB's interest rate risk increased and the bank accumulated unrealized losses on its lower-yielding securities. In 2022, FDIC reported that the banking sector had an overall elevated level of unrealized losses on available-for-sale and held-to-maturity securities.[24] Unrealized losses can become actual losses if a bank needs to sell the securities to meet liquidity needs, which can occur with deposit outflows. According to FRBSF staff and the examination documents, SVB did not effectively manage the interest rate risk of the securities or develop appropriate interest rate risk-management tools, models, or metrics. In a November 2022 supervisory letter to SVB, FRBSF stated that SVB's interest rate simulations were not reliable and called into question the effectiveness of its risk-management practices. At year-end 2022, SVB reported over $15 billion in unrealized losses in its held-to-maturity securities portfolio, equivalent to 89 percent of the bank's common equity tier 1 capital.[25]

On March 8, 2023, SVB announced the sale of approximately $21 billion in securities and a resulting loss of $1.8 billion. At the same time, SVB also announced that it intended to raise about $2.25 billion in new capital.

[23]According to Federal Reserve staff, the bank invested in securities with an average duration of 4 years. Federal Reserve staff said the average duration dropped to slightly under 3 years with interest rate hedges in place at the time.

[24]Federal Deposit Insurance Corporation, *Quarterly Banking Profile, First Quarter 2022* (Washington, D.C.: May 24, 2022).

[25]Common equity tier 1 capital is considered the highest-quality capital that a banking institution can have to support its operations and absorb unexpected financial losses. Common equity tier 1 capital consists primarily of retained earnings (the profits a bank earned but has not paid out to shareholders in the form of dividends or other distributions) and qualifying common stock, with deductions for items such as goodwill and deferred tax assets.

The next day, the bank faced significant and sudden deposit withdrawal requests that totaled over $40 billion. According to FRBSF staff, the bank's concentrated and interconnected client base began to withdraw deposits quickly after speculations about the bank's distress. FRBSF staff told us that they worked with the bank to arrange collateral that would allow it to borrow from the discount window. According to FRBSF staff, on the morning of March 10th, SVB expected to have an additional $100 billion in deposit withdrawal requests for that day. FRBSF staff said the bank did not have enough collateral to borrow from the discount window to pay for its expected obligations.

## Liquidity and Risk Management at Signature Bank

Signature Bank had exposure to the digital assets industry and declining liquidity in the months prior to failure. According to FDIC officials and consistent with findings we saw in FDIC examination documents, poor governance and unsatisfactory risk-management practices were the root causes of Signature Bank's failure. Due to the weak practices, FDIC staff said Signature Bank management was unable to fully understand the bank's liquidity positions in the days and hours before failure. Our review of FDIC examination documents for Signature Bank found that FDIC had repeatedly identified weaknesses related to the bank's liquidity-management framework and contingency planning since 2018. In 2019, FDIC found planning and control weaknesses prevented the bank from adequately identifying, measuring, and controlling liquidity risk.

In the year preceding its failure, Signature Bank had declining liquidity and reduced its exposure to deposits from the digital assets industry. Signature Bank funded its deposit declines with cash and borrowings collateralized with securities and loans. In the fourth quarter of 2022, Signature Bank announced its intent to reduce its exposure to deposits from the digital asset industry. In 2022, the bank's deposits declined by $17.5 billion ($12 billion of which represented deposits related to the digital assets industry). Signature Bank's balance sheet cash holdings were reduced from $30 billion in 2021 to $6 billion in 2022.

In March 2023, FDIC officials said Signature Bank faced increased market scrutiny after a bank perceived to be similar, Silvergate Bank,

experienced distress.[26] On March 10th, Signature Bank began to experience deposit withdrawals following distress at SVB. Signature Bank did not have sufficient cash to fulfill its large number of deposit withdrawal requests. According to FDIC officials, Signature Bank was unprepared for and unable to enact contingency plans against the large deposit withdrawal requests. For example, FDIC staff told us that due to the bank's weak liquidity practices, bank management had difficulty initially determining its borrowing needs to fund pending outflows.

## Regulators Did Not Escalate Supervisory Actions in Time to Mitigate Key Risks Associated with the Bank Failures

In the years prior to 2023, FRBSF and FDIC identified liquidity and management risks at SVB and Signature Bank—key drivers of the banks' failures. However, neither regulator's actions resulted in management sufficiently mitigating the risks that contributed to the banks' failures. As we noted in a 2015 GAO report on bank failures, although regulators often identified risky practices early in previous banking crises, the regulatory process was not always effective or timely in correcting the underlying problems before the banks failed.[27]

### Federal Reserve Identified Risks and Took Supervisory Actions, but Did Not Adequately Escalate Actions Prior to SVB's Failure

FRBSF was generally positive in its ratings of SVB from December 2018 to June 2022, rating SVB's overall condition as "satisfactory" during that period. In addition, examiners assigned the highest available CAMELS rating for SVB's liquidity-management practices from December 2018 to June 2022 (see table 2). In the same period, examiners assigned the second-highest available CAMELS rating for management practices. As noted earlier in this report, deficient liquidity and management practices were factors contributing to the bank's failure.

**Table 2: Uniform Financial Institutions Rating System (CAMELS) Ratings for Silicon Valley Bank, 2018–2023**

| Rating type | 2018 | 2019 | 2020 | 2021 | 2022 | 2023[a] |
|---|---|---|---|---|---|---|
| Composite rating | 2 | 2 | 2 | 2 | 3 | N/A |
| Capital component rating | 2 | 2 | 2 | 2 | 2 | N/A |

[26]Silvergate Bank and Signature Bank focused portions of their business on the digital asset industry and its customers. Starting in the fourth quarter of 2022, Silvergate Bank experienced a bank run due to concerns surrounding its involvement with the digital assets industry. The bank faced steep declines in its deposits and was forced to sell debt securities to cover withdrawals, resulting in a loss to earnings. Silvergate Bank announced its voluntary liquidation on March 8, 2023.

[27]GAO, *Bank Regulation: Lessons Learned and a Framework for Monitoring Emerging Risks and Regulatory Response*, GAO-15-365 (Washington, D.C.: June 25, 2015).

| Rating type | 2018 | 2019 | 2020 | 2021 | 2022 | 2023[a] |
|---|---|---|---|---|---|---|
| Asset quality component rating | 2 | 2 | 2 | 2 | 2 | N/A |
| Management component rating | 2 | 2 | 2 | 2 | 3 | N/A |
| Earnings component rating | 2 | 2 | 2 | 2 | 2 | N/A |
| Liquidity component rating | 1 | 1 | 1 | 1 | 2 | N/A |
| Sensitivity to market risk component rating | 2 | 2 | 2 | 2 | 2 | N/A |

Legend: N/A = not available

Source: GAO presentation of Federal Reserve Bank of San Francisco information. | GAO-23-106736

Note: In an examination, a depository institution is rated on each CAMELS component and then given a composite rating, which generally bears a close relationship to the component ratings. However, the composite is not an average of the component ratings. The component and the composite ratings are scored on a scale of 1 (best) to 5 (worst).

[a]The Federal Reserve Bank of San Francisco had not finalized examinations to determine Silicon Valley Bank's 2023 CAMELS ratings at the time of the bank's failure in March 2023.

Despite overall satisfactory ratings for SVB, FRBSF had noted several concerns relevant to the bank's March 2023 failure. For example, FRBSF examiners made supervisory findings as early as 2018 that indicated concerns with SVB's management practices, according to our review of FRBSF supervisory documents (see table 3). In 2018, FRBSF found that despite liquidity levels appearing strong, funding sources were concentrated and potentially volatile on short notice. Examiners found in 2020 that although stress test modeling showed the bank had ample liquidity over stressed periods, the stress tests did not provide insight into liquidity risks for stressed periods of 30 days or less. FRBSF also issued or had outstanding matters requiring attention related to risk management and liquidity in 2018, 2019, and 2020.[28]

**Table 3: Federal Reserve Supervisory Findings Issued to Silicon Valley Bank, 2018–2023**

| Supervisory action | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| Matters requiring immediate attention (MRIA) | 0 | 0 | 2 | 5 | 6 | 1 |
| MRIAs related to liquidity or risk management | 0 | 0 | 0 | 2 | 3 | 0 |
| Matters requiring attention (MRA) | 10 | 14 | 7 | 14 | 9 | 0 |
| MRAs related to liquidity or risk management | 2 | 3 | 0 | 4 | 1 | 0 |

Source: GAO presentation of Federal Reserve Bank of San Francisco information. | GAO-23-106736

As of April 5, 2021, the bank's overall condition was still "satisfactory" and had the highest CAMELS rating available for its liquidity management.

[28]In 2018, FRBSF issued two matters requiring attention related to SVB's risk management. In 2020, it issued one matter requiring attention related to governance.

The bank also maintained the second-highest rating for its management practices. However, in June 2021, increases in asset levels at SVB Financial Group moved the entity from the Federal Reserve's Regional Banking Organization category into the Large and Foreign Banking Organization category. As such, SVB Financial Group was subject to oversight by the Federal Reserve's Large and Foreign Banking Organization Program and examination under the Large Financial Institution rating system.[29] A Large Financial Institution rating represents a supervisory evaluation of whether a firm possesses sufficient financial and operational strength and resilience to maintain safe-and-sound operations and comply with laws and regulations, including those related to consumer protection, through a range of conditions.[30] According to Federal Reserve staff, moving into the Large Financial Institution rating system meant that SVB had a larger dedicated examination team (with a specific team member covering liquidity) and more rigorous supervisory requirements.

As we detail below, after the Federal Reserve classified SVB as a Category IV bank and subjected it to Large Financial Institution supervision, examiners found liquidity and management deficiencies not previously identified under the Regional Banking Organization supervision program. We plan to further examine how the Category IV designation affected SVB supervision prior to its March 2023 failure and other related issues in an upcoming GAO review.

---

[29]Before 2018, all bank holding companies with more than $50 billion in assets were subject to enhanced prudential regulation to address too-big-to-fail concerns. In 2018, the Economic Growth, Regulatory Relief, and Consumer Protection Act, Pub. L. No.115-174, raised this asset threshold to $250 billion and provided the Federal Reserve with discretion to apply tailored regulation to banks with $100 billion–$250 billion in assets. In its implementing regulation, the Federal Reserve created four categories of tiered regulation for banks with more than $100 billion in assets. Silicon Valley Bank was considered a Category IV bank under the Federal Reserve's regulations, subject to the least-stringent enhanced prudential regulation requirements relative to banks considered Category I–III.

[30]The Large Financial Institution rating system consists of three components: capital planning and positions, liquidity risk management and positions, and governance and controls. Each component rating is assigned along a four-level nonnumeric scale: Broadly Meets Expectations, Conditionally Meets Expectations, Deficient-1, and Deficient-2. According to Federal Reserve staff, firms that are subject to Large and Foreign Banking Organization Program supervision have a higher degree of Federal Reserve Board staff involvement in the direct supervision of the firm.

In August 2021, FRBSF conducted a liquidity review of SVB Financial Group that raised serious concerns around how the institution was managing liquidity risk. FRBSF described the review in its scoping memorandum as a baseline assessment to inform SVB Financial Group's ratings under the Large Financial Institution rating system. In the scoping memorandum, FRBSF further noted that it had conducted limited supervisory work on liquidity and stress testing over the past two supervisory cycles. FRBSF cited an examination pause for Regional Banking Organizations during the pandemic[31] and the tailoring of enhanced prudential standards that resulted in less stringent regulation for Regional Banking Organizations.[32] FRBSF's August 2021 liquidity review found that liquidity risk-management practices were below supervisory expectations. For example, SVB's internal liquidity stress testing, liquidity limits framework, and contingency funding plan had "foundational shortcomings."[33] In response to these issues, FRBSF issued two matters requiring immediate attention and four matters requiring attention that were focused on addressing these liquidity concerns.

In addition, a May 2022 governance and risk-management target review of SVB Financial Group and SVB—conducted under the Large Financial Institution rating system—found that the bank's governance and risk-management practices were below supervisory expectations. In response to these issues, FRBSF issued three matters requiring immediate attention related to risk management.

---

[31]Beginning on March 24, 2020, the Federal Reserve temporarily ceased (for approximately 3 months) most regular examination activity for institutions with less than $100 billion in assets. See Board of Governors of the Federal Reserve System, *Supervision and Regulation Report* (Washington, D.C.: November 2020).

[32]In a prior report, we made a recommendation to the Federal Reserve related to preparations to manage future disruptions to examinations. Specifically, we recommended that the Federal Reserve's Chief Operating Officer develop and document specific action steps and time frames for completing the components of the Federal Reserve's enterprise risk-management framework related to identifying and assessing risks to its supervisory mission, such as those caused by the COVID-19 pandemic. See GAO, *Bank Supervision: Lessons Learned from Remote Supervision during Pandemic Could Inform Future Disruptions*, GAO-22-104659 (Washington, D.C.: Sept. 8, 2022).

[33]Specific examples of foundational shortcomings include that the scenario design for liquidity stress testing did not adequately address both market and idiosyncratic risks, that the liquidity limits framework was inadequate because it did not address post-stress limits or reflect the interconnectedness of liquidity risk, and that the contingency funding plan was outdated and not linked to the liquidity risk framework.

Soon after, on June 30, 2022, FRBSF downgraded SVB's CAMELS composite rating from a 2 to a 3, its management component rating from a 2 to a 3, and its liquidity component rating from a 1 to a 2. Specifically, FRBSF examiners found that the bank's management and board performance needed improvement and were less than satisfactory. For example, the board did not provide effective oversight of implementation of the risk-management framework and execution of the bank's transition into the Large Financial Institution category. The board also did not hold management accountable for the root causes contributing to weaknesses in liquidity risk management and other risks.

On August 17, 2022, FRBSF issued a supervisory letter to SVB Financial Group and SVB on its first Large Financial Institution rating, which indicated weaknesses in governance and controls and liquidity. Specifically, FRBSF rated SVB Financial Group "Deficient-1" for governance and controls, stating that the firm's risk-management program was not effective, did not incorporate coverage for all risk categories, and did not address foundational, enterprise-level risk-management matters, such as risk acceptance, issues management, and escalation protocols (see table 4). FRBSF rated SVB Financial Group's liquidity as "Conditionally Meets Expectations," stating that while actual and post-stress liquidity positions reflected a sufficient buffer, the firm lacked several foundational elements for liquidity risk management that negatively affected the sufficiency of its post-stress liquidity buffer.[34]

**Table 4: Large Financial Institution Ratings for Silicon Valley Bank Financial Group, 2022–2023**

| Rating component | 2022 | 2023[a] |
|---|---|---|
| Governance and controls | Deficient-1 | N/A |
| Liquidity | Conditionally Meets Expectations | N/A |
| Capital | Broadly Meets Expectations | N/A |

Legend: N/A = not available

Source: GAO presentation of Federal Reserve Bank of San Francisco information. | GAO-23-106736.

Note: According to a Federal Reserve Bank of San Francisco supervisory rating letter, Silicon Valley Bank received its first Large Financial Institution rating on August 17, 2022.

[34]Notable missing elements for liquidity risk management included more granular deposit segmentation to produce effective modeling of deposit outflows during stress and more comprehensive testing of its contingent funding plan to assess the feasibility of funding options under stress.

ᵃThe Federal Reserve Bank of San Francisco had not finalized examinations to determine Silicon Valley Bank's 2023 Large Financial Institution ratings at the time of the bank's failure in March 2023.

In the same August 17, 2022, supervisory letter, FRBSF stated its intent to initiate an informal, nonpublic enforcement action, in the form of a memorandum of understanding with SVB Financial Group and SVB.[35] The memorandum's provisions were focused on correcting the management and liquidity risk issues mentioned above and were designed to hold the bank's board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and risk management.

FRBSF staff told us that staff started working on the memorandum of understanding after communicating the July 2022 downgrade. In addition, Federal Reserve Bank staff started working with the Federal Reserve Board's Supervision and Regulation and Legal divisions in late August 2022 to develop the memorandum. The memorandum of understanding was subsequently kept open to allow for the completion of additional examination work by FRBSF. According to Federal Reserve staff, Federal Reserve Board and FRBSF staff collaborated on provisions of the memorandum, including those related to liquidity and risk management, which required senior-level review. However, the Federal Reserve did not finalize it before SVB failed in March 2023.

While SVB management failed to take adequate and timely steps to mitigate risks, FRBSF staff generally accepted SVB's planned actions to correct deficiencies. Our review of examination staff's acknowledgement of SVB management responses found the staff generally agreed that SVB's planned actions were reasonably designed to remediate the underlying supervisory issues. FRBSF staff also said that SVB generally was taking actions to address risks associated with the 2023 failure, but the remediation process was time-consuming considering the scope of the issues. In May 2022, FRBSF granted SVB a 7-month extension to address one of its November 2021 matters requiring immediate attention. FRBSF noted in its letter that SVB had taken prompt action on the matter regarding the bank's inability to identify limitations and make appropriate changes to its liquidity risk-management framework. However, while the bank had made material progress toward remediation, it needed additional time to finalize changes and ensure their sustainability. FRBSF

[35]According to FRBSF officials, they may start to consider enforcement action if a bank's management practices are rated a 3, meaning the bank is "not well-managed."

staff also noted that the bank was taking steps like trying to hire a new board chair and chief risk officer prior to the March 2023 failure.[36]

Although Federal Reserve staff stated that the Federal Reserve's supervisory actions compelled SVB to take steps including replacing the Board Chair, Chief Risk Officer, and Treasurer and revising its incentive compensation program to incorporate risk management as a formal assessment criteria, its supervisory actions were inadequate given the bank's known liquidity and management deficiencies. Furthermore, FRBSF's actions lacked urgency. For example, FRBSF did not recommend the issuance of a single enforcement action despite the bank's serious liquidity and management issues before the bank's failure. We plan to further examine the Federal Reserve's, including FRBSF's, decision-making process for escalating supervisory actions and other related issues in an upcoming GAO review.

## FDIC Identified Risks and Took Supervisory Actions, but Did Not Adequately Escalate Actions Prior to Signature Bank's Failure

FDIC's ratings of Signature Bank found that the bank's overall condition was "satisfactory" from December 2018 to December 2021. In addition, FDIC assigned the second-highest available CAMELS rating for the bank's management practices (see table 5). As noted earlier, weak management practices contributed to the bank's failure.

**Table 5: Uniform Financial Institutions Rating System (CAMELS) Ratings for Signature Bank, 2018–2023**

| Rating type | 2018 | 2019 | 2020 | 2021 | 2022[a] | 2023 (as of March 11, 2023) |
|---|---|---|---|---|---|---|
| Composite rating | 2 | 2 | 2 | 2 | N/A | 5 |
| Capital component rating | 2 | 2 | 2 | 2 | N/A | 3 |
| Asset quality component rating | 2 | 2 | 2 | 2 | N/A | 2 |
| Management component rating | 2 | 2 | 2 | 2 | N/A | 5 |
| Earnings component rating | 2 | 2 | 2 | 2 | N/A | 2 |
| Liquidity component rating | 2 | 3 | 3 | 3 | N/A | 5 |
| Sensitivity to market risk component rating | 2 | 2 | 2 | 2 | N/A | 2 |

Legend: N/A = not available

Source: GAO analysis of Federal Deposit Insurance Corporation information. | GAO-23-106736

Note: In an examination, a depository institution is rated on each CAMELS component and then given a composite rating, which generally bears a close relationship to the component ratings. However, the

[36]According to Federal Reserve staff, the decision to name a new board chair and replace the Chief Risk Officer was first communicated to FRBSF supervision staff in January 2022. The decision to replace the Chief Risk Officer was prompted by oversight deficiencies that FRBSF supervision staff raised with SVB's board of directors during the January 2022 board meeting.

composite is not an average of the component ratings. The component and the composite ratings are scored on a scale of 1 (best) to 5 (worst).

ªAt the time of Signature Bank's failure, the Federal Deposit Insurance Corporation had not completed its 2022 supervisory letters, which would have communicated the updated CAMELS ratings.

Despite FDIC's overall "satisfactory" assessment during 2018–2021, FDIC took numerous supervisory actions to mitigate liquidity and management deficiencies at the bank, including downgrading Signature Bank's liquidity component from 2 to 3 during the 2019 examination cycle, meaning the bank's liquidity management practices needed improvement.[37] In its examination documents, FDIC explained that Signature Bank's practices did not correspond with the bank's complexity, risk profile, and scope of operations due to weaknesses in areas including liquidity contingency planning and internal controls. These weaknesses prevented the bank from appropriately understanding the potential effects of adverse liquidity events and emergency cash flow needs.

In addition, FDIC issued matters requiring board attention and supervisory recommendations related to management, liquidity, and corporate governance risks in each year before the bank's failure (see table 6). For example, FDIC issued two matters requiring board attention in 2018 and one matter requiring board attention in 2019 related to Signature Bank management's handling of the bank's increasing liquidity and management risks. The matters focused on issues including the bank's adherence to its risk appetite statement and liquidity contingency planning.[38] In addition to the matters and supervisory recommendations FDIC issued in a given year, many matters and recommendations carried over to later years because they were unresolved. For instance, FDIC's 2019 matter to Signature Bank on liquidity contingency planning remained outstanding through the bank's failure in March 2023.

[37]As noted earlier, deficient liquidity management practices contributed to the bank's failure.

[38]For example, as loan growth outpaced deposit growth, Signature Bank's loan-to-deposit ratio continued to increase and exceeded the bank's established risk limits throughout most of 2018. In addition, several of the bank's liquidity-related financial metrics breached its established "warning" levels.

**Table 6: FDIC Supervisory Actions Issued to Signature Bank, 2018–2023**

| Supervisory action | 2018 | 2019 | 2020 | 2021 | 2022 | 2023[a] |
|---|---|---|---|---|---|---|
| Matters requiring board attention | 4 | 3 | 0 | 0 | 2 | N/A |
| Matters requiring board attention related to liquidity or risk management | 2 | 1 | 0 | 0 | N/A | N/A |
| Liquidity supervisory recommendations | 4 | 18 | 0 | 0 | N/A | N/A |
| Model risk management supervisory recommendations | 3 | 0 | 0 | 12 | N/A | N/A |
| Sensitivity to market risks supervisory recommendations | 2 | 12 | 0 | 0 | N/A | N/A |
| Corporate governance or enterprise risk management supervisory recommendations | 5 | 0 | 0 | 0 | 4 | N/A |

Legend: FDIC = Federal Deposit Insurance Corporation; N/A = not available

Source: GAO analysis of FDIC information. | GAO-23-106736

[a]At the time of Signature Bank's failure, FDIC had not conducted its 2023 examinations of the bank.

FDIC had not completed its 2022 examination documents for Signature Bank at the time of its failure. FDIC staff told us they were considering escalating supervisory actions in 2022—including taking enforcement actions and downgrading CAMELS composite or component ratings—based on the findings of the completed 2022 corporate governance target review and the in-process target reviews for liquidity and other topics.[39] These escalatory actions would have taken place in the second quarter of 2023, after FDIC staff finalized documentation such as the 2022 report of examination and supervisory letters. According to preliminary findings we reviewed from FDIC's 2022 liquidity target examination, FDIC planned to reiterate its 2019 matter requiring board attention on liquidity contingency planning. It also had drafted a new matter requiring board attention on Signature Bank's audit program for liquidity and funds management, as well as several supervisory recommendations.

FDIC stated that because Signature Bank did not mitigate its liquidity and management-related issues in a timely manner, FDIC issued an interim CAMELS rating downgrade on March 11, 2023, the day before Signature Bank was closed (see again table 5). In the downgrade letter, FDIC

---

[39]According to FDIC's examination module on informal actions, examiners should consider recommending formal enforcement action pursuant to section 8 of the FDI Act for institutions rated 3, particularly if management appears unwilling to take appropriate corrective measures, and for all composite 4- or 5-rated institutions. Furthermore, the examination module states that examiners should consider whether violations or objectionable practices were intentional, repetitive, or substantive; the institution's history of violations and unsatisfactory practices; management's history of instituting timely remedial or corrective actions; and the extent of harm caused, or likely to be caused, by the violations or unsatisfactory practices.

stated that management failed to demonstrate the capability to properly identify, measure, monitor, and control the bank's liquidity position. Furthermore, funds management practices were critically deficient for the complexity of the bank's liquidity risk profile, and the continued viability of the institution was threatened. The lack of urgency, formality, and preparedness around liquidity contingency funding plans reflected poorly on management and was another factor for these downgrades. In the letter, FDIC also notified Signature Bank of its intent to pursue a formal enforcement action against the bank for failure to mitigate concerns outlined in the downgrade letter, but the bank failed the next day.

Signature Bank's management failed to take adequate steps to mitigate the bank's long-standing liquidity and management issues before the bank's failure. For example, FDIC staff told us that Signature Bank management could sometimes be unresponsive and difficult to work with. They added that Signature Bank management would report to FDIC that they mitigated an issue, only for FDIC staff to find the issue unresolved during transaction testing. This behavior caused FDIC to issue repeat supervisory recommendations to Signature Bank. In upcoming work, we will further explore the communication between FDIC and Signature Bank's management and board.

Although FDIC took some actions to escalate its supervisory actions in 2019 and 2020, its actions were inadequate given the bank's long-standing liquidity and management deficiencies. Furthermore, FDIC lacked urgency despite Signature Bank's repeated failures to remediate liquidity and management issues. FDIC did not pursue more forceful supervisory actions in a timely manner that might have helped the bank correct its liquidity and management issues before its failure in March 2023. For example, FDIC only issued an enforcement action and further downgraded the bank's composite or component CAMELS ratings the day before Signature Bank's failure in 2023. Taking more decisive actions in the years prior to Signature Bank's failure could have helped compel bank management to mitigate the liquidity and management weaknesses that contributed to the bank's failure. We plan to further examine FDIC's decision-making process for escalating supervisory actions and other related issues in an upcoming GAO review.

## Past GAO Work Warned about the Risks of Untimely Escalation by Regulators and the Need for Early Triggers

Following the financial crisis of 2007–2009, we identified issues with the banking regulators' escalation of supervisory concerns. In 2011, we reported that the prompt corrective action (PCA) framework—which was designed in 1991 to improve regulators' ability to identify and promptly address deficiencies at depository institutions and minimize losses to the Deposit Insurance Fund—did not result in consistent actions to elevate concerns.[40] We noted that because the PCA framework's triggers for action rely on capital—a lagging indicator of bank health—problems might be discovered too late for banks to recover.

We recommended in 2011 that the federal banking regulators consider additional triggers that would require early and forceful regulatory actions tied to specific unsafe banking practices.[41] The regulators established a working group to review their enforcement practices and tools. They also adopted final rules in 2013 that included another option that we recommended they consider (increasing the capital ratios that place banks into the framework's capital categories). However, they did not take further steps to implement noncapital triggers to initiate more timely action. While the regulators took steps to address our recommendations, we continue to believe that incorporating noncapital triggers would enhance the framework by encouraging earlier action and giving the regulators and banks more time to address deteriorating conditions before capital is depleted. We also plan to further review issues related to SVB's and Signature Bank's failures in upcoming GAO work.

---

[40]GAO, *Bank Regulation: Modified Prompt Corrective Action Framework Would Improve Effectiveness*, GAO-11-612 (Washington, D.C.: June 23, 2011).

[41]We directed our 2011 recommendations to FDIC, the Federal Reserve, and the Office of the Comptroller of the Currency.

GAO-23-106736  2023 Failed Banks

# Treasury and Regulators Identified the Risk of Contagion to Support the Systemic Risk Exception Determinations

## Treasury Made Determinations for Systemic Risk Exception Quickly

The determination to recommend the systemic risk exception took place quickly—essentially over 2 days—during which time SVB and Signature Bank were deteriorating rapidly and Treasury, FDIC, and the Federal Reserve were responding rapidly (see table 7). For more details, see appendix II.

**Table 7: Key Actions Associated with Invoking Systemic Risk Exception for Silicon Valley Bank and Signature Bank, March 9–13, 2023**

| Date | Key action |
|---|---|
| March 9 (Thursday) | The Federal Reserve notified FDIC of the possible failure of SVB the evening before its failure. Principals of Treasury, FDIC, and the Federal Reserve began having informal conversations about whether there might be systemic consequences to SVB's failure |
| March 10 (Friday) | SVB failed and FDIC was appointed receiver. FDIC, in accordance with the least-cost provision of the Federal Deposit Insurance Act, created the Deposit Insurance National Bank of Santa Clara, transferred all insured deposits to it, and developed a list of prospective bidders. |
|  | The Secretary of the Treasury and leaders from FDIC, the Federal Reserve, and the Office of the Comptroller of the Currency gathered to discuss developments around SVB. |
|  | FDIC was notified by the Federal Reserve that Signature Bank was in an overdraft position (late afternoon), and was notified by its New York Regional Office that evening of the possible failure of Signature Bank. |
| March 11 (Saturday) | FDIC and Federal Reserve staff started coordinating efforts to consider recommending the systemic risk exception for SVB and Signature Bank. |
|  | FDIC initiated marketing for the Deposit Insurance National Bank of Santa Clara. |
| March 12 (Sunday) | Signature Bank failed and FDIC was appointed receiver. |
|  | FDIC received one viable bid for SVB, which did not meet the least-cost test. Two other bids were received but lacked required approval from the submitting institution's board of directors and were not valid. The two invalid bids also did not meet the least-cost test. |
|  | The systemic risk exception was invoked for SVB and Signature Bank. Treasury, FDIC, and the Federal Reserve announced the decisions to guarantee all deposits of the two banks. FDIC created bridge banks for SVB and Signature Bank. |

| Date | Key action |
|------|------------|
| March 13 (Monday) | Both bridge banks opened for normal business. |

Legend: FDIC = Federal Deposit Insurance Corporation; Federal Reserve = Board of Governors of the Federal Reserve System; SVB = Silicon Valley Bank

Source: GAO analysis of Treasury, FDIC, and Federal Reserve information. | GAO-23-106736

As SVB and Signature Bank failed, FDIC and the Federal Reserve staff told us that they conducted analyses and worked closely together, including exchanging drafts of the recommendations and supporting analyses to invoke the systemic risk exception for the two banks. The Boards of FDIC and the Federal Reserve unanimously voted in favor of making the systemic risk exception recommendations, and the Secretary of the Treasury made the determinations after having received their written recommendations and consulted with the President. By the evening of March 12th, the three agencies jointly announced the systemic risk determinations authorizing FDIC to guarantee all deposits (including uninsured deposits) of SVB and Signature Bank. For more details, see appendix III.

## Least-Cost Resolution Deemed Likely to Result in Further Bank Runs and Financial Contagion

Treasury staff told us they worked to assess the effects of these failures on the broader banking system. They said that they consulted regularly with FDIC and the Federal Reserve, and concurred with the bases of their recommendations to invoke the systemic risk exception. Treasury also reported in its internal memorandum that its authorization to invoke the systemic risk exception met the requirements of section 13 of the FDI Act.

**Financial contagion.** In the memorandums supporting their recommendations to invoke the systemic risk exception, FDIC and the Federal Reserve reported that they found that a least-cost resolution of SVB and Signature Bank would intensify deposit runs and liquidity pressures on other U.S. banks. The Federal Reserve noted that many other financial institutions that derive large portions of their funding from uninsured deposits also were under considerable pressure, and the failure of the two banks would lead to even greater dislocations in deposit markets. The Federal Reserve also noted that the deposit run at SVB already had caused stress at other banks with similar clients, despite material differences between the firms.

Similarly, FDIC officials told us that the deposit outflows and stress could have caused additional failures. In its memorandum, FDIC reported observing that financial institutions already had experienced net outflows as customers utilized existing lines of credit and depositors and investors

withdrew funds. FDIC also reported that it already was aware of several reports of businesses, including large corporate borrowers, withdrawing large amounts of uninsured deposits.

**Broader economic effects.** FDIC and the Federal Reserve reported observing that many of the uninsured depositors of the banks were corporate enterprises. Therefore, losses to these firms or an inability to access their funds for even a short time could put these firms at risk of not being able to make payroll and pay suppliers, potentially causing disruptions to U.S. market and industrial operations.

The regulators cited examples of disruptions and losses. The Federal Reserve indicated that several depositors of SVB were unable to make payroll payments at the end of the week leading to the failure. In addition, several payroll companies contracted with SVB to process paychecks, which led to delayed payroll for companies that did not bank at SVB. The Federal Reserve also reported that some companies that held deposits at SVB were forced to sell their uninsured deposit claims at 90 cents on the dollar on March 10, 2023, to make payroll.

The Federal Reserve indicated that compliance with the least-cost resolution requirement could result in lending cost increases, and banking organizations could rapidly become less willing or able to lend to businesses and households. Similarly, FDIC reported observing that the uncertainty surrounding the banks' rapid losses had shaken the confidence of investors and other counterparties in the banking industry, and restricted the inflow of private capital necessary to restore the industry's financial health and facilitate new lending. According to the Federal Reserve, these restrictions in credit flows and related effects would contribute to materially weaker economic performance and materially higher unemployment.

## Decision to Insure All Uninsured Deposits at the Two Banks Sought to Avert Financial Contagion and Negative Impact on Broader Economy

The Federal Reserve and FDIC assessed that preserving unimpaired access to all uninsured deposits for SVB and Signature Bank would help mitigate adverse impacts to financial stability and the economy. Treasury concurred with FDIC's and the Federal Reserve's analysis. In the Federal Reserve's analysis, Board staff noted that if the systemic risk exception were invoked, a resolution method could be applied that would avoid all or most of the adverse impacts discussed above. In particular, if all uninsured depositors were largely or fully protected, the adverse effects would be substantially mitigated. The analysis noted that extending only partial protection to uninsured depositors would have some beneficial

effect, but allowing material losses on these uninsured deposits still would result in significant adverse effects in the financial markets.

Federal Reserve Board staff also indicated that by authorizing FDIC to protect the uninsured deposits of these banks, the Deposit Insurance Fund would incur some losses. The staff acknowledged at the time that the size of these losses was unknown, as was the potential impact of such losses on FDIC's resources. They added that FDIC would have to recover any losses incurred as a result of the systemic risk exception through one or more special assessments (as described earlier in this report).

Furthermore, staff raised concerns about exacerbating moral hazard and potentially weakening the market discipline of many depository institutions. As a prior GAO report noted, regulators' use of the systemic risk exception may weaken market participants' incentives to properly manage risk if they come to expect similar emergency actions in the future.[42] We plan to further examine these and other issues related to the use of the exception in an upcoming GAO review (we must report to Congress on each systemic risk determination made by the Secretary of the Treasury).[43]

---

[42]GAO, *Federal Deposit Insurance Act: Regulators' Use of Systemic Risk Exception Raises Moral Hazard Concerns and Opportunities Exist to Clarify Provisions*, GAO-10-100 (Washington, D.C.: Apr. 15, 2010).

[43]12 U.S.C. § 1823(c)(4)(G)(iv).

# Federal Reserve Considered Economic and Statutory Factors in Establishing the Bank Term Funding Program

## Federal Reserve Determined Conditions Met Statutory Requirements to Establish Bank Term Funding Program

After SVB's failure on March 10th, the Federal Reserve determined the need to establish an emergency lending facility to boost operating banks' liquidity and minimize contagion. According to Treasury staff, deliberations about the lending facility and the systemic risk exception occurred in parallel. The proposed Bank Term Funding Program would allow the 12 Reserve Banks to make loans of up to 1 year to eligible U.S. depository institutions or U.S. branches or agencies of foreign banks (see sidebar). In a March 12th memorandum to the Board of Governors, Federal Reserve staff documented the necessity and appropriateness of the program. Specifically, they determined in the memorandum that the following requirements for an emergency lending facility under Section 13(3) of the Federal Reserve Act were met:

- **Unusual and exigent circumstances.** Federal Reserve staff noted that the run on SVB and its subsequent failure caused contagion that spread to Signature Bank and led to substantial deposit outflows at other similar banks. In turn, these conditions put considerable pressure on the Deposit Insurance Fund.

- **Broad-based eligibility.** The BTFP would be designed to provide liquidity to all U.S. federally regulated depository institutions.

- **Protection of taxpayers from losses.** Loans under the BTFP would be secured by any collateral eligible for Federal Reserve purchase in open market operations, provided the borrower owned the collateral as of March 12, 2023. Such collateral consists of U.S. Treasuries, agency securities, and agency mortgage-backed securities, which have a low risk of credit loss. Federal Reserve staff noted that the opportunity for recourse to the borrower and the credit protection provided by Treasury would further mitigate the risk of loss. Federal Reserve staff conducted scenario analyses and concluded that even under an extremely severe scenario featuring widespread defaults, with the Treasury backstop, the Federal Reserve would not incur losses and taxpayers would be adequately protected from losses.

**Terms and Conditions of the Bank Term Funding Program**

**Eligible borrowers:** Any U.S. federally insured depository institution (including a bank, savings association, or credit union) or U.S. branch or agency of a foreign bank that is eligible for primary credit

**Eligible collateral:** Includes any collateral eligible for purchase by Federal Reserve Banks in open market operations, provided that such collateral was owned by the borrower as of March 12, 2023

**Advance size:** Limited to the value of eligible collateral pledged by the eligible borrower

**Rate:** The one-year overnight index swap rate plus 10 basis points; fixed for the term of the advance on the day the advance is made

**Collateral valuation:** Par value; margin at 100 percent of par value

**Prepayment:** Prepayment allowed (including for purposes of refinancing) at any time without penalty

**Advance term:** Up to 1 year

**Fees:** None

**Credit protection to Federal Reserve Banks:** $25 billion from the Department of the Treasury's Exchange Stabilization Fund

**Recourse:** Advances made with recourse beyond the pledged collateral to the eligible borrower

**Program duration:** Requests for advances allowed until at least March 11, 2024

Source: Board of Governors of the Federal Reserve System. | GAO-23-106736

- **Lack of adequate credit accommodations from other banking institutions.** Federal Reserve staff noted that multiple, sizable federally regulated U.S. depository institutions had faced or were facing fatal runs with respect to uninsured deposit liabilities and were unable to meet their outflows on a daily basis. Furthermore, they cited the panic SVB created when it attempted to raise a large amount of equity capital on March 9th. They stated that in the current environment, such routine capital-raising methods might not be available to banks without creating more contagion.

- **Not insolvent borrower.** Participants in the program must be eligible for primary credit (discount window borrowing) under Regulation A, which limits participants to those that, in the judgment of the relevant Federal Reserve Bank, are in generally sound financial condition. Federal Reserve staff noted that under current guidelines, this generally requires depository institutions to be adequately or well capitalized.

- **Penalty rate.** The interest rate for loans under the program would be set to the overnight index swap rate, plus 10 basis points. According to Federal Reserve staff, this rate is likely well above the rate banks pay on at-risk deposits, thus providing borrowers strong incentive to maintain and expand their deposit franchise as a source of funding.

## Treasury Approved and Backstopped BTFP

Treasury approved the BTFP and pledged $25 billion in assets from the Exchange Stabilization Fund to protect against potential future program

losses.[44] In a memorandum to the Secretary of the Treasury regarding the $25 billion backstop, Treasury staff stated that providing more certainty to the market that banks would be able to cover deposit withdrawals without realizing immediate losses on their balance sheets should help prevent broader runs on uninsured deposits. They further noted that the Treasury backstop could be viewed as consistent with the legal uses of the Exchange Stabilization Fund aimed at currency stability and broader financial stability goals. Treasury staff specified that the potential run risk on uninsured deposits presented a broader financial stability question, rather than an issue limited to a small number of regional banks.

## Banks Had Borrowed about $79 Billion Total through the Bank Term Funding Program

As of April 19, 2023, the outstanding amount of advances under the BTFP was approximately $74 billion. This figure represented a slight increase from the previous week's total outstanding amount of about $72 billion. However, it was an overall decrease from the high of $79 billion on April 5, 2023, indicating that some borrowers were paying back their BTFP loans. The total value of the collateral pledged to secure outstanding advances was approximately $102 billion as of April 19, according to Federal Reserve staff.

Depository institutions also borrowed through the Federal Reserve's discount window. As of April 19, 2023, the outstanding amount of loans through the discount window's primary credit program was approximately $70 billion.[45] Primary credit borrowing declined from a high of about $153 billion as of March 15, 2023, indicating that borrowers were paying back these loans as well. The discount window offers shorter-term loans than

[44]The Exchange Stabilization Fund was originally established in the 1930s to stabilize the exchange value of the dollar by buying and selling foreign currencies and gold. The Secretary of the Treasury has broad authority to use the stabilization fund to deal in gold, foreign exchange, and other instruments of credit and securities. Prior to 2008, Treasury primarily used the fund for foreign exchange market intervention and short-term credit operations. In 2008, Treasury used the stabilization fund to guarantee certain money market mutual funds. The fund retains earnings from its operations and had a portfolio asset value of $94 billion in February 2020. In March 2020, Treasury used the fund to support Federal Reserve emergency lending facilities created in response to COVID-19. When the CARES Act was enacted later in the same month, it made available at least $454 billion (and, according to Treasury, up to $500 billion, taking into account any unused funds from other enumerated CARES Act programs) to the Exchange Stabilization Fund for this purpose.

[45]The primary credit program serves as the principal safety mechanism for ensuring adequate liquidity in the banking system and is available to depository institutions that are in generally sound financial condition, with no restrictions on the use of borrowed funds.

the BTFP (maximum term of 90 days vs. 1 year). On March 12, 2023, the Federal Reserve announced it would apply the same 100 percent margins used for securities eligible for the BTFP. Prior to this announcement, the discount window had applied margins ranging from 92 to 99 percent on these types of collateral.

As noted above, the Dodd-Frank Wall Street Reform and Consumer Protection Act provided GAO the authority to study credit facilities authorized by the Federal Reserve Board under section 13(3) of the Federal Reserve Act.[46] We plan to further study the Bank Term Funding Program in future work.

## Agency Comments

We provided a draft of this report to FDIC, the Federal Reserve, and Treasury for review and comment. FDIC, the Federal Reserve, and Treasury provided technical comments that we incorporated as appropriate. The agencies did not provide formal comments.

We are sending copies of this report to the appropriate congressional committees, the Chairman of the Board of Directors of the Federal Deposit Insurance Corporation, Chair of the Board of Governors of the Federal Reserve System, the Secretary of the Treasury, and interested parties. In addition, this report is available at no charge on the GAO website at http://www.gao.gov.

If you or your staff members have any questions about this report, please contact me at (202) 512-8678 or clementsm@gao.gov. Contact points for our Office of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributors to this report are listed in appendix IV.

Michael E. Clements
Director, Financial Markets and Community Investment

---

[46]31 U.S.C. § 714(f).

# Appendix I: Status of Resolution Plans for Silicon Valley Bank and Signature Bank

In recent years, requirements for resolution plans were either under revision or paused. In 2012, the Federal Deposit Insurance Corporation (FDIC) promulgated a final rule requiring covered insured depository institutions with $50 billion or more in total assets (CIDI) to periodically submit resolution plans to FDIC.[1] The Insured Depository Institution Rule (IDI Rule), was established to facilitate FDIC's readiness to resolve such institutions under the Federal Deposit Insurance Act (FDI Act).

In November 2018, FDIC announced that the agency planned to revise the IDI Rule and that the next round of resolution plans submitted pursuant to the IDI Rule would not be required until the rulemaking process was complete. In April 2019, the FDIC Board approved an advance notice of proposed rulemaking to seek comments on potential modifications to the IDI Rule, including creating a tiered plan requirement or revisions to frequency. The Board also adopted a resolution extending the due date for future plan submissions pending completion of the rulemaking process.

In January 2021, FDIC issued a policy statement lifting the moratorium and noted that it would resume resolution plan requirements for insured depository institutions with $100 billion or more in total consolidated assets. On June 25, 2021, FDIC issued a statement with a modified approach for resolution plan requirements for such institutions.[2] FDIC outlined a modified approach to implementing its rule, extending the submission frequency to a 3-year cycle, streamlining content requirements, and placing enhanced emphasis on engagement with firms.

In accordance with the lifting of the moratorium and modified approach, resolution plans for Silicon Valley Bank (SVB) and Signature Bank either were under review at the time of failure or had not been submitted.

SVB submitted its first resolution plan on December 1, 2022. (SVB had exceeded $100 billion in total assets in 2021.) According to FDIC staff, they were still reviewing the plan at the time of the bank's closing. They told us that their reviews of resolution plans typically take 5–6 months.

---

[1]Resolution Plans Required for Insured Depository Institutions with $50 Billion or More in Total Assets, 77 Fed. Reg. 3075 (Jan. 23, 2012).

[2] Federal Deposit Insurance Corporation, *Statement of Resolution Plan for Insured Depository Institutions* (Washington, D.C.: June 25, 2021).

**Appendix I: Status of Resolution Plans for
Silicon Valley Bank and Signature Bank**

The staff said they would have presented the SVB review to the Board for approval and issued formal feedback to the bank.

According to FDIC officials, their preliminary findings were that the bank's initial resolution plan was not thorough. For example, according to FDIC staff, the resolution plan did not list potential acquirers for a whole bank purchase, specific portfolios, and franchise components. The plan did not detail crisis communication, liquidity needs, liquidity resources, or processes for determining liquidity drivers.

Signature Bank was scheduled to submit its resolution plan in June 2023. It exceeded $100 billion in total assets in 2021 and therefore had no plan on file when it failed. FDIC officials said that they conducted a pre-filing meeting on April 26, 2022, which is typical for first-time filers.

# Appendix II: Timeline of Key FDIC Actions Associated with Silicon Valley Bank and Signature Bank Receivership

**Table 8: Key Actions Associated with FDIC Receivership of Silicon Valley Bank and Signature Bank, March 9–13, 2023**

| Date | Silicon Valley Bank | Signature Bank |
|---|---|---|
| March 9 | • Notification (internal) to FDIC Division of Resolutions and Receiverships and Division of Complex Institution Supervision and Resolution, of possible failure of SVB. | |
| March 10 | • SVB was closed by the California Department of Financial Protection and Innovation, which appointed FDIC as receiver (11:15 a.m.). FDIC created the Deposit Insurance National Bank of Santa Clara. At the time of SVB's closing, FDIC transferred all insured deposits to the new bank.<br>• FDIC announced its intent to provide uninsured depositors with an advanced dividend against their claims for the uninsured amounts of their deposits as soon as March 13 when the Deposit Insurance National Bank of Santa Clara was scheduled to open.<br>• Email notice sent to a financial institution with invitation to FDIC virtual data room to view SVB documents for due diligence.<br>• FDIC created potential bidder list with 24 bidders for initial marketing of Deposit Insurance National Bank of Santa Clara. | • Notification (internal) to FDIC Division of Resolutions and Receiverships and Division of Complex Institution Supervision and Resolution, of possible failure of Signature Bank. |
| March 11 | • FDIC initiated marketing process (8:15 p.m.).<br>• Email notice sent to regulatory and FDIC contacts announcing the start of a marketing initiative for Deposit Insurance National Bank of Santa Clara.<br>• Email notice sent to potential bidders announcing acquisition opportunity along with an invitation to FDIC virtual data room.<br>• Bid form and transaction fact sheet made available. | • Internal discussions between Division of Risk Management Supervision, Division of Resolutions and Receiverships, and Division of Complex Institution Supervision and Resolution of possible failure of Signature Bank. |
| March 12 | • Notice sent to supervisors of banks expected to submit bids requesting clearance.<br>• Bids due 2:30 p.m. CDT.<br>• As bids for SVB were being evaluated, the systemic risk determination was made. Secretary Yellen approved actions enabling FDIC to complete its resolution of SVB and Signature Bank in a manner that fully protected all depositors.<br>• To enable bidders to have an opportunity to bid on an all deposit transactions, FDIC reset the marketing window. (Bids received were based on an insured deposits-only basis before the systemic risk determination.)<br>• FDIC filed an application with the Office of the Comptroller of the Currency to establish Silicon Valley Bridge Bank, N.A.<br>• FDIC transferred all deposits and substantially all assets of the former SVB to a newly created, full-service FDIC-operated "bridge bank" in an action designed to protect all depositors of SVB. Depositors and borrowers of SVB automatically became customers of the new bridge bank. | • Signature Bank was closed by the New York State Department of Financial Services, which appointed FDIC as receiver.<br>• FDIC filed an application with the Office of the Comptroller of the Currency to establish Signature Bridge Bank, N.A. and FDIC transferred substantially all of the assets and liabilities of Signature Bank to Signature Bridge Bank, N.A., and marketed such assets and deposits to potential bidders. Depositors and borrowers of Signature Bank automatically became customers of the new bridge bank. |
| March 13 | • SVB Bridge Bank opened and conducted normal business activities. | • Signature Bridge Bank opened and conducted normal business activities. |

Legend: FDIC = Federal Deposit Insurance Corporation; SVB = Silicon Valley Bank

Source: GAO analysis of FDIC information. | GAO-23-106736

# Appendix III: Timeline of Key Actions to Invoke Systemic Risk Exception for Silicon Valley Bank and Signature Bank

**Table 9: Key Actions Associated with Invoking Systemic Risk Exception for Silicon Valley Bank and Signature Bank, March 9–13, 2023**

| Date | Action |
|---|---|
| March 9 | • As SVB was failing that evening, principals of Treasury, FDIC, and Federal Reserve began having informal conversations about whether there might be systemic consequences to SVB's failure. |
| March 10 | • Secretary of the Treasury and leaders from FDIC, the Federal Reserve, and Office of the Comptroller of the Currency gathered to discuss developments around SVB. |
| March 11 | • FDIC and Federal Reserve staff started coordinating efforts to consider recommending the systemic risk exception.<br>• Federal Reserve Board staff at the direction of the Vice Chairman of Supervision started preparing a draft memorandum to recommend the systemic risk exception. |
| March 12 | • FDIC and Federal Reserve continued to coordinate efforts and exchange drafts of the recommendation memorandum and analysis.<br>• Treasury coordinated with FDIC, the Federal Reserve, and the White House, and Secretary of the Treasury consulted with the President. |
| (10:30 a.m.) | • In a media interview with CBS News, Secretary of the Treasury said that she had been working with regulators all weekend to design appropriate policies to address the concerns of depositors and that Treasury was not considering bailouts of investors and owners of SVB and Signature Bank. |
| (1:30 p.m.) | • Federal Reserve Board held meeting to approve staff memorandum recommending systemic risk exception. |
| (5:00–5:20 p.m.) | • FDIC Board of Directors approved resolution recommending systemic risk exception. |
| (4:00–5:45 p.m.) | • Treasury received written recommendations from the Federal Reserve Board and the FDIC Board recommending systemic risk exception. |
| (5:56 p.m.) | • Secretary of the Treasury approved systemic risk exception determinations for SVB and Signature Bank. |
| (6:15 p.m.) | • Secretary of the Treasury, FDIC, and Federal Reserve made a public announcement of the authorization of systemic risk exception.<br>• Federal Reserve announced establishment of the Bank Term Funding Program. |
| (7:30 p.m.) | • Financial Stability Oversight Council held a meeting in which Treasury, FDIC, and Federal Reserve described their actions in invoking systemic risk exception to insure all depositors of SVB and Signature Bank. Council also discussed the Bank Term Funding Program. |
| March 13 | • Treasury sent letters to Congress to notify relevant committees of the systemic risk determinations. |

Legend: FDIC = Federal Deposit Insurance Corporation; Federal Reserve = Board of Governors of the Federal Reserve System; SVB = Silicon Valley Bank

Source: GAO analysis of Treasury, FDIC, and Federal Reserve information. | GAO-23-106736

# Appendix IV: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Michael E. Clements, clementsm@gao.gov, 202-512-8678 |
| **Staff Acknowledgements** | In addition to the contact named above, Karen Tremba (Assistant Director), Lisa Reynolds (Analyst in Charge), Aaron Colsher, Rachel DeMarcus, Risto Laboski, Akiko Ohnuma, Barbara Roesmann, Jessica Sandler, and Jena Sinkfield made key contributions to this report. |

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| Connect with GAO | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. <br> Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts. <br> Visit GAO on the web at https://www.gao.gov. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact FraudNet: <br><br> Website: https://www.gao.gov/about/what-gao-does/fraudnet <br><br> Automated answering system: (800) 424-5454 or (202) 512-7700 |
| Congressional Relations | A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7149 <br> Washington, DC 20548 |
| Strategic Planning and External Liaison | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7814, <br> Washington, DC 20548 |



Please Print on Recycled Paper.